ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
FEB - 6 2006
U.S. COURT OF FEDERAL CLAIMS

JOHN SNOW, INC.
44 Farnsworth Street
Boston, Massachusetts 02210-1211

Plaintiff,

v.

THE UNITED STATES OF AMERICA

Defendant.

Case No. 06-97 C

## COMPLAINT

Plaintiff John Snow, Inc. brings this action against the Defendant, The United States of America, acting by and through the United States Agency for International Development, and states the following:

## PARTIES AND JURISDICTION

1. Plaintiff John Snow, Inc. ("JSI"), incorporated in 1978, is a Massachusetts corporation with its principal place of business at 44 Farnsworth Street, Boston, Massachusetts 02210-1211. JSI provides technical and managerial assistance to public health programs worldwide. With more than 25 years of experience, JSI has implemented projects in 84 countries. JSI frequently contracts with the United States through the United States Agency for International Development.

2. The Defendant is the United States of America, acting by and through the United States Agency for International Development ("USAID").

3. On March 9, 2005, USAID, through a unilateral determination made by its Contracting Officer, issued a Final Decision and Unilateral Debt Determination ("Final

Decision") constituting a final Notice of Disallowance that JSI is indebted to the government in the amount of $872,327.18. A copy of the Final Decision is attached hereto as Exhibit 1. .

4. Plaintiff JSI hereby appeals the Contracting Officer's Final Decision in accordance with the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. §1491.

## STATEMENT OF FACTS

5. JSI entered into the Healthy Mother/Healthy Child Results Package, USAID Contract No. 263-C-0098-00041-00 (the "Contract") with the United States on or about April 6, 1998. The general purpose of the Contract was to implement a United States government program aimed at reducing neonatal and maternal mortality in Egypt. The Contract was a Cost-Plus-Fixed Fee (CPFF) completion contract. JSI procured deliverables or outputs as described in the Contract and was reimbursed its costs plus a fixed fee. Payments of the fixed fee to JSI were based on the completion of performance milestones. Over a period of seven (7) years, JSI's procurements for the government under the Contract were over $50 million ($18 million of which were for commodities), exclusive of its fixed fee. See Exhibit 2 (relevant Contract pages 1-5, 58, and 64-83 of 109).

6. Under the Contract, JSI procured 119 Preemicare, Inc. infant incubators for an amount totaling $785,880.35. [IFB 8, Purchase Order Nos. 205 and 205A] Approvals for the procurements were issued by USAID's Contracting Officer, Cynthia Judge, on June 11, 2001 and November 29, 2001. See Exhibit 3. With these approvals, USAID authorized JSI to enter into subcontracts with ICS for the purchase of the incubators. These incubators were also included in the two base period procurement plan milestones which were approved by the Contracting Officer's Technical Representative (COTR) and copied to the Contracting Officer

on April 26, 1999 and December 10, 2000. The referenced milestone approvals dated April 26, 1999 and December 10, 2000, are attached as Exhibit 16. These procurement plans included 55 and 94 incubators, respectively. As per Contract Modification No. 4 dated October 9, 2000 (see Exhibit 4), the Contracting Officer (CO) delegated authority to the COTR for review of the milestones to determine if they were met and to approve payment of JSI's fee. Even prior to the contract amendment, the COTR issued letters approving performance milestones and fee payments, which copies were provided to the CO. USAID supported, approved, and paid for the procurement of these and other incubators.

7. JSI procured the infant incubators manufactured by Preeimcare, Inc. from a supplier, ICS Technologies, Inc. ("ICS"), which bid to supply the incubators. Though not named as a "party" in this pending action, ICS has an interest in the subject matter of this pending action pursuant to Rule 14(b) of the Rules of the United States Court of Federal Claims. See Paragraphs 54 to 61 below.

8. The 119 Preemicare incubators procured by JSI for USAID in June and November 2001, were delivered to USAID/Egypt's Consignee: HM/HC, USAID Project No. 283-0242, Ministry of Health, 21 Misr Helwan, Maadi, Cairo. There were three shipments which cleared Egyptian customs on January 26, February 12 and April 29, 2002. According to USAID's Final Decision, Item 2, the incubators were delivered and installed at various Egypt Ministry of Health & Population ("MOHP") facilities between May and July 2002.

9. The USAID Contract acknowledged in Article C.8.2.i. Task Definitions & Issues (page 58 of 109) that "too often" equipment and supplies designated for use in foreign countries "are not properly maintained," and "staff who are intended to use them are not fully trained in their proper purpose, operation and maintenance." See Exhibit 2.

10. After delivery, the MOHP staff received some complaints about 18 out of 119 incubators overheating, or having erratic display boards or alarm problems. JSI initiated action to report concern to both the supplier, ICS, and the manufacturer's local representative in Egypt, Hi-Med. A meeting was held on September 24, 2002, among JSI, ICS and Hi-Med to discuss problems and follow-up action.

11. An engineer from Preemicare's headquarters in California, Ms. Rihana, went to Egypt in December 2002 to investigate and remedy the problems reported by the MOHP and JSI. Ms. Rihana issued a report that 14 incubators out of the 18 were not working efficiently because of user problems. To avoid recurring problems, Ms. Rihana provided a list of recommended retrofits that were to be completed on the incubators at Preemicare's own cost. The retrofits' purposes were to render the equipment more user-friendly and eliminate the risks of breakdowns where the incubators were cleaned incorrectly or water touched the fuses. On January 13, 2003, Hi-Med's local representative sent a letter to JSI's Chief of Party (COP) expressing concern on the safety of the incubators and to recommend that the incubators be removed from service until the modifications were made.

12. JSI at once shared this information with USAID and the MOHP. Consequently, on or about January 14, 2003, the MOHP instructed all its facilities which had received Preemicare incubators (including the ones that had had no problems with their operation) to remove the incubators from service The incubators were removed from service in mid- to late-January 2003, more than six months after acceptance, delivery, installation, and payment.

13. Other incubators procured under the Contract by JSI were used by the MOHP as a temporary substitute for some of the incubators which were pulled out of service,

satisfying the MOHP's immediate need for incubators. Those additional incubators were part of a rolling procurement under the Contract and its various modifications for approximately 270 incubators required by the MOHP.

14. During June and July of 2003, seventy-five (75) incubators were retrofitted in Egypt by Preemicare's engineer. ICS collected all of the incubators, which already had been removed from service and were being stored, and brought them to a central location in Cairo to complete the retrofit and recertification process. The MOHP instructed the facilities in writing to release the incubators to ICS as the supplier. ICS provided a receipt which stated that the incubators were still under warranty.

15. In August 2003, the Preemicare engineer completed the retrofit and certifications were issued for 112 of the incubators.

16. Before returning them to service, the MOHP requested JSI to commission an independent test of the incubators. JSI contracted with ECRI, a U.S. non-profit health services research agency with extensive experience with the FDA and other agencies for medical equipment testing. Two incubators were shipped to ECRI's Plymouth Meeting, Pennsylvania facility and tested by ECRI in November 2003. Test results were unsatisfactory. The Preemicare engineer then visited the facility February 5-6, 2004 and performed repairs to the units. After repairs, the units passed. However, based on the initial negative results of the testing, ECRI recommended that a larger sample of incubators be tested. Between May 2nd and 11th, 2004, an ECRI representative tested 44 of the incubators in Egypt. The sample of incubators selected by ICS included incubators which had been retrofitted and certified as "ready for clinical use." ICS had maintained custody of these incubators. Test results were unsatisfactory. ECRI issued a report dated May 25, 2004, in which it recommended that the

incubators not be returned to service until additional repairs were completed. ECRI could not determine if the problems were caused by a manufacturing fault or misuse.

17. ICS and Preemicare responded via e-mail on June 12, 2004, stating that an inappropriate test protocol had been used and that the incubators needed to be recalibrated because they were in an uncontrolled environment (38 - 40 C) for almost one year and there were missing spare parts as a result of misuse by the MOHP facilities.

18. Sometime in or about September 2004, a different USAID Contracting Officer, Roy Plucknett, was assigned to and became responsible for the Healthy Mother/Healthy Child Project for USAID. Mr. Plucknett was the fourth USAID Contracting Officer to work on the Healthy Mother/Healthy Child Project. On September 29, 2004, a meeting was held in Cairo, Egypt among representatives of the MOHP, USAID, and JSI. The parties agreed upon a Plan of Action for returning the incubators to service. See Exhibit 5 (Minutes of the Meeting). The process was meant to wean out incubators that did not meet international testing standards. In furtherance of this Plan, in October 2004, ICS undertook repairs and modifications first on two incubators per the agreed upon Plan of Action. The remaining incubators were to be repaired, retested and certified according to ECRI's test protocol, per the agreed upon Plan of Action. In addition, ICS had agreed to extend the warranty for an additional nine (9) months.

19. In October 2004, Arj-Med, a Nile Medical International representative in Egypt, evaluated the circuitry functions of the Preemicare incubators to ensure their efficient maintenance. Arj-Med confirmed on about October 27, 2004, that they could repair, maintain and guarantee the safe operation of the incubators. Arj-Med also noted that incubators needed to be recalibrated and could then be returned to service. JSI informed USAID via e-mail of Arj-Med's assessment. Thereafter, ICS completed repairs and modifications of the incubators,

and they were tested by the MOHP and JSI engineers (who were trained to conduct the testing protocol by ECRI).

20. On December 15, 2004, the MOHP vis-à-vis Dr. Esmat Mansour, Head of IHC & Nursing Sector, HM/HC Executive Director, notified USAID in writing that the MOHP was satisfied with the resolution of the issues related to the Preemicare incubators and the MOHP was in the process of receiving, testing and distributing incubators to various hospitals in accordance with an agreement reached at the meeting on September 29, 2004. Dr. Mansour thanked JSI and USAID for their cooperation and their actions to maximize the use of incubators for the benefit of the project. See Exhibit 6.

21. Notwithstanding (1) the agreed upon Plan of Action, (2) the MOHP's interest in receiving and distributing the incubators, and (3) the ongoing cooperation of JSI, MOHP, USAID and ICS to resolve the incubator issues, in about November 2004, USAID withdrew from the circle of cooperation, and thereafter abandoned and disavowed the agreed upon Plan of Action. USAID refused to allow the testing and recertification process to be completed and the Preeimcare incubators to be returned to service, and USAID demanded possession of the incubators.

22. On November 1, 2004, USAID's Contracting Officer, Roy Plucknett, who was relatively uninformed about the salient issues, issued a Notice of Intent to Disallow Costs. USAID notified JSI that it intended to disallow the amount of $785,880.35 from costs incurred under the Contract for 119 incubators which it contended, erroneously, represented the costs of replacing infant incubators procured under the Contract. The Notice stated that in December 2002, incubators were taken out of service for safety concerns and after numerous failed attempts to repair the incubators, JSI procured and installed 119 replacement

incubators. Aside from its jumbling and manifest disregard of the factual record, the Notice did not allege that the incubators were defective or otherwise nonconforming or that any of the parties had failed to honor the warranty on the incubators. See Exhibit 7.

23. On November 28, 2004, JSI issued a written response to USAID's Notice of Intent to Disallow Costs and disputed the government's claim. See Exhibit 8.

24. On December 8, 2004, USAID issued an Amended Notice of Intent to Disallow Costs, increasing the disallowance from $785,880.35 to $863,683. The additional costs claimed by the government were $14,931.73 for a fixed fee and $62,870.43 for procurement services which the government claimed that JSI invoiced for the 119 incubators referenced in the original Notice of Intent to Disallow Costs. See Exhibit 9. USAID's Contracting Officer, Roy Plucknett, issued this Amended Notice as well but did nothing to correct the legally deficient and factually incorrect Notice of Intent to Disallow Costs dated November 1, 2004.

25. On December 19, 2004, JSI, through legal counsel, issued a written response to the Amended Notice of Intent to Disallow Costs dated December 8, 2004 and augmented JSI's prior response dated November 28, 2004. JSI disputed the government's claim again, both factually and legally. See Exhibit 10.

26. On January 13, 2005, USAID improperly issued a Notice of Demand for Payment of $863,683, despite the fact that a Notice of Disallowance had not been issued. USAID failed to follow the debt collection procedures set forth in ADS 625, FAR 32.6 and as referenced in AAPD 03-07 (Revised). See Exhibit 11. The Notice of Demand for Payment was an invalid and unauthorized attempt by USAID to prematurely subject JSI to the government's debt collection procedures.

27. On January 14, 2005, JSI disputed the Notice of Demand for Payment. See Exhibit 12. On February 2, 2005, JSI, through legal counsel, augmented its dispute of the Demand for Payment and requested that the Demand be withdrawn. See Exhibit 13.

28. Demonstrating blatant disregard of the procurement record and the rights of JSI, the Notice of Intent to Disallow Costs dated November 1, the Amended Notice to Disallow Costs dated December 8, and the Notice of Demand for Payment dated January 13, 2005, revealed USAID's propensity to act illegally and invalidly to achieve a result – recoupment of the costs of the incubators – which it was not otherwise entitled to under the Contract and the appropriate Federal Acquisition Regulations incorporated therein.

29. On January 26, 2005, USAID's then legal advisor in Egypt, John Groarke, provided an explanatory breakdown of the disputed costs. His breakdown indicated that the disallowed costs were not for "replacement" incubators (contrary to the Notice of Intent to Disallow Costs, Amended Notice of Intent to Disallow Costs, and letters from the Contracting Officer and the Acting Mission Controller), but were for the costs of the original procurement of the Preemicare incubators. However, USAID failed to amend its prior Notices or issue new notices, thereby depriving JSI of a validly issued Notice of Intent to Disallow Costs.

30. On February 2, 2005, JSI, through legal counsel, provided a supplemental response to Mr. Groarke which set forth many of the factual and legal infirmities in USAID's actions. See Exhibit 14.

31. In early 2005, USAID requested and obtained possession of the incubators even though they were then owned by the MOHP and all rights, title and interest in the incubators had long since been transferred to and vested in the MOHP.

32. On March 9, 2005, JSI received from USAID, by fax and e-mail, USAID's Final Decision and Unilateral Debt Determination constituting a final Notice of Disallowance. See Exhibit 1, above. In this "unilateral determination" by the Contracting Officer, USAID claimed that JSI was indebted to the government in the amount of $872,327.18 because JSI had refused to provide a refund for incubators which the government contended were "contractually non-compliant". The Final Decision asserted new and different grounds and contradicted positions taken by USAID in its Notice of Intent to Disallow Costs and Amended Notice of Intent to Disallow Costs. The Final Decision also increased USAID's Fee claim from $14,931.73 to $23,576.41. In the Final Decision, the Contracting Officer admitted that the Notice of Demand for Payment dated January 13, 2005, should not have been issued before a final Notice of Disallowance. Accordingly, USAID withdrew its prior Notice of Demand for Payment but reissued a Revised Notice of Demand for Payment on March 9, 2005, which accompanied the Final Decision. See Exhibit 15.

33. USAID broke down its Final Decision as follows:

| | |
|---|---|
| Price of the 119 Incubators: | $785,880.35 |
| Fee: | $ 23,576.41 |
| Procurement Services Charge: | $ 62,870.43 |
| Total | $872,327.18 |

34. USAID's Contracting Officer, Roy Plucknett, claimed in the Final Decision, Item 1 under Factual Areas of Agreement and Disagreement, that "[t]he parties disagree as to whether these [119] incubators were properly approved under the pertinent procurement plan." This allegation relates back to USAID's Notice of Intent to Disallow Costs dated November 1, 2004, wherein Mr. Plucknett, the USAID Contracting Officer newly assigned to be responsible for the Healthy Mother/Healthy Child Project, mistakenly alleged that JSI's

procurement of $18M in commodities as identified in the procurement plan subject to CTO/CO approval was never approved by the CO. The Final Decision could not have been more mistaken, among the following reasons:

A. The Terms of the Contract (page 58 of 109), Article C.8.2.ii.Desired Outcomes specifically stated: "The Contractor will first design a procurement plan and schedule befitting the HM/HC project needs. Final decisions on the procurement plan will be made during the start-up phase when actual procurement needs are clearer. Additional equipment needs will be incorporated in the procurement plan on an on-going basis in response to the district plans."

B. Performance Milestones 5 and 25 included procurement plans which included 149 incubators. These plans were approved by USAID on April 26, 1999 and December 10, 2000, respectively. USAID approvals for the actual procurement of the incubators were received by JSI as follows: :

USAID APPROVALS TO SUB-CONTRACTS – BASE PERIOD

| Commodity | Contract # | Qty | Date of JSI Request | Document | Date of USAID Approval |
|---|---|---|---|---|---|
| Incubator, Intensive Care Hill-Rom 83A1A1 | 68 | 7 | 16-Dec-99 | | |
| Incubator, Normal Care Hill-Rom C400QT | 68 | 23 | 16-Dec-99 | Russell/Gipson letter | Jan-18-00 |
| Incubator, Intensive Care-Preemicare Model #605-1460500 | 205A | 7 | 25-Nov-01 | Judge/Gipson letter | Nov-29-01 |
| | 205 | 25 | 10-Apr-01 | Judge/Gipson letter | Jun-11-01 |
| Incubator, Normal Care Preemicare Model 605-1460430 | 205A | 18 | 25-Nov-01 | Judge/Gipson letter | Nov-29-01 |
| | 205 | 69 | 10-Apr-01 | Judge/Gipson letter | Jun-11-01 |
| | TOTAL | 149 | | | |

C. The procurements of the 119 Preeimcare incubators were approved by the Contracting Officer on June 11, 2001 and November 29, 2001. See Exhibit 3, above.

D. The procurement plans were also approved by USAID, demonstrated by the fact that JSI received USAID written approvals for the performance milestones from the CTO with a copy to the Contracting Officer and the payment of the associated fees (which included the fees associated with the approved procurement plans, performance milestones 5 and 25). See Exhibit 16. The CTO's explicit approval authority for milestones was officially granted in Contract Modification #4, Section B.3.e, dated October 9, 2000. See Exhibit 4, above. Prior to that time, the CO had the CTO write the milestone approval letters with a "cc" to her. All milestone/fee approvals were completed in this manner. Contract Modification #4, page 5 of 7, amended Section C.8.2, Task Eleven, Commodity Procurement Program, page 58, to provide: "The Contractor shall submit annual reports on progress as part of the milestone documentation for procurement to the USAID COTR. The Contractor shall also submit annual procurement plans to the COTR and Contracting Officer for approval." When the modification was implemented, the CO, COTR/CTO and JSI intended and agreed that the annual procurement reports and procurement plans would be incorporated into the milestones and approved by the COTR with a copy to the CO. This practice was implemented by each of the COs, including Roy Plucknett.

E. USAID has long since waived any and all claims that the CO did not approve the procurement plans.

35. With reference to the Final Decision, <u>Factual Areas of Agreement and Disagreement</u>, to the extent not otherwise addressed in this Complaint or in previous correspondence between the parties, JSI disputes USAID's contentions and grounds for disallowance.

36. With reference to the Final Decision, Statement of Decision, to the extent not otherwise addressed in this Complaint or in previous correspondence between the parties, JSI disputes USAID's contentions and grounds for disallowance.

37. USAID has satisfied all of JSI's alleged indebtedness through administrative offsets of invoices submitted by JSI to USAID for payment. As a result, USAID owes JSI the sum of $872,327, plus administrative fees, costs and interest assessed and collected by USAID through offsets. In addition, USAID owes JSI for its legal fees, costs and expenses pursuant to the Contract and under federal law for the extraordinary Contract costs which JSI has incurred in this Contract dispute with USAID.

38. In yet another change of positions, on July 24, 2005, USAID instructed JSI to re-export from Egypt 118 incubators which USAID had taken possession of. See Exhibit 17. USAID notified JSI that if it did not make arrangements to have the incubators shipped from Egypt, that USAID would ship the incubators to JSI and would hold JSI liable for the shipping costs.

39. JSI complied with the government's request to re-export the incubators from Egypt. JSI is holding the incubators in a storage facility in the United States for USAID and/or the MOHP at a cost of $2,783 per month. On August 11, 2005, JSI, through its legal counsel, notified USAID that it would hold USAID liable for all costs associated with re-exportation, including shipping and storage. See Exhibit 18. USAID is liable to JSI for the re-exportation shipping and storage facility costs. Thus, USAID owes JSI for all costs associated with re-exportation.

**The Government's Breaches of Contract and Violations of the Federal Acquisition Regulations (FAR)**

40. Federal Acquisition Regulation, 48 C.F.R. 33.204, provides: "The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level. Reasonable efforts should be made to resolve controversies prior to the submission of a claim." JSI had been making reasonable efforts to resolve the incubator issue. However, USAID's withdrawal of cooperation, abandonment and disavowal of the agreed upon Plan of Action, including its refusal to allow the testing and recertification process to be completed and the original incubators to be returned to service and its subsequent Notice and Amended Notice of Intent to Disallow Costs and its Final Decision violated the FAR and the government's policy to try to resolve all contractual issues in controversy. The government's violation of the FAR is a breach of the Contract.

41. Federal Acquisition Regulation, 48. C.F.R. 33.211, provides in pertinent part: "When a claim by or against a contractor cannot be satisfied or settled by mutual agreement and a decision on the claim *is necessary*, the contracting officer shall -- " (emphasis added). USAID's Final Decision on its disallowance claim was *not necessary* because (i) reasonable means to satisfy the MOHP had not been exhausted; (ii) JSI had been working diligently with USAID and the MOHP under a Plan of Action to test and recertify the incubators, the final results of which were near completion when USAID ceased cooperation; and (iii) the MOHP expressed satisfaction with JSI's resolution and future disposition of the incubators. USAID violated the FAR, which is a breach of the Contract.

42. USAID's disallowance of a percentage of the fixed fee is a breach of the Contract. The Contract was a performance based contract. Upon information and belief, it was the first performance based contract ever had with the Egypt Mission. In other words, it

was not a traditional cost reimbursement contract. JSI was paid a fixed fee upon completion of performance milestones that were certified by the USAID Contracts Technical Officer (CTO). USAID's disallowance of a percentage of the fixed fee was based on actual costs, not the performance milestones. USAID's unilateral deviation from the performance milestones and disallowance of the fixed fee based on actual costs is not authorized by the Contract, or the FAR, and constitutes a breach of the Contract. The performance milestones for the original Preemicare incubators were fulfilled by JSI, notwithstanding the government's subsequent withdrawal of the incubators from service.

43. In the Final Decision issued March 9, 2005, USAID stated:

> In addition to the 119 original incubators purchased from, Preemicare, JSI purchased 34 Ohmeda brand incubators in November 2002, 72 Hill-Rom brand incubators in November 2003 and 15 Ohmeda incubators in 2004. These incubators were delivered and installed and JSI invoiced and received payment for these incubators. It is disputed whether some or all of these incubators were "replacement" incubators for the original 119 defective Preemicare Incubators. It is also disputed whether the purchase of these incubators was part of an appropriately approved procurement plan.

44. USAID coined the term "replacement" incubators to describe incubators which were procured after procurement of the 119 Preemicare incubators. Even if the incubators had been "replacement" incubators, under the Contract the costs were allowable. Section E-1 of the Contract (page 65 of 109) incorporates FAR 52.246-3. FAR 52.246-3(f) provides, "Except as otherwise provided in paragraph (h) of this clause, the cost of replacement or correction shall be included in allowable costs, determined as provided in the Allowable Cost and Payment clause, but no additional fee shall be paid."

45. The 119 Preemicare incubators had been accepted pursuant to FAR 52.246-3, *Inspection of Supplies – Cost Reimbursement*, which is incorporated by reference in Section E-1 of the contract [page 65 of 109]. FAR 52.246-3(e) provides that unless the contract specifies otherwise, "the Government shall accept supplies as promptly as practicable after delivery, and supplies shall be deemed accepted 60 days after delivery, unless accepted earlier." The incubators were originally delivered to USAID/Egypt's Consignee: HM/HC, USAID Project No. 283-0242, Ministry of Health, 21 Misr Helwan, Maadi, Cairo. There were three shipments which cleared Egyptian customs January 26, February 12 and April 29, 2002. Delivery to the MOHP-designated facilities occurred in May and July 2002. The government accepted the supplies explicitly and by operation of contract and as a matter of law under FAR 52.246-3(e). The government's belated rejection of the supplies occurred long after the passage of 60 days from the dates of delivery and acceptance. As a matter of Contract and the FAR, the government's belated disallowance of costs is a breach of the Contract.

46. FAR 52.246-3(f) provides that, even after acceptance, the Government has no later than six months after acceptance of the supplies to be delivered to require the Contractor to replace or correct any supplies that are nonconforming at time of delivery. In the first place, the incubators were conforming at the time of delivery and acceptance. Second, within six months after acceptance, the government did not require JSI to replace or correct the incubators. Third, the government did not deem the incubators to be nonconforming within six months after acceptance of delivery. As a matter of Contract and the FAR, the government's belated disallowance of costs is a breach of the Contract.

47. Even if the incubators were nonconforming at the time of delivery, under the Contract and the FAR, JSI's liability was limited. FAR 52.246-3(j) provides: "The Contractor [JSI] shall have no obligation or liability under this contract to replace supplies that were nonconforming at the time of delivery, except as provided in this clause or as may be otherwise provided in the contract." JSI is not liable under the Contract to the government for the costs of incubators which the government has deemed to be nonconforming, and JSI has no liability to replace supplies that were nonconforming. The government's disallowance claim imposes liability upon JSI for supplies which were allegedly nonconforming, which is a breach of the FAR and the Contract.

48. JSI complied with the terms of the Contract in its procurement of the 119 Preemicare incubators. The services provided by JSI in procuring these incubators were accepted and paid by the government in 2002. Problems that arose with the incubators were not due to JSI's procurement services. JSI's services were not deemed to be defective. JSI properly earned the Fee ($23,576.41) and Procurement Services Charge ($62,870.43) which the government has disallowed. The government's disallowance of the Fee and Procurement Services Charge is a breach of the Contract.

49. The Contract between JSI and USAID did not contain a warranty clause obligating JSI to provide replacement supplies or repay USAID for costs previously paid and incurred by JSI if USAID deemed supplies to be nonconforming. USAID's disallowance of costs is a backdoor attempt to require JSI to provide a warranty on the supplies procured for USAID. Furthermore, ICS had agreed to extend its warranty for an additional 9 months.

50. JSI's costs of the 119 original incubators are reimbursable under the Contract. [Contract page 5 of 109]. "The U.S. dollar costs allowable shall be limited to reasonable,

allocable and necessary costs determined in accordance with FAR 52.216-7, Allowable Cost and Payment, FAR 52.216-8, Fixed Fee, if applicable, and AIDAR 752.7003, Documentation for Payment."

51. FAR 52.216-7(a)(1) provides: "The Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost for performing this contract." JSI followed the procedures of the FAR and its Contract with USAID by submitting invoices to the Office of Financial Management and the CTO for reimbursement of the costs of the new incubators. The CTO is the authorized representative of the CO under the Contract for authorizing payment. JSI and the CTO met their contractual obligations. The CO has no express authority under the Contract to negate the CTO's prior payment authorization.

52. FAR 52.216-7(b)(1) states that for the "purpose of reimbursing allowable costs, . . . the term 'costs' includes only – (i) Those recorded costs that, at the time of the request for reimbursement, the Contractor has paid by cash, check, or other form of actual payment for items or services purchased directly for the contract;" The FAR explicitly defines reimbursable costs as those costs paid by the Contractor for items purchased directly for the Contract. JSI paid the costs of all incubators at issue, including the 119 Preemicare incubators and the incubators procured thereafter which USAID deems to be "replacement" incubators.

53. On January 26, 2005, USAID's then legal advisor in Egypt, John Groarke, provided an explanatory breakdown of the disputed costs. His breakdown indicated that the disallowed costs were not for "replacement" incubators (contrary to the Notice of Intent to Disallow Costs dated November 1, 2004, Amended Notice of Intent to Disallow Costs dated

December 8, 2004, and letters from the Contracting Officer and the Acting Mission Controller), but were for the costs of the original procurement of the Preemicare incubators. However, USAID failed to amend its prior Notices or issue new notices, thereby depriving JSI of a validly issued Notice of Intent to Disallow Costs. USAID's failure to amend its prior Notices or to issue new Notices is a breach of the Contract and the FAR.

**ICS Technologies, Inc. – Rule 14(b) of the Rules of the United States Court of Federal Claims**

54. ICS Technologies, Inc. ("ICS") is a District of Columbia corporation established in 1984, whose headquarter offices are located at 6663-A Old Dominion Drive, McLean, Virginia 22101. At all times relevant, ICS also maintained an office in New Maadi, Cairo, Egypt to service several procurement orders under the USAID Healthy Mother Healthy Child Project. ICS is a contractor for some of the medical technology projects in the Middle East, whose experience includes the supply and installation of medical equipment.

55. JSI procured the 119 infant incubators from ICS for USAID's Healthy Mother Healthy Child Project. JSI and ICS entered into Purchase Contract No. 04-01-205 dated June 13, 2001, under which ICS agreed to supply ninety-four (94) Preemicare incubators for the purchase price of $620,274.55. See Exhibit 19. JSI and ICS entered into Amendment #1 to Purchase Contract No. 04-01-205 as of November 30, 2005, under which ICS agreed to supply twenty-five (25) additional incubators for the purchase price of $165,605.80. See Exhibit 20.

56. JSI paid ICS the sum of $785,880.35, the costs of the incubators. This is the amount of costs which USAID subsequently disallowed.

57. Under the Warranty clause of the Purchase Contract, ICS agreed that it would replace or repair the medical commodities, spare parts, and parts of such commodities found to be defective due to faulty design, workmanship or materials. Replacements and repairs were to be made without cost to JSI. ICS received notice of the warranty claims. In response to the warranty claims, ICS undertook repairs and modifications to the incubators. USAID asserts, however, that ICS has failed to honor its warranty obligations. To the extent to which ICS has failed to honor its warranty obligations, ICS has breached the Warranty clause of the Purchase Contract and is liable to JSI and/or USAID. Also, if there are "defects" in the incubators that were not remedied by ICS or capable of being remedied, to the extent to which USAID's disallowance of costs is deemed valid and enforceable by this Court, ICS is liable to JSI and/or USAID for the disallowed costs.

58. ICS, as a supplier of commodities on a USAID contract, was required by USAID to sign USAID's Form 1450, "Supplier Certificate and Agreement" and agree to its terms. ICS signed Form 1450 for procurements of the 119 Preemicare, Inc. infant incubators totaling $785,880.35. [IFB 8, Purchase Order Nos. 205 and 205A]. See Exhibit 21. Section 2 of the Supplier Certificate and Agreement states:

> 2. The supplier will upon the request of A.I.D. promptly make appropriate refund to A.I.D., plus interest [at the rate established in accordance with the Internal Revenue Code, 26 U.S.C. 6621 (b) from the time of payment to the supplier, in the event of
>
> (a) its nonperformance, in whole or in part, under said contract;
>
> (b) any breach by it of any of the undertakings in this Certificate and Agreement, or
>
> (c) any false certificate or representation made by it in this Certificate and Agreement or in the Invoice-and-Contract Abstract on the reverse hereof.

59. USAID's sole contractual remedy to recoup the costs of the infant incubators is against ICS. Upon information and belief, USAID disregarded the Supplier Certificate and Agreement and failed to request ICS to refund the cost of the incubators to USAID. ICS, not JSI, would have exposure to liability to USAID for the costs of the infant incubators.

60. If JSI were liable to USAID for the disallowed costs of the 119 Preemicare incubators purchased from ICS, then ICS is liable to JSI on an indemnity claim.

61. Though not named as a party in this pending action, ICS has an interest in the subject matter of this pending action pursuant to Rule 14(b) of the Rules of the United States Court of Federal Claims. Accordingly, JSI submits herewith a Motion for Notice to advise ICS of the pendency of the action and of the opportunity to seek intervention and assert an interest in the action.

**COUNT I**
**<u>Breach of Contract</u>**

62. JSI restates and incorporates herein by reference paragraphs 1 through 61 of this Complaint.

63. JSI performed the services required under the Contract and properly submitted invoices to USAID seeking payment for such services. USAID, through its authorized representatives, issued letters approving performance milestones and fee payments and paid JSI for its costs in procuring the 119 incubators.

64. USAID's disallowance of the cost of 119 incubators ($785,880.35), its disallowance of JSI's Fee ($23,576.41) and its disallowance of JSI's Procurement Services Charge ($62,870.43) is a breach of the Contract.

65. USAID's administrative offset against other invoices due and payable to JSI and the collection from JSI of the claimed indebtedness ($872,327.18) is a breach of the Contract.

66. USAID's administrative offset against other invoices due and payable to JSI and the collection from JSI of interest on the claimed indebtedness is a breach of the Contract.

67. USAID's disallowance and administrative offset are material breaches of the Contract.

68. USAID's requirement that JSI incur the costs of re-exporting the incubators from Egypt to the United States, and the resulting storage facilities costs, are material breaches of the Contract.

69. As a direct and proximate result of USAID's breaches of the Contract, Plaintiff has suffered damages in an amount totaling not less than $872,327.18, plus re-exportation costs of $62,599 and monthly storage costs.

**COUNT II**
**<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>**

70. Plaintiff restates and incorporates herein by reference paragraphs 1 through 69 of this Complaint.

71. An implied covenant of good faith and fair dealing exists under law and in the Contract.

72. The covenant implies a general duty of good faith and fair dealing by USAID in the performance of its obligations under the contract.

73. The covenant prohibits USAID from acting in a manner as to prevent the Plaintiff and/or ICS from performing its obligations under the contract.

74. The United States breached the implied covenant of good faith and fair dealing in that the MOHP, USAID and JSI had agreed upon a Plan of Action in September 2004 for repairs, modification, testing and recertification to be done on the Preemicare incubators in issue, after which the incubators would be distributed to facilities in Egypt; however, in November 2004, USAID refused to allow the testing and recertification process to be completed and the incubators to be returned to service.

75. The United States breached the implied covenant of good faith and fair dealing in that ICS had offered to extend the warranty on the Preemicare incubators but USAID refused to allow the testing and recertification process to be completed and the incubators to be returned to service.

76. The United States breached the implied covenant of good faith and fair dealing in that USAID issued a Notice of Intent to Disallow Costs dated November 1, 2004 and an Amended Notice of Intent to Disallow Costs dated December 8, 2004, which were legally deficient and factually incorrect, and USAID thereafter failed to modify the Notices.

77. The United States breached the implied covenant of good faith and fair dealing in that USAID issued a Notice of Demand for Payment on January 13, 2005, despite the fact that a Notice of Disallowance had not been issued.

78. The United States breached the implied covenant of good faith and fair dealing in that USAID's Final Decision and Unilateral Debt Determination asserted new and different grounds and contradicted positions taken by USAID in its previous Notice and Amended Notice of Intent to Disallow Costs.

79. The United States breached the implied covenant of good faith and fair dealing in that USAID has undertaken Administrative Offsets for the costs of all incubators, the

Plaintiff's fee under the Contract, and the Plaintiff's procurement services charge under the Contract, even though USAID is not entitled to an offset or refund from the Plaintiff under the Contract.

80. The United States breached the implied covenant of good faith and fair dealing in that USAID required JSI to incur the costs of re-exporting the incubators from Egypt to the United States, plus the storage facilities costs.

81. As a direct and proximate result of the United States breach of the implied covenant of good faith and fair dealing, JSI has suffered damages in an amount totaling not less than $872,327.18, plus re-exportation costs of $62,599 and monthly storage costs of $2,783.

**PRAYER FOR RELIEF**

Plaintiff John Snow, Inc. requests the Court to enter a judgment in its favor and against the United States in the following amounts:

A. Not less than $872,327.18 taken by USAID in administrative offsets;

B. Not less than $62,599 for return shipping costs, plus the monthly storage costs of $2,783 in a total amount to be determined;

C. Prejudgment interest;

D. Interest as provided by the Contract Disputes Act of 1978, 41 U.S.C. § 611 and/or the Contract; and

E. Attorneys' fees, costs and expenses.

Plaintiff also requests the Court to grant it such other legal or equitable relief as the Court deems just and proper.

DATED: February 6, 2006

Respectfully submitted,

Daniel A. Ball
SELZER GURVITCH RABIN &
OBECNY, CHTD.
4416 East West Highway, 4th Floor
Bethesda, Maryland 20814
Direct: (301) 634-3147
Main: (301) 986-9600
Fax: (301) 986-1301
E-Mail: dball@sgrolaw.com

Counsel for Plaintiff John Snow, Inc.