# Minutes of the Meeting
## Review and Update on PreemiCare Incubators

**Date:** 29 September 2004
**Time:** 11:30 am - 12:30 pm
**Participants:**

**Dr. Esmat Mansour,** Head of IHC and Nursing Sector, HM/HC Executive Director, MOHP
**Dr. Nahed Matta,** HM/HC Team Leader, USAID
**Dr. Ali Abdel Megeid,** Workforce Team Leader, USAID
**Mr. Yousri Aclimandos,** Vice President, TCA
**Dr. Reginald Gipson,** Chief of Party, JSI

**Purpose:**

1. To review the current situation in reference to the disposition of the PreemiCare Incubators.
2. To address all technical matters pertaining to the incubators and decide on the actions required to have the incubators operating safely, efficiently, tested and returned to the MOHP.
3. To discuss and agree on the action plan for options to resolve the current situation.
4. To discuss the next steps required to implement the plan..

**Plan of Action:**

As a result of the discussions, consensus was reached on the following plan of action:

1- The Supplier, ICS, will proceed with having two incubators repaired by Arj-Med. ICS and PreemiCare are currently working with Arj-Med to be PreemiCare's representative in Egypt.
2- The two incubators will be selected by the MOHP and JSI engineers. It was noted that each incubator which was tested by ECRI has a data sheet which specifies each of the test and records whether the incubator passed or failed the different test items. Therefore, part of the criteria for selection of the incubators to be repaired includes failing the ECRI critical test for temperature control and alarm.
3- The MOHP and JSI engineers were trained by ECRI to perform the required test. Therefore, once the incubators are repaired the MOHP and JSI engineers will retest them according to the test protocol and compare the results after the repair

with the results from the ECRI test before to determine if the areas in which the incubators failed the previous test have been corrected.

4- If the incubators pass the initial tests, an extensive trial test will be performed which includes a simulation test of the incubators operation capacity in a reliable Neonatal Unit setting for 2 to 4 weeks where monitoring of the normal operation (without any infant) will be none by MOHP Neonatal Unit staff , MOHP and JSI engineers.

5- If the incubators pass the trial period, discussions will then proceed in reference to the estimated cost and who will provide the funds for repairs, required spare parts and a maintenance contract for one year for the incubators.

6- Once agreed, the other incubators will be turned over to Arj-Med to undergo the same level of repair and maintenance, test and delivery to the MOHP if they pass the test and trial period.

**Ministry of Health & Population**
**Healthy Mother/Healthy Child Project**
**in Cooperation with USAID**

وزارة الصحة والسكان
مشروع صحة الأم والطفل
بالتعاون مع وكالة التنمية الدولية الأمريكية

December 15, 2004

Dr. Ali Abdel Megeid
HM/HC Team Leader
USAID

Dear Dr. Abdel Megeid,

As a follow up to my letter dated June 9, 2004 and Dr. Matta's reply dated July 13, 2004 (see attached), I would like to express my satisfaction with the current resolution of the issues related to the Preemicare Incubators. We appreciate the continuous cooperation of all parties in resolving this matter, especially the approval of USAID (as stated in Dr. Matta's letter) through JSI's commodity procurement program to procure additional incubators which some were temporarily used while the Preemicare incubators were being repaired. Reference our agreement reached at the 29 September 2004 meeting (see attached Minutes of the Meeting) we are in the process of receiving and testing the Preemicare incubators and distributing them according to the Hospitals' requests and need for incubators.

We appreciate USAID and JSI actions to maximize the use of incubators for the benefit of the Project and especially for Egyptian newborns.

Thanks for your continuous cooperation.

Sincerely,

Dr. Esmat Mansour
Head of IHC & Nursing Sector
HM/HC Executive Director

CC: Dr. Gipson, COP, JSI

21 El Sabaa Sakayaat St., Off El Kasr El Eini st., Fom El Khalig -cairo
Area Code No . 11628 Zein El Abdein
Tel. :5313011 - 5313761 - 5313762 Fax:02-5313757

٢ ش السبع سقايات متفرع من شارع القصر العيني - فم الخليج - القاهرة
رقم بريدى ١١٦٢٨ بريد زين العابدين
تليفون : ٥٣١٣٠١١ - ٥٣١٣٧٦١ - ٥٣١٣٧٦٢ فاكس ٥٣١٣٧٥٧ - ٠٢

USAID

CAIRO, EGYPT

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

November 1, 2004

Mr. Joel Lamstein
President
John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210-1211

Subject: FAR Clause No.52.242-1 Notice of Intent to Disallow Costs

Reference: Contract No. 263-C-00-98-00041-00

Dear Mr. Lamstein:

Pursuant to FAR clause 52.242-1 of the subject contract, this letter is to notify you of USAID's intent to disallow the amount of $785,880.35 from the costs incurred under the subject contract.

Subject contract includes the requirement for JSI to procure approximately $18M in commodities as identified in the procurement plan subject to CTO/CO approval. This plan included procurement of infant incubators. Although the plan was never approved by the CO, JSI proceeded to procure and install 119 incubators. Within a few weeks after installation of the incubators, problems surfaced to the extent that the incubators were taken out of service at the recommendation of JSI's supplier/manufacturers local representative. After numerous failed attempts to repair the incubators JSI procured and installed replacement incubators.

It has come to my attention that the cost of the replacement incubators was inappropriately charged to and mistakenly paid by USAID. This letter serves as notice of our intent to disallow these costs in the amount of $785,880.35 as offsets against future invoices.

A chronology of pertinent events extracted from a JSI/ICS email dated June 28, 2004, is as follows:

USAID Office Building
Plot 1A off El-Laselki Road
New Maadi, Cairo - Egypt
Postal Code: 11435

Tel: (202) 522 7000
Fax: (202) 516 4628
(202) 516 4659

1. On June 13 and November 30, 2001, JSI under subject contract procured 119 Preemicare brand infant incubators.

2. Between approximately May and July 2002, the incubators were delivered and installed at various MOHP locations.

3. Within a few weeks after installation, complaints were received from MOHP staff about overheating, erratic display boards, inconsistent alarms, and other problems. These concerns were shared by JSI with JSI's supplier, ICS, in September 2002.

4. In December 2002, the incubators were taken out of service for safety concerns at the recommendation of JSI's supplier/manufacturers local representative.

5. After numerous failed attempts to repair the incubators, JSI procured and installed 119 replacement incubators.

Based on the above, USAID/Cairo intends to disallow the amount of $785,880.35 from the costs incurred under the subject contract.

The effective date of the Notice is November 1, 2004. In case of disagreement with the Notice, JSI may submit a written response no later than November 14, 2004.

Please confirm receipt of the Notice.

Sincerely,

Roy Plucknett
Contracting Officer
USAID/Egypt

28 November, 2004

Roy Plucknett
Contracting Officer
USAID/Egypt

Subject: Contract 263-C-00-98-00041-00; Notice of Intent to Disallow Costs

Dear Mr. Plucknett,

This letter constitutes a written response [FAR Clause No. 52.242-1 (a) (2)] with justification to your letter dated November 1, 2004 concerning USAID's intent to disallow the amount of $785,880.35 from costs incurred under our contract.

Your Intent to Disallow costs are based on your assessment that JSI purchased replacement incubators mistakenly. The facts surrounding the procurement of the incubators over the life of the contract, including the issues that you raised in your letter are outlined below.

1. Approved procurement of incubators by the CO: JSI procured 119 incubators for an amount totaling $785,880.35. Approvals for these contracts were issued by the Contracting Office on June 11 and November 29, 2001, respectively.

These incubators were also included in two base period procurement plan milestones which were approved by the CTO/COTR and copied to the Contracting Officer on April 26, 1999 and December 10, 2000, respectively.

As per Contract Modification No. 4 dated October 9, 2000, the Contracting Officer delegated the authority for approval of Milestones to the CTO/COTR. Prior to the contract amendment, the CTO/COTR issued the letters approving performance milestones and fee payments with a copy to the Contracting Officer.

In all cases, the CTO and MOHP were fully aware and supported the procurement of these incubators from start to finish.

2. Repair and replacement of incubators: In terms of the problems associated with some of the incubators, JSI agrees that there have been problems and has, and continues to assist the Egyptian MOHP to ensure the proper usage and maintenance of the incubators. JSI's contractual obligation was to deliver the incubators to the Egyptian MOHP which we have done. Other than the product warranty, JSI has no further responsibility for where the incubators are placed, how they are used, or how they are maintained. JSI has worked very hard to respect our obligations and honor our responsibility for warranty support. In fact, we are continuing to work with the MOHP to facilitate discussions between the MOHP and the supplier to ensure that the incubators are repaired and returned to service as soon as possible.

Under the contract option period, additional incubators have been procured. These incubators were purchased at the request of the MOHP, and with full support from the CTO, for new neonatal centers and to supplement the existing centers with less than the recommended number of incubators.

The incubators were included in the procurement plan milestones and amendments approved by the CTO (we acknowledge that this was not in writing). Additionally, JSI has received approval for the purchase of these incubators from the Contracting Office, with the exception of the final 15, whose total purchase price was under $100,000, thus not requiring USAID written approval. In all cases, though, the CTO and the MOHP were fully aware and supported the procurement of these incubators.

3. Charges to and payment by USAID: USAID was not inappropriately billed or charged for replacement incubators. These procurements were all done with full discussions and agreements by USAID and the Egyptian MOHP.

4. Chronology of pertinent events: While we agree with the specific facts for points 1-4 that are presented in the chronology that you have provided in your letter, we do not agree that JSI purchased replacement incubators. These events are considerably more complex than those listed in your November 1 letter.

We recognize your concerns for ensuring that JSI, as a contractor to the US government, is abiding by correct procurement procedures. JSI has an outstanding record of performance in implementing US government contracts over the past 25 years. We feel that we have continued this outstanding record of performance regarding the incubators, as well as for all the approximately $18 million of procurements under the USAID HM/HC Project. JSI is equally proud of the public health work that we have led under the project. Until receiving your letter, JSI has received only the highest praise from USAID and the Egyptian MOHP for our work. All of our work has been performed closely and constructively in a most collaborative manner with our USAID counterparts in the Health Office and in the Contracts Office.

We would hope and expect that in the same spirit of our 6 years of excellent work with USAID in Egypt for the HM/HC contract that we can mutually work through any issues and concerns you have regarding our work under this contract. We are fully confident that we can provide you with any further information which you may require in order to better understand this matter.

Additionally, I am requesting that our Director for the International Division, Mr. Ken Olivola, comes to Cairo the week of 6 December to meet and assist you with any information that you may require.

I would appreciate your reconsidering this issue based on all the facts. Please do not hesitate to contact me should you have any questions.

Most sincerely,

Joel H. Lamstein
President

.cc Reginald Gipson; JSI
Ken Olivola; JSI

December 8, 2004

Mr. Joel Lamstein
President
John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210-1211

Subject: Amended Notice of Intent to Disallow Costs

Reference: Notice of Intent to Disallow Costs dated November 1, 2004
Contract No. 263-C-00-98-00041-00

Dear Mr. Lamstein:

After reviewing additional information, USAID is amending the amount to be disallowed from $785,880.35 to $863,683. The additional costs to be disallowed are:

Fixed fee-$14,931.73
Procurement services-$62,870.43

These additional amounts are disallowable because they are part of the costs invoiced by JSI for the 119 incubators referenced in the original Notice of Intent to disallow costs dated November 1, 2004.

Based on the above, USAID/Cairo intends to disallow the amount of $863,683 from the costs incurred under the subject contract.

The effective date of the amended Notice is December 8, 2004. In case of disagreement with the amended Notice, JSI may submit a written response no later than December 19, 2004.

Please confirm receipt of the amended Notice.

Sincerely,

Roy Plucknett
Contracting Officer
USAID/Egypt

SELZER GURVITCH RABIN & OBECNY
CHARTERED

LAW OFFICES
4416 East West Highway
Fourth Floor
Bethesda, MD 20814-4568
301.986.9600
301.986.1301 FAX
www.sgrolaw.com

Daniel A. Ball
(MD, VA, DC)

Direct Dial: 301-634-3147
dball@sgrolaw.com

Our Client No. 10059.003

December 19, 2004

**Via E-Mail: rplucknett@usaid.gov**

Mr. Roy Plucknett
Contracting Officer
Directorate of Procurement
USAID/Egypt
Unit 64902
APO AE 09839-4902

Re: John Snow, Inc., Contract No. 263-C-00-98-00041-00
Notice of Intent to Disallow Costs dated November 1, 2004, and Amended Notice of Intent to Disallow Costs dated December 8, 2004

Dear Mr. Plucknett:

Our firm has been engaged by John Snow, Inc. (JSI) to augment its letter and e-mail of November 28, 2004, both of which objected to and disagreed with your Notice of Intent to Disallow Costs dated November 1, 2004.

JSI also hereby objects to and disagrees with your Amended Notice of Intent to Disallow Costs dated December 8, 2004, for reasons set forth in its letter and e-mail of November 28, 2004, which are incorporated by reference. The additional costs to be disallowed for the Fixed Fee and the Procurement Services do not appear to be correct or consistent with actual costs allowable under the Contract attributable to the 119 Preemicare Infant Incubators. Thus, we ask you to provide JSI with a breakdown of your calculations.

Admittedly, JSI, but especially my law firm, have been disadvantaged with the short time frames you have given for reaching a mutual agreement of the disputed claim and responding to your Notices. You are the fourth Contracting Officer on a Contract that was awarded in 1998. You came into the picture in August of 2004. There is a long history of cooperation among JSI, ICS (the supplier), MOHP and USAID to address the incubator issues and to reach a resolution. Yet, the first indication JSI received in its Boston headquarters that USAID was withdrawing from this circle of cooperation was your

unexpected Notice of November 1, 2004. If your request for a response is *bona fide* – that is, if you are truly interested in achieving a resolution of the incubator issue in ways which can only benefit the Mission, we request that you defer any disallowance until JSI has had time to present and discuss a plan of resolution. JSI has reason to believe that the incubator issue can be resolved by the end of January 2005, if not earlier.

JSI is of the view that resolving the incubator issue is far better for the Mission and both the United States and USAID's objectives and stature in Egypt than a disallowance at this stage. During the past year, there have been almost monthly meetings between the COTR/CTO, the Egyptian Ministry of Health and Population (MOHP), and JSI's Chief of Party (COP) These meetings were used as the basis for agreement on actions relating to the incubators. We also are aware that there have been internal USAID meetings between and among the Contracting Officer, CTO, Head of the Office of Health, and the Legal Officer on the incubators. JSI's staff in Egypt has been informed by the CTO that they were in agreement with the way JSI has been handling the situation.

JSI has handled the incubator issue with integrity and diplomacy. Consider these facts: In 2001, JSI procured 119 Preemicare incubators. They arrived in Egypt in 2002 and were distributed to MOHP facilities between June and August 2002. After installation, problems with some of the incubators were identified. In September 2002, JSI contacted ICS, the supplier, and the Preemicare local representative (Hi-Med) about the problems. An engineer from Preeimcare's headquarters in California visited Egypt in December 2002. Based on that visit, the local representative of Hi-Med expressed safety concerns to JSI's COP, and advised that the incubators should be removed from service until specific modifications could be made. JSI shared this information with USAID and the MOHP, and the MHOP directed the removal of the incubators in January 2003. In June 2003, Preeimcare's engineer returned to Egypt, where he retrofitted 75 incubators. These incubators were not returned to service as the MOHP did not receive a written certification from the manufacturer that the incubators were ready to be returned to service. The remaining incubators needed additional parts. In July 2003, ICS collected all of the incubators from the MOHP's facilities and brought them to a central location in Cairo to complete the retrofit and re-certification process. In August 2003, certifications were issued for 112 of the incubators. Before returning them to service, the MHOP requested JSI to commission an independent study. JSI contracted with ECRI, a U.S. non-profit health services research agency with extensive experience with the FDA and other agencies for medical equipment testing. ECRI tested the incubators and found additional problems in May 2004. The incubators needed to be recalibrated because they were in an uncontrolled

environment (38 - 40 C) for almost one year. In October 2004, ICS completed repairs and modifications on two of the incubators. They have been tested by MOHP and JSI engineers, who were taught how to do the tests by ECRI, and they passed. Additional repairs and tests have been made to the other incubators. These actions are in accordance with the agreed upon plan between the MOHP, CTO/USAID and JSI to take the necessary steps to repair and ensure that the incubators function safely.

Previously, on June 9, 2003, Dr. Esmat Mansour of the MOHP asked JSI's COP to return the incubators to ICS and instructed: "If ICS/Preemicare fails to repair those incubators up to an acceptable standard I will ask JSI to consult with USAID to make sure the project is adequately compensated and the suppliers are held responsible." The parties have been working together toward the goal of ensuring that the incubators are safe and acceptable to the Mission. This process has been ongoing and is virtually completed. Over 100 of the incubators are in perfect working condition. ICS is in the process of certifying each one and will provide a written warranty. The parties are exploring options for returning the incubators to service. *Thus, this is not an open and shut case as you have commented to JSI's representatives.*

JSI is particularly dismayed by your intention to undermine the cooperation which the parties have historically extended in this Mission. A FAR regulation, 48 C.F.R. 33.204, was enacted to address this very situation, to wit: "The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level. Reasonable efforts should be made to resolve controversies prior to the submission of a claim." JSI has worked diligently and in good faith to resolve the incubator contractual issue. Disallowance of costs at this time before a final disposition of the incubators has been reached would violate this FAR and the policy mandated by the United States Congress.

The FAR also states, "When a claim by or against a contractor cannot be satisfied or settled by mutual agreement and a decision on the claim is necessary, the contracting officer shall -- " see 48 C.F.R. 33.211 (emphasis added). The Government cannot in good faith justify a disallowance *at this time* when (i) reasonable means to satisfy the Government and the Mission have not been exhausted, i.e., the incubators have been retrofitted, repaired and are being certified; (ii) JSI has been working diligently with the Mission and USAID to reach a mutual agreement on repair and future disposition, if any, of the incubators; and (iii) a final decision on the Government's claim is not yet *necessary.*

USAID and the Mission will not be compromised or prejudiced if the Notice of Intent to Disallow is withdrawn or disallowance is deferred in order to give the process a fair and reasonable opportunity for a resolution or mutual agreement. You are not up against any statutory deadline for submitting a written decision on the Government's claim since accrual of the claim has been substantially less than 6 years.

In addition, the rationale for disallowance as expressed in your letter of November 1, 2004, is flawed. You mistakenly believe that the procurement plan for 119 incubators was never approved by the Contracting Officer. Yet, on November 29, 2001, USAID's Contracting Officer, Cynthia Judge, authorized an amendment to the contract (IFB 8, Purchase Order 205 & 205A) to increase the quantity of incubators and the value of the contract for a fixed price of $816,731.94. USAID cannot now claim that the procurement plan under which these authorized purchase orders were issued was not approved by USAID's Contracting Officer and/or through delegated authority, the Contracting Officer's Technical Representative (COTR).

There have been at least twelve modifications to Contract No. 263-C-00-98-00041-00. It would be implausible for the modifications to have been issued and accepted if the underlying procurement plans had not been authorized by USAID.

If you are belatedly questioning the approval process of the procurement plans, you should know that there were at least quarterly meetings between JSI's COP and USAID's COTR to evaluate the procurement plans and JSI's performance on completion of activities in accordance with such plans. The COTR was required to meet at least quarterly with the Contracting Officer. At no time did USAID communicate to JSI that its procurement plans were not accepted, particularly the procurement plans for the IFB option clause under which 119 incubators were procured. In fact, JSI submitted procurement plans to each of the former Contracting Officers and COTR. Upon acceptance of the plans by the Contracting Officer, IFBs were issued, procurements were placed, commodities were supplied and accepted by the Mission, and USAID approved and made payments to JSI. Your belated challenge to the approval process of the procurement plans is tantamount to reversing binding decisions made by the former Contracting Officers - - decisions on which JSI placed reasonable reliance and changed its position. There are many legal doctrines that impede your ill-conceived notion that the procurement plans and, therefore, the incubator procurement, were not authorized by USAID, including but not limited to: breach of contract, promissory estoppel, waiver, forbearance, custom and practice, and the like. In short, JSI procured commodities in reliance upon the expressed approvals of

USAID; and therefore, USAID would be estopped from countermanding those approvals and reneging on the procurements.

Furthermore, and without limiting our position, Contract clause B.3.(e) provides for the Contractor to submit, for technical review, all information and documentation necessary to support the achievement of milestones to the COTR, with a copy to the Contracting Officer. The COTR and Contracting Officer will discuss the COTR's recommendations, and the CO will approve or disprove the payment of fee. Your predecessor Contracting Officers approved payment for the incubators. In Modification No. 4 to the Contract, which covers the option period under which the 119 incubators were purchased, Section 2-B.c.B.3.e provides that the COTR will lead a review of the documentation to determine if the milestones have been met and will either approve or disapprove the payment of the fee. The Modification further provides in Section 2-B.s.C.8.2 and C.8.2.iii that the Contractor shall also submit annual procurement plans to the COTR and Contracting Officer for approval. JSI complied with all of the Contract and Contract Modification clauses, here and elsewhere. If you can find areas of non-performance, they would been occasioned by USAID, which breaches of the contracting process would not be to the detriment of JSI.

For these and other such reasons, the costs should not be disallowed.

Sincerely,

Daniel A. Ball

DAB/is
cc: Joel Lamstein, President
Kenneth J. Olivola, Director, International Division

USAID

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

CAIRO, EGYPT

13 JAN 2005

Mr. Joel Lamstein
President
John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210-1211

Subject: **NOTICE OF DEMAND FOR PAYMENT**

Reference: Contract No. 263-C-00-98-00041-00

Dear Mr. Lamstein:

As you are aware, costs related to the above referenced contract and paid by USAID have been disallowed resulting in a known overpayment of $863,683.00 to your company, John Snow, Inc. ("JSI). Pursuant to FAR Subpart 32.6 and 22 CFR Part 213, **demand for payment of that amount ($863,683.00) is hereby made.** The basis for the debt is as follows:

1. In 2001, JSI procured 119 infant incubators. A procurement plan for this procurement was never approved by the Contracting Officer. Nevertheless, the incubators were delivered and installed sometime in 2002.

2. JSI invoiced and was paid for these 119 incubators.

3. Shortly after delivery and installation, due to safety concerns and the failure of the incubators to perform as intended, JSI removed the incubators from service.

4. JSI unsuccessfully attempted to repair the 119 defective incubators.

5. JSI subsequently procured and installed 119 replacement incubators.

6. JSI also invoiced and was paid for the 119 replacement incubators.

USAID Office Building
Plot 1A off El-Laselki Road
New Maadi, Cairo - Egypt
Postal Code: 11435

Tel: (202) 522 7000
Fax: (202) 516 4628
(202) 516 4659

7. Despite payment for both the defective incubators and the replacement incubators and receiving a notice of intent to disallow payment made for the original 119 defective incubators in the amount of $863,683.00, JSI has refused to voluntarily refund the amount to USAID.

Payment of the $863,683.00 is due within 30 days from the date of demand. Any amounts not paid within 30 days from the date of this demand will be considered delinquent and will bear interest from the date of the demand, or from any earlier date as may be specified in the contract or allowed by law at the rate established by the Secretary of the Treasury, for the period affected, under Public Law 92-41. Additionally, fees or administrative costs may be included.

JSI may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. If JSI disputes the government's demand, JSI should submit a claim under the Disputes clause in the above referenced contract.

Unless a deferment is authorized, if payment is not received within 30 days from the date of this demand, USAID intends to use non-centralized administrative offset to collect the debt plus any additional administrative expenses if appropriate. If collection cannot be accomplished by offset, not later than 90 days after the date of the demand letter, the debt will be transferred to the Financial Management Service in the Department of Treasury, which will collect the amount owed to USAID plus their Treasury processing and administrative costs from JSI and will use all means available to the Federal government for debt collection, including the possibility of referral to the Department of Justice for litigation if the debt cannot be collected.

JSI may challenge the demand for payment to the Contracting Officer. In such case, the Contracting Officer will provide his final decision within any applicable time frames of the Disputes clause of the above referenced contract. The Contracting Officer may authorize a deferment pending resolution of any appeal of his decision. In either case, if the contractor is not successful in its appeal, interest will be calculated based on the initial demand.

JSI may inspect and copy any USAID records related to the debt.

The following officials may be contacted to discuss the debt:

1) Official designated for determining the amount of the debt: Roy Plucknett, Contracting Officer.

Street Address:

Roy Plucknett, Contracting Officer
USAID/Egypt
USAID Building
Plot 1/A Off El Laselki Street
New Maadi, Cairo - Egypt
Postel Code 11435

Mailing Address:

Roy Plucknett, Contracting Officer
USAID/Procurement Office
Unit 64902
APO AE 09839-4902

Telephone: +2-02-522-6910
Email: rplucknett@usaid.gov

2) Official responsible for collection of the debt: Elizabeth Palmer, Acting Controller.

Street Address:
Elizabeth Palmer, Controller
USAID/Egypt
USAID Building
Plot 1/A Off El Laselki Street
New Maadi, Cairo - Egpyt
Postel Code 11435

Mailing Address
Elizabeth Palmer, Controller
USAID/FM
Unit 64902
APO AE 09839-4902

Telephone: +2-02-522-7311
Email: epalmer@usaid.gov.

Sincerely,

Elizabeth Palmer

Elizabeth Palmer
Acting Mission Controller

CC: Roy Plucknett

**Daniel A. Ball**

**From:** Joel Lamstein [joel_lamstein@jsi.com]
**Sent:** Friday, January 14, 2005 5:49 PM
**To:** epalmer@usaid.gov
**Cc:** Ken Olivola; Reginald Gipson; Daniel A. Ball
**Subject:** Ms. Palmer:

Ms. Palmer:

JSI is perplexed and concerned about your Notice of Demand for Payment dated Jan. 13, 2005. There seem to be a number of factual errors in your letter. I would appreciate receiving a clarification from you.

The opening sentence states: "As you are aware, costs related to the above reference contract and paid by USAID have been disallowed...." You also state in paragraph 7: "Despite payment... and receiving a notice of intent to disallow payment...JSI has refused to voluntarily refund the amount to USAID".

To set the record straight:

JSI has not been notified by the Contracting Officer that costs have been disallowed. We received a Notice of Intent to Disallow Costs
(11-1-04) and an Amended Notice (12-8-04), and we responded directly or through legal counsel to both Notices. But, we have not been made aware that the Contracting Officer has actually disallowed costs since the Notices were sent.

Further, the implication that somehow JSI has refused to pay the amount in question is not only offensive but simply wrong. USAID has never asked us to refund the amount in dispute. Clearly, we cannot "refuse to voluntarily refund" money that has not been asked for. Even your Notice alludes to a process for deferring repayment of the debt if it is disputed. And we dispute the contention that JSI has done anything wrong to merit a disallowance.

JSI has been a loyal contractor to USAID in Egypt running one of the most successful health programs ever implemented in Egypt (as evaluated by your own staff). I am unclear, therefore, why the tone of your communication suggests that JSI is somehow remiss in what we have done, when in fact we are following government contract procedures. As you know, we are allowed to dispute the Notice of Intent to Disallow Costs

There are other points made in your letter that we disagree with, but we will reserve our right to address them in another context and time.

The last sentence on page two of your letter states that "JSI may inspect and copy any USAID records related to the debt." We hereby accept your invitation and request copies of all USAID records related to the alleged debt.

Joel Lamstein

President

SELZER GURVITCH RABIN & OBECNY
CHARTERED

LAW OFFICES
4416 East West Highway
Fourth Floor
Bethesda, MD 20814-4568
301.986.9600
301.986.1301 FAX
www.sgrolaw.com

Daniel A. Ball
(MD, VA, DC)

Direct Dial: 301-634-3147
dball@sgrolaw.com

Our Client No. 10059.003

February 2, 2005

**Via Facsimile: (202) 516-0199**
**and E-Mail: epalmer@usaid.gov**

Elizabeth Palmer, Acting Controller
USAID/Egypt
USAID Office Building
Plot 1A off El-Laselki Road
New Maadi, Cairo
Egypt 11435

Re: John Snow, Inc., Contract No. 263-C-00-98-00041-00
Request for Withdrawal of Notice of Demand for Payment,
dated January 13, 2005

Dear Ms. Palmer:

John Snow, Inc. (JSI) received from you a Notice of Demand for Payment dated January 13, 2005, related to Contract No. 263-C-00-98-00041-00 (the "Notice of Demand for Payment"). JSI respectfully requests that the Notice of Demand for Payment be withdrawn for the reasons set forth below.

ADS 625.3.6.1 regarding Billing the Debtor, at a., states that when preparing a demand for payment bill, the Controller is to use "the negotiated settlement or the final settlement letter issued by the Contracting or Agreement Officer" as "documentation of debt due from a contractor." The process is also set forth in AAPD 03-07 (Revised) and FAR 32.6. No such negotiated or final settlement has been reached and no such letter has been issued. In fact, JSI has been actively seeking a resolution of this matter with the Contracting Officer, Roy Plucknett, and the Senior Legal Advisor, John Groarke, because material facts in the case are in dispute, and it appears that decisions are being made by USAID without reference to the contract, the facts and the law.

Mr. Plucknett issued to JSI a Notice of Intent to Disallow Costs dated November 1, 2004 and an Amended Notice dated December 8, 2004. JSI has sought to educate USAID on the inaccuracies of the Notices, bringing issues to the attention of Mr. Plucknett and Mr.

Groarke. JSI has not received a final Notice of Disallowance from Mr. Plucknett, as required.

For these reasons, namely that 1) JSI is actively seeking to resolve this matter pursuant to the contract and FAR 33.204, 2) there are material facts still in dispute in this matter, and 3) no final Notice of Disallowance has been issued by the Contracting Officer as required, JSI respectfully requests that the Notice of Demand for Payment dated January 13, 2005, be withdrawn to allow proper procedures to be followed.

Sincerely,

Daniel A. Ball

DAB/is
cc: Joel Lamstein, JSI, President
Ken Olivola, JSI, Director, International Division
John Groarke, Senior Legal Advisor
Roy Plucknett, Contracting Officer
Anthony Vance, Deputy Director
Marvin Burgos, IG

SELZER GURVITCH RABIN & OBECNY
CHARTERED

LAW OFFICES
4416 East West Highway
Fourth Floor
Bethesda, MD 20814-4568
301.986.9600
301.986.1301 FAX
www.sgrolaw.com

Daniel A. Ball
(MD, VA, DC)

Direct Dial: 301-634-3147
dball@sgrolaw.com

Our Client No. 10059.003

February 2, 2005

**Via Facsimile: (202) 516-0199**
**and E-Mail: jgroarke@usaid.gov**

John Groarke, Senior Legal Advisor
USAID/Egypt
USAID Office Building
Plot 1A off El-Laselki Road
New Maadi, Cairo
Egypt 11435

Re: John Snow, Inc., Contract No. 263-C-00-98-00041-00

Dear Mr. Groarke:

It was good to talk with you on January 25, 2004 I would like to take this opportunity to provide you with certain relevant history regarding the matter in controversy. John Snow, Inc. (JSI) is concerned that you and others in the USAID/Egypt Mission have only fragmented pieces of the record. We understand that confusion may arise due to the number of USAID Contracting Officers, CTOs and Controllers involved in this matter to date.

As you are now aware, the most recent Contracting Officer (the fourth that JSI has worked with on this contract) referred the disputed claim to the Acting Controller, who improperly issued a Notice of Demand for Payment before any final notice by the Contracting Officer had been issued. As you know, the debt collection procedures to be followed prior to the issuance of a demand letter, including initial notification to the contractor, negotiations and final determination, are set forth in ADS 625, FAR 32.6 and referenced in AAPD 03-07 (Revised). ADS 625.3.6.1 regarding Billing the Debtor, at a., states that when preparing a demand for payment bill, the Controller is to use "the negotiated settlement or the final settlement letter issued by the Contracting or Agreement Officer" as "documentation of debt due from a contractor." No such letter has been issued. Due to the fact that 1) JSI is actively seeking to resolve this matter pursuant to the contract and FAR 33.204, 2) there are material facts still in dispute, and 3) no final Notice of Disallowance has

been issued by the Contracting Officer as required, JSI, in a separate letter to Ms. Palmer, has respectfully requested that the Notice of Demand for Payment dated January 13, 2005, be withdrawn to allow proper procedures to be followed.

As noted in our earlier correspondence, JSI requests that USAID comply with the U.S. Government's long-established policy stated at FAR Part 33.204, to "try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level" and that "reasonable efforts should be made to resolve controversies prior to the submission of a claim." Thus far, the current USAID Contracting Officer has not made reasonable efforts to resolve the disallowance controversy with JSI. As we have stated in our previous correspondence, JSI has not received proper notice of a claim or an accurate statement of the dispute leading to the claim. The underlying facts presented by USAID are inaccurate in many material and fundamental respects. It is important that the record and history of this controversy be clarified before the Government makes a decision on the appropriate course of action in this case.

This will acknowledge receipt on January 26th of your explanatory breakdown of the disputed costs. That breakdown makes clear that the disallowed costs are NOT for "replacement" incubators (contrary to the current Contracting Officer's letters and the Acting Mission Controller's letter) but are the costs of the original procurements of Preemicare incubators. The incubators were procured in batches under a CTO-approved rolling procurement plan. The incubators characterized by Mr. Plucknett as "replacement" incubators in his November 1 and December 8, 2004 letters and by Ms. Palmer in her January 13, 2005 letter were not procured to be replacements for the original Preemicare incubators. They were part of the rolling procurement plan. The MOHP had expressed their need for about 270 incubators for facilities throughout Egypt. The incubators in question were not replacement incubators, but were additional incubators procured to meet the MOHP's needs. This is further demonstrated by the fact that USAID, together with JSI, ICS and the MOHP, developed a procedure to test, repair and recertify the incubators that had developed problems. These incubators were being repaired and recertified in order to restore them into service. Since they were to be put back into service, replacements were not needed. As you know, repair and replacement are distinct remedies. Furthermore, you also will find that more than thirty (30) of the incubators which Mr. Plucknett says are "replacement" incubators have been utilized in facilities that did not have the original Preemicare incubators; therefore, they cannot be deemed to be "replacements."

Another error we find with the breakdown is USAID's determination to disallow a percentage of the fixed fee. You may not know but this was the first performance based contract which the Egypt Mission ever had. This was not a traditional cost reimbursement

contract. A fixed fee was paid upon completion of performance milestones that were certified by the CTO. The breakdown shows that USAID is attempting to disallow a percentage of the fixed fee based on actual costs, not the performance milestones. If USAID were to belatedly consider performance milestones in this case, it would find that the milestones for the original Preemicare incubators have been fulfilled notwithstanding the subsequent withdrawal of the incubators from service.

Even if the incubators had been "replacement" incubators, under the USAID-JSI contract the costs would be allowable. I mentioned this in our conversation and referred you to Section E-1 of the contract (page 65 of 109), which incorporates FAR 52.246-3. FAR 52.246-3(f) provides, "Except as otherwise provided in paragraph (h) of this clause, the cost of replacement or correction shall be included in allowable costs, determined as provided in the Allowable Cost and Payment clause, but no additional fee shall be paid."

Your initial reaction on the telephone was that the incubators had not been accepted. In fact, the incubators had been accepted pursuant to FAR 52.246-3, *Inspection of Supplies – Cost Reimbursement*, which is incorporated by reference in Section E-1 of the contract [page 65 of 109]. The FAR discusses the broad authority of the Contracting Officer and other authorized designates to inspect and test supplies to see that they conform to the contract requirements. The Government is required to accept or reject supplies as promptly as practicable after delivery. FAR 52.246-3(e) provides that unless the contract specifies otherwise, "the Government shall accept supplies as promptly as practicable after delivery, and supplies shall be deemed accepted 60 days after delivery, unless accepted earlier." The incubators were originally received at the Egyptian port of entry in two shipments - in January and April 2002. Delivery to the MOHP-designated facilities occurred between June and August 2002. The timelines of the contract and FAR have long since passed. Thus, pursuant to the contract and the FAR, the incubators were accepted.

In addition, FAR 52.246-3(f) provides that, even after acceptance, the Government has no later than six months after acceptance of the supplies to be delivered to require the Contractor to replace or correct any supplies that are nonconforming at time of delivery. There is no evidence that the goods were nonconforming at the time of delivery. And USAID did not reject the incubators for defects within six months. The current Contracting Officer's rejection of the incubators in November 2004 for defects is beyond the time allowable under the contract, the FAR and federal common law. FAR 52.246-3(j) should provide the final resolution of this matter: "The Contractor [JSI] shall have no obligation or liability under this contract to replace supplies that were nonconforming at the time of delivery, except as provided in this clause or as may be otherwise provided in the contract."

JSI has fully complied with the terms of the USAID-JSI contract. JSI procured the Preemicare incubators from a reputable manufacturer and supplier in accordance with the CTO-approved procurement plan. The incubators were delivered to USAID/Egypt, then provided to the MOHP, which took title and designated the health care facilities to receive the incubators. The incubators were placed in service and confirmed as working properly. The end-users were trained in operating the incubators and USAID paid JSI in full. Clearly, the incubators were accepted.

When some of the incubators later developed problems, many of which were due to misuse, excessive heat and inappropriate cleaning methods used on site, JSI, ICS, and USAID worked with an independent company to test all of the incubators procured to date. JSI, ICS and USAID together developed a procedure to have the problem incubators retrofitted or repaired, retested and recertified. USAID did not require JSI to procure replacement incubators. In fact, additional incubators were procured by JSI in accordance with the CTO-approved procurement plans to meet the MOHP's needs for more incubators.

When the current Contracting Officer arrived at post in September 2004, the process for repairing, retrofitting, testing and recertifying the incubators was well under way. USAID had been involved in every step of the process. Despite this fact, the Contracting Officer has demonstrated his intention to revoke the Government's acceptance of the incubators, years after the fact. As the record shows, the incubators were procured, supplied and supported in good faith. JSI complied with the contract in all respects. JSI's responsibility was to procure goods under the contract and incur reasonable, allowable and allocable costs. It did so. You have not cited any basis that these costs are not reasonable, allowable, and allocable.

Moreover, JSI's services in procuring the incubators on behalf of USAID were not defective and were accepted by the Government. Any problems that arose with the incubators are not due to JSI's procurement services and no problem with the services has been cited to our knowledge. In order to disallow the costs of the services, it is necessary that USAID identify defects in the services performed or another specific basis for disallowance. USAID has not done so.

We also note that the contract between JSI and USAID does not contain a warranty clause obligating JSI to provide replacement goods or repay USAID for costs previously paid if USAID decides, years after the fact, to reject the goods.

Pursuant to ADS 625.3.6.5, JSI is aware that you, as USAID Legal Advisor, will be involved in this matter if it rises to the level of a debtor dispute over a determination of

indebtedness in a Bill for Collection. As stated above, JSI has not yet received a valid Bill for Collection. We seek to resolve this matter before it reaches that point.

Also, during our telephone conversation last week, you mentioned that it was the impression of some USAID personnel in the Egypt Mission that (1) JSI was not cooperating with USAID's request for inspection of the stored incubators, and (2) that JSI wanted to place defective incubators back in service. We would like to address these concerns, again:

(1) As you know, JSI does not have title to or control access to the incubators. They currently are in a facility being leased by ICS; JSI does not have a key. When Mr. Burgos inspected the incubators, ICS gave him access; no one from JSI was present. In fact, Mr. Burgos made arrangements with ICS to inspect the incubators, excluding JSI from the process altogether. For legal reasons, JSI does not have the right to give USAID access to the facility which it does not lease and to inspect goods which it does not own. Yet, JSI urged ICS to give USAID access when it became apparent that USAID and ICS would not act until JSI gave its approval.

(2) In previous correspondence, JSI has espoused its mission for more than 25 years of promoting health care throughout the world. As for the incubators, a process had been agreed upon by USAID, the MOHP, ICS and JSI to repair, retrofit, retest and recertify each incubator before each could be returned to service. The process was meant to wean out incubators that did not meet international testing standards. It was not until the fourth Contracting Officer that USAID declared the incubators to be defective. Additionally, JSI was at the forefront in expressing concern over the Preemicare incubators when issues first arose. JSI forwarded the recommendation of Hi-Med Egypt, the manufacturer's local representative, to all parties – including USAID and the MOHP – and helped to facilitate the process of removing the incubators from service.

In our telephone conversation last week and your e-mail of February 2nd, you have requested JSI to transfer the Preemicare incubators to USAID. As you know, JSI cannot turn over incubators which it does not own or have possession of. However, JSI will urge ICS to give USAID access to the storage facility and allow USAID to remove the incubators.

You also requested to know the whereabouts of the two incubators which were sent to the United States. One is with the FDA; we are trying to find out where exactly. The other was sent to ECRI for testing, but has been returned to Egypt and is in JSI's warehouse. That incubator we can transfer to USAID.

We thank you in advance for your help in resolving this controversy.

Sincerely yours,

Daniel A. Ball

DAB/is
cc: Joel Lamstein, JSI, President
Ken Olivola, JSI, Director, International Division
Roy Plucknett, Contracting Officer
Elizabeth Palmer, Acting Controller
Marvin Burgos, IG
Anthony Vance, Deputy Director

USAID

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

CAIRO, EGYPT

Mr. Joel Lamstein
President
John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210-1211

Subject: **REVISED NOTICE OF DEMAND FOR PAYMENT**

Reference: Contract No. 263-C-00-98-00041-00

Dear Mr. Lamstein:

The Notice of Demand for Payment dated January 13, 2005 is withdrawn and is superceded by this Revised Notice of Demand for Payment. As you are aware, the responsible Contracting Officer for the above referenced Contract disallowed certain costs and has made a unilateral determination that John Snow, Inc. is indebted to USAID in the amount of $872,327.18. John Snow, Inc. ("JSI") invoiced and was paid that amount by USAID. Pursuant to FAR Subpart 32.6 and 22 CFR Part 213, **demand for payment of that amount ($872,327.18) is hereby made.** The basis for the debt is as follows:

1. In 2001, JSI procured 119 infant incubators.
2. JSI invoiced and was paid for these 119 incubators.
3. Shortly after delivery and installation, JSI removed the incubators from service due to safety concerns and the failure of the incubators to perform as intended.
4. JSI unsuccessfully attempted to repair the 119 defective incubators.
5. The Contracting Officer, as required under the Contract, never approved the procurement plans for the purchase of the original 119 incubators or the subsequent purchase of replacement incubators for which JSI also was paid.
6. There has been multiple correspondence and meetings between JSI, ICS and USAID to resolve the outstanding issues concerning the defective incubators. These issues were not and have not been resolved.
7. JSI has not satisfactorily resolved the various and serious concerns and safety issues regarding the 119 incubators even though the incubators have been out

of service since at least December 2002. JSI has not agreed to refund in part or in whole any of the amounts received for those incubators nor has JSI adequately provided any reasonable justification, despite multiple opportunities to do so, why it is not legally indebted to USAID for the full amount it received - $872,327.18 – for these incubators.

Payment of the indebted amount ($872,327.18) is due within 30 days from the date of this demand. Any amounts not paid within 30 days from the date of this demand will be considered delinquent and will bear interest from the date of the demand, or from any earlier date as may be specified in the contract or allowed by law at the rate established by the Secretary of the Treasury, for the period affected, under Public Law 92-41. Additionally, fees or administrative costs may be included.

JSI may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. If JSI disputes the government's demand, JSI should since this as a Final Decision make the appropriate appeal under the Disputes clause in the above referenced contract.

Unless a deferment is authorized, if payment is not received within 30 days from the date of this demand, USAID intends to use non-centralized administrative offset to collect the debt plus any additional administrative expenses if appropriate. If collection cannot be accomplished by offset, not later than 90 days after the date of the demand letter, the debt will be transferred to the Financial Management Service in the Department of Treasury, which will collect the amount owed to USAID plus their Treasury processing and administrative costs from JSI and will use all means available to the Federal government for debt collection, including the possibility of referral to the Department of Justice for litigation if the debt cannot be collected.

This demand for payment is accompanied by and incorporates by reference the Contracting Officer's Final Decision and Unilateral Debt Determination. The Contracting Officer may authorize a deferment pending resolution of any appeal of his decision. In either case, if the contractor is not successful in its appeal, interest will be calculated based on the initial demand.

JSI may inspect and copy any USAID records related to the debt.

The following officials may be contacted to discuss the debt:

1) Official designated for determining the amount of the debt: Roy Plucknett, Contracting Officer.

Street Address:

Roy Plucknett, Contracting Officer
USAID/Egypt
USAID Building
Plot 1/A Off El Laselki Street
New Maadi, Cairo - Egypt
Postel Code 11435

Mailing Address:

Roy Plucknett, Contracting Officer
USAID/Procurement Office
Unit 64902
APO AE 09839-4902

Telephone: +2-02-522-6910
Email: rplucknett@usaid.gov

2) Official responsible for collection of the debt: Elizabeth Palmer, Controller.

Street Address:
Elizabeth Palmer, Controller
USAID/Egypt
USAID Building
Plot 1/A Off El Laselki Street
New Maadi, Cairo - Egpyt
Postel Code 11435

Mailing Address
Elizabeth Palmer, Controller
USAID/FM
Unit 64902
APO AE 09839-4902

Telephone: +2-02-522-7311
Email: epalmer@usaid.gov.

Sincerely,

Elizabeth Palmer

Elizabeth Palmer
Mission Controller

CC: Roy Plucknett

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

CAIRO, EGYPT

43

June 2, 2002

Dr. Reginald Gipson
Chief of Party
John Snow, Inc.
Healthy Mother/Healthy Child Results Package
Cairo/Egypt

Subject: Performance Milestones Number 1-Option Period "Development of HM/HC Project Procurement Plan" JSI's contract No. 263-C-00-98-00041-00

Dear Dr. Gipson:

This is to inform you that JSI has successfully completed milestones No. 1 for the Option Period titled "Development of HM/HC Project Procurement Plan " mentioned in the Modified Performance Milestone Plan (MPMP) on page 4 of Attachment No. J.1 of JSI's contract modification dated October 2, 2001.

As required in section B.3 (e) of the JSI's contract, I hereby accept the submitted Project Procurement Plan. This approval letter authorizes JSI to request the fee associated with subject milestone No. 1.

The approval is based on my review of the submitted report which covers the following:

1. The procurement ~~process~~ to ~~be used~~ JSI
2. Development and implementation of the Procurement Plan.
3. Summary of commodities to be procured by categories and recipient's locations.
4. Justification for the commodities proposed.
5. JSI listing of pertinent USAID rules and regulations that govern commodity procurement.
6. A list of proposed commodities by recipient's location and estimated price.

It is worth mentioning that the submitted report for subject milestone is well organized, very informative and concise. It covers all requested information in a brief outline which is adequate for USAID's reporting needs.

USAID Office Building
Plot 1/A off El-Laselki street
New Maadi, Cairo - Egypt.
Postal Code #: 11435

44

I would like to inform you that USAID has received the concurrence of Dr. Esmat Mansour, HM/HC Executive Director, on the procurement plan per her letter to me dated May 16, 2002 (attached).

Please note that some of the sections included in the procurement plan will need further discussions such as the geographical coverage of the neonatal centers and the items suggested for the operating room. Please contact me to schedule a meeting with all relevant JSI staff to discuss these matters.

Sincerely,

N. Matta

Dr. Nahed Matta
Cognizant Technical officer
Population and Health Division

C.C. Cynthia Judge, Contracting Officer, USAID

JSI

**JOHN SNOW, INC.**
**Healthy Mother/ Healthy Child Results Package**

(37)

April 24, 2002

Dr. Nahed Matta
CTO HM/HC Results Package
USAID/Egypt
Cairo, Egypt

Subject: Performance Milestone No. 1 -Option Period- Documentation for "Development of HM/HC Project Procurement Plan"

Dear Dr. Matta,

Pursuant to Section B.2 (e) of JSI/USAID Contract No. 263-C-00-98-00041-00, we are submitting for your approval the attached Performance Milestone Report documenting the achievement of the subject milestone.

If you have any questions during your review of this milestone document, please do not hesitate to contact me.

We appreciate your support and cooperation.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

cc: Ms. Cynthia Judge, Contracting Officer, USAID

Ref: 3013
KCK/dh

21 Misr Helwan Agricultural Road. 10th Floor-P.O.Box 11728-611-Maadi,Cairo Egypt

38

# Healthy Mother/Healthy Child Results Package

## PERFORMANCE MILESTONE REPORT

### Development of HM/HC Project Procurement Plan

March 15, 2002

JSI

John Snow, Inc.
(Contract No. 263-C-00-98-00041-00)
Arabic Software Engineering (ArabSoft)
TransCentury Associates

In collaboration with
The Ministry of Health and Population
Cairo, Egypt

and

USAID/Egypt

# II. PROCUREMENT PLANNING

## II.A Defining Procurement Requirements

In January 2002, the Task Managers of the Healthy Mother/Healthy Child Results Package drafted lists of procurement requirements by task for the Option Period. These initial lists were developed based on a review of lessons learned from the Base Period, physical assessments, and discussions with JSI staff both in Cairo and in the field, MOHP and HM/HC Project staff, HIO staff, and USAID.

For the medical commodities, a detailed review of commodity availability in comparison to the HM/HC Quality Assurance Standards was also completed for 33 hospitals in the governorates of Assiut, Sohag, and Menya. This review was completed as part of the District Hospital Self-Assessment process conducted by a joint team of JSI and MOHP staff in January and February 2002. Data collected from this process was entered into a computerized database and individual reports listing commodity requirements by department, hospital, and governorate were generated. These lists were shared and validated with hospital staff during the Governorate Workshops held in April, 2002. During the workshops, hospital teams used the list of requirements to complete GOE Form 111, the official governmental form for requesting commodities from the government stores.

Using the consolidated data collected from the assessments and follow-up workshops, JSI was able to determine the current requirements for essential items in the Ob-Gyn departments of 26 hospitals. Based on this information, average requirements were determined and the calculated average for each item was extended to cover 50 hospitals. A detailed review of the extended average by item was then completed and required quantities were amended as necessary. These amendments were made based on a variety of things including historical experience, consideration that items now available may not be available and in working order for the entire project period, the possibility that some of the items will be provided through the GOE system, and budgetary constraints.

A similar physical assessment was also completed for the remaining MHIS centers in Giza Governorate. An assessment team from Task Four visited each of the facilities and compiled a list of the remaining commodities required for each center to meet the required standards.

For the IEC requirements, an assessment was completed of items to be printed during the Option Period. As the requirements far exceeded the available budget, a committee met to review and prioritize items. Only priority items were included in the Procurement Plan. Additional funds are being requested from private sector counterparts to print the remaining items.

Based on preliminary estimates, a total of $600,000 was allocated for renovations per the contract modification. Based on discussions held with the MOHP and USAID, it was decided that JSI would fund required renovations in the Phase I health facilities and the MHIS Centers of Giza. For Phases II, III, and IV, major renovations will be completed by the MOHP with technical assistance and minimal funds provided by JSI.

***Procurement Strategy***

The majority of the computing equipment will be purchased in the United States following US source and origin requirements. Arabic software will be purchased locally per the terms of the blanket waiver. The computers purchased for the MHIS conversion process will be purchased locally as they meet the local procurement guidelines and are needed urgently.

## IV.C IEC Materials/Publications

A maximum of $500,000 has been allocated to IEC materials and publication printing. This amount will cover the printing of the following IEC materials: birth preparedness materials, breastfeeding materials, anti-FGM literature, infection control posters, counseling cards, and the newborn screening flyer. The costs for re-printing specific publications for EOC, Operating Room, Midwifery, CSSD, and Neonatal Care have also been included. Printing costs of new materials currently under development have also been included. These documents will all be incorporated into the HM/HC series and include but are not limited to the following:

- Neonatal Care Modules and Resource Materials
- Additional EOC modules and resources
- BEOC Protocols, Modules, and Resource Materials for Physicians and Nurses
- IV Fluid Protocols, Modules, and Service Standards
- Infection Control Protocols for Physicians and Nurses
- Clinical Support Service materials
- IMCI training manuals and Nurses Facilitator Guide
- Materials for the private sector
- Community Outreach Workers Manual
- Health Education Training Curricula
- FGM Training Curricula

***Procurement Strategy***

Materials will be printed locally and in accordance with USAID rules and regulations.

## IV.D Medical Equipment

### IV.D.1 Medical Equipment for District/General Hospitals and Basic Centers

JSI proposes the procurement of a large variety of medical commodities under **Task One**. This list of commodities includes clinical furniture, equipment, medical kits, and disposable supplies required to ensure that the 50 district/general hospitals and a minimum of 50 basic centers in the target governorates meet the basic HM/HC quality standards.

***Ob-Gyn Department***

The proposed list of required medical commodities for the Ob-Gyn Department is based on the Quality Assurance Standard Requirements list. The quantities required for the district hospitals and the basic centers are based on estimates considering the total number of obstetrical deliveries expected in the target governorates. The current estimate of deliveries in the target governorates is 240,000 of which 50% will be

# V. APPLICABLE PROCEDURES, RULES, AND REGULATIONS

The following is a summary of significant contract clauses and AID rules pertaining to the procurement and shipment of commodities. This summary is not meant to be comprehensive and the actual language must be read in its entirety.

Contract No: 263-C-00-98-00041-00

***Section C.10.11:*** ***Task Eleven: Commodity Procurement Program***

The Contractor shall undertake commodity procurement as described in Section C.8.2. The total value of the commodity procurement program in the Option Period is $900,000.

The Contractor shall also manage the warehousing and delivery of all commodities to the end user in collaboration with the MOHP. The Contractor shall also assist in ensuring that the Governmental Forms 111 and 112 are completed as required.

Supplemental physical improvements to various MOHP district health facilities and Health Information Centers in the HM/HC target governorates of Upper Egypt may be funded under the Commodity Procurement Budget in a total amount not to exceed $600,000 in the Option Period. This is for minor renovations vital to the finalization of the facilities that cannot be covered by the MOHP contractor in a timely manner.

***C.10.8.2:*** ***Task Eleven: Commodity Procurement Program***

The Contractor shall undertake commodity needs assessments, shall prepare semi-annual procurement plans and shall undertake all commodity procurement (estimated at $9,362,000 in the Base Period and $6,000,000 in the Option Period) necessary to achieve the results under this contract. Equipment will include inter alia, vehicles, clinical, medical, office, IEC, and computing equipment to support activities with the MOHP and MOI at the central, governorate, and district levels and to meet community and NGO needs.

***Section D.1*** ***Marking Commodities (AIDAR 752.7009 Jan. 1993)***

All commodities purchased by the Contractor shall be marked according to the clause of this contract entitled Marking.

***Section F.1*** ***CIF Destination (52.247-42 Apr. 1984)***

This clause requires certain obligations of the Contractor when the delivery term is CIF destination. The term "CIF Destination", when used in this clause, means free of expense to the Government delivered on board the ocean vessel to the specified point of destination, with the cost of transportation and marine insurance paid by the Contractor.

***Section H.3*** ***Authorized Geographic Code***

The authorized geographic code for procurement of goods and services under this contract is 000, United States.

(42)

JSI/TCA

## Option Period Procurement Plan

| Item Description | Quantity | | Total | Est. Unit Value US$ | Total value US$ | Procurement | Commodity Category |
|---|---|---|---|---|---|---|---|
| CANNULA, IV, SIZE 22 | 5,000 | 5,000 | 10,000 | $0.50 | $5,000 | Local* | Medical Supplies |
| CANNULA, IV, SIZE 24 | 5,000 | 5,000 | 10,000 | $0.50 | $5,000 | Local* | Medical Supplies |
| CATHETER, SUCTION SIZE 8 | 5,000 | 5,000 | 10,000 | $0.25 | $2,500 | Local* | Medical Supplies |
| CATHETER, SUCTION, SIZE 10 | 2,000 | 2,000 | 4,000 | $0.25 | $1,000 | Local* | Medical Supplies |
| CATHETER, SUCTION, SIZE 6 | 2,000 | 2,000 | 4,000 | $0.25 | $1,000 | Local* | Medical Supplies |
| CATHETER, UMBILICAL, SIZE 6 | 1,000 | 1,000 | 2,000 | $0.25 | $500 | Local | Medical Supplies |
| Endotracheal Tube Size 2.5 | 500 | 500 | 1,000 | $1.25 | $1,250 | Local* | Medical Supplies |
| Endotracheal Tube Size 3 | 1,000 | 1,000 | 2,000 | $1.25 | $2,500 | Local* | Medical Supplies |
| Endotracheal Tube Size 3.5 | 500 | 500 | 1,000 | $1.25 | $1,250 | Local* | Medical Supplies |
| GLOVES, EXAMINATION (100/box) | 1,000 | 1,000 | 2,000 | $3 | $6,000 | Local* | Medical Supplies |
| MASK, SURGEONS (100/box) | 1,000 | 1,000 | 2,000 | $3 | $6,000 | Local* | Medical Supplies |
| MEASURING TAPE | 100 | 100 | 200 | $0.50 | $100 | Local | Medical Supplies |
| NASOGASTRIC TUBE SIZE 6 | 3,000 | 3,000 | 6,000 | $0.30 | $1,800 | Local* | Medical Supplies |
| NASOGASTRIC TUBE SIZE 8 | 5,000 | 5,000 | 10,000 | $0.30 | $3,000 | Local* | Medical Supplies |
| Oxygen Mask, Neonatal | 1,000 | 1,000 | 2,000 | $1 | $2,000 | Local | Medical Supplies |
| Oxygen Mask, Premature | 500 | 500 | 1,000 | $1 | $1,000 | Local | Medical Supplies |
| PLASTER, SURGICAL TAPE 5 CM | 1,000 | 1,000 | 2,000 | $0.60 | $1,200 | Local | Medical Supplies |
| Shoe Covers (Boxes of 100) | 150 | 150 | 300 | $2.00 | $600 | Local | Medical Supplies |
| SOAP, HAND WASHING | 10 | 10 | 20 | $3 | $60 | Local | Medical Supplies |
| SUCTION BULBS | 4,000 | 4,000 | 8,000 | $1 | $4,840 | Off-Shore | Medical Supplies |
| SYRINGE, DISPOSABLE 10 ML | 200 | 200 | 400 | $0.08 | $32 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 2 ML | 500 | 500 | 1,000 | $0.05 | $50 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 2.5 ML | 500 | 500 | 1,000 | $0.05 | $50 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 20 ML | 100 | 100 | 200 | $0.14 | $28 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 5 ML | 200 | 200 | 400 | $0.06 | $24 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 50 ML | 100 | 100 | 200 | $0.32 | $64 | Local | Medical Supplies |
| THERMOMETER, NEONATAL | 500 | 500 | 1,000 | $0.30 | $300 | Local | Medical Supplies |
| TRASH CAN, LARGE | 17 | 0 | 17 | $3 | $51 | Local | Medical Supplies |
| TRASH CAN, SMALL | 17 | 0 | 17 | $2 | $34 | Local | Medical Supplies |
| CHAIR, DESK | 17 | 0 | 17 | $50 | $850 | Off-Shore | Office Furniture |
| CHAIR, SIDE | 68 | 0 | 68 | $40 | $2,720 | Off-Shore | Office Furniture |
| DESK | 17 | 0 | 17 | $125 | $2,125 | Off-Shore | Office Furniture |
| FILE CABINET | 17 | 0 | 17 | $50 | $850 | Local* | Office Furniture |

USAID
FROM THE AMERICAN PEOPLE

July 24, 2005

Mr. Joel Lamstein
President
John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210-1211

Re : Return of Defective Incubators
Contract No. 263-C-00-98-00041-00

Dear Mr. Lamstein:

As you know, JSI was indebted to USAID in the amount of $872,327.18. JSI's indebtedness to USAID has almost been satisfied through offset of invoices submitted by JSI for payment to USAID. The remaining amount owed is $3,288.54 (including interest through July 16, 2005).

USAID is in possession of 118 incubators which are being housed for safekeeping in an Embassy warehouse. The incubators need to be re-exported from Egypt in order for JSI to avoid any other further potential violations of U.S. and Egyptian laws. JSI will be held liable for shipping costs back to the United States. Further, before any further sale or use, all USAID logos and references to USAID on the incubators must be removed.

USAID can turn the incubators over to JSI for shipping provided JSI provides the necessary assurances that the incubators will be re-exported from Egypt. If JSI does not take possession and re-export within 21 days

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT / EGYPT

USAID
1A Ahmed Kamel Street
off El-Laselki Street - New Maadi
Cairo - Egypt

IN-COUNTRY MAIL:
P.O.Box 32, Maadi
Cairo - Egypt
Postal Code: 11435

Tel : (202) 522 7000
Fax: (202) 516 4628
(202) 516 4659

from the date of this letter, USAID will ship the incubators back to JSI's home office in Boston or the location of JSI's choice. *If USAID ships the incubators to the United States, JSI must agree to accept delivery. If JSI refuses to accept delivery, then USAID will assume that the incubators have been abandoned and will destroy them accordingly.* The shipping and warehouse costs will be charged against JSI and if necessary additional offsets will be taken.

Sincerely,

John May
Contracting Officer

BCC: William Buckhold, USAID/GC/LE

SELZER GURVITCH
RABIN & OBECNY
CHARTERED

LAW OFFICES
4416 East West Highway
Fourth Floor
Bethesda, MD 20814-4568
301.986.9600
301.986.1301 FAX
www.sgrolaw.com

Daniel A. Ball
(MD, VA, DC)

Direct Dial: 301-634-3147
dball@sgrolaw.com

Our Client No.
10059-3

August 11, 2005

**VIA FACSIMILE: (202) 516-4628**
**AND EMAIL: jmay@usaid.gov**

John May, Contracting Officer
USAID
1A Ahmed Kamel Street
off El-Laselki Street – New Maadi
Cairo - Egypt

Re: Contract No. 263-C-00-98-00041-00

Dear Mr. May:

As you should be aware, our firm represents John Snow, Inc. ("JSI"). We are writing to respond to your letter dated July 24, 2005, addressed to Joel Lamstein.

JSI has disputed USAID's contention that JSI was indebted to USAID in the amount of $872,327.18. Although JSI has satisfied all or substantially all of USAID's claim, JSI has done so with a full reservation of its contract dispute rights.

You have now instructed JSI to take possession of 118 incubators. JSI will make arrangements to have the incubators re-exported from Egypt. Please be advised that JSI will hold USAID liable for the re-exportation costs (packaging, shipping, etc.) and warehouse storage costs, if any, and that JSI will be filing a claim for reimbursement of these costs.

Sincerely yours,

Daniel A. Ball

DAB/jp
cc: Ken Olivola
Joel Lamstein

ORIGINAL

JS1

June 13, 2001

# PURCHASE CONTRACT No. 04-01-205

This Purchase Contract is hereby entered between ICS Systems Integration Division, 6663-A Old Dominion Drive, McLean, VA 22101 (hereinafter called "ICS" or the "Supplier") and JOHN SNOW, INC., 44 Farnsworth Street, Boston, MA 02210 (hereinafter called "JSI" or the "Buyer") for the supply of Medical Equipment.

This Purchase Contract is made in duplicate; one copy for each party following signatures by both parties.

| ICS | JOHN SNOW, INC. |
|---|---|
| NAME | NAME |
| Fawaz Arafat | Kenneth J. Olivola |
| TITLE | TITLE |
| President | Director |
| SIGNATURE | SIGNATURE |
| [signature] | [signature] |
| DATE | DATE |
| 16/6/01 | 12/6/01 |

# PART 1: ACCEPTANCE BY THE CONTRACTING AGENCY

JSI, Healthy Mother/Healthy Child (Contracting Agency) has accepted the offer from ICS, 6663-A Old Dominion Drive, McLean, VA 22101 (Supplier) for the supply of the following Medical equipment as set forth in this contract:

| ITEM # | ITEM DESCRIPTION | Manufacturer | Model # | QTY | UNIT | Incidental Services | | TOTAL | Extended Price | Delivery Time |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Per unit | Total | | | |
| | Neonatal Bassinet Spare Basket | United Metal Fabricator | 8545 | 11 | $52.99 | N/A | | $52.99 | $582.89 | 12 weeks |
| 19 | Gas Supply | Squire-Cogswell/Aeros | Health cair | 11 | $2,476.53 | $275.17 | $3,026.87 | $2,751.70 | $30,268.70 | 5 Weeks |
| 20 | Incubator, intensive care | Medicare Industries | 605-1460500 | 25 | $7,935.10 | $793.51 | $19,837.75 | $ 7,935.10 | $198,377.50 | 11 weeks |
| 21 | Incubator, Normal Care Including Servo Humidifier # 1460430 | MediCare Industries | Preemicare 605 | 69 | $5,503.00 | $611.45 | $42,190.05 | $6,114.45 | $421,897.05 | 11 Weeks |
| | Total | | | | | | $65,054.67 | | $651,126.14 | |

1- COUNTRY OF ORIGIN: U.S.A.
2- This contract consists of the following documents:

PART 1 – ACCEPTANCE BY THE CONTRACTING AGENCY, which includes the Bidder's schedule and itemized prices
PART 2 -- CONDITIONS OF THE CONTRACT
PART 3 - ACKNOWLEDGEMENT OF RECEIPT AND ACCEPTANCE

3- The total FOB value of this contract is $651,126.14.The total value for the commodities is $586,071.47. The total amount for incidental services (Installation and Training) for items #19, 20 and 21 is $65,054.67
4- The Supplier shall deliver all the items to Geologistics, Inc. in Alexandria, VA, USA.
5- PACKING: Each Model shall be specifically marked with

(i) The model name and manufacturer's name.
(ii) The JSI Item number.
(iii) All accompanying parts for each model marked by piece.

Example:
JSI item # 2– Spare Basket
Model No. 8545 United Metal Fabricator

# PART 2: CONDITIONS OF CONTRACT

## 1. Definitions

The terms used in this contract shall have the following meanings:

A. "Agent" means TransCentury Associates who is acting as the procurement services agent for the Contracting Agency.

B. "FOB" is defined in Attachment 1.

C. "Code 000" (US Only) means the geographic area described as in Attachment 3 ("Relevant A.I.D. Geographic Codes").

D. "Contracting Agency" means John Snow, Inc. (JSI) Healthy Mother/Healthy Child in Egypt.

E. "Destination" means the Freight Forwarder in Alexandria, Virginia.

F. "Effective Date" means the date on which the Supplier receives a Contract / P.O. from the Agent.

G. "Egypt" means the Arab Republic of Egypt.

H. "Free World Country" means any country which is not a non-Free World Country.

I. "Non-Free World Country" means any of the following countries: Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's Republic of China, Syria, and Vietnam.

J. "Supplier" means the successful bidder to whom this contract(s) has been awarded.

K. "United States" means the United States of America, including the 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, the Trust Territory of the Pacific Islands, and Guam.

L. "USAID" means the United States Agency for International Development.

M. "Local Representative" means the local in country (Egypt) Representative/Agent of the successful bidder who will be responsible for honoring the warranty, and performing the installation if required.

## 2. Governing Law and Language

The laws of the Commonwealth of Massachusetts govern this purchase contract except in cases where they contradict the AIDAR and/or FAR regulations cited in this purchase contract, in which case the latter shall prevail. The English language version

of this contract shall govern, and all notices pursuant to the provisions of this contract shall be in English. Each reference to a specified number of days shall be deemed to refer to consecutive calendar days

## 3. Delivery

Delivery under this contract shall be on a FOB Destination basis; according to the delivery periods mentioned PART I – ACCEPTANCE BY THE CONTRACTING AGENCY - of this Contract. The Supplier shall deliver all medical commodities, accessories, and spare parts to be supplied under this contract into the custody of the freight forwarder in Alexandria, VA for transportation to Egypt. The freight forwarder address will be specified on the Contract Award Form at the time of award.

## 4. Responsibilities of the Agent

The Agent is employed by the Contracting Agency to supervise this contract and has concurrent authority to take or perform on behalf of the Contracting Agency any action which the Contracting Agency is permitted or required to take or perform under this contract, including (without limitation) (a) witnessing inspection of medical commodities, equipment and supplies prior to shipment to Egypt, (b) inspecting and accepting or rejecting the medical commodities, equipment and supplies at Destination, and (c) requiring replacement of defective parts or spare parts.

## 5. Legal Effect of USAID Approvals and Decisions

The parties hereto understand that the Contract has reserved to USAID certain rights such as, but not limited to, the right to approve the terms of this contract, the Supplier, and any or all plans, reports, specifications, subcontracts, bid documents, drawings, or other documents related to this contract and the project of which it is part. The parties hereto further understand and agree that USAID, is reserving any or all of the foregoing approval rights, has acted solely as a financing entity to assure the proper use of United States Government funds, and that any decision by USAID to exercise or refrain from exercising these approval rights shall be made as a financier in the course of financing this project and shall not be construed as making USAID a party to the contract. The parties hereto understand and agree that USAID may, from time to time, exercise the foregoing approval rights, or discuss matters related to these rights and the project with the parties jointly or separately, without thereby incurring any responsibility or liability to the parties jointly or to any of them. Any approval (or failure to disapprove) by USAID shall not bar the Contracting Agency or USAID from asserting any right, or relieve the Supplier of any liability which the Supplier might otherwise have to the Contracting Agency or USAID.

## 6. Payment

Request for payment shall be submitted in accordance with the following instructions:

A. Payment Terms. One hundred percent (100%) of the contract price for commodities, accessories, and spare parts, excluding the cost of incidental services, will be paid upon presentation of the documents required under

paragraph B below. If any incidental services are required under this contract, one hundred percent (100%) of the contract price for such services will be paid upon presentation of the documents required under paragraph C below. All payments will be made by wire transfer or company check on a net 30 days basis.

B. Request for Payment for Commodities, Accessories and Spare Parts. Payment due to the Supplier under this contract for commodities, and spare parts shall be based upon the Supplier's written request for payment accompanied by the following documentation:

(1) Supplier's itemized Commercial Invoice.

(2) "Supplier's Certificate and Agreement with the Agency for International Development for Project Commodities/ Invoice and Contract Abstract," Form AID 1450-4 (see Attachment 4), executed in accordance with the instructions thereon (a) by the Supplier for the cost of the commodities, (b) by the carrier for the cost of in-land transportation.

(3) Warehouse delivery receipt stating that commodities delivered are in accordance with the Purchase Order in quantities, brand names and marking requirements

(4) A copy of the signed Bid /Award Contract Form.

(5) JSI/TCA Certificate of Acceptance

C. Request for Payment for Incidental Services. Payment due to the Supplier under this contract for incidental services shall be based upon the completion of installation and training services, if required. The Suppliers must submit a written request for payment accompanied by the following documentation:

(1) Supplier's itemized invoice.

(2) "Supplier's Certificate and Agreement with the Agency for International Development for Project Commodities/ Invoice and Contract Abstract " Form AID 1450-4 (see Attachment 4), executed in accordance with the instructions thereon (a) by the Supplier for the cost of the commodities, (b) by the carrier for the cost of in-land transportation.

(3) Certificate of Acceptance by JSI/TCA that services were adequately rendered.

D Both parties agree in accordance with the tender documents that installation is required for items listed in the previous table.

Since the supplier included the cost of installation but did not assign a specific value to incidental charges the amount of Ten Percent (10 %) of the value of those

commodities will be withheld by JSI until installation is completed in accordance with the incidental charges payment clause

7. **Audit and Records**

A. The Supplier shall maintain books, records, documents, and other evidence to substantiate, without limitation, all costs incurred under or in connection with the contract and to substantiate the other contract requirements in accordance with generally accepted accounting principles prevailing in the United States, Egypt, or the International Accounting Standards Committee (an affiliate of the International Federation of Accountants) to substantiate properly all transactions under or in connect with the contract. This clause does not apply to cost records for non-reimbursable cost items incurred under fixed-price (lump sum or unit price) contracts, but it does apply to records concerning source of goods and other comparable contract requirements applicable to such items. The foregoing constitute "records" for the purpose of this clause.

B. The Supplier shall maintain such records during the contract term and for a period of three (3) years after final payment. However, records which relate to appeals under the "Settlement of Disputes" clause or litigation or the settlement of claims arising out of the performance of this contract shall be retained until such appeals, litigation, or claims have been finally settled.

C. All records shall be subject to inspection and audit by the United States Government, Contracting Agency, or its authorized agents at all reasonable times. The Supplier shall afford the auditor proper facilities for such inspection and audit.

D. The Supplier further agrees to include in all its subcontracts hereunder a provision that the subcontract agree to maintain such records and that the U S Government, the Contracting Agency, or any of its authorized agents shall, until the expiration of three (3) years after final payment under the subcontract, have access to and the right to examine any records of such subcontractor involving transactions related to the subcontract.

8. **Assignment**

The Supplier may assign neither its obligation to perform under the contract, nor its rights to receive payment under the contract, except with the prior written consent of both the Contracting Agency and USAID

9. **Host Country Taxes**

A. Pursuant to a bilateral agreement between the United States Government and the Government of Egypt, the Supplier and those of its employees who are not citizens or permanent residents of Egypt shall be free of all taxes, fees, levies, customs, or impositions imposed under laws in effect in Egypt with respect to all items supplied and services performed under this contract. This exemption includes all customs, duties, registration fees, and consular legalization fees.

D The Government of Egypt will allow the Supplier to import free of customs and duties such materials and equipment as may be required under this contract.

## 10. Eligibility of Suppliers

A No equipment, materials or services shall be eligible for USAID financing if offered by a supplier or subcontractor included on any list of suspended, debarred, or ineligible bidders used by USAID.

B Except as otherwise provided in paragraph D below, the Supplier must be:

(1) An individual who is a citizen or legal resident of the United States;
(2) A corporation or partnership organized under the laws of the United States
(3) A controlled foreign corporation, i.e. any foreign corporation of which more than 50 percent of the total voting power of all classes of stock is owned by United States shareholders within the meaning of the Section 957 et seq. of the Internal Revenue Code (26 U.S.C. 957); or
(4) A joint venture or unincorporated association consisting entirely of individuals, corporations, or partnerships which is eligible under any of the foregoing categories.

C. Citizens of any non Free World country, firms and organizations located in or organized under the laws of any non-Free World country, and firms and organizations owned in any part by citizens or organizations of any non-Free World country, are ineligible for financing by USAID as suppliers of commodities or as agents in connection with the supply of commodities; provided, however, that non-U.S. citizens lawfully admitted for permanent residence in the United States are eligible as individuals or owners, regardless of such citizenship; and, provided further, that USAID's Deputy Associate Administrator for Finance and Administration (DAA/FA) may authorize the eligibility of organizations having minimal ownership by citizens or organizations of non-Free World countries.

D. The rules stated in paragraph B above do not apply to suppliers of incidental services which are related to this procurement of equipment and included as part of this contract. Incidental services are defined as the installation or erection of USAID-financed equipment, or the training of Contracting Agency personnel in the maintenance, operation or use of such equipment.

## 11. Eligibility of Commodities

A. Definitions

(1) "Source" means the country from which a commodity is shipped to Egypt or Egypt itself if the commodity is located therein at the time of purchase. However, where a commodity is shipped from a free port or bonded warehouse in the form in which it was received therein, "source" means the country from which the commodity was shipped to the free port or bonded

warehouse.

(2) "Origin" of a commodity is the country or area in which the commodity is mined, grown, or produced. A commodity is produced when through manufacturing, processing, or substantial and major assembling of components a commercially recognized new commodity results that is substantially different in basic characteristics or in purpose or utility from its components.

(3) "Commodity" means each item, which is commercially recognized or sold as an independent unit. However, when the product being purchased is a kit consisting of items such as tools or scientific instruments, which are packaged as a single unit, the kit will be considered to be a single commodity and the items, included in the kit will be the components. When spare parts are being purchased, each separate shipment of spare parts will be considered to be a single commodity, and the parts included in the shipment will be the components. For purposes of this procurement, each of the line items listed in the Technical Specifications (Part E) will be considered a single, separate commodity and not merely a component of some other commodity

(4) "Components" are the goods that go directly into the production of a produced commodity. (See also the definition of "commodity" above.)

B. Rule

**Each commodity shall have its source and origin in the United States (Geographic Code 000) and meet the USAID componentry rules**

Any commodity component from a non-Free World country (**Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's Republic of China, Syria,** and **Vietnam**) makes the commodity **ineligible** for USAID financing; **this means that if even one component of a commodity is from a non-Free World country, then the commodity is ineligible.**

## 12. Change Orders

A. The Contracting Agency may at any time, by a written order, and without notice to the sureties, make changes within the general scope of this contract, in any one or more of the following: drawings, designs, or specifications, where commodities to be furnished under this contract are to be specially manufactured for the Contracting Agency.

B. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. The Supplier of the modification or change must assert any claim by the Supplier for adjustment under this clause within thirty (30) days from the date of receipt. The prior written approval of USAID may be required for any change order, which

exceeds $25,000.

## 13. Amendments

Modification of the terms of this contract shall be made by an amendment signed by the parties.

## 14. Settlement of Disputes

A. In the event of a disagreement under this contract, the Supplier shall submit a written statement to the Contracting Agency, briefly describing the nature of the problem, the position of the Supplier regarding the issue and a narrative of facts in support of the Supplier's position.

B. Within ten (10) days after receipt of the Supplier's statement, the Contracting Agency shall decide the issue and deliver a written statement of the decision to the Supplier, including the reasons supporting the decision, if adverse to the Supplier.

C. Within thirty (30) days after receipt of the Contracting Agency's decision, or the date such decision was due (whichever occurs first), the Supplier may submit to the Contracting Agency a written Notice of Appeal including a detailed description of the facts of the dispute with the dates of events, names of persons involved, references to documentation bearing on the matter (with copies attached), the relevant contract provision(s), the Supplier's contentions and conclusions, and a statement of why the Contracting Agency's decision is being questioned.

D. If within thirty (30) days after delivery of a Notice of Appeal, the parties can not mutually agree to a satisfactory settlement, the matter shall be presented for arbitration, and finally decided under the rules of Conciliation and Arbitration of the US Chamber of Commerce.

## 15. Marking

The Supplier shall ensure that all commodities furnished under this contract and their shipping containers carry the official red, white and blue USAID emblem. Emblems shall be affixed by metal plates, decal, stencil, label, tag, or other means depending upon the type of commodity or shipping container and the nature of the surface to be marked. The emblem placed on the commodities shall be as durable as the trademark, company or brand name affixed by the manufacturer. The emblem on each shipping container must be affixed in a manner, which assures that it will remain legible until the container reaches its destination. A list of suppliers of USAID emblems is set forth in Attachment 5 (which is a copy of Appendix 9B of USAID Handbook15, Chapter 9).

## 16. Inspection

A. All medical commodities and spare parts shall be subject to inspection and

testing by or on behalf of the Contracting Agency at the expense of the Contracting Agency prior to shipment. The Contracting Agency will notify the Supplier in writing of the names of any inspectors or inspection firms. It is understood that inspection and testing shall not in any way release the Supplier from any warranty or other obligations under this Contract.

B. If any inspection or test is made by or on behalf of the Contracting Agency on the premises of the Supplier, the Supplier shall provide all reasonable facilities and assistance for the safety and convenience of the Contracting Agency or its inspectors in the performance of their duties without additional charge.

## 17. Force Majeure

A. Except with respect to default of subcontractors, the Supplier shall not be liable for any excess costs if the failure to perform the Contract arises out of causes beyond the control and without the fault or negligence of the Supplier (Force Majeure) and if the Supplier, within twenty (20) days from the beginning of any such Force Majeure, notifies the Contracting Agency of such prevention of performance and the cause thereof. Such causes may include, but are not restricted to, acts of the Borrower/Grantee in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of the Supplier. If the failure to perform is caused by the default of a subcontractor and if such default arises out of causes beyond the control of both the Supplier and the subcontractor and without the fault or negligence of either of them (Force Majeure), and the Supplier, within twenty (20) days from the beginning of such Force Majeure, notifies the Contracting Agency of such prevention of performance and the cause thereof, the Supplier shall not be liable for any excess costs due to the failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Supplier to meet the required delivery schedule.

B. In the event of a Force Majeure, the Supplier, unless otherwise directed by the Contracting Agency in writing, shall continue to undertake and perform the duties set forth in this contract as far as is reasonably practical.

C. In the event of a Force Majeure resulting in a suspension of work, this contract shall be extended by a period equal to that for which the Supplier was prevented from performing.

D. The Supplier shall be entitled to reasonable costs incurred as a consequence of a Force Majeure.

E. If the Supplier's inability to perform by reason of the Force Majeure lasts for more than forty-five (45) days after notice has been given to the Contracting Agency, either party may terminate this contract and the Supplier shall be entitled to any sums which would be payable in case of termination of this contract by the Contracting Agency for convenience.

18. Termination for Convenience

A. This contract may be terminated by the Contracting Agency in whole, or from time to time in part, in accordance with this clause, whenever the Contracting Agency shall determine that such termination is in the best interest of the Contracting Agency.

B. Termination shall be effected by Notice of Termination to the Supplier, specifying that termination is for the convenience of the Contracting Agency, the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

C. After receipt of a Notice of Termination and except as otherwise directed by the Contracting Agency, the Supplier shall:

1. Stop work under the contract on the date and to the extent specified in the Notice of Termination, and place no further orders or subcontracts except as may be necessary for completion of the portion of the work under contract which is not terminated;

2. Terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the Notice of Termination

3. Assign to the Contracting Agency as it may direct, all of the right, title, and interest of the Supplier under the orders and subcontracts, in which case the Contracting Agency shall have the right to settle or pay any claims arising out of the termination of such orders and subcontracts;

4. With the approval or ratification of the Contracting Agency, to the extent the Contracting Agency may require, which approval or ratification shall be final and conclusive for all purposes of this clause, settle all outstanding liabilities and all claims arising out of such termination of orders and subcontracts;

5. Transfer title to the Contracting Agency and deliver as directed by the Contracting Agency, the completed or partially completed equipment, material, and parts which would be required to be furnished to the Contracting Agency under this contract;

6. Complete performance of the part of the work which has not been terminated by the Notice of Termination; and

7. Take such action as may be necessary for the protection of the property related to this contract which is in the possession of the Supplier and to which the Contracting Agency has title

D. The Supplier shall submit to the Contracting Agency its written claim promptly but not later than three (3) months from the effective date of termination, except as the Contracting Agency may agree in writing.

E. The Supplier and the Contracting Agency shall consult within thirty (30) days of the submission of the claim concerning the whole or any part of the amount to be paid to the Supplier by reason of the termination of work. The contract shall be amended accordingly, and the Supplier shall be paid the agreed amount.

F. In deciding the amount due the Supplier, there shall be deducted (1) all settled claims which the Contracting Agency may have against the Supplier in connection with this contract and (2) the agreed price for, or the proceeds of sale of, property acquired by the Supplier or sold and not otherwise recovered by or credited to the Contracting Agency.

G. Any disagreement regarding termination amounts or procedures shall be settled under the clause of this contract entitled "Settlement of Disputes."

## 19. Termination for Default

A. The Contracting Agency may, by written notice of default sent to the Supplier by registered mail, terminate in whole or part this contract:

(1) If the Supplier fails to make delivery of the equipment within the time specified herein or any extension thereof expressly agreed to buy the Contracting Agency in writing, or

(2) if the Supplier fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and, in either of these two circumstances, does not cure such failure within a period of ten (10) days (or such longer period as the Contracting Agency may authorize in writing) after receipt of notice from the Contracting Agency specifying such failure.

B. In the event the Contracting Agency terminates this contract in whole or in part as provided in paragraph A of this clause, the Contracting Agency may procure, upon such terms and in such manner as the Contracting Agency may deem appropriate, commodities similar to those so terminated, and the Supplier shall be liable to the Contracting Agency for any excess costs for such similar commodities. However, the Supplier shall continue performance of this contract to the extent not terminated under the provisions of this clause.

C. The rights and remedies specified in this clause shall not be exclusive of, but are in addition to, any other rights and remedies available to the Contracting Agency.

## 20. Liquidated Damages

Failure by the Supplier to deliver the quantity or quality of commodities specified herein, or to perform the required incidental services (if any), in accordance with the terms of this agreement will, because of the urgent need for the commodities by the Contracting Agency, cause serious and substantial damages to the Contracting

Agency, however, it will be difficult, if not impossible, to prove the amount of such damages. Therefore, for each day of delay in the delivery of any commodities or in the performance of incidental services with respect to any commodities -- other than delay caused by force majeure as defined in the "Force Majeure" clause above or by the sole fault or negligence of the Contracting Agency or its agents -- the Supplier agrees to pay to the Contracting Agency, as liquidated damages and not as a penalty, one half of one percent (0.5%) the contract price for the commodities in question; provided, however, that the total liquidated damages under this clause shall not exceed ten percent (10%) of the total contract amount. The parties have estimated and agreed upon this sum as an attempt to make a reasonable forecast of probable actual loss because of the difficulty of estimating with exactness the damages, which will result. These liquidated damages are in addition to, not in lieu of, any other rights and remedies available to the Contracting Agency.

## 21. Worker's Compensation Insurance

A. If the Supplier will perform incidental services (i.e., the installation or erection of commodities to be furnished under this contract, or the training of Contracting Agency personnel in the maintenance, operation or use of such commodities) outside of the United States, the Supplier shall provide and thereafter maintain worker's compensation insurance in accordance with the Defense Base Act (DBA) (42 U.S.C. 1651) for overseas employment under this contract of all employees who are hired in the United States or who are U.S. citizens or bona fide residents of the United States.

B. The Supplier agrees to procure the DBA insurance required by this clause from the DBA insurance carrier under contract with USAID unless the Supplier has a DBA self insurance program approved by the Department of Labor or has an approved retrospective rating agreement for DBA. Information on obtaining coverage under the USAID requirements contract and the list of countries for which USAID has secured waiver of DBA coverage for Supplier's employees who are not citizens of, residents of, or hired in the United States are shown in USAID Handbook 11, Chapter 3, Section 4.1.6.22.

C. The Supplier agrees to provide employees who are not citizens of, residents of, or hired in the United Stated with worker's compensation benefits as required by the laws of the country in which the employees are working, or by the laws of the employee's native country, whichever offers greater benefits, or in the absence of such law, employer's liability insurance.

D. With respect to all employees who are hired for employment outside the country, in which they are to be employed, this insurance coverage shall be provided prior to the departure for overseas employment under this contract.

E. The Supplier shall insert a clause similar to this clause, including this sentence, in all subcontracts except those exclusively for furnishing equipment and/or materials.

## 22. Performance Bond or Guaranty

A. The Supplier shall furnish to the Contracting Agency within fifteen (15) days after award, a performance bond or guaranty fully protecting the Contracting Agency against any excess costs incurred by it as a result of any failure by the Supplier to perform any of its obligations under this contract.

I. Such bond or guaranty shall be satisfactory to the Contracting Agency and, at the option of the Supplier, shall be in the form of a surety bond, bank guaranty, or irrevocable letter of credit. If a performance guaranty in the form of a bank guaranty or irrevocable letter of credit is used, it shall be in an amount equal to ten percent (10%) of the contract price. If a performance bond is used, the bond shall be in an amount equal to one hundred percent (100%) of the contract price and shall be in the form attached hereto (Part F). The performance bond or guaranty shall be drawn in favor of John Snow, Inc., and shall be collectible upon receipt of the Agent's written certification of Supplier's default hereunder. Confirmation of the performance bond or guaranty by an Egyptian bank is not required.

The bond or guaranty shall be released not later than thirty (30) days following the date of completion of contract performance, even though the warranty period may extend beyond such time.

## 23. Warranty

The Supplier shall provide a warranty under which the Supplier or its authorized Local In-Country Representative will replace or repair the medical commodities and spare parts to be supplied under this contract, or repair or replace any parts of such commodities, found to be defective due to faulty design, workmanship or materials. The warranty may exclude, however, ordinary wear and tear and damage due to improper handling, storage, or operation. Replacements and repairs shall be made without cost to the Contracting Agency. The Contracting Agency shall give the Supplier prompt notice of any claims under such warranty and, if the Supplier fails to remedy the defects within a reasonable time, the Contracting Agency shall have the right to take such remedial action as may be necessary and to claim the reasonable costs thereof from the Supplier.

**The warranty for the medical commodities and spare parts to be supplied shall be valid for a period of no less than twelve (12) months after installation or eighteen (18) months from the purchase contract effective date, whichever is earlier.**

The warranty shall cover parts and labor, at no cost to the Contracting Agency, and shall be honored by the Supplier's Local In-Country Representative.

## 24. Local In-Country Representative

The Supplier is required to have a Local In-Country Representative/Authorized Agent

for installation and warranty service (parts and labor), at no additional cost to the Contracting Agency. The local in-country representative / authorized agent shall be able to provide spare parts and supplies for the items procured whenever required by the end users. The Supplier shall submit a letter from the Local Representative (on local company's letterhead), who will certify that, they are the Supplier's local representative and shall carry out, the installation and honor the warranty service, for the items offered in conjunction with IFB No 263-0242-1012-8, at no additional cost to the Contracting Agency.

Neither the Supplier nor the Local Representative shall assign repair or maintenance work to any other company without the prior written approval of the Contracting Agency.

## 25. Packing

All materials and equipment must be properly prepared for export to withstand exposure to the elements and rough handling during ocean shipment. Such packing must be sufficient to ensure safe arrival at destination and fully cover such hazards as extreme temperature and/or possible corrosion due to salt air or open space.

## 26. Suspension of Work

A. The Contracting Agency may, at any time, by written order to the Supplier (Suspension of Work Order), require the Supplier to stop all, or any part, of the work required by the contract for a period of up to ninety (90) from the specified effective date

B. Upon receipt of such an order, the Supplier shall immediately comply with its terms and take all steps to minimize the insurance of costs related to the work covered by the Order.

C. Within the period of the Suspension of Work Order, the Contracting Agency shall either:

(1) Cancel the Suspension of Work Order; or

(2) Terminate the work covered by such Order as provided in the "Termination for Convenience" clause above.

D. If the Suspension of Work Order is canceled or the Order expires, the Supplier shall resume work. An equitable adjustment shall be made as necessary in the time schedule, the price, or a combination thereof, or any other provisions of the contract that may be affected, and the contract shall be amended accordingly, if the Supplier asserts a claim for such adjustment within thirty (30) days after the end of the period of work suspension. Failure to agree to any adjustment shall be a dispute under the "Settlement of Disputes" clause of the contract.

27. **Equal Employment Opportunity**

The Supplier will not discriminate in recruitment or employment conditions of personnel hired in the United States because of race, religion, color, sex, or national origin and are in compliance with its equal employment opportunity obligations under Executive Order 11246 dated September 24, 1965.

28. **Vesting of Title and Diversion Rights**

USAID reserves the right to vest in itself title to the goods financed under this contract, provided that such goods are in a deliverable state and have not yet been off loaded in ports of entry in Egypt. USAID may direct the carriers to divert these goods to alternative destinations.

29. **Incidental Services**

The Local Representative shall perform the incidental services (installation and training) as designated in "Technical Specifications" (Part E) or as required by the warranty terms.

All materials and travel related costs required for the performance of the incidental services shall be furnished by the Supplier/Local Representative at no additional cost to the Contracting Agency

Upon arrival in Egypt from the United States, and after appropriate customs and other clearances, the medical commodities shall be delivered by the Contracting Agency or its representative to the project various sites in Upper Egypt (Aswan, Luxor, Qena, Beni-Suef, Fayoum, Assuit, Sohag, and Menya). The Local Representative will then be responsible to install the commodities within a one-week period (5 business days) after notification of the delivery. The Local Representative will also be required to obtain a letter of acceptance from the project site once the incidental service (installation and/or training) has been performed.

The Contractor will attempt to consolidate deliveries/installations in the same governorate but cannot guarantee the consolidation. It is expected that there will be multiple trips required to each governorate.

30. **Notices**

Any notices or other communication given by either party will be in writing or fax, shall be in English, shall be effective on the effective date of the notice or when delivered, whichever is later, and will be deemed duly given or sent when delivered to the following addresses.

A. **To the Supplier:** At the address shown on the Bid/Award/Contract Form

B. **To the Contracting Agency:** John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210
Attn: Ms. Eva Ros

C. **With a copy to the Agent:**

TransCentury Associates
4300 Montgomery Ave
Bethesda, MD
20814
Attention: Mr Yousri Aclimandos

**PART 3: ACKNOWLEDGMENT OF RECEIPT AND ACCEPTANCE**

**ICS,** 6663-A Old Dominion Drive McLean, VA 22101 certifies that it received Purchase Contract No. 04-01-205 for $651,126.14 and that it will supply the required quantities all goods with the technical specifications mentioned for the prices listed and within the delivery times listed.

**DATE:** 06/19/2001

**NAME:** Fawaz Arafat

**TITLE:** President

**SIGNATURE:**

Please make sure to mail this form signed to ISI at 44 Farnsworth Street, Boston, MA 02210 Attn: Ms. Eva Ros within 2 days after receipt. A copy should also be faxed to TCA in Cairo, Egypt 202 - 3936425 Attn: Mr. Yousri Aclimandos.

## PART 3: ACKNOWLEDGMENT OF RECEIPT AND ACCEPTANCE

**ICS,** 6663-A Old Dominion Drive McLean, VA 22101 certifies that it received Purchase Contract No. 04-01-205 for $651,126.14 and that it will supply the required quantities all goods with the technical specifications mentioned for the prices listed and within the delivery times listed.

**DATE:** 06/19/2001

**NAME:** Fawaz Arafat

**TITLE:** President

**SIGNATURE:**

Please make sure to mail this form signed to JSI at 44 Farnsworth Street, Boston, MA 02210 Attn: Ms. Eva Ros within 2 days after receipt. A copy should also be faxed to TCA in Cairo, Egypt 202 - 3936425 Attn: Mr. Yousri Aclimandos.

November 25, 2001

# AMENDMENT #1
# TO
# PURCHASE CONTRACT No. 04-01-205

| ICS System Integration Division | JOHN SNOW, INC |
|---|---|
| NAME: Awaz Arafat | NAME: Ken Olivola |
| TITLE: President | TITLE: Director |
| SIGNATURE: | SIGNATURE: |
| DATE: November 25, 2001 | DATE: 11/28/01 |

Within the terms and conditions of IFB# 263-0247-0101-B which states in Part A Number 19.B that "the Contracting Agency reserves the right to increase or decrease the quantity of a line item duly awarded in accordance with the IFB by 25% plus any fraction necessary to equal a whole number of the quantity bid", this Purchase Contract is amended to increase the quantity of Intensive Care Incubators (Preemicare 605-1460500) manufactured by MediCare Industries by 7 units each and Normal Care Incubators (Preemicare 605) manufactured by MediCare Industries by 18 units. Based on this change, the following clauses are amended:

**Part I – Acceptance by the Contracting Agency**

The Supplier shall provide the following additional goods:

| ITEM DESCRIPTION | QTY | Unit Price in USD* | Total Price |
|---|---|---|---|
| Incubator Normal Care | 18 | $6,114.45 | $110,060.10 |
| Incubator Intensive Care | 7 | $7,935.10 | $55,545.70 |
| | | TOTAL: | $165,605.80 |

*Ten percent of the value of the commodities will be withheld by JSI until installation is completed in accordance with the incidental charges payment clause.

**Part II – Conditions of the Contract**

**3. Delivery**

The Supplier shall deliver the additional Intensive and Normal Care incubators **on January 7, 2002** to the following address:

**Geologistics, Inc.**
**631 South Pickett Street**
**Alexandria VA 22304 USA**

The total value of this amendment is $165,605.80 (One hundred and sixty five thousand, six hundred and five and 80/100 USD)., making the total value of Purchase Contract # 04-01-205 $816,731.94 (Eight hundred and sixteen thousand, seven hundred and thirty one and 94/100).

**All other terms and conditions of Purchase Contract # 04-01-205 remain unchanged.**

SUPPLIER CERTIFICATE AND AGREEMENT WITH THE AGENCY FOR INTERNATIONAL DEVELOPMENT PROJECT COMMODITIES AND CONTRACT ABSTRACT

OMB No. 0412-0020
Exp. Date 08/31/95

**1. COMODITY SUPPLIER'S NAME AND ADDRESS**
*ICS Technologies, Inc.*
*6663 A Old Dominion Drive*
*McLean, VA 22101*

**2. FOR A.I.D. USE**

**3. A.I.D. IMPLEMENTATION NUMBER**

**4. IMPORTER'S NAME AND ADDRESS**
*John Snow International*
*44 Farnsworth Street*
*Boston, MA 02210-1211*

| 5. VESSEL | 6. FLAG | 7. PORT OF LOADING |
|---|---|---|
| | | |

**8. COMMODITY INFORMATION**

| A. Description of Commodity and Schedule B No. | b. Gross Weight (Lbs) | c. Measurement (inch) |
|---|---|---|
| Incubator, Intensive Care | 7300 Lbs | 1442.36 Cu Ft |

**9. INVOICE INFORMATION**
a. Number: EG1 180
b. Date: December 12, 2001
c. Amount After Discount: $ 178,539.75

**10. CONTRACT INFORMATION**
a. Number: PO 04-01-205
b. Date: June 13, 2001
c. Total Amount: $ 651,126.14
d. Source/Origin (Country): USA

**11. SUPPLIER INFORMATION**
a. Small Business ☒ Yes ☐ No (Complete b)
b. Estimated Value (% of Block 9c) Furnished from Small Businesses ____%
c. Socially and Economically Disadvantaged Enterprise ☐ Yes ☒ No (Complete d)
d. Estimated Value (% of Block 9c) Furnished from Socially and Economically Disadvantaged Enterprises ____%
e. Women-Owned Business ☐ Yes ☒ No (Complete b)
f. Estimated Value (% of Block 9c) Furnished from Women-Owned Business ____%

**12. INSURANCE INFORMATION**
a. Insured Value
b. Premium
c. ☐ All-Risk Rate ____ ☐ War Risk Rate ____ ☐ Other (Specify) Rate ____

**13. TRANSPORTATION INFORMATION**
a. Vessel Type ☐ Bulk ☐ Berth ☐ Tnkr ☐ Air
b. B/L or Air Waybill Number
b. B/L or Air Waybill Date
d. Freight Rate
Other Freight Charges
Total Freight Charges

**14. INFORMATION AS TO COMMISSIONS, CREDITS, ALLOWANCES, SIMILAR PAYMNETS, AND SIDE PAYMENTS**

| a. Recipient's Name | b. Recipient's Address | c. Amount Paid or to be Paid |
|---|---|---|
| None | N/A | |

**15. ADDITIONAL INFORMATION AND REMARKS**

**16. If Certification On Other Side Is Made by** ☐ Carrier Or ☐ Insurer (Type or Print Name And Address Of Company)

AID 1450-4 (6-93)

The supplier hereby represents that the sum claimed on the [illegible] is due and owing under the terms of the purchase contract identified on the reverse hereof (hereafter referred to as "said contract") is to be paid, in whole or in part, out of funds made available by the United States Agency for International Development under the Foreign Assistance Act of 1961, as amended. In consideration of the receipt of such sum, the supplier agrees with and certifies A.I.D. as follows

1. The undersigned is the supplier indicated in the Invoice-and-Contract Abstract on the reverse hereof, is entitled under said contract to the payment of the sum claimed, and is executing this Certificate and Agreement to obtain payment from A.I.D. funds.

2. The supplier will, upon the request of A.I.D., promptly make appropriate refund to A.I.D., plus interest (at the rate established in accordance with the Internal Revenue Code, 26 U.S.C. 6621 (b)) from the time of payment to the supplier, in the event of:

(a) its nonperformance, in whole or in part, under said contract; or

(b) any breach by it of any of its undertakings in this Certificate and Agreement; or

(c) any false certification or representation made by it in this Certificate and Agreement, or in the Invoice-and-Contract Abstract on the reverse hereof.

3. The supplier certifies, on the basis of such sources as are available to it and to the best of its information and belief, that:

(a) The price, excluding transportation, of any commodity for which payment is requested on the accompanying invoice does not exceed the lower of (i) the market price prevailing for comparable sales in the source country at the time of purchase or (ii) the price generally charged by the seller for comparable sales in the source country at the time of purchase. A comparable sale is one which is sufficiently similar to the present sale, with respect to quantity, quality, and conditions of sale that the price would not customarily be different from said contract price. Time of purchase means that period encompassing the date the purchase price is fixed during which prices in comparable sales remain substantially constant.

(b) The cost of any ocean or air freight for which payment is requested on the accompanying invoice does not exceed the lowest of the following: (i) the lowest rate charged by the carrier for similar shipments on the same voyage; (ii) the rate prevailing in the industry for similar shipments; or (iii) the rate under any booking or charter approved by A.I.D. covering the transaction for which payment is requested. A similar shipment is one which is similar with respect to type of commodity, commodity rate classification, quantity, flag category, choice of ports and other pertinent factors.

(c) The price of any other commodity-related service does not exceed the lower of (i) the prevailing price for the same or similar service or (ii) the price paid to the supplier under similar circumstances by other customers.

4. The supplier will, upon the request of A.I.D., promptly make refund to A.I.D. of any amount by which the price of commodities, freight, or other commodity-related services exceeds the maximum permitted under paragraph 3 above, plus interest (at the rate established in accordance with the Internal Revenue Code, 26 U.S.C. 6621 (b)) from the date of payment to the supplier.

5. To the best of its information and belief, any commodity or service supplied under said contract meets the source, origin, componentry, and nationality requirements in the contract; any marketing requirements in the contract have been complied with; and, unless otherwise agreed to by A.I.D., any commodity is new and unused.

6. The amount shown in block 9c is net of all trade discounts, whether in the form of payments, credits, allowances by the supplier or its agents to or for the account of the purchaser. The supplier will promptly pay to A.I.D. (Office of Financial Management, A.I.D., Washington, D.C. 20523-1209) any adjustment refunds, credits, or allowances which hereafter become payable to or for the account of the purchaser arising out of the terms of said contract or the customs of the trade.

7. (a) Neither the supplier nor its agent has given or received and will not give or receive a side payment, "kickback", commission or any other payment, credit, allowance, or benefit of any kind in connection with said contract from, to, or for the benefit of the purchaser, the purchaser's agent or the Borrower/Grantee other than those referred to in paragraphs 3 and 6.

(b) Any commission or similar payment paid to or to be paid by the supplier to its agent in connection with the transaction for which payment is requested is shown on the reverse hereof and does not exceed the lesser of (i) the amount customarily paid by the supplier in connection with similar transactions or (ii) the amount customary in the trade. If said contract provides that A.I.D. will not finance such payments, the supplier certifies that the amount of such payments is not included in the amount for which payment is requested.

(c) Any brokerage commission paid or to be paid in connection with the shipment does not exceed 1¼ percent of the ocean freight charge [illegible] The supplier has [illegible] otherwise [illegible] contract except to the extent [illegible] indicated on the reverse hereof.

8. The supplier will for a period of not less than three (3) years after the date of final payment maintain all business records and other documents which bear on its compliance with any of the undertakings and certifications herein and will, at any time requested by A.I.D., promptly furnish such records and documents to A.I.D. and provide such additional information as A.I.D. may request relating to such compliance.

9. The supplier has not been placed on the "Lists of Parties Excluded from Federal Procurement or Nonprocurement Programs," published by the General Services Administration, or the Treasury Department's "Consolidated List of Designated Nationals" and thereby rendered ineligible to receive A.I.D. funds. To the best of its knowledge, the supplier has not acquired, and in any event will not acquire, for resale under A.I.D. financing the goods described on this form from any supplier included on the "Lists of Parties Excluded from Federal Procurement or Nonprocurement Programs" or included on the "Consolidated List of Designated Nationals" or from any affiliate of such a person.

10. The supplier acknowledges that A.I.D. has reserved the right to vest in itself title to the goods financed under said contract, provided that such goods are in a deliverable state and have not yet been offloaded in ports of entry in the cooperating country. A.I.D. may direct carriers to divert these goods to alternative destinations.

11. The supplier certifies that any ocean or air charter directly related to the transaction for which payment is requested has been approved by A.I.D. (Office of Procurement, Transportation Division, A.I.D., Washington, D.C. 20523-1419).

12. The supplier certifies that it has submitted a copy of every ocean bill of lading applicable to the transaction described on the reverse hereof to (i) the Maritime Administration, National Cargo Division, 400 Seventh Street, S.W., Washington, D.C. 20590-0001, and (ii) Office of Procurement, Transportation Division, A.I.D., Washington, D.C. 20523-1419; and that such bill(s) of lading state all the carrier's charges including the basis for calculation such as weight or cubic measurement.

13. The supplier has filled in all applicable portions of the Invoice-and-Contract Abstract on the reverse hereof and certifies to the correctness of the information shown therein.

PERSONAL CERTIFICATION BY NATURAL PERSON SIGNING THIS CERTIFICATE AND AGREEMENT

The natural person who signs this Certificate and Agreement hereby certifies either that he/she is the supplier or that he/she has actual authority to sign on behalf of the supplier and to bind the supplier with regard to all certifications and agreements contained in this Certificate and Agreement. He/she further certifies, if he/she is not personally the supplier, that he/she is either an employee of the supplier or has written power of attorney to sign for and bind the supplier. He/she acknowledges signing and submitting this Certificate and Agreement to receive payment from A.I.D. funds and that A.I.D. in making such payment will rely on the truth and accuracy of this Personal Certificate as well as all other representations in this Certificate and Agreement.

The Supplier's Certificate and Agreement and the personal certification herein shall be governed by and interpreted according to the laws of the United States of America.

■ Commodity Supplier ☐ Carrier ☐ Insurer

Fawaz Arafat, President

Type or print name and title of official authorized to sign

[illegible]

Signature of official authorized to sign for (check one) Date

McLean, Fairfax, VA, USA

Place executed (City, County, State, Country)

NOTES (a) Any amendments of, or additions to, the printed provisions of this Supplier's Certificate and Agreement are improper and will not be considered a part hereof. (b) False statements herein are punishable by United States Law. (c) The word "copy" must be written after the signature on all copies other than the original.

SUPPLIER CERTIFICATE AND AGREEMENT WITH THE AGENCY FOR INTERNATIONAL DEVELOPMENT PROJECT COMMODITIES AND CONTRACT ABSTRACT

1. COMODITY SUPPLIER'S NAME AND ADDRESS
*ICS Technologies, Inc.*
*6663 A Old Dominion Drive*
*McLean, VA 22101*

2. FOR A.I.D. USE

3. A.I.D. IMPLEMENTATION NUMBER

4. IMPORTER'S NAME AND ADDRESS
*John Snow International*
*44 Farnsworth Street*
*Boston, MA 02210-1211*

| 5. VESSEL | 6. FLAG | 7. PORT OF LOADING |
|---|---|---|
| | | |

8. COMMODITY INFORMATION

| A. Description of Commodity and Schedule B No. | b. Gross Weight (Lbs) | c. Measurement (Cu Ft) |
|---|---|---|
| Incubator, Intensive and Normal Care | 6025 Lbs | 1466.87 Cu Ft |

9. INVOICE INFORMATION
a. Number: EG1 1808
b. Date: February 27[th], 2002
c. Amount After Discount: $ 149,045.22

10. CONTRACT INFORMATION
a. Number: Amendment No 1 to PO 04-01-205
b. Date: November 28[th], 2001
c. Total Amount: $ 165,605.80
d. Source/Origin (Country): USA

11. SUPPLIER INFORMATION
a. Small Business: ☒ Yes ☐ No (Complete b)
b. Estimated Value (% of Block 9c) Furnished from Small Businesses: ___%
c. Socially and Economically Disadvantaged Enterprise: ☐ Yes ☒ No (Complete d)
d. Estimated Value (% of Block 9c) Furnished from Socially and Economically Disadvantaged Enterprises: ___%
e. Women-Owned Business: ☐ Yes ☒ No (Complete f)
f. Estimated Value (% of Block 9c) Furnished from Women-Owned Business: ___%

12. INSURANCE INFORMATION
a. Insured Value
b. Premium
c. ☐ All-Risk Rate
☐ War Risk Rate
☐ Other (Specify) Rate

13. TRANSPORTATION INFORMATION
a. Vessel Type: ☐ Bulk ☐ Berth ☐ Tnr ☐ A...
b. B/L or Air Waybill Number
b. B/L or Air Waybill Date
d. Freight Rate
Other Freight Charges
Total Freight Charges

14. INFORMATION AS TO COMMISSIONS, CREDITS, ALLOWANCES, SIMILAR PAYMNETS, AND SIDE PAYMENTS

| a. Recipient's Name | b. Recipient's Address | c. Amount Paid or to be Paid |
|---|---|---|
| None | N/A | |

15. ADDITIONAL INFORMATION AND REMARKS

16. If Certification On Other Side Is Made by ☐ Carrier Or ☐ Insurer (Type or Print Name And Address Of Company)

[illegible]

The supplier [illegible] acknowledges that the sum claimed on the accompanying invoice as claimed to be due and owing under the terms of the purchase contract identified on the reverse hereof (hereafter referred to as 'said contract') is to be paid, in whole or in part, out of funds made available by the United States Agency for International Development under the Foreign Assistance Act of 1961, as amended. In consideration of the receipt of such sum, the supplier agrees with and certifies A.I.D. as follows:

1. The undersigned is the supplier indicated in the Invoice-and-Contract Abstract on the reverse hereof, is entitled under said contract to the payment of the sum claimed, and is executing this Certificate and Agreement to obtain payment from A.I.D. funds.

2. The supplier will, upon the request of A.I.D., promptly make appropriate refund to A.I.D., plus interest (at the rate established in accordance with the Internal Revenue Code, 26 U.S.C. 6621 (b)) from the time of payment to the supplier, in the event of

(a) its nonperformance, in whole or in part, under said contract, or

(b) any breach by it of any of its undertakings in this Certificate and Agreement, or

(c) any false certification or representation made by it in this Certificate and Agreement or in the Invoice-and-Contract Abstract on the reverse hereof.

3. The supplier certifies, on the basis of such sources as are available to it and to the best of its information and belief, that:

(a) The price, excluding transportation, of any commodity for which payment is requested on the accompanying invoice does not exceed the lower of (i) the market price prevailing for comparable sales in the source country at the time of purchase or (ii) the price generally charged by the seller for comparable sales in the source country at the time of purchase. A comparable sale is one which is sufficiently similar to the present sale, with respect to quantity, quality, and conditions of sale that the price would not customarily be different from said contract price. Time of purchase means that period encompassing the date the purchase price is fixed during which prices in comparable sales remain substantially consistent.

(b) The cost of any ocean or air freight for which payment is requested on the accompanying invoice does not exceed the lowest of the following: (i) the lowest rate charged by the carrier for similar shipments on the same voyage; (ii) the rate prevailing in the industry for similar shipments; or (iii) the rate under any ocean or air charter approved by A.I.D. covering the transaction for which payment is requested. A similar shipment is one which is similar with respect to type of commodity, commodity rate classification, quantity, flag category, choice of ports, and other pertinent factors.

(c) The price of any other commodity-related service does not exceed the lower of (i) the prevailing price for the same or similar service or (ii) the price paid to the supplier under similar circumstances by other customers.

4. The supplier will, upon the request of A.I.D. promptly make refund to A.I.D. of any amount by which the price of commodities, freight, or other commodity-related services exceeds the maximum permitted under paragraph 3 above, plus interest (at the rate established in accordance with the Internal Revenue Code, 26 U.S.C. 6621 (b)) from the time of payment to the supplier.

5. To the best of its information and belief, any commodity or service supplied under said contract meets the source, origin, componentry, and nationality requirements in the contract; any marketing requirements in the contract have been complied with; and, unless otherwise agreed to by A.I.D., any commodity is new and unused.

6. The amount shown in block 9e is net of all trade discounts, whether in the form of payments, credits, allowances by the supplier or its agent to or for the account of the purchaser. The supplier will promptly pay to A.I.D. (Office of Financial Management, A.I.D., Washington D.C. 20523-0209) any adjustment refunds, credits, or allowances which hereafter become payable to or for the account of the purchaser arising out of the terms of said contract or the customs of the trade.

7. (a) Neither the supplier nor its agent has given or received and will not give or receive a side payment, 'kickback', commission, or any other payment, credit, allowance, or benefit of any kind in connection with said contract form, to, or for the benefit of the purchaser, the purchaser's agent or the Borrower/Grantee other than those referred to in paragraphs 1 and 6.

(b) Any commission or similar payment paid to or to be paid by the supplier to its agent in connection with the transaction for which payment is requested is shown on the reverse hereof and does not exceed the lesser of (i) the amount customarily paid by the supplier in connection with similar transactions or (ii) the amount customary in the trade. If said contract provides that A.I.D. will not finance such payments, the supplier certifies that the amount of such payments is not included in the amount for which payment is requested.

(c) Any brokerage commission paid or to be paid in connection with the shipment does not exceed 2½ percent of the ocean freight charge.

(d) The supplier [illegible] has not compensated any person to obtain said contract except to the extent, if any, indicated on the reverse hereof.

8. The supplier will for a period of not less than three (3) years after the date of final payment maintain all business records and other documents which bear on its compliance with any of the undertakings and certifications herein and will, at any time requested by A.I.D., promptly furnish such records and documents to A.I.D. and provide such additional information as A.I.D. may request relating to such compliance.

9. The supplier has not been placed on the "Lists of Parties Excluded from Federal Procurement or Nonprocurement Programs," published by the General Services Administration, or the Treasury Department's "Consolidated List of Designated Nationals" and thereby rendered ineligible to receive A.I.D. funds. To the best of its knowledge, the supplier has not acquired, and in any event will not acquire for resale under A.I.D. financing the goods described on this form from any supplier included on the "Lists of Parties Excluded from Federal Procurement or Nonprocurement Programs," or included on the "Consolidated List of Designated Nationals" or from any affiliate of such a person.

10. The supplier acknowledges that A.I.D. has reserved the right to vest in itself title to the goods financed under said contract, provided that such goods are in a deliverable state and have not yet been offloaded in ports of entry in the cooperating country. A.I.D. may direct carriers to divert these goods to alternative destinations.

11. The supplier certifies that any ocean or air charter directly related to the transaction for which payment is requested has been approved by A.I.D. (Office of Procurement, Transportation Division, A.I.D., Washington, D.C. 20523-1419).

12. The supplier certifies that it has submitted a copy of every ocean bill of lading applicable to the transactions described on the reverse hereof to (i) the Maritime Administration, National Cargo Division, 400 Seventh Street, S.W., Washington D.C. 20590-0001, and (ii) Office of Procurement, Transportation Division, A.I.D., Washington, D.C. 20523-1419; and that such bill(s) of lading state all the carrier's charges including the basis for calculation such as weight or cubic measurement.

13. The supplier has filled in all applicable portions of the Invoice and-Contract Abstract on the reverse hereof and certifies to the correctness of the information shown hereon.

PERSONAL CERTIFICATION BY NATURAL PERSON SIGNING THIS CERTIFICATE AND AGREEMENT

The natural person who signs this Certificate and Agreement hereby certifies either that he/she is the supplier or that he/she has actual authority to sign on behalf of the supplier and to bind the supplier with regard to all certifications and agreements contained in this Certificate and Agreement. He/She further certifies, if he/she is not personally the supplier, that he/she is either an employee of the supplier or has written power of attorney to sign for and bind the supplier. He/she acknowledges signing and submitting this Certificate and Agreement to receive payment from A.I.D. funds and that A.I.D. in making such payment will rely on the truth and accuracy of this Personal Certificate as well as all other representations in this Certificate and Agreement.

The Supplier's Certificate and Agreement and the personal certification herein shall be governed by and interpreted according to the laws of the United States of America.

■ Commodity Supplier ☐ Carrier ☐ Insurer

Fawaz Arafat, President

Type or print name and title of official authorized to sign

Signature of official authorized to sign for (check one) Date

McLean, Fairfax, VA, USA

Place executed (City, County, State, Country)

NOTES: (a) Any amendments of, or additions to, the printed provisions of this Supplier's Certificate and Agreement are improper and will not be considered a part hereof. (b) False statements herein are punishable by United States Law. (c) The word 'copy' must be written after the signature on all copies other than the original.