IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOHN SNOW, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 06-0097C |
| | § | (Judge Thomas C. Wheeler) |
| THE UNITED STATES OF AMERICA | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, Plaintiff John Snow, Inc., by and through counsel, has moved for partial summary judgment on Count I of the Complaint. In support thereof, JSI states the following:

## I. SUMMARY

Plaintiff John Snow, Inc. ("JSI") procured 119 Preeimcare incubators for USAID in 2001 under the Healthy Mother/Healthy Child Contract, a contract aimed at reducing neonatal and mortality rates in Egypt. JSI procured the incubators from a supplier, ICS Technologies, Inc. at a cost of $785,880.35, which JSI paid. The incubators were shipped to Alexandria, Egypt where they cleared customs in the Spring of 2002 and were accepted by USAID and its consignee, Egypt and the Ministry of Healthy and Population. USAID paid JSI in 2002 for the costs of the incubators. As a result of maintenance, repairs, testing and recertification required by the incubators, USAID's Contracting Officer decided in November 2004 to disallow the costs of the incubators. On March 9, 2005, USAID issued a Final Decision that disallowed the costs and other fees. Although USAID contends in its Final Decision that the incubators are non-conforming, USAID failed to require JSI to replace or correct the alleged

non-conforming supplies within six (6) months after acceptance. And as a matter of Contract and the FAR, acceptance occurred within sixty (60) days after delivery to Egypt. USAID's remedy, if the incubators were non-conforming, was to require their replacement or correction within six (6) months after acceptance. Furthermore, because the Contract is a "Cost Plus Fixed Fee" contract, as a matter of Contract and the FAR, USAID bears all the risks of the procurement and JSI's liability is limited. Through administrative offsets, USAID collected the sum of $872,327.18, plus interest, from JSI by withholding sums owed to JSI from other aspects of the Contract. For reasons discussed below, USAID breached the Contract.

## II. BACKGROUND OF THE PROCUREMENT

JSI, incorporated in 1978, is a Massachusetts corporation with its principal place of business at 44 Farnsworth Street, Boston, Massachusetts 02210-1211. JSI provides technical and managerial assistance to public health programs worldwide. With more than 25 years of experience, JSI has implemented projects in 84 countries. JSI frequently contracts with the United States through the United States Agency for International Development.

On March 9, 2005, the United States Agency for International Development, through a unilateral determination made by its Contracting Officer, issued a Final Decision and Unilateral Debt Determination ("Final Decision") constituting a final Notice of Disallowance that JSI is indebted to the government in the amount of $872,327.18. *See* Complaint Exhibit 1, incorporated by reference. The belated disallowance related to JSI's procurement of 119 Preemicare incubators in 2001, which incubators were delivered to and accepted by Egypt's Ministry of Health & Population (the "MOHP") and USAID in early 2002.

The incubators were procured by JSI under the Healthy Mother/Healthy Child Results Package, USAID Contract No. 263-C-0098-00041-00 (the "Contract"), entered into with the

United States on or about April 6, 1998. The general purpose of the Contract was to implement a United States government program aimed at reducing neonatal and maternal mortality in Egypt. The Contract was a Cost-Plus-Fixed Fee (CPFF) completion contract. *See Exhibit 1*, Contract page 3 of 109. JSI procured deliverables or outputs as described in the Contract and was reimbursed its costs plus a fixed fee. Payments of the fixed fee to JSI were based on the completion of performance milestones. Over a period of seven (7) years, JSI's procurements for the government under the Contract were over $50 million ($18 million of which were for commodities), exclusive of its fixed fee. *See Exhibit 1*, relevant Contract pages 1-5, 58, and 64-83 of 109.

Under the Contract, JSI procured 119 Preemicare, Inc. infant incubators for an amount totaling $785,880.35. [IFB 8, Purchase Order Nos. 205 and 205A] Approvals for the procurements were issued by USAID's Contracting Officer, Cynthia Judge, on June 11, 2001 and November 29, 2001. *See Exhibit 2*. With these approvals, USAID authorized JSI to enter into subcontracts with ICS Technologies, Inc. for the purchase of the incubators. These incubators were also included in the two base period procurement plan milestones which were approved by the Contracting Officer's Technical Representative (COTR) and copied to the Contracting Officer on April 26, 1999 and December 10, 2000. The referenced milestone approvals dated April 26, 1999 and December 10, 2000, are attached as *Exhibit 3*. These procurement plans included 55 and 94 incubators, respectively. As per Contract Modification No. 4 dated October 9, 2000 *(see Exhibit 4)*, the Contracting Officer (CO) delegated authority to the COTR for review of the milestones to determine if they were met and to approve payment of JSI's fee.

JSI procured the 119 infant incubators from ICS Technologies, Inc. ("ICS"), a District of Columbia corporation established in 1984, whose headquarter offices are located at 6663-A Old Dominion Drive, McLean, Virginia 22101. At all times relevant, ICS also maintained an office in New Maadi, Cairo, Egypt to service several procurement orders under the USAID Healthy Mother Healthy Child Project. ICS is a contractor for some of the medical technology projects in the Middle East, whose experience includes the supply and installation of medical equipment.

JSI and ICS entered into Purchase Contract No. 04-01-205 dated June 13, 2001, under which ICS agreed to supply ninety-four (94) Preemicare incubators for the purchase price of $620,274.55. *See Exhibit 5*. JSI and ICS entered into Amendment #1 to Purchase Contract No. 04-01-205 as of November 30, 2001, under which ICS agreed to supply twenty-five (25) additional incubators for the purchase price of $165,605.80. *See Exhibit 6.*

ICS purchased the 119 incubators from Preemicare. Preemicare invoiced ICS and delivered the incubators to a shipping agent in Alexandria, Virginia, in late 2001 and early 2002. ICS then invoiced JSI and the incubators were shipped from Virginia to Alexandria, Egypt. Attached hereto is *Exhibit 7*, which is a shipping and invoice document maintained by ICS.

JSI paid ICS the sum of $785,880.35 for the costs of the incubators. This is the amount of costs which USAID subsequently disallowed in its Final Decision. Although USAID issued a Notice of Disallowance on March 9, 2005, USAID had paid JSI for the procurement costs of the incubators in 2002, three years earlier. JSI also had paid ICS for the procurement costs of these incubators in 2002. *See Affidavit of Kenneth J. Olivola.*

The 119 Preemicare incubators procured by JSI for USAID in June and November 2001, were delivered to USAID/Egypt's Consignee: HM/HC, USAID Project No. 283-0242, Ministry of Health, 21 Misr Helwan Agricultural Road, Maadi, Cairo. Shipments cleared Egyptian customs on January 26, 2002, February 12, 2002 and April 29, 2002. *See Exhibit 8; and Affidavit of Kenneth J. Olivola***.** According to USAID's Final Decision, Item 2, "These incubators were delivered and installed at various MOHP facilities between May and July 2002."

The USAID Contract acknowledged in Article C.8.2.i. Task Definitions & Issues (page 58 of 109) that "too often" equipment and supplies designated for use in foreign countries "are not properly maintained," and "staff who are intended to use them are not fully trained in their proper purpose, operation and maintenance." *See Complaint Exhibit 1***.** Indeed, many of the problems which later manifested in the performance of the incubators were found to have resulted from environmental conditions in Egypt (e.g., absence of air conditioning) and misuse by improperly trained staff (e.g., immersion of parts in water).

After installation and operation of the incubators, the MOHP staff received some complaints about 18 out of 119 incubators overheating, or having erratic display boards or alarm problems. JSI, a responsible and experienced government contractor, initiated action to report concern to both the supplier, ICS, and the manufacturer's local representative in Egypt, Hi-Med. A meeting was held on September 24, 2002, among JSI, ICS and Hi-Med to discuss the issues and follow-up action.

An engineer from Preemicare's headquarters in California, Ms. Rihana, went to Egypt in December 2002 to investigate and remedy the problems reported by the MOHP and JSI. Ms. Rihana issued a report on January 7, 2003 that 14 incubators out of the 18 were not

working efficiently because of user problems**.** *See Exhibit 9***.** To avoid recurring problems, Ms. Rihana provided a list of recommended retrofits that were to be completed on the incubators at Preemicare's own cost. The retrofits' purposes were to render the equipment more user-friendly and eliminate the risks of breakdowns where the incubators were cleaned incorrectly and water touched the fuses.

On January 13, 2003, Hi-Med's local representative sent a letter to JSI's Chief of Party, Reginald Gipson, MD, expressing concern on the safety of the incubators and to recommend that the incubators be removed from service, temporarily, until the modifications were made. *See Exhibit 10***.**

JSI at once shared this information with the MOHP and USAID. On January 14, 2003, JSI's Chief of Party, Dr. Gipson, shared the Preemicare report dated January 7, 2003, with Dr. Esmat Mansour of the MOHP. Based on the Preemicare report, JSI recommended to the MOHP that the incubators should not be used in the MOHP facilities until the incubators could be updated and repaired. *See Exhibit 11*. JSI's recommendation was voluntarily made in the interests of public health, safety and welfare. USAID was not requiring JSI to repair or replace the incubators.

In June 2003, Preemicare's engineer returned to Egypt, where she retrofitted 75 incubators. These incubators were not returned to service as the MOHP had not yet received a written certification from the manufacturer that the incubators were ready to be returned to service. The remaining incubators appeared to need additional parts.

On July 2, 2003, Dr. Esmat Mansour of the MOHP issued a letter to Dr. Gipson requesting JSI's assistance to collect all the incubators from the MOHP's facilities and hospitals, transport them to one central location in Cairo, perform any "fixation and

maintenance", obtain a certification from Preemicare that the incubators were functioning safely and efficiently, and transport the incubators back to the hospitals. *See Exhibit 12.*

In July 2003**,** ICS, the supplier, picked up all of the incubators from the MOHP facilities for servicing, leaving behind receipts. *See Exhibit 13* for samples of the receipts. In August 2003, maintenance and repairs were completed on 112 of the incubators. Before returning them to service, JSI commissioned an independent study. JSI contracted with ECRI, a U.S. non-profit health services research agency with extensive experience with the FDA and other agencies for medical equipment testing. ECRI tested a sample of two of the incubators in its Plymouth Meeting, Pennsylvania headquarters and issued a report in February 2004. The report stated that after calibration and repair, the two incubators were considered safe for use, but ECRI recommended the other 117 incubators should be tested too. Thereafter, other batches of incubators were tested, calibrated and repaired as necessary.

Sometime in or about September 2004, a different USAID Contracting Officer, Roy Plucknett, was assigned to and became responsible for the Healthy Mother/Healthy Child Project for USAID. Mr. Plucknett was the fourth USAID Contracting Officer to work on the Healthy Mother/Healthy Child Project. On September 29, 2004, a meeting was held in Cairo, Egypt among representatives of the MOHP, USAID, and JSI. The parties agreed upon a Plan of Action for returning the incubators to service. *See Exhibit 14***.** The process was meant to wean out any incubators that did not meet ECRI's international testing standards. In furtherance of this Plan, in October 2004, ICS undertook repairs and modifications first on two incubators per the agreed upon Plan of Action. The remaining incubators were to be repaired, retested and certified according to ECRI's test protocol, per the agreed upon Plan of Action.

In October 2004, Arj-Med, a Nile Medical International representative in Egypt, evaluated the circuitry functions of the Preemicare incubators to ensure their efficient maintenance. Arj-Med confirmed on about October 27, 2004, that they could repair, maintain and guarantee the safe operation of the incubators. Arj-Med also noted that incubators needed to be recalibrated and could then be returned to service. JSI informed USAID via e-mail of Arj-Med's assessment. Thereafter, ICS completed repairs and modifications of the incubators, and they were tested by the MOHP and JSI engineers (who were trained to conduct the testing protocol by ECRI).

On December 15, 2004, the MOHP vis-à-vis Dr. Esmat Mansour, Head of the MOHP's IHC & Nursing Sector and HM/HC Executive Director, notified USAID in writing that the MOHP was satisfied with the resolution of the issues related to the Preemicare incubators and the MOHP was in the process of receiving, testing and distributing incubators to various hospitals in accordance with an agreement reached at the meeting on September 29, 2004. Dr. Mansour thanked JSI and USAID for their cooperation and their actions to maximize the use of incubators for the benefit of the project. *See Exhibit 15.*

Notwithstanding (1) the agreed upon Plan of Action, (2) the MOHP's interest in receiving and distributing the incubators, and (3) the ongoing cooperation of JSI, MOHP, USAID and ICS to resolve the incubator issues, in about November 2004, USAID withdrew from the circle of cooperation, and thereafter abandoned and disavowed the agreed upon Plan of Action. USAID refused to allow the testing and recertification process to be completed and the Preeimcare incubators to be returned to service, and USAID demanded possession of the incubators.

On March 9, 2005, USAID issued its Final Decision and Unilateral Debt Determination constituting a final Notice of Disallowance. In this "unilateral determination" by the Contracting Officer, USAID claimed that JSI was indebted to the government in the amount of $872,327.18 because JSI had refused to provide a refund for incubators which the government contended were "contractually non-compliant". The Final Decision asserted new and different grounds and contradicted positions taken by USAID in late-2004 in its Notice of Intent to Disallow Costs and Amended Notice of Intent to Disallow Costs. The Final Decision also increased USAID's Fee claim from $14,931.73 to $23,576.41. In the Final Decision, the Contracting Officer admitted that a Notice of Demand for Payment dated January 13, 2005, should not have been issued before a final Notice of Disallowance. Accordingly, USAID withdrew its prior Notice of Demand for Payment but reissued a Revised Notice of Demand for Payment on March 9, 2005, which accompanied the Final Decision.

USAID broke down its Final Decision as follows:

| | |
|---|---|
| Price of the 119 Incubators: | $785,880.35 |
| Fee: | $ 23,576.41 |
| Procurement Services Charge: | $ 62,870.43 |
| Total | $872,327.18 |

USAID satisfied all of JSI's alleged indebtedness through administrative offsets of invoices submitted by JSI to USAID for payment. In other words, USAID withheld payments owed to JSI from other procurements under the Contract in order to satisfy this alleged indebtedness. As a result, USAID owes JSI the sum of $872,327, plus administrative fees, costs and interest assessed and collected by USAID through offsets. *See Affidavit of Kenneth J. Olivola.*

There is certainly a dispute between USAID and JSI over the efficacy of the incubators, whether the repairs could be completed and the incubators certified and returned to service, and whether the incubators are "defective" as the Government contended in its Final Decision. However, for reasons discussed below, the Court does not need to reach a decision on the Government's belated claim in 2005 that the incubators are defective or that they are contractually non-compliant.

## III. ARGUMENT

### 1. Legal Standard for Summary Judgment.

Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC") permit a party to move for summary judgment at any time after 60 days from the commencement of the action. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Long v. United States*, 69 Fed. Cl. 566, 569 (2006), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must file with the Court the documentary evidence that supports its assertion that material facts are beyond genuine dispute. *Mann v. United States*, 68 Fed. Cl. 666, 669 (2005). In opposing this motion, the United States has the burden of showing sufficient evidence of any genuine issue of material fact which would preclude the grant of summary judgment. *United Technologies Corp., Sikorsky Aircraft Division v. United States*, 27 Fed. Cl. 393, 396 (1992). *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986). The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party

must set forth specific facts showing that there is a genuine issue for trial. *See* RCFC 56(e). In order for a factual dispute to be genuine, the evidence offered by the non-moving party must be such that a reasonable jury or trier of fact could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (1986).

**2. <u>As A Cost Plus Fixed Fee Contract, The Government Bears The Risks Of Costs.</u>**

The Contract was a "Cost Plus Fixed Fee" (CPFF) contract. *See* Contract, page 3 of 109. In a CPFF, the parties typically negotiate an estimate of the cost of the contract and a pre-established fee. The fee may vary as the contractor performs more work or less work than required by the Contract, if the government and contractor negotiate a variation in the fee. "The contractor bears the risk of the adequacy of the fee while the government bears the risk of the incurrence of additional costs to permit full performance of the work." *See Cost-Reimbursement Contracting*, Cibinic and Nash, at 54, Third Edition (2004). FAR 16.306(a) describes this type of contract as follows:

> A cost-plus-fixed fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract. The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract. This contract type permits contracting for efforts that might otherwise present too great a risk to contractors, but it provides the contractor only a minimum incentive to control costs.

In this Contract, the parties negotiated and agreed upon an estimate of the cost of the Contract. *See* Part I, B.3, page 3 of 109. The base period was $22,090,882 and the option period was $18,804,672. The fixed fee was also negotiated and agreed upon. The base period fixed fee was $1,328,000 and the option period fixed fee was $1,128,000. JSI's proposal to USAID included a fixed fee which JSI deemed reasonable based on past

experiences. The fee was not based on a percentage of any amounts.[1] JSI bore the risk that the fee might not be reasonable. By comparison, USAID assumed the risk of all costs under the Contracts. JSI passed through to USAID the costs of the Preemicare incubators as charged by ICS to JSI. JSI was not a re-seller of the incubators and did not markup the costs. USAID assumed all the risks of the incubators including that the incubators might not meet the needs of the Eqyptians, or that the incubators might require repairs, or that the incubators might be damaged by the Egyptians in transit to the health care facilities, or that the intended operators of the incubators might not know how to operate, clean and maintain the incubators. One of the grounds raised by USAID in disallowing the costs of the 119 incubators is that USAID incurred the costs of procuring "replacement" incubators. Though JSI has disagreed with this characterization, even if USAID incurred costs in purchasing additional incubators, in the CPFF contract, USAID bore the risk of the incurrence of these additional costs. Likewise, USAID bore the risk of the costs of the original 119 Preemicare incubators.

In the case of a cost-reimbursement contract, as we have here, the Contract merely requires the contractor, JSI, to use its best efforts to provide the goods or services at the stated price. If, despite its best efforts, the contractor cannot meet the contractual requirements, the government obtained precisely what it bargained for, namely, the contractor's best efforts. The contractor is entitled to receive or retain the costs for what it has done. The government's only right is the product or services which it paid for under the contract. *McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 295, 299 (1997).

Based on the type of Contract – Cost Plus Fixed Fee – the Government is without authority to disallow the costs of the procurement of the 119 incubators. The Government

[1] In its Final Decision, USAID seems to apply a percentage formula to disallow a percentage of the fee which it equates with the costs of procuring the incubators. There is no basis in the Contract for this

bore the risks of the costs of the procurement of the 119 Preemicare incubators. JSI is not contractually obligated to rebate the costs to the Government under the CPFF Contract.

**3. Title To The Property Vested In The MOHP Upon Clearing Customs In Egypt.**

AIDAR 752.245-71, which is incorporated by reference in the Contract (page 80 of 109) and cited by USAID in its Final Decision, is included in government contracts where the contract will acquire property under the contract for use overseas and the contract funds are obligated under a strategic objective with the Cooperating Government. *See Exhibit 16* for a copy of AIDAR 752.245-71. This AIDAR provides that title to the property [the 119 Preemicare incubators] shall be in the name of the Cooperating Government [Egypt], or a public or private agency as the Cooperating Government may designate [the Ministry of Health and Population (MOHP)] – unless title is reserved to USAID under provisions of the Contract. Title to the property transferred to the Cooperating Government once the property arrived in Egypt and was released from customs. This is why, for example, the Bills of Lading (B/L) are to the Egyptian Ministry of Health. *See Exhibit 17***.** The Contract did not reserve title to USAID under any provision.

The 119 Preemicare incubators were delivered to USAID/Egypt's consignee: HM/HC, USAID Project No. 283-0242, Ministry of Health, 21 Misr Helwan Agricultural Road, Maadi, Cairo, Egypt. There were three shipments from the United States. As soon as the incubators arrived in Egypt, JSI's Chief of Party, Reginald G. Gipson, M.D., facilitated their release from Egyptian customs by requesting that exemption letters be addressed to the Director of Exemption Customs Administration at Alexandria Port for the release of the shipment. By way of example, JSI sent letters on January 14, 2002, January 21, 2002 and

approach.

April 2, 2002. *See Exhibit 17*. In the chart below and attached as *Exhibit 8*, a document maintained by JSI in the ordinary course of business, the "Arrival Date in Egypt" refers to the dates that the incubators cleared customs. The dates for clearance from Egypt customs of the 119 Preemicare incubators are January 26, 2002, February 12, 2002, and April 29, 2002. *See Exhibit 8; and Affidavit of Kenneth J. Olivola.*

| B/L - AWB # | Carrier | Date B/L | Arrivel Date in Egypt | Item Description | P.O. or Contract | Qty Received |
|---|---|---|---|---|---|---|
| POCLSOC151433483 | Chesapeake Bay | December 27, 2001 | January 26, 2002 | Incubator Normal care Including Servo Humidifier | 205 | 69 |
| POCLSOC211426813 | Endurance ERU2668 | March 27, 2002 | April 29, 2002 | Incubator Normal care Including Servo Humidifier | 205/A | 18 |
| | | | | | | |
| POCLSOC152434505 | Endeavor ENV 2658 | January 9, 2002 | February 12, 2002 | Incubator Intensive Care | 205 | 25 |
| POCLSOC211426813 | Endurance ERU2668 | March 27, 2002 | April 29, 2002 | Incubator Intensive Care | 205/A | 7 |

When the incubators arrived in country (once they cleared customs), they immediately became the property of the Cooperating Government. When the 119 Preemicare incubators arrived at the Alexandria port and cleared customs, they immediately became the property of Egypt and its public agency, the MOHP. *See Affidavit of Kenneth J. Olivola.*

Under the Healthy Mother/Healthy Child Contract, and in discussions between the MOHP and JSI, it was decided that JSI would retain disposition of the procured commodities (including the incubators), store them in a JSI-hired warehouse, and transport and install the items in the pre-approved MOHP facilities. This was a decision made to ensure that items were transported to the correct destinations in a timely manner given the MOHP's limited capacity to ensure this. Upon information and belief, this was an informal arrangement between JSI and the MOHP. Even though JSI assisted the MOHP in transporting the incubators, the incubators became the property of the Cooperating Government, Egypt and the

MOHP upon clearing customs, and the incubators were accepted by USAID and its consignee, Egypt and the MOHP, on the customs clearance dates. *See Affidavit of Kenneth J. Olivola***.**

It was the policy of the Government of Egypt and the MOHP that when the commodities, including incubators, were received in Egypt and cleared customs, they were immediately and officially logged into their central-level inventory records. *See Affidavit of Kenneth J. Olivola.*

When the property cleared Egyptian customs at the port of entry, title to the property immediately vested in the name of the Cooperating Government, Egypt, and its public agency, the MOHP. Under the Contract, and by operation of AIDAR 752.245-71, the property was accepted by USAID's consignee, the Egyptian MOHP.

**4. <u>The Contract Required Supplies To Be Accepted 60 Days After Delivery, Unless Accepted Earlier.</u>**

As discussed above, the incubators were accepted by USAID consignee, Egypt and the MOHP, and became the property of Egypt and the MOHP, and titled vested in their name upon delivery of the incubators to Egypt and clearance by customs. At that time, JSI fulfilled its contractual obligation and was entitled to be reimbursed for its costs of procurement. In fact, JSI had paid ICS the sum of $785,880.35 for procuring the supplies, and likewise, in 2002, USAID paid JSI for these procurement costs. Final acceptance is evinced by the fact that the Government paid JSI for its costs of procurement. It was not until 2 ½ years later, in about September 2004, that the Government appeared to repudiate its prior acceptance of the incubators and, in March 2005, disallowed the costs. Three years after the incubators were accepted, the Government, without authority under the Contract or FAR, disallowed the costs.

The Government's rights and JSI's obligations with respect to the quality of the incubators are covered by FAR 52.246-3, *Inspection of Supplies - Cost Reimbursement*, which is incorporated by reference in Section E-1 of the Contract [page 65 of 109]. FAR 52.246-3(e) provides that unless the contract specifies otherwise, "the Government shall accept supplies as promptly as practicable after delivery, and supplies shall be deemed accepted 60 days after delivery, unless accepted earlier."

As a matter of the Contract and the FAR, the Government's acceptance of the incubators occurred upon delivery to the Alexandria, Egypt port of entry and release from customs by the Director of Exemption Customs Administration at the Alexandria Port. Even if the Government were to argue that acceptance did not occur on those dates, the incorporated FAR is very specific, to wit: the Government shall accept the supplies as promptly as possible and the supplies are deemed accepted 60 days after delivery, if not earlier.[2] Thus, the Government's acceptance of the incubators could not have occurred later than 60 days after each shipment cleared Egyptian customs: January 26, 2002, February 12, 2002, and April 29, 2002.

## 5. If JSI Had An Obligation To Correct Defects, The Obligation Was For No More Than Six (6) Months.

The contractor's obligation to correct defects, if any, extends for no more than six (6) months after acceptance under the *Inspection of Supplies* clause. FAR 52.246-3(f) provides

[2] According to USAID's Final Decision, Item 2, at page 4, "These incubators [the 119 Preemicare incubators] were delivered and installed at various MOHP locations between May and July 2002." For purposes of the FAR and Contract, delivery means delivery to the Cooperating Government, not the transportation dates to each of the facilities designated by the Cooperating Government to receive the incubators. It should be of no moment, however, because even if the delivery dates to the MOHP facilities are deemed the acceptance dates, it was not until July 2003 that the incubators were removed from the MOHP facilities for maintenance and repair – more than a year after delivery.

that, even after acceptance, the Government has no later than six months after acceptance of the supplies to be delivered to require the Contractor to replace or correct any supplies that are nonconforming at time of delivery. "[T]he contractor's obligations to make corrections ceases six months after acceptance, while under fixed price contracts the contractor's obligation to correct latent defects continues indefinitely." *See Cost-Reimbursement Contracting*, Cibinic and Nash, at 1048, Third Edition (2004), *citing* FAR 52.246-2 and *Federal Pac. Elec.Co.*, IBCA 334, 1964 BCA ¶ 4494.

Although USAID contends in its Final Decision that the incubators are non-conforming, USAID failed to require JSI to replace or correct the alleged non-conforming supplies within six (6) months after acceptance. And as a matter of Contract and the FAR, acceptance had to occur within sixty (60) days after delivery. USAID's remedy, if the incubators were non-conforming, was to require their replacement or correction within six (6) months after acceptance.

It was not until the fourth USAID Contracting Officer began to work on the Healthy Mother/Healthy Child Project in September 2004 that USAID questioned the efforts of JSI, ICS and the MOHP in repairing and recertifying the incubators. Then, in about November 2004, USAID first refused to allow the recertification process to be completed even though the MOHP, which owned the incubators, was interested in having the repairs and modifications completed. As referenced above, on December 15, 2004, the MOHP vis-à-vis Dr. Esmat Mansour notified USAID in writing that the MOHP was satisfied with the process of receiving, testing and distributing the incubators to various hospitals and thanked JSI and USAID for their cooperation and actions to maximize the use of the incubators for the benefit of the project. *See Exhibit 15.*

Even when the contractor makes corrections, the contractor is entitled to recover the costs of making corrections unless the contract is a fixed price contract, in which case the contractor bears the cost of correction. *Id.* Thus, even if we assume that the only means of correcting the 119 Preemicare incubators is to take them out of service and provide substitute incubators, the costs of correcting the allegedly defective incubators is allowable and the Government is not entitled to be reimbursed for costs already paid to its contractor, unless the contract is a fixed price contract. *See Caskel Forge, Inc.*, ASBCA 7638, 1962 BCA ¶ 3318, involving a convenience termination claim, where the Armed Services Board of Contract Appeals stated at 17,108:

> Costs of producing defective work are normally reimbursable under a cost reimbursement contract, unless it is established that the defective production resulted from "the contractor's own fault or folly" or "careless conduct of the work or other disregard of his contractual duties." 21 Comp. Gen. 149, 151.

This rule has been followed in *New York Shipbuilding Co.*, ASBCA 15443, 73-1 BCA ¶ 9852 (reimbursement required unless defects resulted from "gross disregard of contractual obligations"); *D.E.W. & D.E. Wurzbach, (J.V.),* ASBCA 50796, 98-1 BCA ¶ 29,385 (test is "gross disregard of contractual obligations"); *see also Morton Thiokol, Inc.*, ASBCA No. 32629, 90-3 B.C.A. ¶ 23,207 at 116,471-72 (absent showing of gross misconduct, government must reimburse costs of producing defective work under cost reimbursement contract; proof that defects resulted from contractor's careless mistakes not sufficient to disallow costs).

The only limitation on this rule is found in FAR 52.246-3(h). If the defects are due to the contractor's fraud, lack of good faith, or willful misconduct by the contractor's employees. None of these exceptions are prevalent in this case; and there is no evidence and has been no claim that the defects are due to JSI's fraud, lack of good faith, or willful misconduct.

### 6. **The Government Gave Final Acceptance By Paying JSI For The Costs Of The Incubators.**

The Government gave its final acceptance to the incubators by paying JSI in 2002 for the procurement costs.

There is some authority to suggest that a "latent defect" arguably may negate the effect of final acceptance under a contract, *United Technologies Corp., Sikorsky Aircraft Division v. United States*, 27 Fed. Cl. 393, 398-399 (1992). But it is well established that defects which can be discovered readily by an ordinary examination or test are not latent and a failure to make the examination or test does not make them latent; the finality of acceptance is not diminished by the failure to test. *Id., citing Polan Industries, Inc.*, ASBCA Nos. 3996 et al., 58-2 BCA ¶ 1982 [1958 WL 576]; *Hercules Engineering & Manufacturing Co*., ASBCA No. 4979, 59-2 BCA ¶ 2426 [1959 WL 625]. The same is said for a delay in testing. Since the finality of acceptance is not diminished by the failure to test for discoverable defects, the delay in testing also does not negate final acceptance. There is certainly a dispute between USAID and JSI over whether the incubators are "defective." Tests have been performed on the incubators by ECRI, an independent agency. The fact that ECRI could have discovered problems with the incubators that necessitated their repair means that the alleged "defects" were discoverable upon testing. If they were discoverable upon testing, they cannot be "latent" defects – and therefore, as a matter of law, the Government's acceptance of the incubators was final.

In *United Technologies Corp., Sikorsky Aircraft Division v. United States*, 27 Fed. Cl. 393 (1992), the Government failed to test or require testing of helicopter spindles before final

acceptance of the equipment. "That it chose not to [test] does not diminish finality of acceptance. Nor can it shift responsibility to the plaintiff for the consequences." *Id* at 399.

In the Contract, the Government did not bargain for and require JSI to replace the incubators at its costs; nor to accept the return of the incubators at JSI's costs; nor to force JSI to refund to the Government the costs which it paid ICS to procure the incubators for the Government. The Government has unilaterally imposed such an obligation upon JSI now. There is no Contract provision that requires JSI to refund the costs of the incubators to the Government.

Even if the incubators were defective, the Government has the burden of demonstrating that it has a basis for recovery – namely, disallowing the costs of the incubators. The Contract does not give the Government a post-acceptance right to recover the costs of the incubators. As an initial matter, the Cost Plus Fixed Fee Contract affords the Government no basis for relief. As a general rule, a contractor is not liable for defects, latent or otherwise, under a cost-reimbursement contract. The Government assumes the risk of performance because the contractor receives only what it spends plus a previously determined fee. *Accord United Technologies Corp., Sikorsky Aircraft Division v. United States*, 27 Fed. Cl. 393, 400 (1992), and quoting J. Cibinic and R. Nash, *Formation of Government Contracts*, 705 (2nd ed. 1985): "Under such an arrangement, 'it is extremely remote that the contractor would incur any liabilities for defective or untimely work.'"

**7. <u>The Burden of Proving The Costs Unallowable Is On The Government</u>.**

JSI's costs of the 119 original incubators are reimbursable under the Contract. [Contract page 5 of 109]. "The U.S. dollar costs allowable shall be limited to reasonable, allocable and necessary costs determined in accordance with FAR 52.216-7, Allowable Cost

and Payment, FAR 52.216-8, Fixed Fee, if applicable, and AIDAR 752.7003, Documentation for Payment." FAR 52.216-7(b)(1) states that for the "purpose of reimbursing allowable costs, . . . the term 'costs' includes only – (i) Those recorded costs that, at the time of the request for reimbursement, the Contractor has paid by cash, check, or other form of actual payment for items or services purchased directly for the contract;" The FAR explicitly defines reimbursable costs as those costs paid by the Contractor for items purchased directly for the Contract. JSI paid ICS for the costs of the 119 Preemicare incubators. USAID's disallowance of these costs is a breach of the Contract.

"[T]he Government has the burden of proving that a statute, regulation or contract provision makes a cost unallowable." ." See *Cost-Reimbursement Contracting*, Cibinic and Nash, at 724, Third Edition (2004). *See Lockheed Martin Western Dev. Labs.*, ASBCA 51452, 01-1 BCA ¶ 31,803, stating at 157012:

> The Government has the burden of proof in establishing the unallowability (by operation of a specific contract provision or regulation) of a cost. *Lockheed-Georgia Company, A Division of Lockheed Corporation*, ASBCA No. 27660, 90-3 BCA ¶ 22,957 at 115,276; *Rockwell International Corp.*, ASBCA No. 20304, 76-2 BCA ¶ 12,131 at 58,302.

**8. <u>The Government Has Breached The Contract And Violated The FAR</u>.**

USAID's disallowance of a percentage of the fixed fee is a breach of the Contract. The Contract was a performance based contract. JSI was paid a fixed fee upon completion of performance milestones that were certified by the USAID Contracts Technical Officer (CTO). USAID's disallowance of a percentage of the fixed fee was based on actual costs, not the performance milestones. USAID's unilateral deviation from the performance milestones and disallowance of the fixed fee based on actual costs is not authorized by the Contract, or the

FAR, and constitutes a breach of the Contract. The performance milestones for the original Preemicare incubators were fulfilled by JSI, notwithstanding the Government's subsequent withdrawal of the incubators from service.

FAR 52.246-3(f) provides, "Except as otherwise provided in paragraph (h) of this clause, the cost of replacement or correction shall be included in allowable costs, determined as provided in the Allowable Cost and Payment clause, but no additional fee shall be paid." The Contract explicitly contemplates that if the incubators require replacement or correction, the costs are allowable nonetheless. The Contract does not authorize USAID, anywhere, to obtain a refund of the costs which it paid JSI. USAID's disallowance of costs is an attempt to require JSI to correct the incubators, but the Contract requires the costs to be shouldered by USAID. It was a breach of the Contract for USAID to have disallowed the costs almost three years after the costs were accepted.

The 119 Preemicare incubators had been accepted pursuant to FAR 52.246-3, *Inspection of Supplies – Cost Reimbursement*, which is incorporated by reference in Section E-1 of the contract [page 65 of 109]. FAR 52.246-3(e) provides that unless the contract specifies otherwise, "the Government shall accept supplies as promptly as practicable after delivery, and supplies shall be deemed accepted 60 days after delivery, unless accepted earlier." The incubators were originally delivered to USAID/Egypt's Consignee: HM/HC, USAID Project No. 283-0242, Ministry of Health, 21 Misr Helwan, Maadi, Cairo. There were three shipments which cleared Egyptian customs on January 26, 2002, February 12, 2002 and April 29, 2002. Delivery to the MOHP-designated facilities occurred in May and July 2002. The Government accepted the supplies explicitly and by operation of contract and as a matter of law under FAR 52.246-3(e). The Government's belated rejection of the

supplies occurred long after the passage of 60 days from the dates of delivery and acceptance. As a matter of Contract and the FAR, the Government's belated disallowance of costs is a breach of the Contract.

FAR 52.246-3(f) provides that, even after acceptance, the Government has no later than six months after acceptance of the supplies to be delivered to require the Contractor to replace or correct any supplies that are nonconforming at time of delivery. In the first place, the incubators were conforming at the time of delivery and acceptance. Second, within six months after acceptance, the Government did not require JSI to replace or correct the incubators. Third, the Government did not deem the incubators to be nonconforming within six months after acceptance of delivery. As a matter of Contract and the FAR, the Government's belated disallowance of costs is a breach of the Contract.

Even if the incubators were nonconforming at the time of delivery, under the Contract and the FAR, JSI's liability was limited. FAR 52.246-3(j) provides: "The Contractor [JSI] shall have no obligation or liability under this contract to replace supplies that were nonconforming at the time of delivery, except as provided in this clause or as may be otherwise provided in the contract." JSI is not liable under the Contract to the Government for the costs of incubators which the government has deemed to be nonconforming, and JSI has no liability to replace supplies that were nonconforming. The Government's disallowance claim imposes liability upon JSI for supplies which were allegedly nonconforming, which is a breach of the FAR and the Contract.

JSI complied with the terms of the Contract in its procurement of the 119 Preemicare incubators. The services provided by JSI in procuring these incubators were accepted and paid by the Government in 2002. Problems that arose with the incubators were not due to

JSI's procurement services. JSI's services were not deemed to be defective. JSI properly earned the Fee ($23,576.41) and Procurement Services Charge ($62,870.43) which the Government has disallowed. The Government's disallowance of the Fee and Procurement Services Charge is a breach of the Contract.

USAID's disallowance of the cost of 119 incubators ($785,880.35), its disallowance of JSI's Fee ($23,576.41) and its disallowance of JSI's Procurement Services Charge ($62,870.43) is a breach of the Contract.

USAID's administrative offset against other invoices due and payable to JSI and the collection from JSI of the claimed indebtedness ($872,327.18) is a breach of the Contract.

USAID's administrative offset against other invoices due and payable to JSI and the collection from JSI of interest on the claimed indebtedness is a breach of the Contract.

USAID's requirement that JSI incur the costs of re-exporting the incubators from Egypt to the United States, and the resulting storage facilities costs, are material breaches of the Contract.

WHEREFORE, for the foregoing reasons, and such other reasons as may be presented in a reply brief and at the hearing on this matter, Plaintiff John Snow, Inc. requests the Court to grant partial summary judgment in its favor on Count I.

Respectfully submitted,

/s/

Daniel A. Ball
Ball Law Offices
4416 East West Highway, Suite 400
Bethesda, Maryland 20814-4568
Direct: (301) 634-3147
Fax: (301) 215-9297
E-Mail: dball@dablaw.com

Dated: October 26, 2006

Counsel for Plaintiff John Snow, Inc.

**REQUEST FOR HEARING**

Plaintiff respectfully requests a hearing in Court on its Motion for Partial Summary Judgment.

**CERTIFICATE OF FILING**

I hereby certify that on October 26, 2006, a copy of PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AFFIDAVIT OF KENNETH J. OLIVOLA, EXHIBITS 1 – 17, AND PROPOSED FINDINGS OF UNCONTROVERTED FACT were filed electronically. I understand that notice of these filings will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/
Daniel A. Ball