***EXHIBITS 2-17***

***EXHIBIT 2***

## USAID APPROVALS TO SUB-CONTRACTS

| Tender | Commodity | PO # | Date | Vendor | Qty | Unit $ | Total $ | Document | Date |
|---|---|---|---|---|---|---|---|---|---|
| BASE PERIOD | | | | | | | | | |
| IFB 3 | Incubator, Intensive Care Hillrom 83A1A1 | 68 | 16-Dec-99 | UUM | 7 | 9,179.28 | 64,254.96 | Russell/Gipson letter | Jan-18-00 |
| | Incubator, Normal Care Hillrom C400QT | 68 | 16-Dec-99 | UUM | 23 | 7,920.00 | 182,160.00 | | |
| IFB 8 | Incubator, Intensive Care -Medicare Model # 605-1460500 | 205A | 25-Nov-01 | ICS | 7 | 7,935.10 | 55,545.70 | Judge/Gipson letter | Nov-29-01 |
| | | 205 | 10-Apr-01 | ICS | 25 | 7,935.10 | 198,377.50 | Judge/Gipson letter | Jun-11-01 |
| | Incubator, Normal Care Medicare Model 605-1460430 | 205A | 25-Nov-01 | ICS | 18 | 6,114.45 | 110,060.10 | Judge/Gipson letter | Nov-29-01 |
| | | 205 | 10-Apr-01 | ICS | 69 | 6,114.45 | 421,897.05 | Judge/Gipson letter | Jun-11-01 |
| IFB 9 | Incubator (Portable) | 202 | 4-Mar-01 | ICS | 30 | 9,331.04 | 279,931.20 | Judge/Gipson letter | Jun-11-01 |
| | | 202A | 25-Nov-01 | ICS | 8 | 9,331.04 | 74,648.32 | | |
| OPTION PERIOD | | | | | | | | | |
| IFB 12 | Incubator, Normal Care, Ohmeda 3000 Double Wall | 354 | 7-Nov-02 | ARJ-MED | 34 | 5,621.00 | 191,114.00 | Judge/Gipson letter | Oct-20-02 |
| IFB 13 | Incubator, Normal Care, Hillrom Double Wall C450 w/2 Humidifiers | 504 | 5-Nov-03 | ICS | 72 | 6,718.32 | 483,718.79 | Taylor/Gipson letter | Oct-28-03 |
| RFQ 0597 | Incubator, Normal Care, Ohmeda 3000 Double Wall | 639 | 11-Aug-04 | OHMEDA | 15 | 6,500.00 | 97,500.00 | No USAID approval required under $100K | |
| RFQ 0598 | Incubator, Portable | 655 | 16-Aug-04 | OHMEDA | 1 | 13,288.54 | 13,288.54 | No USAID approval required under $100K | |

USAID

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

CAIRO, EGYPT

June 11, 2001

JOHN SNOW, INC. (JSI)
Healthy Mother/Healthy Child Results Package
21 Misr Helwan Agricultural Road, 10th Floor
P.O. Box 11728-611, Maadi
Cairo, Egypt

ATTN.: Reginald F. Gipson, MD
Chief of Party

SUBJECT: Requested Subcontract Consent Under Contract No. 263-C-00-98-00041-00

REF: JSI Letter Dated May 20, 2001
USAID/Egypt (O/PROC) Letter Dated May 22, 2001
USAID/Egypt meeting with JSI on May 23, 01

Dear Dr. Gipson:

Based on your submission dated May 20, 2001, Contracting Officer consent is hereby granted to issue the following subcontracts/grants under the subject contract as described below:

1. The Fixed Price Subcontract between JSI and Promoseven Egypt to work with JSI on Task Eight to produce and air IEC materials for a national campaign related to "Care of the Mother and Baby".

2. The three Fixed Price Subcontracts resulting from IFB #8, between JSI and the following suppliers to provide medical commodities:

    1) Arj-Med, Inc.
    2) International Construction Services (ICS)
    3) First Gulf International, Inc.

3. The Fixed Price Subcontract resulting from IFB #9, between JSI and International Construction Services, Systems Integration Division (ICS) for the commodity procurement of portable incubators.

4. The following Small Grants – Beni Suef NGOs:

    1) Massaret Abu-Seer El Mala CDA
    2) Beni-Soliman El Sharqia CDA
    3) Beni-Soliman El Sharqia Environmental Protection and Community Development Assoc.
    4) Coptic Organization for Services and Training
    5) Family Care and Development Association

6) Beba Island CDA
7) Scientific Foundation for Environment and Community Development, Beba
8) Menshat Nasser CDA

5. Subcontract Amendment between JSI and Geologistics Services, Inc. – IQC subcontract to provide freight forwarding of Healthy Mother/Healthy Child commodities.

Contracting Officer consent to the subject subcontracts/small grants does not constitute acceptability of the terms and conditions, nor the consent of the USAID cognizant technical officer, nor the allowability of any subcontract price/grant amount or of any amount paid under the subcontract/small grant.

The consent also does not constitute approval for JSI to incur costs which exceed the total estimated cost of the contract or the total obligated amount, whichever is less, and does not relieve the contractor of any responsibility for performing its contract.

In addition to the above granted consent, please note that your referenced letter of May 20, 2001 requested the Contracting Officer approval on items marked priority "6" "Approval for Changes in Review panel" and priority "8" "Emergency Travel Approval for Mr. Sunil Mehra". In order to streamline the approval process, JSI is requested to cite where in the contract Contracting Officer approval is required and provide the requisite justification, if necessary.

Finally, please provide documentation from John Snow, Inc. headquarters delegating to you the authority to request approvals and conduct contractual-related matters with USAID/Egypt. Normally these types of transactions are conducted through an organization's headquarters and not the Chief-of-Party.

If you have any questions or need to clarify any issues presented above, I will be happy to meet with you.

Sincerely,

Cynthia Judge
Contracting Officer

USAID

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

CAIRO, EGYPT

**Office of Procurement**

November 29, 2001

Reginald F. Gipson, MD
Chief of Party
JOHN SNOW, INC. (JSI)
21 Misr Helwan Agricultural Road, 10th Floor
P.O. Box 11728-611, Maadi
Cairo, Egypt

SUBJECT: Contracting Officer Consent to Subcontract Award & Subcontract Modification Healthy Mother/Healthy Child Results Package, 263-0242, Contract No. 263-C-00-98-00041-00

REF: (1) USAID Letter to JSI dated June 11, 2001
(2) JSI E-mail Dated October 10, 2001 – ArabSoft Subcontract
(3) USAID Nationality Waiver dated November 4, 2001
(4) JSI Letter dated November 26, 2001 – Amendment to Fixed Price Subcontract #205 to ICS for Medical Commodities (IFB # 8)
(5) JSI Letter dated November 21, received at USAID on 11/29/2001 – Small Grant Program – Review Panel

Dear Mr. Gipson:

Based on your referenced submissions and the USAID approved Nationality waiver for Arabsoft, dated November 4, 2001, Contracting Officer consent is hereby granted as described below:

1. **Amendment to the JSI – Arabic Software Engineering, Inc. (Arabsoft), subcontract No. 5113-S-004,** exercising the option period and increasing the total subcontract amount by $389,000 from $247,500 to $636,500 (base and option.

2. **Amendment to the JSI subcontract with the U.S. supplier, ICS, Systems Integration Division (ICS), (IFB # 8)** increasing the quantity of incubators required for line items #20 and 21 (Incubator Intensive Care and Incubators Normal Care) through exercising of the IFB option clause, therefore increasing the value of the contract by $165,605.80 for a new total fixed price amount of $816,731.94

3. The revised composition of the Small Grant Program – Review Panel as follows:
   1) Mr. Sobhi Moharam, JSI
   2) Mr. Mohamed Mansour, JSI
   3) Dr. Hany Riad, JSI
   4) Mr. Sayed Keshta, JSI
   5) Mrs. Katrina Kruhm, JSI
   6) TBD/JSI (to be determined based on technical input needed in relation of the subject of the project proposal)
   7) Dr. Emad Yanni, USAID/Cairo

Contracting Officer consent to the above subcontracts/subcontract modifications does not constitute acceptability of the terms and conditions, nor the consent of the USAID Cognizant Technical Officer, nor the allowability of any subcontract/subcontract modification amount or of any amount paid under the above subcontracts/subcontract modification.

The consent also does not constitute approval for (the Contractor) to incur costs, which exceed the total estimated cost of the contract or the total obligated amount, whichever is less, and does not relieve the contractor of any responsibility for performing its contract, nor modify any other terms and conditions of the contract.

If you have any questions or need to clarify any issues presented above, I will be happy to meet with you.

Sincerely,

Cynthia Judge
Contracting Officer

CC: Dr. Nahed Matta, CTO
Dr. Emad Yanni, HDD/PH

TOTAL P.03

***EXHIBIT 3***

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

CAIRO, EGYPT

(43)

June 2, 2002

Dr. Reginald Gipson
Chief of Party
John Snow, Inc.
Healthy Mother/Healthy Child Results Package
Cairo/Egypt

Subject: Performance Milestones Number 1-Option Period "Development of HM/HC Project Procurement Plan" JSI's contract No. 263-C-00-98-00041-00

Dear Dr. Gipson:

This is to inform you that JSI has successfully completed milestones No. 1 for the Option Period titled "Development of HM/HC Project Procurement Plan " mentioned in the Modified Performance Milestone Plan (MPMP) on page 4 of Attachment No. J.1 of JSI's contract modification dated October 2, 2001.

As required in section B.3 (e) of the JSI's contract, I hereby accept the submitted Project Procurement Plan. This approval letter authorizes JSI to request the fee associated with subject milestone No. 1.

The approval is based on my review of the submitted report which covers the following:

1. The procurement process to be used JSI.
2. Development and implementation of the Procurement Plan.
3. Summary of commodities to be procured by categories and recipient's locations.
4. Justification for the commodities proposed.
5. JSI listing of pertinent USAID rules and regulations that govern commodity procurement.
6. A list of proposed commodities by recipient's location and estimated price.

It is worth mentioning that the submitted report for subject milestone is well organized, very informative and concise. It covers all requested information in a brief outline which is adequate for USAID's reporting needs.

USAID Office Building
Plot 1/A off El-Laselki street
New Maadi, Cairo - Egypt.
Postal Code #: 11435

44

I would like to inform you that USAID has received the concurrence of Dr. Esmat Mansour, HM/HC Executive Director, on the procurement plan per her letter to me dated May 16, 2002 (attached).

Please note that some of the sections included in the procurement plan will need further discussions such as the geographical coverage of the neonatal centers and the items suggested for the operating room. Please contact me to schedule a meeting with all relevant JSI staff to discuss these matters.

Sincerely,

N. Matta

Dr. Nahed Matta
Cognizant Technical officer
Population and Health Division

C.C. Cynthia Judge, Contracting Officer, USAID

JSI

**JOHN SNOW, INC.**

**Healthy Mother/ Healthy Child Results Package**

(37)

April 24, 2002

Dr. Nahed Matta
CTO HM/HC Results Package
USAID/Egypt
Cairo, Egypt

Subject: Performance Milestone No. 1 -Option Period- Documentation for "Development of HM/HC Project Procurement Plan"

Dear Dr. Matta,

Pursuant to Section B.2 (e) of JSI/USAID Contract No. 263-C-00-98-00041-00, we are submitting for your approval the attached Performance Milestone Report documenting the achievement of the subject milestone.

If you have any questions during your review of this milestone document, please do not hesitate to contact me.

We appreciate your support and cooperation.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

cc: Ms. Cynthia Judge, Contracting Officer, USAID

Ref: 3013
KCK/dh

38

# Healthy Mother/Healthy Child Results Package

## PERFORMANCE MILESTONE REPORT

### Development of HM/HC Project Procurement Plan

March 15, 2002

JSI

John Snow, Inc.
(Contract No. 263-C-00-98-00041-00)
Arabic Software Engineering (ArabSoft)
TransCentury Associates

In collaboration with
The Ministry of Health and Population
Cairo, Egypt

and

USAID/Egypt

# II. PROCUREMENT PLANNING

## II.A Defining Procurement Requirements

In January 2002, the Task Managers of the Healthy Mother/Healthy Child Results Package drafted lists of procurement requirements by task for the Option Period. These initial lists were developed based on a review of lessons learned from the Base Period, physical assessments, and discussions with JSI staff both in Cairo and in the field, MOHP and HM/HC Project staff, HIO staff, and USAID.

For the medical commodities, a detailed review of commodity availability in comparison to the HM/HC Quality Assurance Standards was also completed for 33 hospitals in the governorates of Assiut, Sohag, and Menya. This review was completed as part of the District Hospital Self-Assessment process conducted by a joint team of JSI and MOHP staff in January and February 2002. Data collected from this process was entered into a computerized database and individual reports listing commodity requirements by department, hospital, and governorate were generated. These lists were shared and validated with hospital staff during the Governorate Workshops held in April, 2002. During the workshops, hospital teams used the list of requirements to complete GOE Form 111, the official governmental form for requesting commodities from the government stores.
Using the consolidated data collected from the assessments and follow-up workshops, JSI was able to determine the current requirements for essential items in the Ob-Gyn departments of 26 hospitals. Based on this information, average requirements were determined and the calculated average for each item was extended to cover 50 hospitals. A detailed review of the extended average by item was then completed and required quantities were amended as necessary. These amendments were made based on a variety of things including historical experience, consideration that items now available may not be available and in working order for the entire project period, the possibility that some of the items will be provided through the GOE system, and budgetary constraints.

A similar physical assessment was also completed for the remaining MHIS centers in Giza Governorate. An assessment team from Task Four visited each of the facilities and compiled a list of the remaining commodities required for each center to meet the required standards.

For the IEC requirements, an assessment was completed of items to be printed during the Option Period. As the requirements far exceeded the available budget, a committee met to review and prioritize items. Only priority items were included in the Procurement Plan. Additional funds are being requested from private sector counterparts to print the remaining items.

Based on preliminary estimates, a total of $600,000 was allocated for renovations per the contract modification. Based on discussions held with the MOHP and USAID, it was decided that JSI would fund required renovations in the Phase I health facilities and the MHIS Centers of Giza. For Phases II, III, and IV, major renovations will be completed by the MOHP with technical assistance and minimal funds provided by JSI.

***Procurement Strategy***

The majority of the computing equipment will be purchased in the United States following US source and origin requirements. Arabic software will be purchased locally per the terms of the blanket waiver. The computers purchased for the MHIS conversion process will be purchased locally as they meet the local procurement guidelines and are needed urgently.

## IV.C IEC Materials/Publications

A maximum of $500,000 has been allocated to IEC materials and publication printing. This amount will cover the printing of the following IEC materials: birth preparedness materials, breastfeeding materials, anti-FGM literature, infection control posters, counseling cards, and the newborn screening flyer. The costs for re-printing specific publications for EOC, Operating Room, Midwifery, CSSD, and Neonatal Care have also been included. Printing costs of new materials currently under development have also been included. These documents will all be incorporated into the HM/HC series and include but are not limited to the following:

- Neonatal Care Modules and Resource Materials
- Additional EOC modules and resources
- BEOC Protocols, Modules, and Resource Materials for Physicians and Nurses
- IV Fluid Protocols, Modules, and Service Standards
- Infection Control Protocols for Physicians and Nurses
- Clinical Support Service materials
- IMCI training manuals and Nurses Facilitator Guide
- Materials for the private sector
- Community Outreach Workers Manual
- Health Education Training Curricula
- FGM Training Curricula

***Procurement Strategy***

Materials will be printed locally and in accordance with USAID rules and regulations.

## IV.D Medical Equipment

### IV.D.1 Medical Equipment for District/General Hospitals and Basic Centers

JSI proposes the procurement of a large variety of medical commodities under **Task One**. This list of commodities includes clinical furniture, equipment, medical kits, and disposable supplies required to ensure that the 50 district/general hospitals and a minimum of 50 basic centers in the target governorates meet the basic HM/HC quality standards.

***Ob-Gyn Department***

The proposed list of required medical commodities for the Ob-Gyn Department is based on the Quality Assurance Standard Requirements list. The quantities required for the district hospitals and the basic centers are based on estimates considering the total number of obstetrical deliveries expected in the target governorates. The current estimate of deliveries in the target governorates is 240,000 of which 50% will be

# V. APPLICABLE PROCEDURES, RULES, AND REGULATIONS

The following is a summary of significant contract clauses and AID rules pertaining to the procurement and shipment of commodities. This summary is not meant to be comprehensive and the actual language must be read in its entirety.

Contract No: 263-C-00-98-00041-00

***Section C.10.11:*** ***Task Eleven: Commodity Procurement Program***

The Contractor shall undertake commodity procurement as described in Section C.8.2. The total value of the commodity procurement program in the Option Period is $900,000.

The Contractor shall also manage the warehousing and delivery of all commodities to the end user in collaboration with the MOHP. The Contractor shall also assist in ensuring that the Governmental Forms 111 and 112 are completed as required.

Supplemental physical improvements to various MOHP district health facilities and Health Information Centers in the HM/HC target governorates of Upper Egypt may be funded under the Commodity Procurement Budget in a total amount not to exceed $600,000 in the Option Period. This is for minor renovations vital to the finalization of the facilities that cannot be covered by the MOHP contractor in a timely manner.

***C.10.8.2:*** ***Task Eleven: Commodity Procurement Program***

The Contractor shall undertake commodity needs assessments, shall prepare semi-annual procurement plans and shall undertake all commodity procurement (estimated at $9,362,000 in the Base Period and $6,000,000 in the Option Period) necessary to achieve the results under this contract. Equipment will include inter alia, vehicles, clinical, medical, office, IEC, and computing equipment to support activities with the MOHP and MOI at the central, governorate, and district levels and to meet community and NGO needs.

***Section D.1*** ***Marking Commodities (AIDAR 752.7009 Jan. 1993)***

All commodities purchased by the Contractor shall be marked according to the clause of this contract entitled Marking.

***Section F.1*** ***CIF Destination (52.247-42 Apr. 1984)***

This clause requires certain obligations of the Contractor when the delivery term is CIF destination. The term "CIF Destination", when used in this clause, means free of expense to the Government delivered on board the ocean vessel to the specified point of destination, with the cost of transportation and marine insurance paid by the Contractor.

***Section H.3*** ***Authorized Geographic Code***

The authorized geographic code for procurement of goods and services under this contract is 000, United States.

42

JSI/TCA

## Option Period Procurement Plan

| Item Description | Quantity | | Total | Est. Unit Value US$ | Total value US$ | Procurement | Commodity Category |
|---|---|---|---|---|---|---|---|
| CANNULA, IV, SIZE 22 | 5,000 | 5,000 | 10,000 | $0.50 | $5,000 | Local* | Medical Supplies |
| CANNULA, IV, SIZE 24 | 5,000 | 5,000 | 10,000 | $0.50 | $5,000 | Local* | Medical Supplies |
| CATHETER, SUCTION SIZE 8 | 5,000 | 5,000 | 10,000 | $0.25 | $2,500 | Local* | Medical Supplies |
| CATHETER, SUCTION, SIZE 10 | 2,000 | 2,000 | 4,000 | $0.25 | $1,000 | Local* | Medical Supplies |
| CATHETER, SUCTION, SIZE 6 | 2,000 | 2,000 | 4,000 | $0.25 | $1,000 | Local* | Medical Supplies |
| CATHETER, UMBILICAL, SIZE 6 | 1,000 | 1,000 | 2,000 | $0.25 | $500 | Local | Medical Supplies |
| Endotracheal Tube Size 2.5 | 500 | 500 | 1,000 | $1.25 | $1,250 | Local* | Medical Supplies |
| Endotracheal Tube Size 3 | 1,000 | 1,000 | 2,000 | $1.25 | $2,500 | Local* | Medical Supplies |
| Endotracheal Tube Size 3.5 | 500 | 500 | 1,000 | $1.25 | $1,250 | Local* | Medical Supplies |
| GLOVES, EXAMINATION (100/box) | 1,000 | 1,000 | 2,000 | $3 | $6,000 | Local* | Medical Supplies |
| MASK, SURGEONS (100/box) | 1,000 | 1,000 | 2,000 | $3 | $6,000 | Local* | Medical Supplies |
| MEASURING TAPE | 100 | 100 | 200 | $0.50 | $100 | Local | Medical Supplies |
| NASOGASTRIC TUBE SIZE 6 | 3,000 | 3,000 | 6,000 | $0.30 | $1,800 | Local* | Medical Supplies |
| NASOGASTRIC TUBE SIZE 8 | 5,000 | 5,000 | 10,000 | $0.30 | $3,000 | Local* | Medical Supplies |
| Oxygen Mask, Neonatal | 1,000 | 1,000 | 2,000 | $1 | $2,000 | Local | Medical Supplies |
| Oxygen Mask, Premature | 500 | 500 | 1,000 | $1 | $1,000 | Local | Medical Supplies |
| PLASTER, SURGICAL TAPE 5 CM | 1,000 | 1,000 | 2,000 | $0.60 | $1,200 | Local | Medical Supplies |
| Shoe Covers (Boxes of 100) | 150 | 150 | 300 | $2.00 | $600 | Local | Medical Supplies |
| SOAP, HAND WASHING | 10 | 10 | 20 | $3 | $60 | Local | Medical Supplies |
| SUCTION BULBS | 4,000 | 4,000 | 8,000 | $1 | $4,640 | Off-Shore | Medical Supplies |
| SYRINGE, DISPOSABLE 10 ML | 200 | 200 | 400 | $0.08 | $32 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 2 ML | 500 | 500 | 1,000 | $0.05 | $50 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 2.5 ML | 500 | 500 | 1,000 | $0.05 | $50 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 20 ML | 100 | 100 | 200 | $0.14 | $28 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 5 ML | 200 | 200 | 400 | $0.06 | $24 | Local | Medical Supplies |
| SYRINGE, DISPOSABLE 50 ML | 100 | 100 | 200 | $0.32 | $64 | Local | Medical Supplies |
| THERMOMETER, NEONATAL | 500 | 500 | 1,000 | $0.30 | $300 | Local | Medical Supplies |
| TRASH CAN, LARGE | 17 | 0 | 17 | $3 | $51 | Local | Medical Supplies |
| TRASH CAN, SMALL | 17 | 0 | 17 | $2 | $34 | Local | Medical Supplies |
| CHAIR, DESK | 17 | 0 | 17 | $50 | $850 | Off-Shore | Office Furniture |
| CHAIR, SIDE | 68 | 0 | 68 | $40 | $2,720 | Off-Shore | Office Furniture |
| DESK | 17 | 0 | 17 | $125 | $2,125 | Off-Shore | Office Furniture |
| FILE CABINET | 17 | 0 | 17 | $50 | $850 | Local* | Office Furniture |

# *EXHIBIT 4*

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | PAGE OF PAGES 1 7 |
|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 04 | See block 16c | 263-0242-3-94132, A.4 | 263-0242 |

| 6. ISSUED BY CODE | 7. ADMINISTERED BY (If other than Item 6) CODE |
|---|---|
| Office of Procurement<br>USAID/Egypt<br>Unit 64902<br>APO AE 09839-4902 | USAID/Egypt, HDD/PHN |

COPY

Accounting

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP code) | | |
|---|---|---|
| John Snow, Inc.<br>44 Farnsworth street<br>Boston, MA 02210-1211<br><br>TIN: 04257850<br>DUNS: 09-150-0090 | | 9A. AMENDMENT OF SOLICITATION NO. |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>263-C-00-98-00041-00 |
| CODE / FACILITY CODE | | 10B. DATED (SEE ITEM 13)<br>March 15, 1998 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended. Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

See pages 6 of this modification

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| | |
|---|---|
| X | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. FAR 52-243-2 CHANGES - COST REIMBURSEMENT |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: The FAA of 1961, as amended, E.). 11223, FAR and AIDAR |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The purpose of this modification is to:

1. Extend the dates of several milestones.
2. Approve key personnel changes.
3. Realign and increase the budget pursuant to FAR 52.253-2 Changes-Cost Reimbursement.
4. Increase the Total Estimated and the obligated amounts of the contract by $4,608,314.
5. Correct inconsistencies in JSI's original contract.
6. Modify and/or extend JSI's tasks no. one, five, six, nine and eleven.
7. Modify the milestone plan to reflect changes in section C.
8. Change the CTO.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| Joel H. Lamstein President | | Gary V. Kinney | |
| 15B. CONTRACTOR/OFFEROR<br>[signature]<br>(Signature of person authorized to sign) | 15C. DATE SIGNED<br>Sept 29 2000 | 16B. UNITED STATES OF AMERICA<br>BY [signature]<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>9 Oct 00 |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

1. Cover Page, block 15, delete in its entirety and substitute the following in lieu thereof.

| Item No (A) | Supplies/Services (B) | Quantity (C) | Unit (D) | Unit Price (E) | Amount (F) |
|---|---|---|---|---|---|
| 1 | Task One | 1 | EA | $2,749,177 | $2,749,177 |
| 2 | Task Two | 1 | EA | $2,920,520 | $2,920,520 |
| 3 | Task Three | 1 | EA | $681,556 | $681,556 |
| 4 | Task Four | 1 | EA | $848,172 | $848,172 |
| 5 | Task Five | 1 | EA | $1,899,282 | $1,899,282 |
| 6 | Task Six | 1 | EA | $1,770,901 | $1,770,901 |
| 7 | Task Seven | 1 | EA | $1,493,267 | $1,493,267 |
| 8 | Task Eight | 1 | EA | $2,658,563 | $2,658,563 |
| 9 | Task Nine | 1 | EA | $1,523,999 | $1,523,999 |
| 10 | Task Ten | 1 | EA | $1,285,851 | $1,285,851 |
| 11 | Task Eleven | 1 | EA | $10,195,908 | $10,195,908 |
| | | | | Total Amount of contract (g) | $28,027,196 |

2. SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS

a. B.3. entitled ESTIMATED COST, FIXED FEE, AND OBLIGATED AMOUNT, Paragraph B., delete in its entirety and substitute the following in lieu thereof"

"a. The estimated cost for the performance of the work required hereunder, exclusive of fixed fee, if any is $26,438,348, for the base period and $18,804,672 for the option period. The fixed fee is $1,588,848 for the base period and $1,128,000 for the option period. The estimated cost plus fixed fee for the base period is $28,027,196 and the total estimated cost plus fixed fee for the option period is $19,932,672."

b. B.3.b., delete "$23,418,882" and substitute "$28,027,196" in lieu thereof.

c. B.3.e. Delete in its entirety and substitute the following in lieu thereof:

(e) The contractor shall submit, for technical review, all information and appropriate documentation necessary to demonstrate and support the achievement of milestones to the Contracting Officer's Technical Representative (COTR), with a copy to the Contracting Officer. The Contractor shall also provide an explanation and/or justification if any milestones have not been achieved according to the schedule. The COTR will lead a review of the documentation to determine if the milestones have been met and will either approve or disapprove the payment of the fee."

d. B.4. entitled LINE ITEMS, delete in its entirety and substitute the following in lieu thereof.

**Base Period**

| | Total Cost | Fee | Total Estimated Cost plus Fixed Fee |
|---|---|---|---|
| Task One | 2,589,817 | 159,360 | $2,749,177 |
| Task Two | 2,774,440 | 146,080 | $2,920,520 |
| Task Three | 575,316 | 106,240 | $681,556 |
| Task Four | 741,932 | 106,240 | $848,172 |
| Task Five | 1,819,602 | 79,680 | $1,899,282 |
| Task Six | 1,651,381 | 119,520 | $1,770,901 |
| Task Seven | 1,360,467 | 132,800 | $1,493,267 |
| Task Eight | 2,512,483 | 146,080 | $2,658,563 |
| Task Nine | 1,438,546 | 85,453 | $1,523,999 |
| Task Ten | 1,126,491 | 159,360 | $1,285,851 |
| Task Eleven | 9,847,873 | 348,035 | $10,195,908 |
| Total | 26,438,348 | 1,588,848 | $28,027,196 |

**Option Period**

| | Total Cost | Fee | Total Estimated Cost plus Fixed Fee |
|---|---|---|---|
| Task One | 2,507,944 | 150,000 | 2,657,944 |
| Task Two | 2,718,212 | 163,000 | 2,881,212 |
| Task Three | 906,848 | 54,000 | 960,848 |
| Task Four | 711,982 | 43,000 | 754,983 |
| Task Five | 1,745,562 | 105,000 | 1,850,562 |
| Task Six | 2,033,244 | 122,000 | 2,155,244 |
| Task Seven | 1,842,374 | 111,000 | 1,953,374 |
| Task Eight | 6,338,506 | 380,000 | 6,718,505 |
| Total | 18,804,672 | 1,128,000 | 19,932,672 |

3. SECTION C - DESCRIPTIONS/SPECIFICATIONS/WORK STATEMENT

a. C.4.2.1.iv., Task One, add the following:

"Activity 4: The contractor shall provide technical assistance in the form of architectural and engineering services (developing plans and bills of quantities and monitoring activities of the MOHP A&E contractors) to expedite the renovation of MOHP district health facilities (five governorates) and health information centers in eight Upper Egypt governorates.

Activity 5: The contractor shall provide technical assistance to ensure that the essential obstetric and neonatal protocols and standards are being implemented in the field by providing on-the-job training."

b. C.4.2.1.v., Task One, under "Monitoring Plan & Completion Indicator", add the following to the Performance Target

"- Architectural and Engineering technical assistance provided for the 100 anchor facilities that require renovation by MOHP.
- Performance Evaluation instrument utilized for trained physicians on Essential Obstetric Care (EOC) services."

c. C.4.2.2, Task Two, under "Monitoring Plan & Completion Indicator", 6th bullet, delete "month 48" and substitute "Month 42" in lieu thereof.

d. C.5.2.1, Task Three, section III entitled, Strategies and Rationale for Reach Outcomes, second paragraph, delete "four target governorates" and substitute "five target governorates" in lieu thereof.

e. C.5.2.3.iv. Task Five, under Activity 2, add the following: "Add a perinatal/neonatal component to the 2000/2001 Perinatal neonatal maternity Mortality Study (PNMMS).

f. C.5.2.3.iv. Task Five, add the following:

"Activity 5: Additional technical assistance to strengthen the newly established maternal mortality surveillance system in the Upper Egypt governorates."

g. C.5.2.3, Task Five, delete all references to "1999/2000" and substitute "2000/2001" in lieu thereof.

h. C.5.2.3, Task Five, under "Performance Targets", add the following:

"- Add a perinatal/neonatal component to the 2000/2001 National Maternal Mortality Study to become the Perinatal/Neonatal Maternal Mortality Study (PNMS).
- Perinatal/Neonatal mortality component of the NMMS completed and report written.
- A maternal mortality surveillance system developed and functioning in the Upper Egypt governorates."

i. C.6.2.1.iv., Task Six, delete "Under HM/HC, the Contractor Team will expand the Daya Training Program to 60 districts not covered by the CSP" and insert "The Contractor will assist in finalizing a refresher training curricula for Dayas and in conducting these courses in 25 target districts of Upper Egypt" in lieu thereof.

j. C.6.2.1.iv, Task Six, add the following to Activity 3.

"- Additional technical assistance to implement an expanded package of activities to improve the national and target perinatal care program
- Development of national clinical protocols and service standards for Level I-IV neonatal care-centers
- Assist the MOHP in the newly established neonatal screening program for congenital anomalies."

k. C.6.2.1.v., Task Six, add the following to Performance Targets

"- Level of care improved in neonatal Centers in HMHC target Governorates
- Summary reports submitted to USAID detailing the improvement of the neonatal centers in groups of 25."

l. C.7.2.2, delete all references to "SIS" and substitute with "MOHP and other partners" in lieu thereof.

m. C.7.2.2.iv. entitled Activities: Delete Activity one in its entirety.

n. C.7.2.2.v. Task Seven, Monitoring Plan and Completion Indicators, delete "Achievement of the following performance indicators will be regularly monitored during the first four years of the project" and replace with " Achievement of the following performance indicators will be regularly monitored during the first three and half years of the project"

o. C.7.2.3.vi. Task Nine, Activity 1, add the following:

"- Increase the level of effort to ensure sustainable implementation of the school-based intervention for adolescents
- Expand the scope of work to include boys as well as girls
- Strengthen nutrition health messages and explore adding anti-smoking messages in the education curricula."

p. C.7.2.3.v., Task Nine, under Performance Targets, add the following:

"- The inclusion of pilot-tested antismoking messages in an education curricula."

q. C.8.1, Task Ten, delete 3rd paragraph and substitute the following in lieu thereof:

"The total funds for small to medium size grants ($500 to $20,000) available will be up to $1,000,000 (one million) for activities. The conditions governing the small grant program are contained in Section H."

r. C.8.1.v., Task Ten, Small Grants Program, delete "Performance Targets" in its entirety and insert the following in lieu thereof:

Award Approximately 100 small grants to NGOs not to exceed $1,000,000 in the target districts.

| By | Cumulative Total |
|---|---|
| June 15, 2000 | 20 small grants |
| November 15, 2000 | 50 small grants |
| March 15, 2001 | 90 small grants |
| September 15, 2001 | 100 small grants" |

s. C.8.2., and C.8.2.iii, Task Eleven, delete "The Contractor will submit semi-annual reports on progress to the USAID COTR and semi-annual procurement plans to the Contracting Officer for approval" and insert "The Contractor shall submit annual reports on progress as part of the milestone documentation for procurement to the USAID COTR. The Contractor shall also submit annual procurement plans to the COTR and Contracting Officer for approval." in lieu thereof.

t. C.8.2. Task Eleven, delete "$6,000,000" and substitute "$9,362,000" in lieu thereof.

u. C.8.2.iv, Task Eleven, add the following:

"Activity 2: Supplemental physical improvements to various MOHP district health facilities and Health Information Centers in the HM.HC target governorates of Upper Egypt governorates maybe funded under the commodity Procurement Budget in a total amount not to exceed $300,000. This is for minor renovations vital to the finalization of the facilities that can not be covered by the MOHP Contractor in a timely manner."

v. C.10.6, Task six for the Option Period, entitled Established National Child Survival Programs Sustained is deleted in its entirety.

w. C.10.7, Task Seven for the Option Period, entitled Better Social Community Services is renumbered as C.10.6, Task Six.

x. C.10.8, Task Eight for the Option Period, entitled Small Grant Program is renumbered as C.10.7, Task Seven.

y. C.10.9 Task Nine for the Option Period, entitled Commodity Procurement Program is renumbered as C.10.8 Task Eight.

4. SECTION F - DELIVERIES OR PERFORMANCE

f.6., Key personnel, delete "IEC specialist: Tawhida Hamed Khalil" and insert "Coordinator of Community Health Development : Sunil Mehra" in lieu thereof.

5. SECTION G - CONTRACT ADMINISTRATION DATA

a. G.3. Contracting Officer's Technical Representative, delete "Francisco Zamora" as the CTO and substitute "Nahed Matta" in lieu thereof.

b. G.6, Accounting and Appropriation Data, add the following:

"Modification No. 4:

| | |
|---|---|
| MAARD No.: | 263-0242-3-94132, A.4 |
| Appropriation Symbol: | 72X1037 |
| Budget Plan Code: | HES4-95-23263-IG13 |
| Amount Obligated: | $448,517.65 |

| | |
|---|---|
| MAARD No.: | 263-0242-3-94132, A.4 |
| Appropriation Symbol: | 72X1037 |
| Budget Plan Code: | HES6-96-23263-IG13 |
| Amount Obligated: | $9,040.00 |

| | |
|---|---|
| MAARD No.: | 263-0242-3-94132, A.4 |
| Appropriation Symbol: | 729/01037 |
| Budget Plan Code: | HES9-99-23263-IG13 |
| Amount Obligated: | $103,792.48 |
| | |
| MAARD No.: | 263-0242-3-94132, A.4 |
| Appropriation Symbol: | 720/11037 |
| Budget Plan Code: | HES0-00-23263-IG13 |
| Amount Obligated: | $1,142,521.52 |
| | |
| MAARD No.: | 263-0242-3-94132, A.4 |
| Appropriation Symbol: | 729/01037 |
| Budget Plan Code: | HES0-00-23263-IG13 |
| Amount Obligated: | $3,094,378.11 |
| | |
| MAARD No.: | 263-0242-3-94132, A.4 |
| Appropriation Symbol: | 720/11037 |
| Budget Plan Code: | HES9-99-23263-IG13 |
| Amount Obligated: | $267,621.89" |

6. SECTION I - CONTRACT CLAUSES

Delete "FAR 52.244-2 SUBCONTRACTS (COST REIMBURSEMENT AND LETTER CONTRACTS)(OCT 1997)" and insert "FAR 52.244-2 SUBCONTRACTS (COST REIMBURSEMENT AND LETTER CONTRACTS)(AUG 1998)" in lieu thereof.

7. SECTION J - ATTACHMENTS

a. Delete Attachment no. 1 entitled Performance Milestone Plan and substitute with attachment no. J.1 entitled Modified Performance Milestone Plan.

b. Add Attachment no 2 entitled Agreement between JSI and USAID concerning Grants under Contracts.

**Attachment No. J.1.**
**Page 1 of 5**
**MODIFIED PERFORMANCE MILESTONE PLAN**
**Base Period -- 3/15/98 - 9/15/01**

**Result 5.1.1. Quality of Essential Maternal, Perinatal and Child Health Services Improved**

| Time | Milestone | Data Collection | Evaluation | Validation | Fee |
|---|---|---|---|---|---|
| Yr. 1, Qtr. 2, (9/15/98) | 1 HM/HC Package Consensus Meeting held and package finalized. (Task One) | Submission of Consensus Meeting Report to MHP and USAID | MOHP and USAID approval of Consensus Meeting Report | Consensus Meeting Attendance. | $39,840 |
| Qtr. 4, (3/15/99) | Lead Trainers trained for 5 districts and package implemented in 5 districts. (Task Two) | Training Report submitted to MOHP/USAID; MHIS forms record service del. And util. Data. | Analysis of MHIS data and comparison with Project target. | Field visits to verify Trainings and delivery of basic package | $26,560 |
| Yr. 2, Qtr. 2, (7/15/00) | HM/HC curricula taught in 2 medical and 2 nursing schools. (Task Two) | Submission of a report detailing the steps taken by JSI and the medical/nursing schools to implement the HM/HC curricula. | USAID approval of report. | Validation of report | $26,560 |
| Qtr. 4, (11/15/00) | Implementation of basic package in 10 districts (Task One) | Report detailing implementation of basic package in each district including service delivery and utilization data. | USAID approval of report. | Field visits to verify delivery of basic package | $39,840 |
| Yr. 3, Qtr. 2, (10/15/00) | HM/HC curricula taught in 6 medical and 6 nursing schools (Task Two) | Submission of a report detailing the steps taken by JSI and the medical/nursing schools to implement the HM/HC curricula. | USAID approval of report. | Validation of report | $26,560 |
| Qtr. 4, (3/15/01) | Implementation of basic package in 20 districts (Task One) | Report detailing implementation of basic package in each district including service delivery and utilization data. | USAID approval of report. | Field visit to verify delivery of basic package. | $39,840 |
| Qtr. 4, (3/15/01) | HM/HC curricula taught in 10 medical and 10 nursing schools (Task Two) | Submission of a report detailing the steps taken by JSI and the medical/nursing schools to implement the HM/HC curricula. | USAID approval of report. | Validation of report | $39,840 |
| Yr. 4, Qtr. 2, (9/15/01) | HM/HC curricula taught in 13 medical and 13 nursing schools (Task Two) | Submission of a report detailing the steps taken by JSI and the medical/nursing schools to implement the HM/HC curricula. | USAID approval of report. | Validation of report | $26,560 |
| Qtr. 2, (9/15/01) | Implementation of basic package in 25 districts (Task One) | Report detailing implementation of basic package in each district including service delivery and utilization data. | USAID approval of report. | Field visits to verify delivery of basic package. | $39,840 |

**Attachment No. J.1.**
**Page 2 of 5**
**MODIFIED PERFORMANCE MILESTONE PLAN**
**Base Period -- 3/15/98 - 9/15/01**

**Result 5.1.2. Districts Implementing Essential M, P & C Services in Target Governorates**

| Time | Milestone | Data Collection | Evaluation | Validation | Fee |
|---|---|---|---|---|---|
| Yr. 1, Qtr. 1, (6/15/98) | Commencement of MHIS Assessment (Task Four) | Submission of MHIS Assessment Tool to MOHP and USAID. | MOHP and USAID approval of Assessment | Site visit to observe or verify MHIS assessment. | $26,560 |
| Qtr. 3, (12/15/98) | Completion of HM/HC management guidelines for district planning. (Task Three) | Submission of HM/HC Guidelines to MOHP/USAID. | MOHP and USAID approval of HM/HC Guidelines | N/A | $39,840 |
| Yr. 2, Qtr. 1, (6/15/99) | Assist MOHP to establish 10 district MHIS centers. (Task Four) | HM/HC quarterly reports document technical assistance to MOHP in 10 districts. | Review of HM/HC quarterly reports | Field visits to observe district MHIS centers | $26,560 |
| Qtr. 3, (12/15/99) | 8 District health plans and monitoring systems developed and implemented (Task Three) | Submission of D.H.P. to MOHP; MHIS reports document system functioning | DHP approved by MOHP; analysis of MHIS reports | Field visit to district to observe use of system | $39,840 |
| Yr. 3, Qtr. 1, (6/15/00) | Assist MOHP to establish 30 district MHIS centers. (Task Four) | HM/HC quarterly reports documents technical assistance to MOHP in 30 districts. | Review of HM/HC quarterly reports | Field visits to observe district MHIS centers | $26,560 |
| Qtr. 3, (12/15/00) | 20 District health plans and monitoring systems developed and implemented (Task Three) | Submission of D.H.P. to MOHP; MHIS reports document system functioning. | DHP approved by MOHP; analysis of MHIS reports | Field visit to district to observe use of system | **$13,280** |
| Yr. 4, Qtr. 1, (6/15/01) | Assist MOHP to establish 65 district MHIS centers. (Task Four) | HM/HC quarterly reports documents technical assistance to MOHP in 65 districts. | Review of HM/HC quarterly reports | Field visits to observe district MHIS centers | $26,560 |
| Qtr. 2, (9/15/01) | 25 District health plans and monitoring systems developed and implemented. (Task Three) | Submission of D.H.P. to MOHP; MHIS reports document system functioning. | DHP approved by MOHP; analysis of MHIS reports | Field visit to district to observe use of system | **$13,280** |

**Attachment No. J.1.**
**Page 3 of 5**
**MODIFIED PERFORMANCE MILESTONE PLAN**
**Base Period -- 3/15/98 - 9/15/01**

**Result 5.1.3. Established National Child Survival Program Sustained**

| Time | Milestone | Data Collection | Evaluation | Validation | Fee |
|---|---|---|---|---|---|
| Yr. 1, Qtr. 2, (9/15/98) | Assessment of neonatal centers conducted. (Task Six) | Submission of Neonatal Center Assessment Report to MOHP and USAID. | MOHP and USAID approval of Neonatal Center Assessment Report. | Field visits to neonatal centers to verify assessment results. | $26,560 |
| Qtr. 4, (3/15/99) | Completion of Egypt-specific Integrated Sick Child Management Plan. (Task Six) | Plan submitted to MOHP and USAID. | MOHP and USAID approval of Sick Child Management Plan. | N/A | $39,840 |
| Yr. 2, Qtr. 2, (9/15/99) | Daya training program modified and ready for implementation. (Task Six) | Submission of revised Daya Training Program to MOHP and USAID. | MOHP and USAID approval of revised Daya Training Program. | Field visit to Daya training site to verify appropriateness of training. | $26,560 |
| Qtr. 4, (3/15/00) | 3 operations research studies completed. (Task Five) | 3 Research Reports submitted to MOHP and USAID. | Statistical analysis of research results. | Validation of study. | $39,840 |
| Yr. 3, Qtr. 2, (6/15/01) | 2000/2001 Maternal Mortality Survey completed with perinatal/neonatal component. (Task Five) | MMS results submitted to MOHP and USAID. | Statistical analysis of survey results. | Validation of study | $39,840 |
| Qtr. 4, (12/15/00) | Neonatal services at centers are linked with comprehensive perinatal programs in 25 target districts. (Task Six) | Report showing evidence of activities and linkages. | USAID approval of report. | Validation of report. | $13,280 |
| Yr. 4, Qtr. 1, (7/15/01) | Services improved in 100 MOHP neonatal centers. (Task Six) | Report detailing action taken to improve the service standards in the selected 100 neonatal centers. | Analysis of Pre and Post assessment scores for the neonatal centers in the eight Upper Egypt target governorates. | Validation of report. | $13,280 |

**Attachment No. J.1.**
**Page 4 of 5**
**MODIFIED PERFORMANCE MILESTONE PLAN**
**Base Period -- 3/15/98 - 9/15/01**

**Result 5.1.4. Increased Knowledge and Improved Behavior in Households**

| Time | Milestone | Data Collection | Evaluation | Validation | Fee |
|---|---|---|---|---|---|
| Yr. 1, Qtr. 1, (6/15/98) | Rapid Assessment of existing print and mass media conducted. (Task Eight) | Assessment report submitted to MOHP and USAID. | MOHP and USAID approval of Assessment Report. | N/A | $26,560 |
| Qtr. 3, (12/15/98) | Field test of protocols for linking communication groups with providers completed. (Task Seven) | Protocol completed. | MOHP and USAID approval of protocol. | Field visit to verify use of protocol | $26,560 |
| Yr. 2, Qtr. 1, (6/15/99) | National IEC Strategy to support HM/HC developed. (Task Eight) | Strategy document and budget completed and submitted to MOHP and USAID. | Strategy and budget approved by USAID and MOHP. | N/A | $39,840 |
| Qtr. 3, (12/15/99) | Needs identification tool implemented in 5 communities. (Task Seven) | Implementation Report completed and submitted. | MOHP and USAID approve Implementation Report. | Field visit to observe needs identification process. | $26,560 |
| Yr. 3, Qtr. 1, (6/15/00) | National IEC campaign developed. (Task Eight) | Media reports documenting # of broadcasts, materials printed, community activities conducted. | Review and analysis of media report. | Spot checks to verify media broadcast and availability of materials. | $39,840 |
| Qtr. 2, (9/15/00) | Health Educator Guide and education materials for use in schools developed (Task Nine) | Health Educator Guide and education materials submitted to USAID | USAID approval of materials | N/A | $39,840 |
| Qtr. 2, (10/15/00) | SMIP nutrition education and anemia supplementation program implemented in one governorate (Task Nine) | Submission of a report documenting no. of schools and students reached | USAID assessment of report | USAID approval of report | $22,806 |
| Qtr. 3, (12/15/00) | Community Action Plans developed and implemented in 20 districts. (Task Seven) | Report which includes details of the implementation of each Community Action Plan. | USAID approval of report | Field site visit to target communities. | $39,840 |
| Yr. 4, Qtr. 1, (6/15/01) | FGM component integrated into overall HM/HC message package. (Task Eight) | FGM Media Report submitted to USAID and MOHP. | Review and analysis of FGM report. | Spot checks to verify inclusion of FGM messages. | $39,840 |
| Qtr. 2, (9/15/01) | Community Action Plans developed and implemented in 25 districts (Task Seven) | Report which includes details of the implementation of each Community Action Plan. | USAID approval of report | Field visits to target communities. | $39,840 |
| Qtr. 2, (9/15/01) | SMIP nutrition education and anemia supplementation program plans being implemented five target governorates and national SMIP plan developed (Task Nine) | Submission of a report documenting no. of schools and students reached | USAID assessment of report | USAID approval of report | $22,807 |

**Attachment No. J.1.**
**Page 5 of 5**
**MODIFIED PERFORMANCE MILESTONE PLAN**
**Base Period -- 3/15/98 - 9/15/01**

**Supporting Activities -- Small Grants Program and Commodity Procurement Program**

| Time | Milestone | Data Collection | Evaluation | Validation | Fee |
|---|---|---|---|---|---|
| Yr. 1, Qtr. 2, (9/15/98) | Development of HM/HC Project Procurement Plan. (Task Eleven) | Submission of Procurement Plan to USAID. | Review and approval of Procurement Plan. | N/A | $26,560 |
| Qtr. 4, (6/15/00) | 20 small grants awarded to NGOs in target districts. (Task Ten) | Grant documentation submitted to USAID. | Review of the grant proposal and supporting documentation. | Field visit to NGOs to verify receipt of grants. | $39,840 |
| Yr. 2, Qtr. 2, (9/15/99) | Procurement of $900,000 of Project commodities. (Task Eleven) | Submission of invoices and receipts to USAID. | Spot checks/audit to verify accuracy of reporting. | Spot check to verify procurement of commodities. | $26,560 |
| Qtr. 4, (11/15/00) | Development of HM/HC Procurement Plan for the additional $ 3,362,000 in commodities. (Task Eleven) | Submission of Procurement Plan to USAID. | USAID review of Procurement Plan. | N/A | $71,745 |
| Qtr. 4, (11/15/00) | 50 small grants awarded to NGOs in target districts. (Task Ten) | Grant documentation submitted to USAID. | Review of the grant proposal and supporting documentation. | Field visit to NGOs to verify receipt of grants. | $39,840 |
| Yr. 3, Qtr. 2, (9/15/00) | Procurement of $3 Million of Project commodities. (Task Eleven) | Submission of a report detailing commodities procured and distribution. | Spot checks/audit to verify accuracy of reporting. | Spot check to verify procurement of commodities. | $26,560 |
| Qtr. 3, (12/15/00) | Procurement of $4.5 Million of Project commodities (Task Eleven) | Submission of a report detailing commodities procured and distribution. | Spot checks/audit to verify accuracy of reporting. | Spot check to verify procurement of commodities. | $26,560 |
| Qtr. 4, (3/15/01) | 90 small grants awarded to NGOs in target districts. (Task Ten) | Grant documentation submitted to USAID. | Review of the grant proposal and supporting documentation. | Field visit to NGOs to verify receipt of grants. | $39,840 |
| Qtr. 4, (3/15/01) | Procurement of $ 6,181,000 of Project Commodities. (Task Eleven) | Submission of a report detailing commodities procured and distribution. | Spot checks/audit to verify accuracy of reporting. | Spot check to verify procurement of commodities | $71,745 |
| Yr. 4, Qtr. 2, (9/15/01) | Procurement of $9,362,000 of Project commodities. (Task Eleven) | Submission of a report detailing commodities procured and distribution. | Spot checks/audit to verify accuracy of reporting. | Spot check to verify procurement of commodities. | $98,305 |
| Qtr. 2, (9/15/01) | 100 small grants awarded to NGOs in 25 target districts. (Task Ten) | Grant documentation submitted to USAID. | Review of the grant proposal and supporting documentation. | Field visit to NGOs to verify receipt of grants. | $39,840 |

**AGREEMENT BETWEEN JOHN SNOW, INC.
AND THE AGENCY FOR INTERNATIONAL DEVELOPMENT
CONCERNING GRANTS UNDER CONTRACT NO. 263-C-00-98-00041-00**

WHEREAS, John Snow, Inc. (the "Contractor") and the U.S. Agency for International Development ("USAID") have entered into a contract (No. 263-C-00-98-00041-00, the "Contract") calling for the Contractor to provide certain foreign assistance services in the area of Sustainable Improvements in the Health of Women and Children (the "Program");

WHEREAS, the Contract provides that the Contractor and USAID will agree on an arrangement under which the Contractor will award and administer certain grants on behalf of USAID;

NOW, THEREFORE, the parties agree as follows:

1. General. The Contractor will award grants, which are anticipated to range from $500 to $25,000, on behalf of USAID to eligible recipients (see Section 3 below) to further the Program, and will administer such awarded grant(s), in accordance with the requirements of USAID's Automated Directives System 303 (see Section 4 below), the provisions of this Agreement and applicable law, as required by Section C.8.1 of the Contract (and if the contract option is exercised, Section C.10.8 of the Contract).

2. USAID Approval of Grantees. The Contractor shall coordinate with USAID with respect to the establishment of selection criteria for grantees, such that USAID shall have substantial involvement in the establishment of the selection criteria. Before awarding a proposed grant, the Contractor must receive the prior written approval of the USAID Contracting Officer on the Contract (the "Contracting Officer") as to (1) the identity of the proposed grantee, (2) the amount of the proposed grant, and (3) the nature of the grant activities.

3. Ineligible Recipients. Without the prior written consent of the Contracting Officer, the Contractor may not award any grant to: (1) any entity which is a "private voluntary organization" ("PVO") but has not registered as such with USAID; (2) any entity whose name appears on the "List of Parties Excluded from Federal Procurement and Non-Procurement Programs"; (3) any "public international organization"; (4) any governmental organization; (5) any entity whose country of origin/nationality is not the Cooperating Country; or (6) any entity affiliated with the Contractor or any of its directors, officers or employees. In the case of an unregistered PVO which the Contractor believes might be able to undertake useful grant activities to further the Program, the Contractor may encourage the organization to register as a PVO with USAID, provided that the Contractor makes no promise, actual or implied, that the organization shall thereafter receive a grant.

4. Automated Directives System 303. The Contractor shall follow all requirements of USAID's Automated Directives System (ADS) 303 on grant making and administration, as well as the specially modified grant provisions attached as Appendix 4 hereto, except as modified by this Agreement or as approved through a specific written deviation granted by the Contracting Officer.

5. Award of Grants. Without limiting the foregoing, this Section sets forth a brief overview of the Contractor's grant-making responsibilities. Grant-making duties include: (1) with USAID, establishing eligibility and selection criteria; (2) selecting grant recipients in accordance with competition requirements; and (3) after securing USAID's approval, drafting, negotiating and awarding grants.

Selection Criteria for the Program. Illustrative grant activities to be supported through the Program are contained in Section C.8.1 of the Contract. It is anticipated that up to 100 small grants in 25 districts will be awarded to Egyptian NGOs/PVOs which support community health services within the framework of district plans. Such support may include community needs assessment and planning as well as implementation, education and service delivery activities. USAID will have substantial involvement in the selection criteria for the grantees. Should the option under the Contract be exercised, it is anticipated that an additional 70 small grants in 60 additional target districts will be awarded.

Competition for Grants. ADS 303 calls for competition to be used to the maximum extent practicable in selecting grantees. In general, an Invitation for Applications ("IA") is to be published in appropriate publications and applications from a minimum of two applicants must be considered. The Contracting Officer must give his or her prior approval to all IAs before publication. In the absence of, or in addition to, publicizing the IA in appropriate publications, the Contractor shall, inter alia, disseminate information on the IA in public meetings, distribute flyers or brochures, affix posters or handbills in appropriate places, etc. in the target districts. It is anticipated that the Contractor will develop a blanket IA suitable for use in all districts throughout the life of this Agreement; once the Contracting Officer has approved the blanket IA, no further approval shall be required unless the Contractor proposes changes to the blanket IA.

The Contractor will convene a Review Panel, not more frequently than monthly, composed of appropriately qualified and independent personnel (which shall include a USAID Technical Office representative), approved in advance by the Contracting Officer, to consider grant applications. Applications will be evaluated in accordance with the selection criteria set forth in the IA. Based on the work of the Review Panel, the Contractor will notify the Contracting Officer of its recommendation concerning the proposed grant award(s), including the identity of the recipient(s), the amount of the grant(s) and the nature of the proposed grantee activities. The Contractor shall not recommend for a grant any organization unless, in accordance with ADS 303, it shall have made a positive written determination that the organization is responsible (with the necessary management, financial systems, personnel and travel policies, etc., specified in ADS 303). Should there be questions concerning these responsibility matters, the Contractor shall consult with the Contracting Officer as appropriate, in its discretion. **In all cases, USAID's prior approval is required before the Contractor may award any grant.**

ADS 303 permits the award of grants noncompetitively under certain circumstances. If the Contractor intends to make a noncompetitive award, it shall submit to the Contracting Officer for prior approval a written justification based on one of the competition exceptions set forth in ADS 303.

Form of Grant. Each grant awarded by the Contractor on behalf of USAID under this Agreement shall be in the following form: (1) a grant letter substantially in the form of Appendix 1 hereto; (2) a Schedule substantially in the form of Appendix 2 hereto; (3) a Program Description to be developed by the grantee and the Contractor; and (4)(i) the mandatory standard provisions attached as Appendix 4A hereto, and (ii) any applicable required-as-applicable standard provisions from the list attached as Appendix 4B hereto.

Limitations. Grants may only be awarded to Egyptian organizations operating (or planning to operate) in the 25 target districts (and 60 additional districts under the contract option) and may not exceed $25,000 per grant without the approval of the Contracting Officer. In addition, grants may not finance: 1) international travel and transportation, 2) capital expenditures (including construction) or equipment having a useful life of

more than one year and an acquisition cost of $5,000 or greater (equipment necessary to support activities under the Small Grant Program shall be procured by the Contractor under the Commodity Procurement Program (Sections C.8.2 and C.10.8 in the Contract), 3) subawards or subcontracts, 4) participant training, 5) indirect costs or 6) human subject research (as defined by (22 CFR 225) without written approval, in advance, from the Contracting Officer.

6. Term of Grants. The Contractor may not award any grant for a period extending beyond the estimated termination or completion date of its Contract.

7. Amount of Grants. The total estimated value of the grant program under the Contract is $2,000,000. The Contractor will not execute grants aggregating more than this amount unless the option under the contract is exercised in which case the Contractor will not execute grants aggregating more than $3,000,000.

8. Funding of Grants; Separate Account. The Contractor will give periodic advances to the recipients of all grants hereunder, in accordance with the Required-as-Applicable Standard Provision (No. 1 of Appendix 4). The Contractor will receive reimbursement from USAID of such advanced amounts through its usual vouchering procedure under the Contract. All interest and other refunds by grant recipients hereunder will be made to a special, non-commingled, interest-bearing account established by the Contractor (the "Separate Account"). The Contractor has no beneficial interest in any funds in the Separate Account. Funds in the Separate Account may be used for grant-making or shall be paid annually to USAID, as directed by the Contracting Officer. At the conclusion of the Contract, any funds remaining in the Separate Account shall be returned to USAID. The Contractor may also make grants utilizing payment on a reimbursement basis, in accordance with the Required-as-Applicable Standard Provision (No. 2 of Appendix 4).

9. Right of USAID to Supersede Contractor Decisions. Recognizing the paramount interest of the United States and USAID in grant-making, the parties agree that USAID may, in its sole discretion, supersede any decision, act or omission taken by the Contractor in respect of any grant made by it, or proposed to be made by it, hereunder. Notwithstanding any other provision of this Agreement, USAID retains the right, at all times hereunder, through the Contracting Officer, to (1) dictate a different decision with respect to the award or administration of any grant; (2) rectify an omission by the Contractor with respect to the award or administration of any grant; (3) take over the administration of any grant awarded hereunder; and/or (4) terminate, in whole or in part, the Contractor's authorities under this Agreement.

10. Amendment of Grants. The Contractor has the authority to make, without the prior approval of the Contracting Officer, written amendments to awarded grants, provided that the amendments (1) are of a minor or administrative nature, (2) do not change the obligated amount or the purposes of any grant, (3) are satisfactory to the grantee, and (4) are promptly transmitted to the Contracting Officer. The Contracting Officer must give his or her prior approval to all other amendments.

11. Conflicts. In performing its duties hereunder, the Contractor shall scrupulously avoid any conflicts of interest. Should any conflict of interest arise, the Contractor shall immediately notify the Contracting Officer as to the conflict and the Contractor's proposed solution for avoiding the conflict, and the Contractor shall follow the instructions of the Contracting Officer.

12. Records Retention. The Contractor will act as custodian for USAID of all records relating to grants under the Contract. The Contractor will preserve all records with respect to its grant-making (including with respect to the deliberations of all Review Panels) and grant administration hereunder.

Copies of all reports received from grantees will be promptly forwarded to the Contracting Officer or his/her designee. USAID and the Comptroller General shall have full access to all documents, papers and others records of the Contractor with respect to its duties hereunder. At the conclusion of the Contract, the Contractor shall consult with the Contracting Officer for direction as to which records shall be transferred to USAID.

13. Liability. The Contractor shall have no liability to USAID with respect to its awarding and administration of grants on behalf of USAID hereunder, or with respect to the acts or omissions of its grantees hereunder, except to the extent that losses to the USAID foreign assistance program arise from the Contractor's negligence or bad faith in performing its responsibilities hereunder.

14. Publications. With reference to Required as Applicable Standard Provision No. 5 entitled "Publications and Media Releases" the Contractor shall be responsible for forwarding one copy of all published works referenced in paragraph (c) to POL/CDIE, 1300 Pennsylvania Avenue, N.W., Washington, DC 20523-1802.

15. Language. The text of all grants awarded shall be in English. Grants may be prepared in an Arabic version as well. However, in the event that the text is prepared in both languages, the text of the grant shall provide that, in the case of any conflict between the English and Arabic versions, the English language version shall prevail.

Reginald F. Glynn

John Snow, Inc.

9 March 1999

Date

Donella J. Russell

Donella J. Russell, Contracting Officer

3/9/99

Date



30-AUG-00 09:20 FROM:JSI HMHC CAIRO EGYPT ID:3513818 PAGE 5/5

***EXHIBIT 5***

ORIGINAL

JSI

June 13, 2001

# PURCHASE CONTRACT No. 04-01-205

This Purchase Contract is hereby entered between **ICS Systems Integration Division**, 6663-A Old Dominion Drive, McLean, VA 22101 (hereinafter called "ICS" or the "Supplier") and **JOHN SNOW, INC.**, 44 Farnsworth Street, Boston, MA 02210 (hereinafter called "JSI" or the "Buyer") for the supply of Medical Equipment.

This Purchase Contract is made in duplicate; one copy for each party following signatures by both parties.

| ICS | JOHN SNOW, INC. |
|---|---|
| NAME | NAME |
| Fawaz Arafat | Kenneth J. Olivola |
| TITLE | TITLE |
| President | Director |
| SIGNATURE | SIGNATURE |
| [signature] | [signature] |
| DATE | DATE |
| 16/6/01 | 12/6/01 |

# PART 1: ACCEPTANCE BY THE CONTRACTING AGENCY

JSI, Healthy Mother/Healthy Child (Contracting Agency) has accepted the offer from ICS, 6663-A Old Dominion Drive, McLean, VA 22101 (Supplier) for the supply of the following Medical equipment as set forth in this contract:

| ITEM # | ITEM DESCRIPTION | Manufacturer | Model # | QTY | UNIT | Incidental Services | | TOTAL | Extended Price | Delivery Time |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Perunit | Total | | | |
| | Neonatal Bassinet Spare Basket | United Metal Fabricator | 8545 | 11 | $52.99 | N/A | | $52.99 | $582.89 | 12 weeks |
| 19 | Gas Supply | Squire-Cogswell/Aeros | Health cair | 11 | $2,476.53 | $275.17 | $3,026.87 | $2,751.70 | $30,268.70 | 5 Weeks |
| 20 | Incubator, intensive care | Medicare Industries | 605-1460500 | 25 | $7,935.10 | $793.51 | $19,837.75 | $ 7,935.10 | $198,377.50 | 11 weeks |
| 21 | Incubator, Normal Care Including Servo Humidifier # 1460430 | MediCare Industries | Preemicare 605 | 69 | $5,503.00 | $611.45 | $42,190.05 | $6,114.45 | $421,897.05 | 11 Weeks |
| | Total | | | | | | $65,054.67 | | $651,126.14 | |

1- COUNTRY OF ORIGIN: U.S.A.
2- This contract consists of the following documents:

PART 1 – ACCEPTANCE BY THE CONTRACTING AGENCY, which includes the Bidder's schedule and itemized prices
PART 2 – CONDITIONS OF THE CONTRACT
PART 3 - ACKNOWLEDGEMENT OF RECEIPT AND ACCEPTANCE

3- The total FOB value of this contract is $651,126.14.The total value for the commodities is $586,071.47. The total amount for incidental services (Installation and Training) for items #19, 20 and 21 is $65,054.67
4- The Supplier shall deliver all the items to Geologistics, Inc. in Alexandria, VA, USA.
5- PACKING: Each Model shall be specifically marked with:

(i) The model name and manufacturer's name.
(ii) The JSI Item number.
(iii) All accompanying parts for each model marked by piece.

**Example:**
JSI item # 2– Spare Basket
Model No. 8545 United Metal Fabricator

# PART 2: CONDITIONS OF CONTRACT

## 1. Definitions

The terms used in this contract shall have the following meanings:

A. "Agent" means TransCentury Associates, who is acting as the procurement services agent for the Contracting Agency.

B. "FOB" is defined in Attachment 1.

C. "Code 000" (US Only) means the geographic area described as in Attachment 2 ("Relevant A.I.D. Geographic Codes").

D. "Contracting Agency" means John Snow, Inc. (JSI) Healthy Mother/Healthy Child in Egypt.

E. "Destination" means the Freight Forwarder in Alexandria, Virginia.

F. "Effective Date" means the date on which the Supplier receives a Contract / P.O. from the Agent.

G. "Egypt" means the Arab Republic of Egypt.

H. "Free World Country" means any country which is not a non-Free World Country.

I. "Non-Free World Country" means any of the following countries: Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's Republic of China, Syria, and Vietnam.

J. "Supplier" means the successful bidder to whom this contract(s) has been awarded.

K. "United States" means the United States of America, including the 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, the Trust Territory of the Pacific Islands, and Guam.

L. "USAID" means the United States Agency for International Development.

M. "Local Representative" means the local in country (Egypt) Representative/Agent of the successful bidder who will be responsible for honoring the warranty, and performing the installation if required.

## 2. Governing Law and Language

The laws of the Commonwealth of Massachusetts govern this purchase contract except in cases where they contradict the AIDAR and/or FAR regulations cited in this purchase contract, in which case the latter shall prevail. The English language version

of this contract shall govern, and all notices pursuant to the provisions of this contract shall be in English. Each reference to a specified number of days shall be deemed to refer to consecutive calendar days.

## 3. Delivery

Delivery under this contract shall be on a FOB Destination basis; according to the delivery periods mentioned PART 1 – ACCEPTANCE BY THE CONTRACTING AGENCY - of this Contract. The Supplier shall deliver all medical commodities, accessories, and spare parts to be supplied under this contract into the custody of the freight forwarder in Alexandria, VA for transportation to Egypt. The freight forwarder address will be specified on the Contract Award Form at the time of award.

## 4. Responsibilities of the Agent

The Agent is employed by the Contracting Agency to supervise this contract and has concurrent authority to take or perform on behalf of the Contracting Agency any action which the Contracting Agency is permitted or required to take or perform under this contract, including (without limitation) (a) witnessing inspection of medical commodities, equipment and supplies prior to shipment to Egypt, (b) inspecting and accepting or rejecting the medical commodities, equipment and supplies at Destination, and (c) requiring replacement of defective parts or spare parts.

## 5. Legal Effect of USAID Approvals and Decisions

The parties hereto understand that the Contract has reserved to USAID certain rights such as, but not limited to, the right to approve the terms of this contract, the Supplier, and any or all plans, reports, specifications, subcontracts, bid documents, drawings, or other documents related to this contract and the project of which it is part. The parties hereto further understand and agree that USAID, is reserving any or all of the foregoing approval rights, has acted solely as a financing entity to assure the proper use of United States Government funds, and that any decision by USAID to exercise or refrain from exercising these approval rights shall be made as a financier in the course of financing this project and shall not be construed as making USAID a party to the contract. The parties hereto understand and agree that USAID may, from time to time, exercise the foregoing approval rights, or discuss matters related to these rights and the project with the parties jointly or separately, without thereby incurring any responsibility or liability to the parties jointly or to any of them. Any approval (or failure to disapprove) by USAID shall not bar the Contracting Agency or USAID from asserting any right, or relieve the Supplier of any liability which the Supplier might otherwise have to the Contracting Agency or USAID.

## 6. Payment

Request for payment shall be submitted in accordance with the following instructions:

A. Payment Terms. ~~One hundred percent (100%) of the contract price for~~ commodities, accessories, and spare parts, excluding the cost of incidental services, will be paid upon presentation of the documents required under

paragraph B below. If any incidental services are required under this contract, one hundred percent (100%) of the contract price for such services will be paid upon presentation of the documents required under paragraph C below. All payments will be made by wire transfer or company check on a net 30 days basis.

B. Request for Payment for Commodities, Accessories and Spare Parts. Payment due to the Supplier under this contract for commodities, and spare parts shall be based upon the Supplier's written request for payment accompanied by the following documentation:

(1) Supplier's itemized Commercial Invoice.

(2) "Supplier's Certificate and Agreement with the Agency for International Development for Project Commodities/ Invoice and Contract Abstract," Form AID 1450-4 (see Attachment 4), executed in accordance with the instructions thereon (a) by the Supplier for the cost of the commodities, (b) by the carrier for the cost of in-land transportation.

(3) Warehouse delivery receipt stating that commodities delivered are in accordance with the Purchase Order in quantities, brand names and marking requirements.

(4) A copy of the signed Bid /Award Contract Form.

(5) JSI/TCA Certificate of Acceptance.

C. Request for Payment for Incidental Services. Payment due to the Supplier under this contract for incidental services shall be based upon the completion of installation and training services, if required. The Suppliers must submit a written request for payment accompanied by the following documentation:

(1) Supplier's itemized invoice.

(2) "Supplier's Certificate and Agreement with the Agency for International Development for Project Commodities/ Invoice and Contract Abstract," Form AID 1450-4 (see Attachment 4), executed in accordance with the instructions thereon (a) by the Supplier for the cost of the commodities, (b) by the carrier for the cost of in-land transportation.

(3) Certificate of Acceptance by JSI/TCA that services were adequately rendered.

D. Both parties agree in accordance with the tender documents that installation is required for items listed in the previous table.

Since the supplier included the cost of installation but did not assign a specific value to incidental charges the amount of Ten Percent (10 % )of the value of those

commodities will be withheld by JSI until installation is completed in accordance with the incidental charges payment clause

## 7. Audit and Records

A. The Supplier shall maintain books, records, documents, and other evidence to substantiate, without limitation, all costs incurred under or in connection with the contract and to substantiate the other contract requirements in accordance with generally accepted accounting principles prevailing in the United States, Egypt, or the International Accounting Standards Committee (an affiliate of the International Federation of Accountants) to substantiate properly all transactions under or in connect with the contract. This clause does not apply to cost records for non-reimbursable cost items incurred under fixed-price (lump sum or unit price) contracts, but it does apply to records concerning source of goods and other comparable contract requirements applicable to such items. The foregoing constitute "records" for the purpose of this clause.

B. The Supplier shall maintain such records during the contract term and for a period of three (3) years after final payment. However, records which relate to appeals under the "Settlement of Disputes" clause or litigation or the settlement of claims arising out of the performance of this contract shall be retained until such appeals, litigation, or claims have been finally settled.

C. All records shall be subject to inspection and audit by the United States Government, Contracting Agency, or its authorized agents at all reasonable times. The Supplier shall afford the auditor proper facilities for such inspection and audit.

D. The Supplier further agrees to include in all its subcontracts hereunder a provision that the subcontract agree to maintain such records and that the U.S. Government, the Contracting Agency, or any of its authorized agents shall, until the expiration of three (3) years after final payment under the subcontract, have access to and the right to examine any records of such subcontractor involving transactions related to the subcontract.

## 8. Assignment

The Supplier may assign neither its obligation to perform under the contract, nor its rights to receive payment under the contract, except with the prior written consent of both the Contracting Agency and USAID.

## 9. Host Country Taxes

A. Pursuant to a bilateral agreement between the United States Government and the Government of Egypt, the Supplier and those of its employees who are not citizens or permanent residents of Egypt shall be free of all taxes, fees, levies, customs, or impositions imposed under laws in effect in Egypt with respect to all items supplied and services performed under this contract. This exemption includes all customs, duties, registration fees, and consular legalization fees.

B. The Government of Egypt will allow the Supplier to import free of customs and duties such materials and equipment as may be required under this contract.

## 10. Eligibility of Suppliers

A. No equipment, materials or services shall be eligible for USAID financing if offered by a supplier or subcontractor included on any list of suspended, debarred, or ineligible bidders used by USAID.

B. Except as otherwise provided in paragraph D below, the Supplier must be:

(1) An individual who is a citizen or legal resident of the United States;
(2) A corporation or partnership organized under the laws of the United States
(3) A controlled foreign corporation, i.e. any foreign corporation of which more than 50 percent of the total voting power of all classes of stock is owned by United States shareholders within the meaning of the Section 957 et seq. of the Internal Revenue Code (26 U.S.C. 957); or
(4) A joint venture or unincorporated association consisting entirely of individuals, corporations, or partnerships which is eligible under any of the foregoing categories.

C. Citizens of any non-Free World country, firms and organizations located in or organized under the laws of any non-Free World country, and firms and organizations owned in any part by citizens or organizations of any non-Free World country, are ineligible for financing by USAID as suppliers of commodities or as agents in connection with the supply of commodities; provided, however, that non-U.S. citizens lawfully admitted for permanent residence in the United States are eligible as individuals or owners, regardless of such citizenship; and, provided further, that USAID's Deputy Associate Administrator for Finance and Administration (DAA/FA) may authorize the eligibility of organizations having minimal ownership by citizens or organizations of non-Free World countries.

D. The rules stated in paragraph B above do not apply to suppliers of incidental services which are related to this procurement of equipment and included as part of this contract. Incidental services are defined as the installation or erection of USAID-financed equipment, or the training of Contracting Agency personnel in the maintenance, operation or use of such equipment.

## 11. Eligibility of Commodities

A. Definitions

(1) "Source" means the country from which a commodity is shipped to Egypt or Egypt itself if the commodity is located therein at the time of purchase. However, where a commodity is shipped from a free port or bonded warehouse in the form in which it was received therein, "source" means the country from which the commodity was shipped to the free port or bonded

warehouse.

(2) "Origin" of a commodity is the country or area in which the commodity is mined, grown, or produced. A commodity is produced when through manufacturing, processing, or substantial and major assembling of components a commercially recognized new commodity results that is substantially different in basic characteristics or in purpose or utility from its components.

(3) "Commodity" means each item, which is commercially recognized or sold as an independent unit. However, when the product being purchased is a kit consisting of items such as tools or scientific instruments, which are packaged as a single unit, the kit will be considered to be a single commodity and the items, included in the kit will be the components. When spare parts are being purchased, each separate shipment of spare parts will be considered to be a single commodity, and the parts included in the shipment will be the components. For purposes of this procurement, each of the line items listed in the Technical Specifications (Part E) will be considered a single, separate commodity and not merely a component of some other commodity.

(4) "Components" are the goods that go directly into the production of a produced commodity. (See also the definition of "commodity" above.)

B. Rule

**Each commodity shall have its source and origin in the United States (Geographic Code 000) and meet the USAID componentry rules**

Any commodity component from a non-Free World country (**Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's** Republic of China, Syria, and Vietnam) makes the commodity ineligible for USAID financing; **this means that if even one component of a commodity is from a non-Free World country, then the commodity is ineligible.**

## 12. Change Orders

A. The Contracting Agency may at any time, by a written order, and without notice to the sureties, make changes within the general scope of this contract, in any one or more of the following: drawings, designs, or specifications, where commodities to be furnished under this contract are to be specially manufactured for the Contracting Agency.

B. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. The Supplier of the modification or change must assert any claim by the Supplier for adjustment under this clause within thirty (30) days from the date of receipt. The prior written approval of USAID may be required for any change order, which

exceeds $25,000.

## 13. Amendments

Modification of the terms of this contract shall be made by an amendment signed by the parties.

## 14. Settlement of Disputes

A. In the event of a disagreement under this contract, the Supplier shall submit a written statement to the Contracting Agency, briefly describing the nature of the problem, the position of the Supplier regarding the issue and a narrative of facts in support of the Supplier's position.

B. Within ten (10) days after receipt of the Supplier's statement, the Contracting Agency shall decide the issue and deliver a written statement of the decision to the Supplier, including the reasons supporting the decision, if adverse to the Supplier.

C. Within thirty (30) days after receipt of the Contracting Agency's decision, or the date such decision was due (whichever occurs first), the Supplier may submit to the Contracting Agency a written Notice of Appeal including a detailed description of the facts of the dispute with the dates of events, names of persons involved, references to documentation bearing on the matter (with copies attached), the relevant contract provision(s), the Supplier's contentions and conclusions, and a statement of why the Contracting Agency's decision is being questioned.

D. If within thirty (30) days after delivery of a Notice of Appeal, the parties can not mutually agree to a satisfactory settlement, the matter shall be presented for arbitration, and finally decided under the rules of Conciliation and Arbitration of the US Chamber of Commerce.

## 15. Marking

The Supplier shall ensure that all commodities furnished under this contract and their shipping containers carry the official red, white and blue USAID emblem. Emblems shall be affixed by metal plates, decal, stencil, label, tag, or other means depending upon the type of commodity or shipping container and the nature of the surface to be marked. The emblem placed on the commodities shall be as durable as the trademark, company or brand name affixed by the manufacturer. The emblem on each shipping container must be affixed in a manner, which assures that it will remain legible until the container reaches its destination. A list of suppliers of USAID emblems is set forth in Attachment 5 (which is a copy of Appendix 9B of USAID Handbook15, Chapter 9).

## 16. Inspection

A. All medical commodities and spare parts shall be subject to inspection and

testing by or on behalf of the Contracting Agency at the expense of the Contracting Agency prior to shipment. The Contracting Agency will notify the Supplier in writing of the names of any inspectors or inspection firms. It is understood that inspection and testing shall not in any way release the Supplier from any warranty or other obligations under this Contract.

B. If any inspection or test is made by or on behalf of the Contracting Agency on the premises of the Supplier, the Supplier shall provide all reasonable facilities and assistance for the safety and convenience of the Contracting Agency or its inspectors in the performance of their duties without additional charge.

## 17. Force Majeure

A. Except with respect to default of subcontractors, the Supplier shall not be liable for any excess costs if the failure to perform the Contract arises out of causes beyond the control and without the fault or negligence of the Supplier (Force Majeure) and if the Supplier, within twenty (20) days from the beginning of any such Force Majeure, notifies the Contracting Agency of such prevention of performance and the cause thereof. Such causes may include, but are not restricted to, acts of the Borrower/Grantee in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of the Supplier. If the failure to perform is caused by the default of a subcontractor and if such default arises out of causes beyond the control of both the Supplier and the subcontractor and without the fault or negligence of either of them (Force Majeure), and the Supplier, within twenty (20) days from the beginning of such Force Majeure, notifies the Contracting Agency of such prevention of performance and the cause thereof, the Supplier shall not be liable for any excess costs due to the failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Supplier to meet the required delivery schedule.

B. In the event of a Force Majeure, the Supplier, unless otherwise directed by the Contracting Agency in writing, shall continue to undertake and perform the duties set forth in this contract as far as is reasonably practical.

C. In the event of a Force Majeure resulting in a suspension of work, this contract shall be extended by a period equal to that for which the Supplier was prevented from performing.

D. The Supplier shall be entitled to reasonable costs incurred as a consequence of a Force Majeure.

E. If the Supplier's inability to perform by reason of the Force Majeure lasts for more than forty-five (45) days after notice has been given to the Contracting Agency, either party may terminate this contract and the Supplier shall be entitled to any sums which would be payable in case of termination of this contract by the Contracting Agency for convenience.

## 18. Termination for Convenience

A. This contract may be terminated by the Contracting Agency in whole, or from time to time in part, in accordance with this clause, whenever the Contracting Agency shall determine that such termination is in the best interest of the Contracting Agency.

B. Termination shall be effected by Notice of Termination to the Supplier, specifying that termination is for the convenience of the Contracting Agency, the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

C. After receipt of a Notice of Termination and except as otherwise directed by the Contracting Agency, the Supplier shall:

1. Stop work under the contract on the date and to the extent specified in the Notice of Termination, and place no further orders or subcontracts except as may be necessary for completion of the portion of the work under contract which is not terminated;

2. Terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the Notice of Termination

3. Assign to the Contracting Agency as it may direct, all of the right, title, and interest of the Supplier under the orders and subcontracts, in which case the Contracting Agency shall have the right to settle or pay any claims arising out of the termination of such orders and subcontracts;

4. With the approval or ratification of the Contracting Agency, to the extent the Contracting Agency may require, which approval or ratification shall be final and conclusive for all purposes of this clause, settle all outstanding liabilities and all claims arising out of such termination of orders and subcontracts;

5. Transfer title to the Contracting Agency and deliver as directed by the Contracting Agency, the completed or partially completed equipment, material, and parts which would be required to be furnished to the Contracting Agency under this contract;

6. Complete performance of the part of the work which has not been terminated by the Notice of Termination; and

7. Take such action as may be necessary for the protection of the property related to this contract which is in the possession of the Supplier and to which the Contracting Agency has title.

D. The Supplier shall submit to the Contracting Agency its written claim promptly but not later than three (3) months from the effective date of termination, except as the Contracting Agency may agree in writing.

E. The Supplier and the Contracting Agency shall consult within thirty (30) days of the submission of the claim concerning the whole or any part of the amount to be paid to the Supplier by reason of the termination of work. The contract shall be amended accordingly, and the Supplier shall be paid the agreed amount.

F. In deciding the amount due the Supplier, there shall be deducted (1) all settled claims which the Contracting Agency may have against the Supplier in connection with this contract and (2) the agreed price for, or the proceeds of sale of, property acquired by the Supplier or sold and not otherwise recovered by or credited to the Contracting Agency.

G. Any disagreement regarding termination amounts or procedures shall be settled under the clause of this contract entitled "Settlement of Disputes."

## 19. Termination for Default

A. The Contracting Agency may, by written notice of default sent to the Supplier by registered mail, terminate in whole or part this contract:

(1) If the Supplier fails to make delivery of the equipment within the time specified herein or any extension thereof expressly agreed to buy the Contracting Agency in writing, or

(2) If the Supplier fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and, in either of these two circumstances, does not cure such failure within a period of ten (10) days (or such longer period as the Contracting Agency may authorize in writing) after receipt of notice from the Contracting Agency specifying such failure.

B. In the event the Contracting Agency terminates this contract in whole or in part as provided in paragraph A of this clause, the Contracting Agency may procure, upon such terms and in such manner as the Contracting Agency may deem appropriate, commodities similar to those so terminated, and the Supplier shall be liable to the Contracting Agency for any excess costs for such similar commodities. However, the Supplier shall continue performance of this contract to the extent not terminated under the provisions of this clause.

C. The rights and remedies specified in this clause shall not be exclusive of, but are in addition to, any other rights and remedies available to the Contracting Agency.

## 20. Liquidated Damages

Failure by the Supplier to deliver the quantity or quality of commodities specified herein, or to perform the required incidental services (if any), in accordance with the terms of this agreement will, because of the urgent need for the commodities by the Contracting Agency, cause serious and substantial damages to the Contracting

Agency; however, it will be difficult, if not impossible, to prove the amount of such damages. Therefore, for each day of delay in the delivery of any commodities or in the performance of incidental services with respect to any commodities -- other than delay caused by force majeure as defined in the "Force Majeure" clause above or by the sole fault or negligence of the Contracting Agency or its agents -- the Supplier agrees to pay to the Contracting Agency, as liquidated damages and not as a penalty, one half of one percent (0.5%) the contract price for the commodities in question; provided, however, that the total liquidated damages under this clause shall not exceed ten percent (10%) of the total contract amount. The parties have estimated and agreed upon this sum as an attempt to make a reasonable forecast of probable actual loss because of the difficulty of estimating with exactness the damages, which will result. These liquidated damages are in addition to, not in lieu of, any other rights and remedies available to the Contracting Agency.

## 21. Worker's Compensation Insurance

A. If the Supplier will perform incidental services (i.e., the installation or erection of commodities to be furnished under this contract, or the training of Contracting Agency personnel in the maintenance, operation or use of such commodities) outside of the United States, the Supplier shall provide and thereafter maintain worker's compensation insurance in accordance with the Defense Base Act (DBA) (42 U.S.C. 1651) for overseas employment under this contract of all employees who are hired in the United States or who are U.S citizens or bona fide residents of the United States.

B. The Supplier agrees to procure the DBA insurance required by this clause from the DBA insurance carrier under contract with USAID unless the Supplier has a DBA self insurance program approved by the Department of Labor or has an approved retrospective rating agreement for DBA. Information on obtaining coverage under the USAID requirements contract and the list of countries for which USAID has secured waiver of DBA coverage for Supplier's employees who are not citizens of, residents of, or hired in the United States are shown in USAID Handbook 11, Chapter 3, Section 4.1.6.22.

C. The Supplier agrees to provide employees who are not citizens of, residents of, or hired in the United Stated with worker's compensation benefits as required by the laws of the country in which the employees are working, or by the laws of the employee's native country, whichever offers greater benefits, or in the absence of such law, employer's liability insurance.

D. With respect to all employees who are hired for employment outside the country, in which they are to be employed, this insurance coverage shall be provided prior to the departure for overseas employment under this contract.

E. The Supplier shall insert a clause similar to this clause, including this sentence, in all subcontracts except those exclusively for furnishing equipment and/or materials.

## 22. Performance Bond or Guaranty

A. The Supplier shall furnish to the Contracting Agency within fifteen (15) days after award, a performance bond or guaranty fully protecting the Contracting Agency against any excess costs incurred by it as a result of any failure by the Supplier to perform any of its obligations under this contract.

1. Such bond or guaranty shall be satisfactory to the Contracting Agency and, at the option of the Supplier, shall be in the form of a surety bond, bank guaranty, or irrevocable letter of credit. If a performance guaranty in the form of a bank guaranty or irrevocable letter of credit is used, it shall be in an amount equal to ten percent (10%) of the contract price. If a performance bond is used, the bond shall be in an amount equal to one hundred percent (100%) of the contract price and shall be in the form attached hereto (Part F). The performance bond or guaranty shall be drawn in favor of John Snow, Inc., and shall be collectible upon receipt of the Agent's written certification of Supplier's default hereunder. Confirmation of the performance bond or guaranty by an Egyptian bank is not required.

The bond or guaranty shall be released not later than thirty (30) days following the date of completion of contract performance, even though the warranty period may extend beyond such time.

## 23. Warranty

The Supplier shall provide a warranty under which the Supplier or its authorized Local In-Country Representative will replace or repair the medical commodities and spare parts to be supplied under this contract, or repair or replace any parts of such commodities, found to be defective due to faulty design, workmanship or materials. The warranty may exclude, however, ordinary wear and tear and damage due to improper handling, storage, or operation. Replacements and repairs shall be made without cost to the Contracting Agency. The Contracting Agency shall give the Supplier prompt notice of any claims under such warranty and, if the Supplier fails to remedy the defects within a reasonable time, the Contracting Agency shall have the right to take such remedial action as may be necessary and to claim the reasonable costs thereof from the Supplier.

**The warranty for the medical commodities and spare parts to be supplied shall be valid for a period of no less than twelve (12) months after installation or eighteen (18) months from the purchase contract effective date, whichever is earlier.**

The warranty shall cover parts and labor, at no cost to the Contracting Agency, and shall be honored by the Supplier's Local In-Country Representative.

## 24. Local In-Country Representative

The Supplier is required to have a Local In-Country Representative/Authorized Agent

for installation and warranty service (parts and labor), at no additional cost to the Contracting Agency. The local in-country representative / authorized agent shall be able to provide spare parts and supplies for the items procured whenever required by the end users. The Supplier shall submit a letter from the Local Representative (on local company's letterhead), who will certify that, they are the Supplier's local representative and shall carry out, the installation and honor the warranty service, for the items offered in conjunction with IFB No 263-0242-1012-8, at no additional cost to the Contracting Agency.

Neither the Supplier nor the Local Representative shall assign repair or maintenance work to any other company without the prior written approval of the Contracting Agency.

## 25. Packing

All materials and equipment must be properly prepared for export to withstand exposure to the elements and rough handling during ocean shipment. Such packing must be sufficient to ensure safe arrival at destination and fully cover such hazards as extreme temperature and/or possible corrosion due to salt air or open space.

## 26. Suspension of Work

A. The Contracting Agency may, at any time, by written order to the Supplier (Suspension of Work Order), require the Supplier to stop all, or any part, of the work required by the contract for a period of up to ninety (90) from the specified effective date.

B. Upon receipt of such an order, the Supplier shall immediately comply with its terms and take all steps to minimize the insurance of costs related to the work covered by the Order.

C. Within the period of the Suspension of Work Order, the Contracting Agency shall either:

(1) Cancel the Suspension of Work Order; or

(2) Terminate the work covered by such Order as provided in the "Termination for Convenience" clause above.

D. If the Suspension of Work Order is canceled or the Order expires, the Supplier shall resume work. An equitable adjustment shall be made as necessary in the time schedule, the price, or a combination thereof, or any other provisions of the contract that may be affected, and the contract shall be amended accordingly, if the Supplier asserts a claim for such adjustment within thirty (30) days after the end of the period of work suspension. Failure to agree to any adjustment shall be a dispute under the "Settlement of Disputes" clause of the contract.

## 27. Equal Employment Opportunity

The Supplier will not discriminate in recruitment or employment conditions of personnel hired in the United States because of race, religion, color, sex, or national origin and are in compliance with its equal employment opportunity obligations under Executive Order 11246 dated September 24, 1965.

## 28. Vesting of Title and Diversion Rights

USAID reserves the right to vest in itself title to the goods financed under this contract, provided that such goods are in a deliverable state and have not yet been off loaded in ports of entry in Egypt. USAID may direct the carriers to divert these goods to alternative destinations.

## 29. Incidental Services

The Local Representative shall perform the incidental services (installation and training) as designated in "Technical Specifications" (Part E) or as required by the warranty terms.

All materials and travel related costs required for the performance of the incidental services shall be furnished by the Supplier/Local Representative at no additional cost to the Contracting Agency

Upon arrival in Egypt from the United States, and after appropriate customs and other clearances, the medical commodities shall be delivered by the Contracting Agency or its representative to the project various sites in Upper Egypt (Aswan, Luxor, Qena, Beni-Suef, Fayoum, Assuit, Sohag, and Menya). The Local Representative will then be responsible to install the commodities within a one-week period (5 business days) after notification of the delivery. The Local Representative will also be required to obtain a letter of acceptance from the project site once the incidental service (installation and/or training) has been performed.

The Contractor will attempt to consolidate deliveries/installations in the same governorate but cannot guarantee the consolidation. It is expected that there will be multiple trips required to each governorate.

## 30. Notices

Any notices or other communication given by either party will be in writing or fax, shall be in English, shall be effective on the effective date of the notice or when delivered, whichever is later, and will be deemed duly given or sent when delivered to the following addresses:

A. To the Supplier: At the address shown on the Bid/Award/Contract Form

B. To the Contracting Agency:

John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210
Attn: Ms. Eva Ros

C. **With a copy to the Agent:**

TransCentury Associates
4300 Montgomery Ave
Bethesda, MD
20814
Attention: Mr. Yousri Aclimandos

**PART 3: ACKNOWLEDGMENT OF RECEIPT AND ACCEPTANCE**

**ICS,** 6663-A Old Dominion Drive McLean, VA 22101 certifies that it received Purchase Contract No. 04-01-205 for $651,126.14 and that it will supply the required quantities all goods with the technical specifications mentioned for the prices listed and within the delivery times listed.

**DATE:** 06/19/2001

**NAME:** Fawaz Arafat

**TITLE:** President

**SIGNATURE:**

Please make sure to mail this form signed to JSI at 44 Farnsworth Street, Boston, MA 02210 Attn: Ms. Eva Ros within 2 days after receipt. A copy should also be faxed to TCA in Cairo, Egypt 202 - 3936425 Attn: Mr. Yousri Aclimandos.

## PART 3: ACKNOWLEDGMENT OF RECEIPT AND ACCEPTANCE

**ICS,** 6663-A Old Dominion Drive McLean, VA 22101 certifies that it received Purchase Contract No. 04-01-205 for $651,126.14 and that it will supply the required quantities all goods with the technical specifications mentioned for the prices listed and within the delivery times listed.

**DATE:** 06/19/2001

**NAME:** Fawaz Arafat

**TITLE:** President

**SIGNATURE:**

Please make sure to mail this form signed to JSI at 44 Farnsworth Street, Boston, MA 02210 Attn: Ms. Eva Ros within 2 days after receipt. A copy should also be faxed to TCA in Cairo, Egypt 202 - 3936425 Attn: Mr. Yousri Aclimandos.

***EXHIBIT 6***

**November 25, 2001**

# AMENDMENT #1
# TO
# PURCHASE CONTRACT No. 04-01-205

| ICS System Integration Division | JOHN SNOW, INC |
|---|---|
| NAME: FAWAZ ARAFAT | NAME: Ken Olivola |
| TITLE: PRESIDENT | TITLE: Director |
| SIGNATURE: [signature] | SIGNATURE: [signature] |
| DATE: NOVEMBER 30, 2001 | DATE: 11/28/01 |

Within the terms and conditions of IFB# 263-0242-0101-8 which states in Part A Number 19.B that "the Contracting Agency reserves the right to increase or decrease the quantity of a line item duly awarded in accordance with the IFB by 25% plus any fraction necessary to equal a whole number of the quantity bid", this Purchase Contract is amended to increase the quantity of Intensive Care Incubators (Preemicare 605-1460500) manufactured by MediCare Industries by 7 units each and Normal Care Incubators (Preemicare 605) manufactured by MediCare Industries by 18 units. Based on this change, the following clauses are amended:

**Part I – Acceptance by the Contracting Agency**

The Supplier shall provide the following additional goods:

| ITEM DESCRIPTION | QTY | Unit Price in USD* | Total Price |
|---|---|---|---|
| Incubator Normal Care | 18 | $6,114.45 | $110,060.10 |
| Incubator Intensive Care | 7 | $7,935.10 | $55,545.70 |
| | | TOTAL: | $165,605.80 |

*Ten percent of the value of the commodities will be withheld by JSI until installation is completed in accordance with the incidental charges payment clause.

**Part II – Conditions of the Contract**

**3. Delivery**

The Supplier shall deliver the additional Intensive and Normal Care incubators **on January 7, 2002** to the following address: **Geologistics, Inc.**
**631 South Pickett Street**
**Alexandria VA 22304 USA**

The total value of this amendment is $165,605.80 (One hundred and sixty five thousand, six hundred and five and 80/100 USD)., making the total value of Purchase Contract # 04-01-205 $816,731.94 (Eight hundred and sixteen thousand, seven hundred and thirty one and 94/100).

**All other terms and conditions of Purchase Contract # 04-01-205 remain unchanged.**

***EXHIBIT 7***

**From:** Heimberg, Scott [sheimberg@AKINGUMP.COM]
**Sent:** Friday, October 13, 2006 11:35 AM
**To:** Daniel Ball
**Subject:** FW: John Snow Inc

**Attachments:** Preemicare Shipment.xls

---

**From:** Fawaz Arafat (ICS) [mailto:farafat@ics-technologies.com]
**Sent:** Friday, October 13, 2006 11:34 AM
**To:** Heimberg, Scott
**Cc:** Maguid Younes (ICS Egypt)
**Subject:** RE: John Snow Inc

Dear Scott

Here you are. I estimated the dates where the incubators were delivered to the hospital. This info should be with JSI, but I am trying to get it from Mr.. Younes in Egypt

Best Regards
Fawaz

---

**From:** Heimberg, Scott [mailto:sheimberg@AKINGUMP.COM]
**Sent:** Wednesday, October 11, 2006 7:01 PM
**To:** Fawaz Arafat (ICS)
**Subject:** FW: John Snow Inc

**Premicare delivered the following shipment to the warehouse in Alexandria VA on the following Dates**

| Preemicare invoice Number | Reference ICS PO Number | Incubators QTY Normal Care | Incubators QTY Intensive Care | Date of invoice preemicare | Date of Shipment |
|---|---|---|---|---|---|
| #107,#108 | PO#EG1 1801 | **20** | | 11/1/2001 | 11/1/2001 |
| #109,#110 | PO#EG1 1801 | **20** | | 11/15/2001 | 11/15/2001 |
| #111,#112 | PO#EG1 1801 | **29** | | 11/26/2001 | 11/26/2001 |
| #114,#115 | PO#EG1 1801 | | **25** | 12/5/2001 | 12/5/2001 |
| #203,#204 | PO#EG1 1806 | | **7** | 2/22/2002 | 2/22/2002 |
| #201,#202 | PO#EG1 1806 | **18** | | 2/22/2002 | 2/22/2002 |
| | **TOTAL** | **87** | **32** | | |

**ICS Invoiced John Snow after the incubators were accepted by JSI at the warehouse as follows**

| ICS invoice number | Reference JSI PO | Incubators QTY Normal Care | Incubators QTY Intensive Care | Date of invoice ICS | Estimated Date of arriving Egypt and Hospitals |
|---|---|---|---|---|---|
| EG1 1803 | Contract 04-01-205 | **20** | | 11/6/2001 | 11/6/2002 |
| EG1 1804 | Contract 04-01-205 | **49** | | 11/26/2001 | 1/26/2002 |
| EG1 1805 | Contract 04-01-205 | | **25** | 12/12/2001 | 2/12/2002 |
| EG1 1806 | Contract 04-01-205 | **18** | **7** | 2/27/2002 | 4/27/2002 |
| | **TOTAL** | **87** | **32** | | |

***EXHIBIT 8***

| B/L - AWB # | Carrier | Date B/L | Arrivel Date in Egypt | Item Description | P.O. or Contract | Qty Received |
|---|---|---|---|---|---|---|
| POCLSOC151433483 | Chesapeake Bay | December 27, 2001 | January 26, 2002 | Incubator Normal care Including Servo Humidifier | 205 | 69 |
| POCLSOC211426813 | Endurance ERU2668 | March 27, 2002 | April 29, 2002 | Incubator Normal care Including Servo Humidifier | 205/A | 18 |
| | | | | | | |
| POCLSOC152434505 | Endeavor ENV 2658 | January 9, 2002 | February 12, 2002 | Incubator Intensive Care | 205 | 25 |
| POCLSOC211426813 | Endurance ERU2668 | March 27, 2002 | April 29, 2002 | Incubator Intensive Care | 205/A | 7 |

***EXHIBIT 9***

T20

# PREEMICARE INDUSTRIES, INC.

REPORT ON

Preemicare Incubators Model 605
Delivered under
Purchase Order # IFB 2623-0242-0101-8

January 7, 2003

# Table of Contents

INTRODUCTION .......... 3

FACT FINDING & TRAINING .......... 4

DETAILED TABLE OF PROBLEMS ENCOUNTERED, INCLUDING PROBABLE CAUSE & COMMENTS .......... 7

NOTE ON OVERHEATING: .......... 9

SUMMARY OF SPECIFIC CONCLUSIONS .......... 11

RECOMMENDATIONS .......... 12

APPENDIX 1 - Description of our Testing Protocol .......... 14

APPENDIX 2 – Sample of a Test Sheet .......... 15

APPENDIX 3 - Proposed Minutes of Meeting .......... 16

APPENDIX 4 - Comments on Proposed Minutes of Meeting of 12/12/02 .......... 18

## INTRODUCTION

Preemicare Industries Inc. manufactured and supplied, through IFB 2623-0242-0101-8, awarded in June of 2001, (and as subsequently amended,) a total of 119 Preemicare model no. 605 neo-natal incubators to ICS Inc., based in McLean, Virginia. ICS acted as the Supplier to John Snow Inc. for supply of this and other equipment under the above referenced IFB, to the U.S. Agency for International Development. These units were shipped to Egypt as part of the ongoing Healthy Mother/Healthy Child Program in place. The order was comprised of 32 Intensive Care units and 87 Normal Care units.

Preemicare's distributor in Egypt is Hi-Med, whose place of business is 41 Montaza St., Heliopolis, Cairo, Egypt. Hany El Shafei, the owner of this enterprise, has many years of experience servicing a large number of Preemicare model 205 & 305 incubators currently in service in Egypt.

Some time after the delivery and installation of this order of incubators the manufacturer, Preemicare, was advised by Hi-Med of a variety of miscellaneous problems related to the operation of some of the units. Initially efforts were made to "troubleshoot" the problems through the local agent. However this proved problematic as there was not an adequate inventory of spare parts on hand, and importation of all parts ordered on an "as needed" basis involved lengthy delays related to importation procedures into Egypt. Additional difficulties were encountered as the model 605 includes a number of sophisticated nuances not included in earlier product models, and for which Hi-Med required additional training.

The problems being described at various locations in Egypt were not consistent with our experiences with this product in other markets, and were not consistent with the testing each individual unit receives at the factory prior to shipment. (see Appendix 1)

In response to concerns related to delays in returning out-of-service units into service Preemicare elected to send Eng. Randa Rihana to Egypt with the following brief:

- To carry with her a specialized testing fixture unique to the model 605, and to train Hi-Med technicians in the use of this testing fixture
- To carry with her miscellaneous small parts to expedite the repair cycle of several units
- To train Hi-Med technicians in the nuances of the Model 605 that were distinct from the earlier models – and teach trouble shooting techniques
- To get a first-hand view and clear understanding of the environment within which the units were operating
- To make recommendations for any modifications she felt may be necessary to the installation procedure, operating procedure and servicing procedure as it relates to the Model 605.

Eng. Rihana is the Preemicare electrical engineer most intimately familiar with the functions of the electronic controls and circuitry and software on the Model 605 and has a thorough working knowledge of the entire manufacturing process of the Model 605. Ms. Rihana speaks several languages, including Arabic, fluently.

The body of this report is based on Ms. Rihana's visit to Egypt from December 08 thru December 16. The Hospitals visited were identified by JSI/TCA as having reported difficulties with some units.

## FACT FINDING & TRAINING

**12/09** – Arrived in Egypt

**12/10**
Met with local agent, Hany El Shafei of Hi-Med together with Hi-Med technicians.
Discussed reported problems that seemed common between various facilities.
Visited a local hospital to become familiar with local practices. This facility was equipped with 9 of Model 605 units which were placed in service by Hi-Med in the Spring of 2002. (These units were purchased privately by the hospital, and were not supplied by US AID.)
Conducted troubleshooting training with Hi-Med technicians/

**12/11**
Visited **El Fayaoum General Hospital**, inspected 2 Incubators on site, and made the following observations as itemized by serial number:

- S/N: 8798118 I: Out of Service – no display on LCD
- S/N: 9098075 I: Out of Service – no display on LCD

Observation: On removal each LCD display showed evidence of a chalk-like liquid residue on internal electronic components.
Action Taken: Each unit was field-tested using a test LCD / Display – and each unit functioned properly. LCD displays were removed from each unit for subsequent replacement by Hi-Med.

Visited **Sannoures Hospital** – Hi-Med installed 3 units, bearing serial numbers as follows, and conducted a brief training for the Doctor on site.

- S/N: 9098001 I
- S/N: 9098002 I
- S/N: 9098003 I

Observation: The physician present displayed polite interest in the training, but her time available was constrained by other pending duties. No members of the nursing staff or housekeeping/cleaning staff were made available for the training.
Action Taken: None

Visited **BaneSweif General Hospital,** inspected 7 Units, and made the following observations as itemized by serial number:

- S/N: 9098072 I: In Service - Working OK- Air Sensor loose (secured on site)
- S/N: 9098092 I: In Service - Working OK
- S/N: 8798098 I: In Service - Working OK
- S/N: 8798109 I: In Service - Working OK
- S/N: 9098093 I: In Service - Working OK
- S/N: 9098070 I: Out of Service – no display on LCD
- S/N: 8798106 I: Out of Service – no display on LCD

Observation: On removal each LCD display showed evidence of a chalk-like liquid residue on internal electronic components.
Action Taken: Each out-of-service unit was field-tested using a test LCD / Display – and each unit functioned properly. LCD displays were removed from each unit for subsequent replacement by Hi-Med.

**12/12**

Meeting with John Snow Inc –
Referenced separately:

- Proposed Minutes of Meeting– Appendix 3
- Comments on Proposed Minutes of Meeting of 12/12/02- Appendix 4

**12/13**
Visited **Samallout Hospital**, inspected 4 incubators, and made the following observations as itemized by serial number:

- Unit with S/N: 9098025 I: In Service - Working OK
- Unit with S/N: 9098030 I: Out of Service
- Unit with S/N: 9098031 I: Out of Service
- Unit with S/N: 9098029 I: In Service - Working OK

Observations: Both out-of-service units were not receiving power. Inspection disclosed that each unit contained two spent fuses.
Action Taken: The control boxes were removed to Hi-Med's facility for further testing. Additional testing disclosed that the EMI filters were also damaged. Filters and fuses were replaced and the units were tested and left with Hi-Med, ready for return to service.

Visited **El Menya General Hospital**, inspected 3 incubators, and made the following observations as itemized by serial number:

- S/N: 9098039 I: In Service - Working OK
- S/N: 9098040 I: In Service - Working OK
- S/N: 9098042 I: Out of Service.

Observations: The out-of-service unit showed markings consistent with extreme heat concentrated under the mattress tray local to the air heater. The Air Flow Sensor was damaged and the Air Scroll was deformed. Additional miscellaneous damage was noted.
Action Taken: Unit was permanently removed from service- The Control Box was removed to Hi-Med facilities for further testing. Additional testing showed Control Box working OK. Unit was left for Burn-in at Hi-Med facilities – Please see the NOTE on OVERHEATING - Page 9.

Visited **Mallawi Hospital**, inspected 4 incubators, and made the following observations as itemized by serial number:

- S/N: 9098043 I: In Service - Working OK
- S/N: 9098047 I: In Service - Working OK- but LCD contrast not working full range & Air Sensor loosened
- S/N: 9098041 I: In Service - Working OK
- S/N: 9098046 I: In Service - Working OK

Observations: Damage to unit S/N: 9098047 I is consistent with rough handling. Access roads to this location were extremely rough, and automotive travel even at very low speeds resulted in ongoing multiple jarring shocks.
Action Taken: Potentiometer replaced to restore full working range to LCD on unit S/N: 9098047 I. Sensor Housing was completely replaced.

**12/14**

Visited **Kawsia Hospital**, inspected 1 incubator, and made the following observations as itemized by serial number:

- S/N: 9098026I : Out of Service – Display on LCD was giving reading for display board failure.

Observation: On removal the LCD display showed evidence of a chalk-like liquid residue on internal electronic components.
Action Taken: The out-of-service unit was field-tested using a test LCD display – and the unit functioned properly. LCD displays were replaced in the field, and the unit was returned to service.

Visited **Al Iman Old Hospital**, inspected 4 incubators, and made the following observations as itemized by serial number:

- S/N: 9098023I: Out of Service – no display on LCD
- S/N: 9098020I: Out of Service – no display on LCD
- S/N: 9098018I: In Service - Working OK
- S/N: 9098022I: In Service - Working OK

Observation: On removal each LCD display showed evidence of a chalk-like liquid residue on internal electronic components.
Action Taken: Each out-of-service unit was field-tested using a test LCD display – and each unit functioned properly. LCD displays were replaced in the field, and the units were returned to service.

Visited **Al Iman New Hospital**, inspected 5 incubators, and made the following observations as itemized by serial number:

- S/N: 9098011 I: In Service - Working OK
- S/N: 9098012 I: In Service - Working OK
- S/N: 9098014 I: In Service - Working OK
- S/N: 9098006 I: In Service - Working OK Water Level Sensor in Humidifier was erratic
- S/N: 9098014 I: Out of Service - Fan Scroll was rubbing on Tub material causing Air Flow Alarm to sound

Observations: Build up of minerals and other residue on the Water Level Sensor (unit S/N: 9098006 I) is consistent with the use of tap water in the humidifier. The Fan Scroll had been removed from the unit and improperly replaced.
Action Taken: The Fan Scroll was replaced on unit S/N: 9098014 I, and the unit was returned to service. Unit S/N: 9098006 I was left in service and a new Water Level Sensor was ordered.

## DETAILED TABLE OF PROBLEMS ENCOUNTERED, INCLUDING PROBABLE CAUSE & COMMENTS

| Units w/Problems | S/N | Problem Encountered | Probable Cause of Problem | Comments |
|---|---|---|---|---|
| El Fayoum General Hospital | 8798118 I | No Display on LCD | Chalk-like liquid residue present is consistent with cleaning agents in use. Chemical has migrated inside the front panel leaving residue on the circuitry, and leading to a failure of the Display processor board and LCD | Page 51. of the Operating Manual recommends the use of a type of cleanser which does not leave a residue. Additionally the cleaning should be accomplished by using a cloth dampened with the cleaning agent. Care should be taken to insure that the cleaning agent is not splashed indiscriminately over the area of the LCD display. |
| | 9098075 I | No Display on LCD | (same as above) | Same as above |
| BaneSweif General Hospital | 9098072 I | OK- Air Sensor loose | Sensor Housing is not being removed during the cleaning of the unit. This results in potential rough handling of the Air Sensor during the cleaning process, leading to a loosening of the Air Sensor. | Page 47, item # 6 requires the removal of the Sensor Housing (including Air Sensor) when cleaning the acrylic hood. Air Sensor is permanently fixed inside the Housing, and shouldn't be pulled out. A Label recommending not to hang objects on the sensor is also affixed in the Hood next to the housing. |
| | 9098070 I | No Display on LCD | Chalk-like liquid residue present is consistent with cleaning agents in use. Chemical has migrated inside the front panel leaving residue on the circuitry, and leading to a failure of the Display processor board and LCD | Please see Comments #1. |
| | | Motor drive shaft is sticking | Failure to remove the Motor Fan Scroll during the cleaning operation will cause residue to be trapped beneath the Fan Scroll leading to a build-up of hardened residue around the motor drive shaft. | Page 49 of the Operation Manual Fan requires that the Fan Scroll should be removed as shown during the cleaning operation. (Also see Comment # 1 – regarding recommended cleaning material.) |
| | 8798106 I | No Display on LCD | Chalk-like liquid residue present is consistent with cleaning agents in use. Chemical has migrated inside the front panel leaving residue on the circuitry, and leading to a failure of the Display processor board and LCD | Please see Comments # 1. |
| Samallout Hospital | 9098031 I | 2 Spent Fuses | This problem is consistent with a very high Electrical Surge, which has damaged the EMI filter, and blown the fuses protecting the circuit boards. | 4. Page 10 of the Operation Manual describes the Power Input as 220/240 Volts. Each unit is protected by a spike suppressor of 270V. A voltage higher than 270V will trigger the suppressor and cause the fuses to blow, preventing damage to the internal circuitry of the controls. |
| | 9098030 I | 2 Spent Fuses | Same as above | Please see Comment # 4. |

| Units w/ Problems | S/N | Problem Encountered | Probable Cause of Problem | Comments |
|---|---|---|---|---|
| El Menya General Hospital | 9098042 I | Heater Failure – Overheating causing removal of unit from service. | Failure is still under investigation. Controller was retrieved and checked at Hi-Med facilities, and all circuit board readings were correct. | Please see the <u>NOTE on OVERHEATING</u> below for further description- Page 9. |
| Mallawi Hospital | 9098047 I | LCD Contrast Not at full capacity | Resistance detected in the rotation of the LCD Contrast Potentiometer is consistent with foreign matter (such as sand or dirt) being trapped inside the control knob. | 5. Care should be taken to protect the units in the field from air-borne contaminants such as dirt or sand from migrating into the controls of the unit. |
| Kawsia Hospital | 9098026 I | No Display on LCD | Chalk-like liquid residue present is consistent with cleaning agents in use. Chemical has migrated inside the front panel leaving residue on the circuitry, and leading to a failure of the Display processor board and LCD | Please see comments # 1. |
| El Iman Old Hospital –Assiout | 9098023 I | No Display on LCD | Chalk-like liquid residue present is consistent with cleaning agents in use. Chemical has migrated inside the front panel leaving residue on the circuitry, and leading to a failure of the Display processor board and LCD | Please see comments # 1. |
| | 9098020 I | No Display on LCD | Chalk-like liquid residue present is consistent with cleaning agents in use. Chemical has migrated inside the front panel leaving residue on the circuitry, and leading to a failure of the Display processor board and LCD | Please see comments # 1. |
| El-Iman New Hospital | 9098006 I | Water Level Sensor Erratic | Use of tap water, containing minerals and other residue, in the Humidifier – shortening the life of the Water Level Sensor. | 6. Page 35 of the Operation Manual recommends Sterilized Water only for use in the Humidifier. |
| | 9098013 I | Air Flow Alarm | Fan Scroll was removed during cleaning and improperly re-installed. | 7. All Fan Scrolls on the units referenced in this report have been replaced by a modified design that incorporates a locking locator nut in the design – reducing the likelihood of improper re-installation. Hi-Med has sufficient parts inventory to replace the Fan Scrolls in the remainder of the US AID units. |

**NOTE ON OVERHEATING:**

Of all of the units visited the problem realized with this unit is the most significant; as it is the only instance where there is a risk to an infant. While the other problems are troublesome, they pose no risk to the patient. Consequently this event has been a primary focus of our review, and has contributed to the late delivery of this report.

There are several possible causes for overheating. Below is a table listing various possible causes, and also showing the safeguards built into the product design to prevent any such failure from putting a patient at risk. In each case a breakdown of multiple safeguards would be required in order to account for the damage associated with this equipment failure.

By way of explanation, the air in the incubator is warmed by an electrical heater located beneath the mattress deck. The operating temperature is determined by the programmed settings input by the operator, as described on Page 20 of the Operations Manual. The heater corrects the air temperature within the ranges permitted by the software as more specifically described on Page 10 of the Operation Manual. The heater is regulated, on & off as dictated by the settings, by two temperature sensors. The Main air temperature sensor is located in the Sensor Housing inside the acrylic hood, and the Back-up air temperature sensor is located below the mattress deck, in the return air passage. Any failure on the part of the Heater to maintain the set temperature is signaled either by a Hi-Temp or Low-Temp alarm. In the case of a Hi-Temp alarm power to the heater is discontinued. In the case of the measured temperature being at the upper maximum of the setting range of 39.9 C . an independent Hi-Temp Cut-off Potentiometer will discontinue the supply of power to the unit. Each alarm is both audible and visual.

| **Possible Cause for Over-heating** | **Design prevention** |
|---|---|
| Motor Failure - failing to circulate heated air – (from failure to run or failure to turn Fan Scroll) – resulting in Heater (Overheating) Failure | An Air Flow Sensor is located directly in the flow of air from the Fan Scroll. Any reduction (below a preset value) of the Air Flow coming from the motor will generate a visual and audible alarm (which cannot be silenced) and will cut the power to the heater. |
| Main Air Flow Sensor Failure – simultaneous with Motor Failure | This would trigger the Hi-Temp Alarm and ultimately cause the Hi-Temp Cut-off Potentiometer to discontinue the supply of power to the heater |
| General Software Failure resulting in Processor not cutting the power to the Heater | A Calibrated Hi-temperature Cut-Off Potentiometer is implemented. It works independently from the Microprocessor and cuts the heater (no matter what) when Measured Temperature from Air Sensor Hood reaches 39.9 Deg C. |
| Main Electronic Relays (TRIAC) commanded by the Processor fail. | There are 2 electronic relays. In addition a mechanical relay is implemented and is commanded by the High Temp Cut-off Potentiometer. |
| Mechanical relay failure due to extremely high temperature applied on it | Function of 2 electronic relays (TRIAC) are unrelated to the mechanical relay and are the primary relays controlling the heater. |

In spite of our best efforts to date we have been unable to recreate such a failure at our facility, but investigation is still under way. The fact that the unit had functioned properly for several weeks prior to the event and also the fact that the software and control panel in the damaged unit was afterward found to be functioning normally, seem to indicate that the problem is not related to control software.

This event could be accounted for if a foreign object made from a combustible fabric-like material became entangled around the Heater. Under this circumstance the motor would function normally – circulating air past the Air Flow Sensor and the Heater. In fact if a combustible fabric-like material was entangled around the Heater – restricting the circulation of heat inside the unit – the Air Temperature Sensors (Main & Back-up) would be instructing the processor board to provide a full supply of electricity to the Heater to make up for any shortfall as measured against the set temperature. Until combustion occurred there would be no overt change in temperature inside the unit. This is consistent with the attendant interviewed by Hi-Med, who indicated that no alarm sounded prior to the event. In the absence of compelling evidence pointing to any alternate cause, this possibility, however unlikely, must be considered. However we continue to self-examine all aspects of the mechanical hardware as well as the control software of the unit for any additional clues as to how such an event could occur.

## SUMMARY OF SPECIFIC CONCLUSIONS

1. Cleaning materials used are not as stipulated on Page 51 in the Operator's Manual. Significant quantities of chemical cleaning agents have migrated inside the Front Panel leaving residue on the circuitry, producing short-circuits on the Front Panel boards. This has lead to the failure of the LCD and Display processor board in various units.

2. The Fan Scroll has not been removed while cleaning some units as recommended on Page 49 of the Operator's Manual. This results in a buildup of residue from cleaning materials being trapped beneath the scroll and solidifying around the motor drive shaft, causing high torque on the motor. This might shorten the motor life and in some case disable it from turning freely.

3. When cleaning the acrylic hood, the Sensor Housing is not being removed as recommended on Page 47 of the Operation Manual. The Air Sensor is then subject to rough handling during the cleaning process and with time the connection may fail.

4. The AC Power in some Hospitals is not stable within acceptable limits. Our Units are protected against high spikes generated by huge play in the Power. A spike suppressor is used to protect the circuitry, but spikes higher that 270V will trigger the fuses, causing the units to go out-of-service.

5. The Motor Fan Scroll is sometimes loose on the motor drive shaft – either due to improper re-installation after cleaning, or due to a relaxation in the material of the scroll itself. This results in friction between the scroll and the tub base, causing noise and reducing the air flow. This condition will result in the air flow alarm sounding.

6. Operating Manual requests that Humidifier should be filled with Sterilized water. Using Tap water rich in minerals, salt and residue will shorten the life of the level sensor.

**RECOMMENDATIONS**

Cleaning Chemicals Currently In Use (as referenced in Items 1 & 2, above) - While the easy answer is to stipulate that the cleaning materials recommended by the Manufacturer be used – it is unlikely that this insistence will result in a change to the current cleaning protocol in place at the local hospitals. The Manufacturer recognizes that there is a distinct advantage to use a cleaning material that is locally available and apply it generically to all equipment, irrespective of Manufacturer's recommendations. Further it is unlikely that it will be possible to effectively retrain purchasing agents and cleaning staff, many of whom have limited skill sets. We must presume that the chemicals currently in use will continue in use, and that they will be liberally applied to the exterior surfaces of the units, irrespective of our instructions.

In consideration of this we recommend the following:

a) the installation of an impermeable sealant between the Front Display Panel and the body of the Tub – to prevent the continued migration of chemicals and residues onto the LCD processor boards, and
b) the installation of an impermeable elastomeric seal around motor drive-shaft, to prevent the build-up of solidified materials around the shaft to prevent added torque to the motor load.
c) Provide simple cleaning instructions in Arabic as a guide to hospital staff

Damage to Air Sensor (as referenced in Item 3 above) – Currently the removal of the Sensor Housing requires the removal of two screws. Apparently this has been a deterrent to hospital cleaning staff.

In consideration of this we recommend the following:

a) to refit the fasteners of the Sensor Housing so that it may be removed using two thumb-screw type connections, and
b) include removal instructions in Arabic, to accompany the above-referenced Arabic instructions

Surges in Electrical Energy Beyond Acceptable Limits (as referenced in Item 4 above) - This condition is expected to continue. This circumstance is beyond the control of the Manufacturer. This problem may be mitigated if the hospitals in question elect to install equipment necessary to condition the electricity to acceptable ranges. The interruption in service of the units affected by unacceptable electrical surges is brief, as the fuses are triggered and no substantial damage to the units is experienced.

Motor Fan Scroll Loosening (as referenced in Item 5 above) – This problem has been addressed by the Manufacturer. All units visited have been updated with a modified Fan Scroll using a locking locator nut. This will assist in reducing noise, assisting in insuring proper re-installation after cleaning and increasing the life of the fan scroll itself. The replacement parts to effect this modification are currently in Egypt, and many of the units have already been so corrected.

<u>Use of Sterilized Water in Humidifiers (as referenced in Item 6 above)</u> – Our preliminary investigation leads us to believe that the practice of using tap water will continue. We have come to understand that sterilized water is not readily available to the staff at some or perhaps many of the hospitals in question. The continued use of tap water will result in calcification and corrosion of the sensing element of the Level Sensor failing at an accelerated rate. We are currently experimenting with various other less corrosive conductive materials that may be suitable for this application. In the interim the Level Sensors will require replacement more frequently than originally contemplated.

<u>Spare Parts</u>
Initial steps have been taken to insure that adequate quantities of spare parts are inventoried with Hi-Med in Egypt. Some items will be required in greater quantities than it was possible to forecast earlier - in order to compensate for damage done to the units - specifically the LCD display components - that are not related to normal wear and tear. We estimate that within 60 days a full inventory of components will be available locally

Appendix 1 – Description of our Testing Protocol

Appendix 2 - Sample of a Test Sheet

Appendix 3 – Proposed Minutes of John Snow Meeting

Appendix 4 - Comments on Proposed Minutes of Meeting of 12/12/02

# APPENDIX 1

## Description of our Testing Protocol

**Purpose:**
This appendix outlines the test steps taken to test and calibrate each Incubator Model 605 prior to shipment.

**Description:**
The Controller includes a maximum of 6 boards: Display Board, Processor Board, Power Supply board Main, Power Supply board option, Humidity board and Oxygen Board.
The Sensor Housing includes 2 boards, 1 Air Sensor permanently fixed and one Humidity sensor (removable). It also can receive a Skin Sensor and an Oxygen Sensor.
The Oxygen manifold is attached to the Pedestal.

**Notes:**
Each Unit has its own DHR (Device History Record) to ensure traceability. Data and readings from every step described hereafter in the tests are recorded and kept in the DHR.

**Testing:**

- Sensor Housing testing:

Each Sensor Housing is tested individually.

- Boards Testing:

Each board is individually tested and calibrated. This test is designed to check the board and components response to various situations. Boards that fail to pass the test (values measured are not in the acceptable limits) are rejected.

- Controller burn-in:

Once the boards have passed the tests, they are mounted in the Controller. Each controller will then go on the bench for a 48 hours burn-in period.
This test is designed to check for any component aging or failure in the normal working status. (48 hours is usually more than enough to detect any aging /failure of components).

- Temperature Accuracy Test

The controller will then go into its unit (Tub/Hood) for a Temperature Accuracy test.
This test is designed to compare Air temperature Reading from Air Sensor with various Air temp set points. A Calibrated Air temperature probe is also used in this test to compare readings.
This test usually needs 8 hours to be performed.

- Humidity test:

This test is designed to check the Humidity Servo in various conditions. It also checks and compares the Humidity Reading with the Humidity Set Points under various Air Set Temperature. A Calibrated digital Hygrometer is also used to compare results.
The unit is then left to work non-stop for 1 week in order to finish all tests.

- Oxygen test:

The O2 manifolds are calibrated individually. This test is designed to check the Oxygen Servo System and its reaction to various conditions. It also checks the O2 Concentration and how fast it reaches the set-value.
An independent calibrated O2 analyzer is used to compare readings.

## APPENDIX 3

### Proposed Minutes of Meeting

Date : 12/10/2002

**Attendees:**
Ms. Katrina Kruhm, JSI
Dr. Lamia Mohsen, JSI
Mr. Sobhi Moharram, JSI
Dr. Ayman el Mohandes, JSI
Eng. Khaled Saber, JSI
Eng. Iman Radwan, JSI

Dr. Abdel Meguid Youness, ICS
Mr. Hazem Youness, ICS

Dr. Hany El Shafei, Hi Med Egypt

Ms. Randa Rihana, Preemicare Industries, Inc.

Mr. Yousri Aclimandos, TCA

**Location: JSI offices in Maadi.**

**Purpose:**
Address problems incurred during Hi-Med Egypt Co. installation and maintenance of infant incubators procured by TCA for JSI from ICS. Address additional issues related to warranty extension and spare part availability.

**Issues raised/discussed:**

1- Comments from Eng. Randa based on review of machines in Fayoum and Beni-Suef:
Majority of problems have been caused by improper cleaning methods. Control unit is being damaged because the unit is being flooded. This may cause the display to go blank and for the alarms to go off unnecessarily. The motor/fan is also becoming blocked because of build-up.

2- Local agent (Hi-Med) confirmed that no training has been provided at the time of installation regarding proper cleaning methods.

3- Other complaints identified by JSI staff -- these complaints are to be inspected by Eng Randa during her field visits:
a- Sensor housing
b- Alarms
c- Air sensor
d- Oxygen hose

4- Eng Randa explained that she is adding sealant on the control modules of all incubators visited. She approved that Eng Iman from JSI could add the sealant to the incubators she is visiting in Qena.

5- Next steps discussed:
a- Eng Randa would submit report to JSI by December 19, 2002 on observations and recommendations for solving problems.
b- Detailed instructions for proper cleaning procedures in Arabic needs to be developed and printed to accompany all incubators by Preemicare/Hi-Med.
c- Plan for putting the sealant on all Preemicare incubators needs to be finalized by Preemicare/Hi-Med.
d- Inspection/Installation of incubators currently in the JSI/TCA warehouse needs to be conducted by Hi-Med to ensure that there are no additional out-of-box failures.
e- In-service/refresher training needs to be provided at all facilities. An initial training should be held by Hi-Med with JSI Neonatal Clinical Supervisors. A training plan should then be developed for each governorate.

6- Warranty Issues:
a- JSI/TCA have requested an extended warranty to add the year of 2003 to the warranty.
b- JSI/TCA needs a letter from both Preemicare and Hi-Med that all problems have been solved and that spare parts will be available for warranty maintenance as required and will not require long delivery items.
c- The local agent should have available spare parts/disposables for MOHP procurement after the warranty per the terms of the IFB.

7- Minutes:
a- The minutes from the last meeting have been delayed and need to be shared with all parties.

**Thank You.**
**K. Kruhm**

## APPENDIX 4

**Comments on Proposed Minutes of Meeting of 12/12/02.**

Item # 1 – No additional comments.

Item # 2 – Clarification - Local agent (Hi-Med) indicated, or intended to be understood, that frequently during installation personnel responsible for the use of the equipment, and the cleaning and maintenance of the equipment were engaged in their daily duties, and were not made available for training. This applies to representatives of both medical as well as cleaning staff.

Item # 3 – Oxygen supply hose for intensive care units is not traditionally supplied with an incubator.

Item # 4 – Sealant is being added between the acrylic panel housing the LCD control display and the body of the incubator to protect internal electronic components, in recognition of the local practice of flooding the exterior of the unit with cleaning chemicals. It is important to note that the part of the incubator referenced is outside of the chamber enclosing the patient.

Item # 5a – Eng. Rihana committed to submitting her report as soon as practicably possible. There were a number of items unknown to her at the time the scheduling of the report was discussed – including time and resources available on her return required to conduct software investigations and availability of other members of the Preemicare staff whose input she required – that prevented her from committing to a specific date.

Item # 5d – It is important to note that Eng. Rihana saw no evidence of "out-of-the-box" failures during her visit. Most of the incubators visited were found to be in-service. Those that were out-of-service had been damaged, in the majority of cases, by migration of cleaning chemicals into the LCD display electronic components.
Testing at the Preemicare facility is not done on a random sampling basis. Each incubator is placed in service and operated for a minimum of 48 hours, under a range of temperature and humidity settings. The test protocol on each individual unit is very stringent.
Additionally, once the units were shipped from the Preemicare facility and received by JSI/TCA in Virginia they were again inspected prior to acceptance.
Finally, all of the units visited had obviously been working prior to the damage caused by the flooding of the cleaning chemicals having occurred.

Item # 6a – In response to the request by JSI/TCA for an extended warranty, Dr. Abdel Maguid Youness, ICS committed to providing JSI/TCA the requested extension.

Item # 7 - To date no minutes from any earlier meetings regarding this contract have been provided to Preemicare.

*EXHIBIT 10*

21

Hi-Med letter

From: Reginald Gipson
Sent: Monday, January 20, 2003 11:25 AM
To: Katrina Kruhm
Subject: FW: PREEMICARE 605 INCUBATORS

-----Original Message-----
From: Hany ElShafei [mailto:hanyhimed@hotmail.com]
Sent: Monday, January 13, 2003 2:32 PM
To: rgipson@jsiegypt.com
Cc: tca@tadata.net.eg; icsegypt@gega.net; Jim@preemicare.com; Randa@preemicare.com; tca@gega.net; hanyhimed@hotmail.com
Subject: PREEMICARE 605 INCUBATORS

>>Dr. Reginald Gipson
>>Chief of Party, HMHC
>>JSI.
>>Maadi - Cairo
>>Egypt.
>>
>>
>>Subject: Preemicare incubators model 605 delivered by Preemicare
>>Industries,
>>Inc. through ICS to JSI, Healthy Mother/ Healthy Child USAID Project.
>>
>>
>>Dear Dr. Gipson,
>>
>>We would like to inform you that we received the report of Preemicare
>>Engineer dated January 7, 2003. The Preemicare report tackles most of
>>the problems identified by our technical team. The report recommends
>>certain corrective measures that Hi-Med as the local representative
>>will be responsible to implement. JSI technical engineers have also
>>requested certain actions to be taken. To comply with those
>>recommendations and requests, Hi-Med will perform a check on all 119
>>incubators using a check list that will be developed in collaboration
>>with JSI technical staff. The aim of the check to be performed is to
>>make sure that all incubators are safe and do not represent any
>>danger.
>>
>>Some of the issues to be done by Hi-Med include but are not limited
>>to:
>>
>>1- Apply a sealant on all control modules, incubator bodies and motor
>>drive-shafts to prevent leakage and/or built up of cleaning material
>>residue.
>>2- Refit the fasteners of the sensor housing so that it may be removed
>>using two thumb-screw type connections.
>>3- Installing the modified fan scroll using a locking locator nut and
>>replacing all defective fans.
>>4- Make sure that all LCD panels are working properly.
>>5- Make sure that all alarms are tested and certified to be working
>>and
>>accurate.
>>6- Measure the sound imposed to the babies to make sure that it is
>>within the acceptable range.
>>7- Deliver Arabic instructions for operation and cleaning while
>>providing refresher training at each facility.

***EXHIBIT 11***

92

JSI

**JOHN SNOW, INC.**
**Healthy Mother/ Healthy Child Results Package**

January 14, 2003

Dr. Esmat Mansour
PHC Undersecretary
HM/HC Executive Director
Cairo, Egypt

**Subject:** Preemicare incubators model 605 delivered by Preemicare Industries, Inc. through ICS to JSI, Healthy Mother/ Healthy Child USAID Project.

Dear Dr. Mansour,

We would like to share with you the Preemicare report dated January 7, 2003 and the subsequent letter received from Hi-Med President, Dr. Hany Al Shafei, the local representative of the manufacturer.

As noted in the report and the subsequent letter, there is a need to update/repair some of the features on each of the incubators. Based on this need, JSI agrees with Hi-Med that the incubators should not be used in any of the MOHP facilities until all of the incubators are inspected and updated. Hi-Med estimates that this process will take approximately 30 days for the 119 units after the necessary parts are made available by Preemicare.

We, therefore, would like to recommend that the attached list of facilities which have been provided with the subject incubators are notified that the incubators should not be used until further notice. The JSI Clinical Supervisors assigned in the field can assist in this process, specifically for the facilities in Upper Egypt.

After the inspection/updates are completed, Hi-Med will issue written statements certifying that each incubator has been updated and meets all required safety standards. We will then forward these certificates to you so that the incubators may be returned to service.

It is JSI's understanding that the manufacturer suggested solutions and the commitment of Hi-Med to implement the recommendations will resolve the existing problems and guarantee the proper operation of the incubators. JSI and TCA will follow-up with the Supplier/Local Agent to monitor the timely correction of the problems identified. In case of delays or if further concerns are identified, JSI will keep both the MOHP and USAID informed.

Thank you for your attention to this urgent matter. Please feel free to contact me if you have any further questions.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

cc: Dr. Nahed Matta, HM/HC RP Team Leader

Ref.: 3442
RG/kck

***EXHIBIT 12***

4

Ministry of Health & Population
Healthy Mother/Healthy Child Project
in Cooperation with USAID

وزارة الصحة والسكان
مشروع صحة الأم والطفل
بالتعاون مع وكالة التنمية الدولية الأمريكية

July 2, 2003

**Dr. Reginald F. Gipson M.D.**
**Chief of Party**
**John Snow, INC.**

صادر ٢٠٨٧
مشروع صحة الأم والطفل
تاريخ ٢٠٠٣/٧/٥
مرفقات

Dear Dr. Gipson,

Reference is made to the Premicare Incubators, purchased last year through TCA/JSI/offshore procurement and taken out of service by the end of January 2003. As per our agreement in the meeting held at JSI premises on July 1st 2003 in the presence of JSI/HMHCP/USAID/TCA representatives to :

- Collect all Premicare Incubators model 605 distributed in 2002 on neonatal care units.
- Perform the required fixation and maintenance in a central workshop in Cairo by certified engineers form Premicare.
- Premicare should also issue a certificate that the incubators are functioning safely and efficiently after retrofitting them as incubators are still in the warranty period.

Please take the necessary arrangements to prepare a suitable place for fixing the incubators and arrange their transportation from hospitals to this site in Cairo and back to hospitals after necessary maintenance is performed.

Thank you and best regards

Esmat

**Dr. Esmat Mansour**

**HM/HC Project Executive Director**
**Undersecretary for Primary Health Care**

| Ref. 3647 | |
|---|---|
| Action | Date |

c.c.: Dr. Nahed Matta HM/HCP Team Leader

***EXHIBIT 13***

25

Ministry of Health and Population
HM/HC Project
In Cooperation with USAID

Dear Dr. Head of **Kouseyah District Hospital**

As per the Preemicare company's request and the ICS company that delivered the Preemicare incubators model number 605 that has been distributed to the neonatal care units in El Kouseyah Hospital. The company will collect the incubators from the hospital units to facilitate making the necessary maintenance in a special workshop belongs to the company itself.

Therefore, we kindly request you to take the necessary action to deliver these incubators to the company's representative after his signature on a receiving receipt for the incubators stamped by the company, provided that the company will return the incubators as soon as they finish from the maintenance process.

Best regards,

Dr. Esmat Mansour
IHC Undersecretary
HM/HC Executive Director

**Receiving Receipt**

Governorate: **Assiut**
Hospital Name: **Kouseyah District Hospital**

I hereby **Mansour Mohamed Mahmoud Saadawy, ID number 2103032**, ICS representative, received one Preemicare incubator model number 605 as described:
1- Incubator number 909802611.

For the maintenance process provided that the incubator will be returned to the hospital as soon as the maintenance process is done as the incubator is still in the warranty.

This is a receipt from the company with the above mentioned subject.

Receiver:

Mansour Mohamed Mahmoud Saadawy

**Receiving Receipt**

Governorate: **Fayoum**
Hospital Name: **Senouras**

I hereby **Ali Fathy Ali Hassan Nassar, ID number 61594 Fayoum**, ICS representative, received 3 Preemicare incubators model number 605 as described:

1. Incubator number 90980031.
2. Incubator number 90980021.
3. Incubator number 90980011.

For the maintenance process provided that the incubators will be returned to the hospital as soon as the maintenance process is done as the incubators are still in the warranty.

This is a receipt from the company with the above mentioned subject.

Receiver:

Ali Fathy Ali Hassan

**Receiving Receipt**

Governorate: **Assiut**
Hospital Name: **Ob/Gyn Hospital**

I hereby **Mohamed Sayed Mohamed, ID number 50804**, ICS representative, received 4 Preemicare incubators model number 605 as described:

1. Incubator number 90980181.
2. Incubator number 90980201.
3. Incubator number 90980221.
4. Incubator number 90980231.

For the maintenance process provided that the incubators will be returned to the hospital as soon as the maintenance process is done as the incubators are still in the warranty.

This is a receipt from the company with the above mentioned subject.

Receiver:

Mohamed Sayed Mohamed

**Receiving Receipt**

Governorate: **Menya**
Hospital Name: **Menya Hospital**

I hereby **Mohamed Sayed Mohamed, ID number 50804**, ICS representative, received 3 Preemicare incubators model number 605 as described:

1. Incubator number 9098039.
2. Incubator number 9697127.
3. Incubator number 9098040.

For the maintenance process provided that the incubators will be returned to the hospital as soon as the maintenance process is done as the incubators are still in the warranty.

This is a receipt from the company with the above mentioned subject.

Receiver:

Mohamed Sayed Mohamed

**Receiving Receipt**

Governorate: **Assiut**
Hospital Name: **Al Eman Al Gadeeda Hospital**

I hereby **Mohamed Sayed Mohamed, ID number 50804**, ICS representative, received 5 Preemicare incubators model number 605 as described:

1. Incubator number 90980121.
2. Incubator number 90980061.
3. Incubator number 90980141.
4. Incubator number 90980111.
5. Incubator number 90980131.

For the maintenance process provided that the incubators will be returned to the hospital as soon as the maintenance process is done as the incubators are still in the warranty.

This is a receipt from the company with the above mentioned subject.

Receiver:

Mohamed Sayed Mohamed

***EXHIBIT 14***

# Minutes of the Meeting
# Review and Update on PreemiCare Incubators

**Date:** 29 September 2004
**Time:** 11:30 am – 12:30 pm
**Participants:**

**Dr. Esmat Mansour,** Head of IHC and Nursing Sector, HM/HC Executive Director, MOHP
**Dr. Nahed Matta,** HM/HC Team Leader, USAID
**Dr. Ali Abdel Megeid,** Workforce Team Leader, USAID
**Mr. Yousri Aclimandos,** Vice President, TCA
**Dr. Reginald Gipson,** Chief of Party, JSI

**Purpose:**

1. To review the current situation in reference to the disposition of the PreemiCare Incubators.
2. To address all technical matters pertaining to the incubators and decide on the actions required to have the incubators operating safely, efficiently, tested and returned to the MOHP.
3. To discuss and agree on the action plan for options to resolve the current situation.
4. To discuss the next steps required to implement the plan..

**Plan of Action:**

As a result of the discussions, consensus was reached on the following plan of action:

1- The Supplier, ICS, will proceed with having two incubators repaired by Arj-Med. ICS and PreemiCare are currently working with Arj-Med to be PreemiCare's representative in Egypt.
2- The two incubators will be selected by the MOHP and JSI engineers. It was noted that each incubator which was tested by ECRI has a data sheet which specifies each of the test and records whether the incubator passed or failed the different test items. Therefore, part of the criteria for selection of the incubators to be repaired includes failing the ECRI critical test for temperature control and alarm.
3- The MOHP and JSI engineers were trained by ECRI to perform the required test. Therefore, once the incubators are repaired the MOHP and JSI engineers will retest them according to the test protocol and compare the results after the repair

with the results from the ECRI test before to determine if the areas in which the incubators failed the previous test have been corrected.

4- If the incubators pass the initial tests, an extensive trial test will be performed which includes a simulation test of the incubators operation capacity in a reliable Neonatal Unit setting for 2 to 4 weeks where monitoring of the normal operation (without any infant) will be none by MOHP Neonatal Unit staff, MOHP and JSI engineers.
5- If the incubators pass the trial period, discussions will then proceed in reference to the estimated cost and who will provide the funds for repairs, required spare parts and a maintenance contract for one year for the incubators.
6- Once agreed, the other incubators will be turned over to Arj-Med to undergo the same level of repair and maintenance, test and delivery to the MOHP if they pass the test and trial period.

***EXHIBIT 15***

**Ministry of Health & Population**
**Healthy Mother/Healthy Child Project**
**in Cooperation with USAID**

**وزارة الصحة والسكان**
**مشروع صحة الأم والطفل**
**بتعاون مع وكالة التنمية الدولية الأمريكية**

December 15, 2004

Dr. Ali Abdel Megeid
HM/HC Team Leader
USAID

Dear Dr. Abdel Megeid,

As a follow up to my letter dated June 9, 2004 and Dr. Matta's reply dated July 13, 2004 (see attached), I would like to express my satisfaction with the current resolution of the issues related to the Preemicare Incubators. We appreciate the continuious cooperation of all parties in resolving this matter, especailly the approval of USAID (as stated in Dr. Matta's letter) through JSI's commodity procurement program to procure additional incubators which some were temporarily used while the Preemicare incubators were being repaired. Reference our agreement reached at the 29 September 2004 meeting (see attached Minutes of the Meeting) we are in the process of receiving and testing the Preemicare incubators and distributing them according to the Hospitals' requests and need for incubators.

We appreciate USAID and JSI actions to maximize the use of incubators for the benefit of the Project and especially for Egyptian newborns.

Thanks for your continuous cooperation.

Sincerely,

Esmat

Dr. Esmat Mansour
Head of IHC & Nursing Sector
HM/HC Executive Director

CC: Dr. Gipson, COP, JSI

21 El Sabaa Sakayaat St., Off El Kasr El Eini st., Fom El Khalig -cairo
Area Code No . 11628 Zein El Abdein
Tel. :5313011 - 5313761- 5313762 Fax:02-5313757

٢ ش السبع ساقايات متفرع من شارع القصر العيني - فم الخليج - القاهرة
رقم بريدى ١١٦٢٨ بريد زين العابدين
تليفون : ٥٣١٣٠١١ - ٥٣١٣٧٦١ - ٥٣١٣٧٦٢ فاكس : ٥٣١٣٧٥٧ - ٠٢

***EXHIBIT 16***

**752.245-71** Title to and Care of Property

As prescribed in 745.106(a), the following clause shall be included in all contracts when the contractor will acquire property under the contract for use overseas and the contract funds were obligated under a Strategic Objective agreement (or similar agreement) with the Cooperating Country.

**TITLE TO AND CARE OF PROPERTY (APR 1984)**

(a) Title to all non-expendable property purchased with contract funds under this contract and used in the Cooperating Country, shall at all times be in the name of the Cooperating Government, or such public or private agency as the Cooperating Government may designate, unless title to specified types or classes of non-expendable property is reserved to USAID under provisions set forth in the schedule of this contract; but all such property shall be under the custody and control of Contractor until the owner of title directs otherwise, or completion of work under this contract or its termination, at which time custody and control shall be turned over to the owner of title or disposed of in accordance with its instructions. All performance guaranties and warranties obtained from suppliers shall be taken in the name of the title owner. (Non-expendable property is property which is complete in itself, does not lose its identity or become a component part of another article when put into use; is durable, with an expected service life of two years or more; and which has a unit cost of $500 of more.)

(b) Contractor shall prepare and establish a program, to be approved by the Mission, for the receipt, use, maintenance, protection, custody, and care of non-expendable property for which it has custodial responsibility, including the establishment of reasonable controls to enforce such program.

(c) (1) For non-expendable property to which title is reserved to the U.S. Government under provisions set forth in the schedule of this contract, Contractor shall submit an annual report on all non-expendable property under its custody as required in the clause of this contract entitled "Government Property".

(2) For non-expendable property titled to the Cooperating Government, the Contractor shall, within 90 days after completion of this contract, or at such other date as may be fixed by the Contracting Officer, submit an inventory schedule covering all items of non-expendable property under its custody, which have not been consumed in the performance of this contract. The Contractor shall also indicate what disposition has been made of such property.I56Subpart 752.70—Texts of USAID Contract Clauses

[49 FR 13259, Apr. 3, 1984, as amended at 62 FR 40470, July 29, 1997; 64 FR 5009, Feb. 2, 1999]

***EXHIBIT 17***

16

JOHN SNOW, INC.

**Healthy Mother/ Healthy Child Results Package**

April 2, 2002

Mr. Ahmed Moustafa
MGT/EXO
USAID, Cairo
Egypt

Dear Mr. Moustafa,

Attached please find a copy of B/L# POCLSOC211426813, for the Healthy Mother/Healthy Child Project.

Kindly issue an exemption letter addressed to the Director of Exemption Customs Administration at Alexandria Port for the release of the shipment on a permanent basis according to exemption Decree No. (6) 1993 as these are USAID project funded commodities.

Please note that the shipment includes medical equipment.

We appreciate your kind cooperation.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

Enc.: B/L# POCLSOC211426813
Copy of the Valued Inventory
Copy of the Commercial Invoice

Ref: 2979

21 Misr Helwan Agricultural Road, 10th Floor-P.O.Box 11728-611-Maadi,Cairo Egypt
[illegible]

Nedlloyd Limited • P&O Nedlloyd BV • Farrell Lines Incorporated • North American Trade

| | |
|---|---|
| ER / EXPORTER<br>GEOLOGISTICS SERVICES, INC. AS AGENTS<br>FOR: TRANSCENTURY ASSOCIATES<br>205 SOUTH WHITING STREET, SUITE 500<br>ALEXANDRIA, VA 22304 USA<br>PHONE: 703.461.8700 | BOOKING NUMBER NRC2666648<br>BILL OF LADING NO.<br>BROKERAGE<br>EXPORT REFERENCES 41-9031-022 |
| IGNEE<br>HEALTHY MOTHER/HEALTHY CHILD<br>USAID PROJECT NO. 283-0242<br>MINISTRY OF HEALTH<br>21 MISR HELWAN AGRICULTURAL ROAD<br>MAADI, EGYPT | FORWARDING AGENT - REFERENCES<br>GEOLOGISTICS SERVICES, INC. FMC 3261<br>205 SOUTH WHITING STREET, SUITE 500<br>ALEXANDRIA, VA 22304<br>POINT AND COUNTRY OF ORIGIN<br>ALEXANDRIA, VA USA |
| Y PARTY (It is agreed that no responsibility shall attach to the Carrier or his Agents for failure of the arrival of the goods (see clause 20 on reverse))<br>HEALTHY MOTHER/HEALTHY CHILD<br>USAID PROJECT NO. 283-0242<br>MINISTRY OF HEALTH<br>21 MISR HELWAN AGRICULTURAL ROAD<br>MAADI, EGYPT | ALSO NOTIFY / ROUTING / INSTRUCTIONS |
| ARRIAGE BY / PLACE OF RECEIPT BY PRECARRIER: BALTIMORE, MD | |
| TING CARRIER (VESSEL): ENDURANCE ERU2668 / PORT OF LOADING: NORFOLK, VA | LOADING PIER / TERMINAL |
| OF DISCHARGE: ALEXANDRIA, EGYPT / PLACE OF DELIVERY BY ONCARRIER: ALEXANDRIA, EGYPT | TYPE OF MOVEMENT |

PARTICULARS FURNISHED BY SHIPPER (but not acknowledged by the Carrier (see clause 11))

| MARKS AND NUMBERS | NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|

CONSIGNEES TO PAY DEMURRAGE AS FOLLOWS: 22ND TO 28TH DAY US$7.50 PER 20' AND US$15.00 PER 40' PER DAY 29TH TO 41ST DAY US$15.00 PER 20' AND US$30.00 PER 40' PER DAY THEREAFTER US$30.00 PER 20' AND US$45.00 PER 40' PER DAY FOR OPEN TOP AND OTHER SPECIAL EQUIPPED CONTAINERS ABOVE RATES TO BE DOUBLED. FOR REEFER CONTAINERS: 4TH TO 14TH DAY US$22.50 PER 20' AND US$45.00 PER 40' PER DAY 15TH TO 27TH DAY US$45.00 PER 20' AND US$90.00 PER 40' PER DAY THEREAFTER US$90.00 PER 20' AND US$135.00 PER 40' PER DAY.

VALUATION: REFER TO CLAUSE 7 (3) ON REVERSE SIDE

ITEM NUMBER 3006000000

GHT CHARGES PAYABLE AT: PONL PORTSMOUTH

AL NO. OF CONTAINERS/PACKAGES RECEIVED BY THE CARRIER

| FREIGHT AND CHARGES | PREPAID | COLLECT |
|---|---|---|
| | | |

...from the Shipper in apparent good order and condition unless otherwise ... number of quantity of Containers or other packages or units indicated ... "Total No. of Containers/Packages received by the Carrier" for Carriage ... all the terms and conditions hereof (INCLUDING THE TERMS AND CONDITIONS ON THE REVERSE HEREOF AND THE TERMS OF THE CARRIER'S APPLICABLE TARIFF) from the Place of Receipt or the Port of Loading, whichever is applicable, to the ... of the Place of Delivery, whichever is applicable. If the Carrier so requires ... delivery of the Goods one original Bill of Lading, duly endorsed, must be ... In accepting this Bill of Lading the Merchant expressly accepts and agrees ... whether printed, stamped or written, or otherwise incorporated ... of this Bill of Lading by the Merchant.

...SS whereof ( 3) THREE original Bills of Lading (unless otherwise stated) have been signed, one of which being accomplished, the others shall be void.

...r P&O Nedlloyd Ltd as Carrier:

TOTAL CHARGES

PAGE 2 OF 2

P&O Nedlloyd Limited • P&O Nedlloyd BV • ... North American Trade

SHIPPER / EXPORTER
GEOLOGISTICS SERVICES, INC. AS AGENTS
FOR: TRANSCENTURY ASSOCIATES
205 SOUTH WHITING STREET, SUITE 500
ALEXANDRIA, VA 22304 USA
PHONE: 703.461.8700

BOOKING NUMBER: NRC2666648
BILL OF LADING NO.
BROKERAGE
EXPORT REFERENCES: 41-9031-022

CONSIGNEE
HEALTHY MOTHER/HEALTHY CHILD
USAID PROJECT NO.283-0242
MINISTRY OF HEALTH
21 MISR HELWAN AGRICULTURAL ROAD
MAADI, EGYPT

FORWARDING AGENT - REFERENCES
GEOLOGISTICS SERVICES, INC. FMC 3261
205 SOUTH WHITING STREET, SUITE 500
ALEXANDRIA, VA 22304

POINT AND COUNTRY OF ORIGIN
ALEXANDRIA, VA USA

NOTIFY PARTY
HEALTHY MOTHER/HEALTHY CHILD
USAID PROJECT NO.283-0242
MINISTRY OF HEALTH
21 MISR HELWAN AGRICULTURAL ROAD
MAADI, EGYPT

ALSO NOTIFY / ROUTING / INSTRUCTIONS

| PRECARRIAGE BY | *PLACE OF RECEIPT BY PRECARRIER | |
|---|---|---|
| | BALTIMORE, MD | |
| EXPORTING CARRIER (VESSEL) | PORT OF LOADING | LOADING PIER / TERMINAL |
| ENDURANCE ERU2668 | NORFOLK, VA | |
| PORT OF DISCHARGE | *PLACE OF DELIVERY BY ONCARRIER | TYPE OF MOVEMENT |
| ALEXANDRIA, EGYPT | ALEXANDRIA, EGYPT | |

PARTICULARS FURNISHED BY SHIPPER (but not acknowledged by the Carrier (see clause 1))

| MARKS AND NUMBERS | NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| CONTAINER#: | SEAL#: | 1 X 20FT CONTAINER SAID TO CONTAIN 8 PIECES OF MEDICAL EQUIPMENT | | |
| POCU0557920/010351 | 8 PCS | | 5440 LB | 702.00 |
| OCLU1182290/010370 | 24 PCS | 1 X 40FT CONTAINER SAID TO CONTAIN 24 PIECES OF MEDICAL EQUIPMENT | 5784 LB | 1416.0 |

NO SED REQUIRED AES-541378078-419031022

"FREE-OUT ALL RE-LOADING OF EMPTY CONTAINER(S), INCLUDING CRANE CHARGES IF ANY, AND ALL OTHER CHARGES, INCLUDING OFFICIAL/CUSTOMS' CHARGES, TO BE FOR ACCOUNT AND RISK OF THE CARGO RECEIVER".
CONTAINER(S) TO BE STRIPPED AND RE-DELIVERED TO OWNERS DEPOT AS DESTINATION WITHIN 21(TWENTY ONE) CALENDAR DAYS FROM THE FIRST DAY AFTER THE VESSEL HAS COMPLETED DISCHARGE. THEREAFTER

EXCESS VALUATION: REFER TO CLAUSE 7 (3) ON REVERSE SIDE

FREIGHT CHARGES PAYABLE AT: PONL PORTSMOUTH

ITEM NUMBER: 3006000000

**TOTAL NO. OF CONTAINERS/PACKAGES RECEIVED BY THE CARRIER: 2

| FREIGHT AND CHARGES | | PREPAID | COLLECT |
|---|---|---|---|
| | | | |

RECEIVED by the Carrier from the Shipper in apparent good order and condition (unless otherwise noted herein) the total number or quantity of Containers or other packages or units indicated in the box entitled "**Total No. of Containers/Packages received by the Carrier" for Carriage subject to all the terms and conditions hereof (INCLUDING THE TERMS AND CONDITIONS ON THE REVERSE HEREOF AND THE TERMS OF THE CARRIER'S APPLICABLE TARIFF) from the Place of Receipt or the Port of Loading, whichever is applicable, to the Port of Discharge or the Place of Delivery, whichever is applicable. ...

IN WITNESS whereof ( 3) THREE original Bills of Lading (unless otherwise stated above) have been signed, one of which being accomplished, the others shall be void.

For P&O Nedlloyd Ltd as Carrier

RESP. CODE | TOTAL CHARGES

PAGE 1 OF 2

JOHN SNOW, INC.

Healthy Mother/ Healthy Child Results Package

January 14, 2002

Mr. Ahmed Moustafa
MGT/EXO
USAID, Cairo
Egypt

Dear Mr. Moustafa,

Attached please find a copy of B/L# POCLSOC151433483, for the Healthy Mother/Healthy Child Project.

Kindly issue an exemption letter addressed to the Director of Exemption Customs Administration at Alexandria Port for the release of the shipment on a permanent basis according to exemption Decree No. (6) 1993 as these are USAID project funded commodities.

Please note that the shipment includes medical equipment.

We appreciate your kind cooperation.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

Enc.: B/L# POCLSOC151433483
Copy of the Valued Inventory

Ref: 2786
GI

BILL OF LADING FOR COMBINED TRANSPORT OR PORT TO PORT SHIPMENT

P&O Nedlloyd Limited • P&O Nedlloyd BV • Farrell Lines Incorporated • North American Trade

NOT NEGOTIABLE UNLESS CONSIGNED "TO ORDER"

SHIPPER / EXPORTER

GEOLOGISTICS SERVICES, INC. AS AGENTS
FOR: TRANSCENTURY ASSOCIATES
205 SOUTH WHITING STREET, SUITE 500
ALEXANDRIA, VA 22304 USA
PHONE: 703.461.8700

BOOKING NUMBER: NRC1679617

BILL OF LADING NO

BROKERAGE

EXPORT REFERENCES: 712410111

CONSIGNEE

HEALTHY MOTHER/HEALTHY CHILD
USAID PROJECT NO. 263-0242,
MINISTRY OF HEALTH
21 MISR HELWAN AGRICULTURAL ROAD
MAADI, EGYPT

FORWARDING AGENT - REFERENCES

GEOLOGISTICS SERVICES, INC. FMC3261
205 SOUTH WHITING STREET, SUITE 500
ALEXANDRIA, VA 22304

POINT AND COUNTRY OF ORIGIN: ALEXANDRIA, VA USA

NOTIFY PARTY (It is agreed that no responsibility shall attach to the Carrier or his Agents for failure to notify of the arrival of the goods (see clause 20 on reverse))

TRANSCENTURY ASSOCIATES
TEL 202 393 4132

ALSO NOTIFY / ROUTING / INSTRUCTIONS

CONTAINER PICKUP: HALE INTERNATIONAL
1080 SOUTH CLINTON BALTIMORE, MD
(410) 342-1500
SHIPPING LINE: P&O NEDLLOYD

| *PRECARRIAGE BY | *PLACE OF RECEIPT BY PRECARRIER | |
|---|---|---|
| | BALTIMORE, MD | |
| EXPORTING CARRIER (VESSEL) | PORT OF LOADING | LOADING PIER / TERMINAL |
| CHESAPEAKE BAY CRK1679 | NORFOLK, VA | |
| PORT OF DISCHARGE | *PLACE OF DELIVERY BY ONCARRIER | TYPE OF MOVEMENT |
| ALEXANDRIA, EGYPT | ALEXANDRIA, EGYPT | OCEAN |

PARTICULARS FURNISHED BY SHIPPER (but not acknowledged by the Carrier (see clause 11))

| MARKS AND NUMBERS | NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| CONTAINER/SEAL | #PIECES | 1X20-FT CONTAINER SAID TO CONTAIN 9 PIECES OF MEDICAL 9 PIECES OF MEDICAL EQUIPMENT | | |
| PONU1580779/010364 | 23 PCS | 3X40-FT CONTANERS SAID TO 69 PIECES OF MEDICAL EQUIPMENT | 5543 LB | 1380.0 |
| GSTU4089368/010365 | 9 PCS | | 7871 LB | 829.00 |
| PONU1459253/010354 | 23 PCS | | 5543 LB | 1380.0 |
| POCU1186838/010371 | 23 PCS | | 5543 LB | 1380.0 |

NO SED REQUIRED-AES-541378078-712410111

"FREE-OUT ALL RE-LOADING OF EMPTY CONTAINER(S), INCLUDING CRANE CHARGES IF ANY, AND ALL OTHER CHARGES, INCLUDING OFFICIAL/CUSTOMS' CHARGES, TO BE FOR ACCOUNT AND RISK OF THE CARGO RECEIVER".
CONTAINER(S) TO BE STRIPPED AND RE-DELIVERED TO OWNERS DEPOT AS DESTINATION WITHIN 7 (SEVEN) CALENDAR DAYS (REEFER CONTAINERS 3 (THREE) CALENDAR DAYS FROM THE FIRST DAY AFTER THE VESSEL HAS COMPLETED DISCHARGE. THEREAFTER

EXCESS VALUATION: REFER TO CLAUSE 7 (3) ON REVERSE SIDE

FREIGHT CHARGES PAYABLE AT: PONL PORTSMOUTHY

ITEM NUMBER: 3006000000

**TOTAL NO. OF CONTAINERS/PACKAGES RECEIVED BY THE CARRIER: 4

| FREIGHT AND CHARGES | PREPAID | COLLECT |
|---|---|---|
| | | |

Received by the Carrier from the Shipper in apparent good order and condition (unless otherwise noted herein) the total number or quantity of Containers or other packages or units indicated in the box above entitled **"Total No. of Containers/Packages received by the Carrier" for Carriage subject to all the terms and conditions hereof (INCLUDING THE TERMS AND CONDITIONS ON THE REVERSE HEREOF AND THE TERMS OF THE CARRIER'S APPLICABLE TARIFF) from the Place of Receipt or the Port of Loading, whichever is applicable, to the Port of Discharge or the Place of Delivery, whichever is applicable. If the Carrier so requests, before he arranges delivery of the Goods one original Bill of Lading, duly endorsed, must be surrendered by the Merchant to the Carrier at the Port of Discharge or at some other location acceptable to the Carrier. In accepting this Bill of Lading the Merchant expressly accepts and agrees to all its terms and conditions whether printed, stamped or written, or otherwise incorporated, notwithstanding the non-signing of this Bill of Lading by the Merchant.

IN WITNESS whereof ( 3) THREE original Bills of Lading (unless otherwise stated above) have been signed, one of which being accomplished, the others shall be void.

For P&O Nedlloyd Ltd as Carrier

FOCLSOC151433483 DEC 27 2001

TOTAL CHARGES CONVERTED TO USD

RESP CODE

TOTAL CHARGES

PAGE 1 OF 2

...DING FOR
...D TRANSPORT OR
...O PORT SHIPMENT
...Nedlloyd Limited • P&O Nedlloyd BV • Farrell Lines Incorporated • North American Trade

NOT NEGOTIABLE UNLESS CONSIGNED "TO ORDER"

| EXPORTER | BOOKING NUMBER / EXPORT REFERENCES |
|---|---|
| GEOLOGISTICS SERVICES, INC. AS AGENTS FOR: TRANSCENTURY ASSOCIATES<br>205 SOUTH WHITING STREET, SUITE 500<br>ALEXANDRIA, VA 22304 USA<br>PHONE: 703.461.8700 | BOOKING NUMBER: NRC1679617<br>BILL OF LADING NO:<br>BROKERAGE:<br>EXPORT REFERENCES: 712410111 |
| CONSIGNEE | FORWARDING AGENT - REFERENCES |
| HEALTHY MOTHER/HEALTHY CHILD<br>USAID PROJECT NO. 263-0242,<br>MINISTRY OF HEALTH<br>21 MISR HELWAN AGRICULTURAL ROAD<br>MAADI, EGYPT | GEOLOGISTICS SERVICES, INC. FMC3261<br>205 SOUTH WHITING STREET, SUITE 500<br>ALEXANDRIA, VA 22304<br>POINT AND COUNTRY OF ORIGIN: ALEXANDRIA, VA USA |
| NOTIFY PARTY (It is agreed that no responsibility shall attach to the Carrier or his Agents for failure to notify of the arrival of the goods (see clause 20 on reverse)) | ALSO NOTIFY / ROUTING / INSTRUCTIONS |
| TRANSCENTURY ASSOCIATES<br>TEL 202 393 4132 | CONTAINER PICKUP: HALE INTERNATIONAL<br>1080 SOUTH CLINTON BALTIMORE, MD<br>(410) 342-1500<br>SHIPPING LINE: P&O NEDLLOYD |

| *PRECARRIAGE BY | *PLACE OF RECEIPT BY PRECARRIER | |
|---|---|---|
| | BALTIMORE, MD | |
| EXPORTING CARRIER (VESSEL) | PORT OF LOADING | LOADING PIER / TERMINAL |
| CHESAPEAKE BAY CRK1679 | NORFOLK, VA | |
| PORT OF DISCHARGE | *PLACE OF DELIVERY BY ONCARRIER | TYPE OF MOVEMENT |
| ALEXANDRIA, EGYPT | ALEXANDRIA, EGYPT | OCEAN |

PARTICULARS FURNISHED BY SHIPPER (but not acknowledged by the Carrier (see clause 11))

| MARKS AND NUMBERS | NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| | | | | |

CONSIGNEES TO PAY DEMURRAGE AS FOLLOWS: 8TH TO 14TH DAY US$7.50 PER 20' AND US$15.00 PER 40' PER DAY 15TH TO 27TH DAY US$15.00 PER 20' AND US$30.00 PER 40' PER DAY THEREAFTER US$30.00 PER 20' AND US$45.00 PER 40' PER DAY FOR OPEN TOP AND OTHER SPECIAL EQUIPPED CONTAINERS ABOVE RATES TO BE DOUBLED. FOR REEFER CONTAINERS: 4TH TO 14TH DAY US$22.50 PER 20' AND US$45.00 PER 40' PER DAY 15TH TO 27TH DAY US$45.00 PER 20' AND US$90.00 PER 40' PER DAY THEREAFTER US$90.00 PER 20' AND US$135.00 PER 40' PER DAY.

EXCESS VALUATION: REFER TO CLAUSE 7 (3) ON REVERSE SIDE

FREIGHT CHARGES PAYABLE AT: PONL PORTSMOUTH

ITEM NUMBER 3006000000

**TOTAL NO. OF CONTAINERS/PACKAGES RECEIVED BY THE CARRIER

| FREIGHT AND CHARGES | PREPAID | COLLECT |
|---|---|---|
| | | |

Received by the Carrier from the Shipper in apparent good order and condition (unless otherwise noted herein) the total number or quantity of Containers or other packages or units indicated in the box above entitled "**Total No of Containers/Packages received by the Carrier" for Carriage subject to all the terms and conditions hereof (INCLUDING THE TERMS AND CONDITIONS ON THE REVERSE HEREOF AND THE TERMS OF THE CARRIER'S APPLICABLE TARIFF) from the Place of Receipt or the Port of Loading, whichever is applicable, to the Port of Discharge or the Place of Delivery, whichever is applicable. If the Carrier so requires, before he arranges delivery of the Goods one original Bill of Lading, duly endorsed, must be surrendered by the Merchant to the Carrier at the Port of Discharge or at some other location acceptable to the Carrier. In accepting this Bill of Lading the Merchant expressly accepts and agrees to all its terms and conditions whether printed, stamped or written, or otherwise incorporated, notwithstanding the non signing of this Bill of Lading by the Merchant.

IN WITNESS whereof ( 3) THREE original Bills of Lading (unless otherwise stated above) have been signed, one of which being accomplished, the others shall be void.

For P&O Nedlloyd Ltd as Carrier

POCLSOC1514334B3 DEC 27 2001

TOTAL CHARGES CONVERTED TO USD

| RESP. CODE | TOTAL CHARGES | | |
|---|---|---|---|
| | | | |

PAGE 2 OF 2

REV 10/2000

JOHN SNOW, INC.
Healthy Mother/ Healthy Child Results Package

January 21, 2002

Mr. Ahmed Moustafa
MGT/EXO
USAID, Cairo
Egypt

Dear Mr. Moustafa,

Attached please find a copy of B/L# POCLSOC152434505, for the Healthy Mother/Healthy Child Project.

Kindly issue an exemption letter addressed to the Director of Exemption Customs Administration at Alexandria Port for the release of the shipment on a permanent basis according to exemption Decree No. (6) 1993 as these are USAID project funded commodities.

Please note that the shipment includes medical equipment.

We appreciate your kind cooperation.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

Enc.: B/L# POCLSOC152434505
Copy of the Valued Inventory
Copy of the Commercial Invoice

Ref: 2791
GI

COMBINED TRANSPORT OR PORT TO PORT SHIPMENT

P&O Nedlloyd Limited • P&O Nedlloyd BV • Farrell Lines Incorporated • North American Trade

NOT NEGOTIABLE UNLESS CONSIGNED "TO ORDER"

| | |
|---|---|
| SHIPPER / EXPORTER<br>GEOLOGISTICS SERVICES, INC. AS AGENTS<br>FOR TRANSCENTURY ASSOCIATES<br>205 SOUTH WHITING STREET, SUITE 500<br>ALEXANDRIA, VA 22304 USA<br>PHONE:703.461.8700 | BOOKING NUMBER: NAC2658616<br>BILL OF LADING NO:<br>BROKERAGE:<br>EXPORT REFERENCES: 712443121 |
| CONSIGNEE<br>HEALTHY MOTHER/HEALTHY CHILD<br>USAID PROJECT NO. 263-0242<br>MINISTRY OF HEALTH<br>21 MISR HELWAN AGRICULTURAL ROAD<br>MAADI, EGYPT | FORWARDING AGENT - REFERENCES<br>GEOLOGISTICS SERVICES, INC. FMC 3261<br>205 SOUTH WHITING STREET, SUITE 500<br>ALEXANDRIA, VA 22304<br>POINT AND COUNTRY OF ORIGIN<br>ALEXANDRIA, VA USA |
| NOTIFY PARTY (It is agreed that no responsibility shall attach to the Carrier or his Agents for failure to notify of the arrival of the goods (see clause 20 on reverse))<br>TRANSCENTURY ASSOCIATES<br>TEL 202 393 4132 | ALSO NOTIFY / ROUTING / INSTRUCTIONS<br>CONTAINER PICKUP: UNIVERSAL<br>DUNDALK MARINE TERMINAL<br>14TH AND SERVICE ROAD<br>2700 BROENINT HWY. BALTIMORE, MD<br>SHIPPING LINE:P&O NEDLOYD |

| | | |
|---|---|---|
| PRECARRIAGE BY | *PLACE OF RECEIPT BY PRECARRIER: BALTIMORE, MD | |
| EXPORTING CARRIER (VESSEL): ENDEAVOR ENV2658 | PORT OF LOADING: NORFOLK, VA | LOADING PIER / TERMINAL |
| PORT OF DISCHARGE: ALEXANDRIA, EGYPT | *PLACE OF DELIVERY BY ONCARRIER: ALEXANDRIA | TYPE OF MOVEMENT: OCEAN |

**ORIGINAL**

PARTICULARS FURNISHED BY SHIPPER (but not acknowledged by the Carrier (see clause 11))

| MARKS AND NUMBERS | NO. OF PKGS. | H M | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|---|
| CONTAINER/SEAL | # PIECES | | 1 X20-FT CONTAINER SAID TO CONTAIN 8 PIECES OF MEDICAL EQUIPMENT | | |
| OCLU0925220/010345 | 8 PCS | | | 4304 LB | 808.00 |
| | | | 1 X40-FT CONTAINER SAID TO CONTAIN 23 PIECES OF | | |
| OCLU1498876/010346 | 23 PCS | | MEDICAL EQUIPMENT | 6716 LB | 1334.0 |
| | | | NO SED REQUIRED-AES-541378078-712443121 | | |

"FREE-OUT ALL RE-LOADING OF EMPTY CONTAINER(S), INCLUDING CRANE CHARGES IF ANY, AND ALL OTHER CHARGES, INCLUDING OFFICIAL/CUSTOMS' CHARGES, TO BE FOR ACCOUNT AND RISK OF THE CARGO RECEIVER".

LESS VALUATION: REFER TO CLAUSE 7 (3) ON REVERSE SIDE

FREIGHT CHARGES PAYABLE AT: PONL PORTSMOUTH

ITEM NUMBER: 9000000001

TOTAL NO. OF CONTAINERS/PACKAGES RECEIVED BY THE CARRIER

| FREIGHT AND CHARGES | PREPAID | COLLECT |
|---|---|---|
| | | |
| EXCESS VALUE CHARGE (SEE CLAUSE 7 (3)) | | |
| TOTAL CHARGES CONVERTED TO USD | | |
| RESP. CODE / TOTAL CHARGES | | |

Received by the Carrier from the Shipper in apparent good order and condition (unless otherwise noted herein) the total number or quantity of Containers or other packages or units indicated in the box above entitled "*Total No. of Containers/Packages received by the Carrier" for Carriage subject to all the terms and conditions hereof (INCLUDING THE TERMS AND CONDITIONS ON THE REVERSE HEREOF AND THE TERMS OF THE CARRIER'S APPLICABLE TARIFF) from the Place of Receipt or the Port of Loading, whichever is applicable, to the Port of Discharge or the Place of Delivery, whichever is applicable. If the Carrier so requires, the surrender of the Goods one original Bill of Lading, duly endorsed, must be surrendered to the Carrier at the Port of Discharge ... In accepting this Bill of Lading the Merchant expressly accepts and agrees to all its terms and conditions whether printed, stamped or written ... this Bill of Lading ...

... 3/ THREE ...

For P&O Nedlloyd Ltd as Carrier

APPLICATION FOR COMBINED TRANSPORT ONLY

| BL NO. | MO | DAY | YEAR |
|---|---|---|---|
| PCCL8CCLE2434501 | JAN | [illegible] | 2002 |

...TRANSPORT OR ...O PORT SHIPMENT

...lloyd Limited • P&O Nedlloyd BV • Farrell Lines Incorporated • North American Trade

NOT NEGOTIABLE UNLESS CONSIGNED "TO ORDER"

| | |
|---|---|
| EXPORTER<br>...OLOGISTICS SERVICES,INC.AS AGENTS<br>... TRANSCENTURY ASSOCIATES<br>...5 SOUTH WHITING STREET, SUITE 500<br>...EXANDRIA, VA 22304 USA<br>...ONE:703.461.8700 | BOOKING NUMBER: NRC2658616<br>BILL OF LADING NO:<br>BROKERAGE:<br>EXPORT REFERENCES: 712443121 |
| ...E<br>...ALTHY MOTHER/HEALTHY CHILD<br>...AID PROJECT NO. 263-0242<br>...NISTRY OF HEALTH<br>... MISR HELWAN AGRICULTURAL ROAD<br>...ADI, EGYPT | FORWARDING AGENT - REFERENCES<br>GEOLOGISTICS SERVICES,INC. FMC 3261<br>205 SOUTH WHITING STREET,SUITE 500<br>ALEXANDRIA, VA 22304<br>POINT AND COUNTRY OF ORIGIN<br>ALEXANDRIA,VA USA |
| ...ARTY (It is agreed that no responsibility shall attach to the Carrier or his Agents for failure ... arrival of the goods (see clause 20 on reverse))<br>...ANSCENTUARY ASSOCIATES<br>... 202 393 4132 | ALSO NOTIFY / ROUTING / INSTRUCTIONS<br>CONTAINER PICKUP: UNIVERSAL<br>DUNDALK MARINE TERMINAL<br>14TH AND SERVICE ROAD<br>2700 BROENINT HWY. BALTIMORE,MD<br>SHIPPING LINE:P&O NEDLOYD |
| ...IAGE BY / *PLACE OF RECEIPT BY PRECARRIER: BALTIMORE,MD | |
| ...G CARRIER (VESSEL): ...DEAVOR ENV2658 / PORT OF LOADING: NORFOLK,VA | LOADING PIER / TERMINAL — ORIGINAL |
| ...DISCHARGE: ...EX...DRIA,EGYPT / *PLACE OF DELIVERY BY ONCARRIER: ALEXANDRIA | TYPE OF MOVEMENT: OCEAN |

PARTICULARS FURNISHED BY SHIPPER (but not acknowledged by the Carrier (see clause 11))

| ...KS AND NUMBERS | NO. OF PKGS. | H M | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|---|

...NTAINER(S) TO BE STRIPPED AND RE-DELIVERED TO OWNERS DEPOT AS DESTINATION
...THIN 21 (TWENTY-ONE) CALENDAR DAYS FROM THE FIRST DAY AFTER THE VESSEL HAS
...MPLETED DISCHARGE. THEREAFTER CONSIGNEES TO PAY DEMURRAGE AS FOLLOWS:
...ND TO 28TH DAY US $7.50 PER 20' AND US$15.00 PER 40' PER DAY
...TH TO 41ST DAY US$15.00 PER 20' AND US$30.00 PER 40' PER DAY
...EREAFTER US$30.00 PER 20' AND US$45.00 PER 40' PER DAY
... OPEN TOP AND OTHER SPECIAL EQUIPPED CONTAINERS ABOVE RATES TO BE
...BLED. FOR REEFER CONTAINERS: 4TH TO 14TH DAY US$22.50
... 20' AND US$45.00 PER 40' PER DAY 15TH TO 27TH DAY US$45.00
... 20' AND US$90.00 PER 40' PER DAY THEREAFTER US$90.00 PER 20' AND
...135.00 PER 40' PER DAY.

...UATION: REFER TO CLAUSE 7 (3) ON REVERSE SIDE

T...ARGES PAYABLE AT: PONL PORTSMOUTH — ITEM NUMBER: 9000000001

...O. OF CONTAINERS/PACKAGES RECEIVED BY THE CARRIER

| FREIGHT AND CHARGES | PREPAID | COLLECT |
|---|---|---|
| | | |

...Carrier from the Shipper in apparent good order and condition (unless otherwise ...he total number or quantity of Containers or other packages or units indicated in ...ntitled "Total No. of Containers/Packages received by the Carrier" for Carriage ...he terms and conditions hereof (INCLUDING THE TERMS AND CONDI... ...E REVERSE HEREOF AND THE TERMS OF THE CARRIER'S APPLICA... ...from the Place of Receipt or the Port of Loading, whichever is applicable, to the ...ge or the Place of Delivery, whichever is applicable. If the Carrier so requests, ...ent of the Goods one original Bill of Lading, duly endorsed, must be sur... [illegible] ...the original of the Bill of Lading by the Merchant.

... ( 3 ) THREE ... Bills of Lading (unless otherwise...) have been signed, one of which being accomplished, the others shall be void.

[signature]

/P&O Nedlloyd Ltd as CARRIER:

...N FOR COMBINED TRANSPORT ONLY

| NO. | MO. | DAY | YEAR |
|---|---|---|---|
| LSOC152434505 | JAN | 09 | 2002 |

EXCESS VALUE CHARGE (SEE CLAUSE 7 (3))

TOTAL CHARGES CONVERTED TO USD

RESP. CODE — TOTAL CHARGES