No. 06-97C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JOHN SNOW, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

June 29, 2007

Attorneys For Defendant

# TABLE OF CONTENTS

PAGES

DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ........ 1

INTRODUCTION ........ 2

STATEMENT OF FACTS ........ 3

ARGUMENT ........ 6

I. Standard For Summary Judgment ........ 6

II. JSI's Motion Should Be Denied ........ 7

A. The Incubators Provided By Plaintiff Were Nonconforming And Defective ........ 7

B. The Delivery Of Non-Conforming Goods Constitutes A Breach Of Contract ........ 7

C. JSI's Argument Regarding When Title Allegedly Passed Is Immaterial ........ 13

D. JSI's Argument That The Government Bore The Risk Of Costs For Defective Goods Is Unfounded ........ 14

E. In The Event Of A Conflict, The Commercial Items Clause of FAR 52.212-4 Takes Precedence ........ 16

F. The Government May Recover Monies Paid As The Result Of A Mistake ........ 17

G. JSI's Argument That The Government Breached The Contact By Disallowing Its Costs Is Unfounded ........ 17

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**CASES** **PAGES**

Aetna Casualty & Surety Co. v. United States,
208 Ct. Cl. 515, 526 F.2d 1127 (1975) ........ 17

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........ 6

Applied Companies v. United States,
144 F.3d 1470 (Fed. Cir. 1998) ........ 17

Dalton v. Cessna Aircraft Company,
98 F.3d 1298 (Fed Cir. 1996) ........ 10

Fansteel Metallurgical Corp. v. United States,
145 Ct. Cl. 496, 172 F. Supp. 268 (1959) ........ 17

Fortec Constructors v. United States,
760 F.2d 1288 (Fed. Cir.1985) ........ 10

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 351 F.2d 972 (1965) ........ 10

International Data Products Corp. v. United States
Nos. 5083 and 5084 (Fed. Cir. June 27, 2007) ........ 13

McDonnell Douglas Corp. v. United States,
37 Fed. Cl. 295 (1997) ........ 16

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) ........ 6

Ran-Page Company, Inc. v. United States,
35 Fed. Cl. 117 (1992) ........ 7

United States v. Johnson Controls, Inc.,
713 F.2d 1541 (Fed. Cir.1983) ........ 10

United States v. Wurts,
303 U.S. 414 (1938) ........ 17

United Technologies Corp. v. United States,
27 Fed. Cl. 393 (1992) ........................................ 15

Wisconsin Central Railroad Co. v. United States,
164 U.S. 190 (1896) ........................................ 17

**REGULATIONS**

21 C.F.R.§ 807(e) ........................................ 18

21 C.F.R. § 880.5400 ........................................ 18

FAR 12.102 ........................................ 16

FAR 12.207 ........................................ 16

FAR 12.301 ........................................ 16

FAR 16.301 ........................................ 16

FAR 31.103 ........................................ 19

FAR 31.204 ........................................ 18

60 F.R. 48231-01 ........................................ 16

FAR 52.212-4 ........................................ passim

FAR 52.246-3 ........................................ 9, 12

AIDAR 752.245-71 ........................................ 9, 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOHN SNOW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-97C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, the United States, respectfully submits this memorandum of law in opposition to plaintiff's motion for partial summary judgment. Plaintiff seeks summary judgment upon Count I of its complaint (Breach of Contract). Because there are genuine issues of material fact that preclude summary judgment, plaintiff's motion should be denied. In opposing plaintiff's motion, we rely upon the pleadings, defendant's appendix, the affidavit of Marvin Burgos, and this memorandum of law.[1]

1 Plaintiff's motion for partial summary judgment is cited "Pl. Mot. __." References are to page numbers. The exhibits to plaintiff's motion are cited Pl. Exh. __." References are to exhibit number. Our appendix is cited "A__." To reduce the size of the appendix, there are some gaps in the page numbering of the appendix. Affidavits are cited are cited, e.g., "Olivola Aff'd. __, ¶ __." References are to appendix page and/or paragraph numbers. For purposes of responding to this motion, we cite numerous times to plaintiff's complaint, A1-A25, and treat certain statements in the complaint as admissions. See RCFC 56(c) (listing pleadings as one of the factors to be considered by Court in connection with a summary judgment motion).

## INTRODUCTION

This is a breach of contract action involving the procurement of 119 neonatal incubators. The procuring agency is the United States Agency for International Development ("USAID"). The underlying contract is related to a United States Government program aimed at reducing neonatal and maternal mortality in Egypt. Although the Government paid plaintiff, John Snow, Inc. ("JSI"), for the incubators, they proved unsuitable for the use intended. As a result, the contracting officer issued a final decision finding JSI liable to the Government for the defective incubators. Thereafter, the Government collected $872,327.18, plus interest, from JSI through administrative offset.

Despite well-documented problems with the incubators, JSI claims that the Government breached the contract by taking the administrative offset. Essentially, JSI claims that, even assuming the incubators were defective, it was entitled to payment for those incubators. JSI is wrong. We will establish, through further proceedings in this case, including trial, if necessary, that JSI breached its contract by delivering defective incubators. Further, we will establish that the Government was within its rights to be reimbursed for the monies paid to JSI.

However, the question now before the court is whether JSI's motion for summary judgment should be denied. JSI acknowledges that "[t]here is certainly a dispute between USAID and JSI over . . . whether the incubators [were] defective as the Government contended in its Final Decision." Pl. Br. 10. JSI contends, however, that the Court does not need to decide whether the incubators were defective or contractually non-compliant because, in JSI's view, even if the incubators were nonconforming, it still is entitled to summary judgment.

Thus, the question in this summary judgment motion is not whether there is an issue of fact. JSI expressly acknowledges that there is and, for the purposes of this motion, we agree. The question is whether the factual issue is material. As we demonstrate below, the issue of whether the goods were conforming is a material issue. The delivery of non-conforming goods constitutes a breach of contract under well-established contract principles. The administrative offset effectively reimbursed the Government for the sums paid to JSI for the non-conforming goods. Because JSI is not entitled to payment for defective goods, the administrative offset was proper. Therefore, JSI's motion for partial summary judgment should be denied.

## STATEMENT OF FACTS

The United States provides extensive development assistance to the Republic of Egypt under the terms of the Camp David Peace Accords. One significant component of this assistance is the effort to improve Egypt's health care system generally, and to specifically improve maternal and newborn health. To this end, the Government, through USAID, contracted with JSI in 1998 to provide services and equipment to the Egyptian Ministry of Health ("MOHP"). The Healthy Mother/Healthy Child Results Package, USAID Contract No. 263-C-0098-00041-00 (the Contract), included a task for procuring commodities, including medical equipment. A45-46 (Contract Clause C.8.2).

In 2001, JSI was tasked with providing normal care and intensive care incubators. See, e.g., A168 (purchase contract between JSI and its supplier, ICS Technologies, Inc. ("ICS")). JSI procured these incubators through its subcontractor, ICS, who delivered the incubators to Egypt in several shipments. A3, ¶¶7-8. From May to July 2002, the incubators were delivered and installed in hospitals and health care facilities throughout Egypt. A30, ¶ 2.

Numerous problems arose shortly after installation, including overheating, erratic display boards, and malfunctioning alarms. A4, ¶ 10; A29-A30, ¶¶ 2, 4. ISC had provided a warranty to JSI covering, among other things, defects due to design, workmanship or materials. A179. The warranty remained in effect even after the incubators had been installed. See id. JSI relayed its concerns to its subcontractor-supplier, ICS, in September 2002. A4, ¶ 10. JSI also participated in a September 24, 2002 meeting in Egypt with ICS and the manufacturer's local representative, Hi-Med, to discuss and attempt to resolve problems with the incubators. Id. The manufacturer, Preemicare, sent an engineer to Egypt in December 2002, to investigate and remedy the problems with the incubators. A4, ¶ 11. The incubators were taken out of service in December 2002 on account of safety concerns. A30, 5.

On January 13, 2003, the manufacturer's local representative sent a letter to JSI expressing concern regarding the safety of the incubators and recommending that they be removed from service until modifications could be made. Id. The next day, MOHP instructed all facilities that had received incubators to remove them from service, which was done later that month. A4, ¶ 12. In June and July 2003, 75 incubators were retrofitted in Egypt by Preemicare's engineer and, in August 2003, the retrofit was completed and certifications were issued for 112 incubators. A5, ¶¶ 14-15. However, notwithstanding the retrofit, the results of tests performed by an independent medical testing company that JSI had retained were disturbing.

Initially, two incubators were tested – a normal care incubator and an intensive care incubator. The normal care unit failed the test for high-temperature-alarm testing. The incubator's humidification system did not operate, and the power cord lacked a restraining mechanism to prevent accidental power disconnection. The tests on the intensive care unit were

no better. Its temperature display was erratic and there were problems with the alarm. The humidification system did not work and the power cord did not have an appropriate restraining mechanism that would protect against accidental power disruption. A194-195. ECRI concluded: "Both incubators had major failures requiring manufacturing service. . . . Due to the major failures identified in our testing, ECRI recommend[s] that the other 117 incubators also be independently inspected." A195.

The conclusion and results of a second set of tests were even worse. In May 2004, ECRI dispatched a representative to Cairo. A229. He tested 44 of the 119 incubators that had been requisitioned to a warehouse. Id. Despite Preemicare's August 2003 certification that the incubators were ready for use, and that repairs had been made to the units in August 2003 (see A5, ¶¶ 14-15), ECRI's second report to JSI "recommend[ed] that JSI not use the Preemicare incubators for patient care." A231.

Of the 44 incubators tested, the overall failure rate was 90 per cent, "which is extreme." A231. "The combined testing, performed both in May 2004 and in the fall of 2003, indicates that the Preemicare incubators fail in their main purpose – temperature regulation." Id. Fifty-six per cent failed the temperature inspection. Id. "ECRI generally considers a 5% failure rate or greater as cause for concern, and in general, such delivered models would be considered unacceptable." Id. ECRI's report concluded:

> Healthcare organizations in the United States would not accept these incubators for clinical care based on their extremely poor inspection results, especially in regards to temperature control. In addition Preemicare has still not provided the requested service documentation and there are numerous reasons to question its ability to support the incubators over their remaining life expectancy of at least seven years. ECRI strongly recommends that JSI not return the Preemicare incubators to hospitals for clinical use.

Id. (emphasis added).

After the incubators were removed from MOHP hospitals, JSI, on its own accord or through ICS, had the incubators stored in an apartment in Maadi Cairo, Egypt. A30-31, ¶ 11. On or about February 28, 2005, when issues over rent payments threatened to lead to the impounding of the unsafe incubators and their possible release on the open market, USAID felt compelled to take possession of the incubators. Burgos Aff'd. 1-2, ¶ 5(h). Apparently, JSI failed to diligently pursue its warranty claims against ICS. A31, ¶ 12.

On November 1, 2004, AID sent JSI a notice of intent to disallow costs related to the incubators. A116-117. On March 9, 2005, USAID issued a Contracting Officer's Final Decision and subsequently collected the amounts due by administrative offset. A27, A1, ¶ 3.

## ARGUMENT

### I. Standard For Summary Judgment

Pursuant to RCFC 56(b), a "party against whom a claim . . . is asserted or a declaratory judgment is sought may, at any time, move with our without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Pursuant to RCFC 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A "material fact" is one "that might affect the outcome of the suit under the governing law," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. at 248.

## II. JSI's Motion Should Be Denied

### A. The Incubators Provided By Plaintiff Were Nonconforming And Defective

JSI's admission that an issue of fact exists regarding whether the incubators were defective is sufficient to preclude summary judgment. Pl. Br. 10. Therefore, it is not incumbent upon the Government to present any evidence regarding that issue. Nonetheless, the evidence that JSI delivered goods that did not conform to the requirements of the contract, as required by FAR 52.212-4(a), is overwhelming.

In sum, numerous problems arose shortly after installation of the incubators, including overheating, erratic display boards, and malfunctioning alarms. A4, ¶ 10; A30, ¶ 4. JSI took numerous steps to try and remedy the defects. A4, ¶¶ 10, 11. It would have not had to take such action had the goods not been defective. Further JSI's own testing contractor concluded that the defects were so great, and involved so many incubators, that the incubators should not be used for patient care, which is the very purpose for which they were purchased. See A231.

The Government did not receive what it had bargained for. Although JSI had a warranty on the incubators from its supplier, ICS, for reasons not known to the Government, JSI apparently has decided to seek to shift the burden for JSI's own failure to deliver conforming goods to its customer, rather than pursue its own supplier.

### B. The Delivery Of Non-Conforming Goods Constitutes A Breach Of Contract

The evidence clearly establishes that JSI violated the warranty of merchantability and fitness for use for a particular purpose, as set forth in FAR 52.212-4(o). Thus, JSI breached the obligations under the contract. See Ran-Page Company, Inc. v. United States, 35 Fed. Cl. 117, 123 (1992) (granting summary judgment to Government on issue of liability where plaintiff

delivered non-conforming goods). Given that the incubators are lifesaving medical devices, JSI's failure to deliver conforming goods was especially serious.

Although the evidence is overwhelming, this Court does not need to find that the incubators were defective in order to deny JSI's motion. This is because JSI acknowledges that "[t]here is certainly a dispute between USAID and JSI over . . . whether the incubators [were] defective as the Government contended in its Final Decision." Pl. Br. 10. Thus, the main issue for this Court to decide is whether, assuming JSI delivered nonconforming goods, it still was entitled to retain the monies paid for the goods. The answer is the same as it would be if a consumer had purchased a defective television set from a retailer and then sought a refund. In that case, as in the current case, the party in breach of contract was the seller, not the buyer.

JSI's contract incorporated FAR 52.212-4 (Contract Terms and Conditions – Commercial Items), which provides, in pertinent part, as follows:

> (a) Inspection/Acceptance. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The government must exercise its postacceptance rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.
>
> (o) Warranty. The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract.
>
> (q) Other compliances. The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under the contract.

See A49.

JSI's arguments ignore its clear contractual duty to deliver conforming commercial goods. The evidence shows that JSI (i) delivered defective goods; (ii) promptly was advised of the deficiencies; and (iii) ultimately failed to either provide conforming goods or satisfy its obligations under the contract's warranty provision by curing the deficiencies in the incubators it did provide.

JSI relies upon the six-month rejection period, set forth in FAR 52.246-3(f), which states:

> At any time during contract performance, but no later than 6 months (or such other time as may be specified in the contract) after acceptance of the supplies to be delivered under the contract, the Government may require the Contractor to replace or correct any supplies that are nonconforming at time of delivery.

However, although JSI focuses upon when the incubators cleared customs, it acknowledges that, even after the incubators cleared customs, it retained possession of the incubators, stored them in a JSI-hired warehouse, and finally transported to and installed them at OHP facilities. Pl. Br. 14.[2] In this case, JSI has not demonstrated that the Government did not take appropriate action within six months of their delivery to the MOHP facilities. In any event, the six-month provision of FAR 52.246–3(f) is not controlling. FAR 52.246–3(f) states that the Government may require repair or replacement of supplies within six months of acceptance "or such other time as may be specified in the contract." FAR 52.212–4(a), in turn, permits the

---

2 Pursuant to AIDAR 752.245-71 (a) ("[A]ll such property shall be under the custody and control of Contractor until the owner of title directs otherwise, or completion of work under this contract or its termination, at which time custody and control shall be turned over to the owner of title or disposed of in accordance with its instruction."). Mr. Burgos, in his affidavit, states that it was his understanding that the incubators had been stored by JSI in an apartment building since early 2002. Burgos Aff'd. 2, ¶ 5(b). We acknowledge that this is an error, and that, from May to July 2002, the incubators were delivered and installed in hospitals and health care facilities throughout Egypt. A30, ¶ 2. The error in Mr. Burgos's affidavit is immaterial to the outcome of plaintiff's motion.

Government to exercise its post-acceptance right to require the repair or replacement of nonconforming supplies "within a reasonable time after the defect was discovered or should have been discovered." The "reasonable time" provided for in section FAR 52.212–4(a) constitutes "such other time as may be specified in the contract," as set forth in FAR 52.246–3(f). Therefore, read together, the Government had a reasonable time to require the repair or replacement of the incubators.

JSI's reading ignores the requirements of FAR 52.212-4. This conflicts with well-settled principles of contract interpretation. Courts read the language of a particular contractual provision in the context of the entire agreement. United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed.Cir.1983); Dalton V. Cessna Aircraft Company, 98 F.3d 1298, 1304 (Fed Cir. 1996). Similarly, a contract is to be construed so as not to render portions of it meaningless. Fortec Constructors v. United States, 760 F.2d 1288, 1292 (Fed.Cir.1985). The interpretation that accords a reasonable meaning to each of the contract's provisions should be applied. Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 351 F.2d 972, 979 (1965); Dalton, 98 F.3d at 1304.

Here, the Government clearly acted in a reasonable and prompt manner. The defects were first uncovered almost immediately after the incubators were installed at the MOHP facilities. At that point, JSI was notified of the defects and, as would be expected of a party that knew it was responsible for the defects, JSI began to take steps to remedy the problems with the incubators.

Moreover, JSI's own repeated attempts to cure the defects in the incubators, including having independent tests conducted by a consultant it retained, contradicts its assertion that the Government failed to timely invoke its rights under the contract. According to JSI's logic, all a

supplier of goods needs to do to avoid liability is to delay the process, make inadequate repairs, and then declare that the time for requiring the correction of defects has passed. Such a result would be absurd. Further, if JSI truly believed it was under no obligation to fix the incubators, it would not have continued to attempt to make repairs for such a long period of time. JSI recognized that it was under an obligation to make repairs.

Although JSI now contends that its obligation under the contract ceased upon installation of the incubators in hospitals, its actions demonstrate the opposite. As previously noted, JSI took numerous steps to try and remedy the problem. Further, JSI eventually took the dangerous incubators out of service and removed the incubators to a warehouse/apartment, for which JSI or its subcontractor, ICS, apparently had paid rent. Burgos Aff'd. 2, ¶ 5(f)-(g). Indeed, it was JSI's own subcontractor, ECRI, that "strongly recommend[ed] that JSI not return the Preemicare incubators to hospitals for clinical use." ECRI May Report at 6.

JSI also promised to provide replacement incubators from another manufacturer, agreeing to "replace[] one-for-one" the defective Preemicare incubators with conforming incubators manufactured by HillRom. JSI letter to MOHP (June 1, 2004), A65. However JSI tries to label its actions, the reality is that JSI recognized that it had provided defective equipment under the contract and took necessary steps to provide replacements that would be conforming and safe for use.

In sum, JSI's attempt to demonstrate that USAID was somehow remiss in directing that its defective incubators be fixed within six months of their installation is misguided. JSI: (i) was almost immediately aware of the numerous deficiencies in the incubators it provided under the contract; (ii) freely acknowledged those deficiencies; and (iii) repeatedly attempted to cure the deficiencies. It was clearly understood by USAID and JSI, based in part upon JSI's own actions

and representations, that the incubators were deficient and that those deficiencies required correction by JSI.

JSI's arguments also are based upon the faulty premise that replacement or correction of the incubators were the only remedies available to the Government. However, JSI's premise is faulty. The Government had other remedies available.

For instance, FAR 52.246-3(g)(1) provides that, "[i]f the Contractor fails to proceed with reasonable promptness to perform requirement replacement or correction, the Government may "[b]y contract or otherwise, perform the replacement or correction and charge to the Contractor any increased cost or make an equitable reduction in any fixed fee paid or payment under the contract." Here, JSI failed to replace or repair the incubators with reasonable promptness. Therefore, the Government was within its rights to obtain the incubators elsewhere or make an equitable adjustment. The Government accomplished the equitable adjustment through an administrative offset. This action complied with the terms of the contract.

Indeed, the ultimate value of what JSI provided – defective goods, along with the services necessary to acquire those defective goods – was zero. Given that incubators are critical lifesaving devices, defective incubators are worse than no incubators at all. Quite literally, the Government would have been better off had JSI simply provided no incubators to begin with. Thus, the contracting officer acted reasonably in disallowing the entire payment made in connection with the incubators.

In addition, even assuming, for the sake of argument, that the Government did not timely require the repairs, FAR 52.246-3(h) provides relief from the six-month requirement. That provision provides, in relevant part, as follows:

> Notwithstanding paragraphs (f) and (g) above, the Government may at any time require the Contractor to correct or replace, without cost to the Government, nonconforming supplies, if the nonconformances are due to (1) fraud, lack of good faith, or willful misconduct on the part of the Contractor's managerial personnel.

As previously noted, the evidence establishes that JSI delivered grossly defective goods. Further, a 2004 investigation revealed that there were irregularities regarding the 510(k) certification process that is intended to demonstrate that the devices were safe and effective. Burgos Aff'd. 1-3, ¶¶ 4-6. Certainly, this raises a factual issue regarding whether there was willful misconduct or lack of good faith in connection with the transactions at issue. Indeed, JSI's delivery of so many incubators with such significant problems also raises the issue of whether JSI knew or should have known that there were problems with the incubators before they were supplied.

**C. JSI's Argument Regarding When Title Allegedly Passed Is Immaterial**

JSI claims that title vested in Egypt, as the cooperating government, when the property cleared customs between January and April 2002. Pl. Br. 14. This assertion is not relevant. Even if title passed when JSI claims it did, JSI has failed to demonstrate that title is relevant. JSI's obligation to deliver conforming goods did not end the moment title passed. Indeed, if that were the case, the entire concept of warranties on goods would be rendered meaningless. Cf. International Data Products Corp. v. United States, Fed. Cir. Nos 5083 and 5094 (Fed. Cir. June 27, 2007) (where the cost of warranty services is included in the contract pricing, the warranty survives even when a contract is terminated for the convenience of the Government), A72-73.

Further, to the extent that JSI makes the argument regarding the transfer of title in an attempt to bolster its argument regarding when acceptance occurred, the argument remains immaterial. For reasons discussed in detail previously, the Government exercised its remedies in a timely fashion. Eventually, JSI proved unable to cure the defects in the incubators. The Government requested a refund. JSI refused. As a result, the Government was required to take action to ensure that JSI did not keep the payment that the Government had erroneously made for grossly defective lifesaving medical equipment.

Finally, JSI, relying upon AIDAR 752.245-71, dealing with "Title To and Care of Property," argues that delivery constituted acceptance. Plaintiff's Memorandum p. 15. JSI's argument is misplaced. The transfer of title of the incubators by virtue of delivery to the Egyptian MOHP does not constitute acceptance.

### D. JSI's Argument That The Government Bore The Risk Of Costs For Defective Goods Is Unfounded

JSI claims that, because this was a cost plus fixed fee contract, the Government bore the risk of incurrence of additional costs to obtain full performance of the work. Pl. Br. 12. It claims that the Government "assumed all the risks of the incubators including that the incubators might not meet the needs of the Egyptians, or that the incubators might require repairs . . . ." Pl. Br. 12. JSI further claims that the Government bore the risk of purchasing replacement incubators. Id.

JSI's argument is without merit. The Government contracted for incubators that worked properly. This is why the contract contained, among other provisions, a clause providing that "[t]he Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract." FAR 52-212–4(o). Instead, JSI

provided goods that could not satisfy the requirements for which they were acquired. Given that the purpose of the incubators was to decrease infant mortality, it is hard to imagine a worse breach of contract.

Further, JSI's reliance upon United Technologies Corp. v. United States, 27 Fed. Cl. 393 (1992) is misplaced. That case involved a cost-reimbursement development contract for the design and manufacture of the Black Hawk Helicopter. Id. at 394, 399. However, there is no indication that the FAR 52.212-4 clause covering commercial items was included in the contract or at issue in the case. For reasons previously demonstrated, the inclusion of the clause in the present contract precludes summary judgment in favor of JSI.

JSI claims that it used its best efforts to obtain the goods and services at the stated price, and that JSI's best efforts were what the Government bargained for. Pl. Br. 12. JSI is incorrect. The warranty provision does not contain an exception where a contractor claims to have used its best efforts. FAR 52.212–4(o). Further, the contract expressly required JSI to provide conforming goods. FAR 52.212–4(a). Moreover, even if JSI's assertion is relevant, the question of whether JSI used its best efforts is a question of fact, especially given that the objective evidence – the delivery of not one or two, but rather the delivery of more than 100 defective incubators – would imply that JSI's breach was willful, that JSI was grossly negligent, and that JSI did not use its best efforts.

### E. In The Event Of A Conflict, The Commercial Items Clause of FAR 52.212-4 Takes Precedence

The contract at issue contains standard clauses for acquisition of commercial items and standard clauses for cost-reimbursement contracts. The former, including the FAR 52.212-4 commercial items warranties of merchantability and fitness for a particular purpose, controls to

the extent of any conflict. FAR Part 12 addresses commercial items: FAR 12.301(b)(3) prescribes the FAR 52.212-4 standard clause; FAR 12.102(c) establishes the commercial items standard clause's precedence: "Contracts for the acquisition of commercial items are subject to the policies in other parts of [the FAR]. When a policy in another part of [the FAR] is inconsistent with a policy in this part, this Part 12 shall take precedence for the acquisition of commercial items."

Further, the FAR prohibits use of cost-reimbursement contracts for the acquisition of commercial items, with only a few exceptions, none of which are relevant here. FAR 16.301-3(b); FAR 12.207(a), (b)(1)(iii). Basically, whenever applicable, the principles of commercial practices should control acquisition of commercial items. Indeed, cost-reimbursement contracts are limited for commercial items and FAR standard clause 52.212-4 for commercial items exists precisely to ensure that government treatment of commercial items is "consistent with customary commercial practice." 60 F.R. 48231-01. In customary commercial practice, commercial items have commercial warranties. This contract contains those warranties.

JSI also claims that the Government's "only right is the product or services which it paid for under the contract." Pl. Br. 12 (citing McDonnell Douglas Corp. v. United States, 37 Fed. Cl. 295, 299 (1997)). Even by JSI's own definition, its argument must fail. USAID did not contract for defective goods, it contracted for goods that worked. It paid JSI for incubators that were supposed to save the lives of newborn infants. Instead, the incubators that were supplied, had they been used, would have endangered the infants' lives. To suggest that the Government received what it paid for is absurd.

### F. The Government May Recover Monies Paid As The Result Of A Mistake

Here, USAID should not have paid for the incubators because JSI was in breach of contract. It is well settled that –

> [t]he Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. 'No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute . . . .

United States v. Wurts, 303 U.S. 414, 415 (1938); accord Wisconsin Central Railroad Co. v. United States, 164 U.S. 190, 212 (1896); Applied Companies v. United States, 144 F.3d 1470, 1478 (Fed. Cir. 1998); Aetna Casualty & Surety Co. v. United States, 208 Ct. Cl. 515, 526 F.2d 1127, 1130 (1975) ("It is a well-settled principle that the Government has inherent authority to recover sums illegally or erroneously paid, and that it cannot be estopped from doing so by the mistakes of its officers or agents."); Fansteel Metallurgical Corp. v. United States, 145 Ct. Cl. 496, 499-500, 172 F. Supp. 268, 270 (1959).

Here, there is no justification for JSI retaining the sums paid for the incubators. Therefore, the contracting officer properly recovered those monies through administrative offset.

### G. JSI's Argument That The Government Breached The Contact By Disallowing Its Costs Is Unfounded

JSI's claims that the Government's disallowance of the monies that JSI paid to ICS was a breach of contract. Pl. Br. 21. It further claims that the costs were not allowable. Id.

Here, JSI's tender of nonconforming, deficient incubators ultimately led to the removal of those incubators from service and their eventual return to JSI. See A30, ¶¶ 8, 10-11; A13, ¶¶ 38-39. As previously noted, the incubators were deficient, unmerchantable and unfit for their intended purpose in numerous respects, including overheating, erratic display boards and alarm

problems; these deficiencies became apparent shortly after the installation of the incubators. Burgos Affidavit at ¶ 5(c); A30, ¶¶ 4-5; A229-232.

These deficiencies resulted in a breach of JSI's contractual obligations, which included obligations to: (i) "assist . . . in sustaining the established 100 neonatal centers by . . . ensuring effective use of equipment," A44a; (ii) ensur[e] the "sustainability of 100 neonatal centers providing acceptable case," A44b; (iii) "undertake all commodity procurement . . . necessary to achieve the results under this contract." A45.

Neonatal centers cannot be sustained or provide acceptable service without functioning neonatal incubators. At all relevant times, JSI was well aware of the deficiencies with the incubators at issue. See A 4, ¶¶ 10, 11, 16; Burgos Affidavit at ¶ 5(c). In addition, the incubators were not properly certified by the Food and Drug Administration, as required by Federal law and the contract. Burgos Affidavit at ¶¶ 3, 4, 5(d), 6; A31, ¶13. JSI's failure to provide properly certified incubators was a further breach of its obligations under the contract. See 21 CFR 880.5400 (designating neonatal incubators as Class II medical devices); 21 CFR 807(e) (requires letter from FDA prior to marketing a Class II medical device).

In light of these facts, JSI cannot seriously contend that the payments it made to ICS were allowable, reasonable, justified, or in any way proper. The incubators not only were useless, they were dangerous, in that they were not fit for the purposes intended – saving lives. Regardless of whether a contract is a fixed price or a cost-reimbursement contract, "costs incurred are allowable to the extent they are reasonable, allocable, and determined to be allowable under 31.201, 31.202, 31.203, and 31.205." FAR 31.204(a). The cost principles and procedures set forth in Subpart 31.2 of the FAR apply to contracts with commercial organizations including cost-reimbursement contracts and cost reimbursement or fixed price

subcontracts entered into under cost reimbursement contracts. FAR 31.103(b)(1); see also FAR 31.204(a). FAR 31.201-2 provides that a cost is allowable only when the cost complies with, among other requirements, "reasonableness," which is defined in subpart 31.2 of the FAR as follows:

> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. . . . No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.
>
> (b) What is reasonable depends upon a variety of considerations and circumstances, including —
>
> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance
>
> (2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;
>
> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
>
> (4) Any significant deviations from the contractor's established practices.

For the reasons discussed at length previously, the costs incurred by JSI and submitted for reimbursement were not reasonable. Indeed, while it may be reasonable to incur costs for incubators that worked, it cannot be deemed reasonable to seek costs for incubators which so failed to conform to contractual requirements.

Further, JSI's responsibilities to USAID, to the Egyptian Government, and to the public at large extended beyond the delivery and installation of the incubators. Contractually, JSI was

tasked with, among other things, sustaining over 100 neonatal centers through training of staff and procurement of additional equipment. "Technical assistance and training will ensure competency in the delivery of services and the appropriate and effective use of equipment in order to improve the quality of care." A44d. The contract required JSI to undertake all commodity procurement necessary to achieve the results under the contract, recognizing that poor procurement practices could doom a project "to unmet deadlines, unmet commitments and shattered credibility." This is what happened here.

JSI explicitly and implicitly had an obligation, contractually and otherwise, to see that the medical equipment it was providing was safe and operable. The incubators provided were not. Reasonableness and the terms of the contract dictate that the costs for the incubators cannot be deemed allowable. Therefore, the contracting officer's disallowance was proper.

## **CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

*s/Deborah A. Bynum*

DEBORAH A. BYNUM
Assistant Director

*s/Richard P. Schroeder*

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

June 29, 2007

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 29th day of June 2007, a copy of the foregoing "DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to plaintiff by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard P. Schroeder