president or chief financial officer of the business segment of the Contractor that submits the proposal.

(b) Failure by the Contractor to submit a signed certificate, as described in this clause, may result in final indirect costs at rates unilaterally established by the Contracting Officer.

(c) The certificate of final indirect costs shall read as follows:

CERTIFICATE OF FINAL INDIRECT COSTS

This is to certify that I have reviewed this proposal to establish final indirect cost rates and to the best of my knowledge and belief:

1. All costs included in this proposal (identify proposal and date) to establish final indirect costs rates for (identify period covered by rate) are allowable in accordance with the cost principles of the Federal Acquisition Regulation (FAR) and its supplements applicable to the contracts to which the final indirect cost rates will apply; and

2. This proposal does not include any costs which are expressly unallowable under applicable cost principles of the FAR or its supplements.

Firm: ______________________________

Signature: ______________________________

Name of Certifying Official: ______________________________

Title: ______________________________

Date of Execution: ______________________________

[End of Clause]

I.12 NOTIFICATION OF CHANGES

In accordance with FAR 52.243-7, Notification of Changes, the Contractor shall notify the Contracting Officer in writing promptly, within 10 calendar days from the date that the Contractor identifies any Government conduct that the Contractor regards as a change to the contract terms and conditions. The Contracting Officer shall promptly, within 15 calendar days after receipt of notice, respond to the notice in writing.

[End of Clause]

I.13 52.252-4 ALTERATIONS IN CONTRACT (APR 1984)

Portions of this contract are altered as follows:

(a) AIDAR 752-7007, Personnel Compensation (AUG 1984), is amended to delete reference to the "Foreign Service Officer Class

FS-1" and insert "Foreign Service Officer Class FS-6".

[End of Clause]

I.14 52.252-6 AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984)

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any Agency for International Development Acquisition Regulation clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

[End of Clause]

I.15 COMMUNICATIONS PRODUCTS (OCT 1994)

(a) Definition - Communications products are any printed materials (other than non-color photocopy material), photographic services or video production services.

(b) Standards - USAID has established standards for communications products. These standards must be followed unless otherwise specifically provided in the contract or approved in writing by the contracting officer. A copy of the standards for USAID financed publications and video productions is attached.

(c) Communications products which meet any of the following criteria are not eligible for USAID financing under this agreement unless specifically authorized in the contract or in writing by the contracting officer:

(1) All communications materials funded by operating expense account funds;

(2) Any communication products costing over $25,000, including the costs of both preparation and execution. For example, in the case of a publication, the costs will include research, writing and other editorial services (including any associated overhead), design, layout and production costs.

(3) Any communication products that will be sent directly to, or likely to be seen by, a Member of Congress or Congressional staffer; and

(4) Any publication that will have more than 50 percent of its copies distributed in the United States (excluding copies provided to CDIE and other USAID/W offices for internal use.

(d) The initial proposal must provide a separate estimate of the cost of every communications product as defined in paragraph (a) above [not just those which meet the criteria in paragraph

(c)] which is anticipated under the contract. Each estimate must include all of the costs associated with preparation and execution of the product. Any subsequent request for approval of a covered communication product must provide the same type of cost information.

[End of Clause]

I.16 752.225-70 SOURCE, ORIGIN AND NATIONALITY REQUIREMENTS (FEB 1997)

(a) Except as may be specifically approved by the Contracting Officer, all commodities (e.g., equipment, materials, vehicles, supplies) and services (including commodity transportation services) which will be financed under this contract with U.S. dollars shall be procured in accordance with the requirements in 22 CFR Part 228, "Rules on Source, Origin and Nationality for Commodities and Services Financed by USAID." The authorized source for procurement is Geographic Code 000 unless otherwise specified in the schedule of this contract. Guidance on eligibility of specific goods or services may be obtained from the Contracting Officer.

(b) Ineligible goods and services. The Contractor shall not procure any of the following goods or services under this contract:
(1) Military equipment
(2) Surveillance equipment
(3) Commodities and services for support of police and other law enforcement activities
(4) Abortion equipment and services
(5) Luxury goods and gambling equipment, or
(6) Weather modification equipment.

(c) Restricted goods. The Contractor shall not procure any of the following goods or services without the prior written approval of the Contracting Officer:
(1) Agricultural commodities,
(2) Motor vehicles,
(3) Pharmaceuticals and contraceptive items
(4) Pesticides,
(5) Fertilizer,
(6) Used equipment, or
(7) U.S. government-owned excess property.
If USAID determines that the Contractor has procured any of these specific restricted goods under this contract without the prior written authorization of the Contracting Officer, and has received payment for such purposes, the Contractor agrees to refund to USAID the entire amount of the purchase.

I.17 752.225-71 LOCAL PROCUREMENT (FEB 1997)

(a) Local procurement involves the use of appropriated funds to finance the procurement of goods and services supplied by local businesses, dealers or producers, with payment normally being in the currency of the cooperating country.

(b) All locally-financed procurements must be covered by source/origin and nationality waivers as set forth in Subpart F of 22 CFR Part 228 except as provided for in 22 CFR 228.40, Local

procurement.

[End of Clause]

[END OF SECTION I]

APPENDIX J.1.

task 1+2

PERFORMANCE MILESTONE PLAN
Base Period --3/15/98 - 9/15/01

**Result 5.1.1 Quality of Essential Maternal, Perinatal and Child Health Services Improved** (C.4.2.1 + C.4.2.2)

| Time | Milestone | Data Collection | Evaluation | Validation | Fee |
|---|---|---|---|---|---|
| task 1 — Yr. 1, Qtr. 2 | 1 HM/HC Package Consensus Meeting held and package finalized | Submission of Consensus Meeting Report to MHP and USAID | MOHP and USAID approval of Consensus Meeting Report | Consensus Meeting Attendance | $19,840 |
| task 1 / task 1 Qtr. 4 | Lead Trainers trained for 5 districts and package implemented in 5 districts | Training Report submitted to MOHP/USAID; MHIS forms record service del. and util. data | Analysis of MHIS data and comparison with Project targets | Field visits to verify Trainings and delivery of basic package | $26,560 |
| task 2 Yr. 2, Qtr. 2 | HM/HC curricula taught in 2 medical and 2 nursing schools | Submission of curricula to MOHP and USAID; course evaluation collected | Analysis of course evaluation; MOHP and USAID approval of curricula | Observation of Instructor training and classroom instruction | $26,560 |
| task 1 — Qtr. 4 | Implementation of basic package in 10 districts | MHIS forms record service delivery and utilization data | Analysis of MHIS data and comparison with Project targets | Field visits to verify delivery of basic package | $39,840 |
| task 2 Yr. 3, Qtr. 2 | HM/HC curricula taught in 6 medical and 6 nursing schools | Course evaluation forms collected from students | Analysis of course evaluation | Observation of Instructor training and classroom instruction | $26,560 2 |
| task 1 — Qtr. 4 | Implementation of basic package in 20 districts | MHIS forms record service delivery and utilization | Analysis of MHIS data and comparison with Project targets | Field visits to verify delivery of basic package | $39,840 |
| task 2 Yr. 4, Qtr. 2 | HM/HC curricula taught in 13 medical and 13 nursing schools | Course evaluation forms collected from students | Analysis of course evaluation | Observation of Instructor training and classroom instruction | $26,560 2 |
| task 1 Qtr. 2 | Implementation of basic package in 25 districts | MHIS forms record service delivery and utilization | Analysis of MHIS data and comparison with Project targets | Field visits to verify delivery of basic package | $39,840 |

Contract 263-C-00-98-00041-00
John Snow, Inc.
Page 93 of 109

064

JSI

# JOHN SNOW, INC.
## Healthy Mother/ Healthy Child Results Package

June 1, 2004

Dr. Esmat Mansour
HM/HC Executive Director
IHC Undersecretary
Cairo, Egypt

**Subject: Preemicare Incubators**

Dear Dr. Mansour,

We would like to thank you and your team for their assistance during the ECRI testing of the Preemicare incubators. The report is completed and has been attached for your reference.

As you will note in the report, 44 incubators were tested. Only four units passed all of the tests, translating in to a 90% failure rate. Based on this high failure rate, ECRI has recommended that the incubators not be used.

Per their recommendations, JSI has requested ICS/PreemiCare to take possession of the incubators from the MOHP on "repair status" and make all required changes in order for them to pass the testing protocol. A copy of the letter sent to ICS has been attached. Once the incubators are repaired, they will undergo third-party testing again prior to the official return of the incubators.

We are waiting for final feedback from ICS/PreemiCare and will forward their response as soon as it is received. Assuming their feedback is favorable, we will request you and your team's assistance in completing the paperwork required for officially transferring possession of the incubators back to the supplier for repairs.

In the meantime, JSI/TCA, with assistance from the MOHP, has delivered 51 of the 72 HillRom incubators. The remaining incubators should be delivered by mid-June. This means that all of Preemicare incubators have been replaced one-for-one and there is no shortage of incubators in the subject facilities.

Thank you for your continued cooperation. Please do not hesitate to contact me if you have any further questions.

With Kind Regards,

Reginald F. Gipson, M.D.
Chief of Party

cc: Dr. Nahed Matta, USAID HM/HC Team Leader

Attachments: ICS Letter

Ref: 4057

# United States Court of Appeals for the Federal Circuit

2006-5083, -5094

INTERNATIONAL DATA PRODUCTS CORP.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

Edward J. Tolchin, Fettmann, Tolchin & Majors, P.C., of Fairfax, Virginia, argued for plaintiff-appellant.

Allison Kidd-Miller, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General, and Deborah A. Bynum, Assistant Director. Of counsel on the brief were E. Michael Chiaparas, Director, Contract Disputes Resolution Center, Defense Contract Management Agency, of Manassas, Virginia, and John T. Lauro, Trial Attorney, Commercial Litigation Division, Air Force Legal Services Agency, of Arlington, Virginia.

Appealed from: United States Court of Federal Claims

Judge George W. Miller

# United States Court of Appeals for the Federal Circuit

2006-5083, -5094

INTERNATIONAL DATA PRODUCTS CORP.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

---

DECIDED: June 27, 2007

---

Before LOURIE, RADER, and PROST, Circuit Judges.

RADER, Circuit Judge.

The Air Force terminated for convenience its Desktop V contract with International Data Products Corporation (IDP) because IDP lost its status as a small entity favored under section 8(a) of the Small Business Act. Small Business Act, Pub. L. No. 85-536, 72 Stat. 384 (codified as amended in scattered sections of 15 U.S.C.). The Air Force, however, required IDP to continue to perform warranty and upgrade services under the contract. IDP sued for the costs of performing those services. The Court of Federal Claims determined that the termination for convenience also terminated IDP's obligation to continue to provide warranty and upgrade services. Int'l Data Prods. Corp. v. United States, 70 Fed. Cl. 387, 394 (2006) (citing Int'l Data Prods. Corp. v. United States, 64 Fed. Cl. 642, 650-51 (2005)). The Court of Federal Claims, however, also denied IDP's claim for termination costs. Id. at 390. IDP appeals the

denial of termination costs while the government cross-appeals the termination of IDP's obligation to provide services for which it already received payment. Because 15 U.S.C. § 637(a)(21)(A) does not terminate IDP's warranty and upgrade services obligations, this court reverses the trial court's holding that the termination for convenience terminated IDP's warranty and upgrade obligations. This court otherwise affirms the trial court's rulings.

I

IDP manufactures and sells computers and computer equipment. In 1995, IDP won award of a Small Business Administration § 8(a) contract to provide computers to the Air Force under the Desktop V contract. This contract was an indefinite-delivery, indefinite-quantity (ID/IQ) agreement. The contract consisted of a single base year with a minimum purchase requirement of $100,000 and four one-year options having no minimum purchase requirement. Under the contract terms, the Air Force needed only to buy a minimum of $100,000 in products and services from IDP and could purchase from other contractors after meeting the minimum purchase amount.

IDP's contract originally included a purchase maximum of $1.685 Billion. However, Dynamic Decisions, Inc. (DDI), a competitor of IDP, sued to enjoin the original contract. In the resulting settlement, both IDP and DDI received Desktop V contracts. Both contracts retained the $100,000 minimum purchase obligation. Both contracts also included a maximum at $729 million (a little less than half the maximum in IDP's original contract). The settlement agreement also amended the contracts to include an additional term, a "total estimated quantity" of $100 million.

In 1998, Dunn Computer Corporation (Dunn), a non-section 8(a) company, purchased IDP. Under § 637(a)(21)(A) of the Small Business Act, this acquisition required the Air Force to terminate IDP's contract because IDP would no longer qualify under section 8(a). 15 U.S.C. § 637(a)(21)(A) (2006). By this time, the Air Force had purchased a total of $35 million of equipment from IDP. The Air Force requested a waiver per § 637(a)(21)(B) from the Small Business Administration. The Administration, however, denied the request. On October 8, 1999, the Air Force officially notified IDP of the termination of its contract.

The termination letter stated:

> This termination will not affect the rights and liabilities of the parties, arising under the contract or otherwise, concerning defects, guarantees or warranties relating to any articles or component parts furnished to the Government by the Contractor under the contract or this agreement, nor the rights and liabilities of the parties concerning software upgrades as required by Section C of the contract.

After the termination date, the Air Force continued to demand that IDP provide warranty and upgrade services. IDP attempted to convince the Air Force to abandon these services or negotiate an additional contract to cover their cost. The Air Force refused and threatened to default and debar IDP and its parent corporation if IDP did not perform as requested.

In mid-April 2000, IDP decided the warranty costs were threatening its survival and the survival of its parent company. IDP therefore stopped all warranty and upgrade work. IDP seeks damages to cover the cost to repair and replace components, shipping, labor, and fees paid to third party service firms.

II

In reviewing judgments of the Court of Federal Claims, this court reviews conclusions of law, such as contract or statutory interpretation, without deference. Mass. Bay Transp. Auth. v. United States, 254 F.3d 1367, 1372 (Fed. Cir. 2001); Kane v. United States, 43 F.3d 1446, 1448 (Fed. Cir. 1994). Findings of facts receive review under the "clearly erroneous" standard. City of El Centro v. United States, 922 F.2d 816, 819 (Fed. Cir. 1990); Hankins Constr. Co. v. United States, 838 F.2d 1194, 1195 (Fed. Cir. 1988).

A

The trial court held that when IDP entered into an agreement with Dunn Corporation, a non-section 8(a) entity, to purchase IDP, IDP was no longer required to continue to provide warranty and upgrade services under the Desktop V contract. Int'l Data Prods. 64 Fed. Cl. at 649. In particular, the trial court held that "the Government was required by the Small Business Act to terminate the Desktop V contract for convenience or seek a waiver allowing contract performance to continue as provided by 15 U.S.C. § 637(a)(21)(B)." Id. In the circumstances of this case, 15 U.S.C. § 637(a)(21)(A) requires the government to terminate the contract for the convenience of the government:

> Subject to the provisions of subparagraph (B), a contract (including options) awarded pursuant to this subsection shall be performed by the concern that initially received such contract. Notwithstanding the provisions of the preceding sentence, if the owner or owners upon whom eligibility was based relinquish ownership or control of such concern, or enter into any agreement to relinquish such ownership or control, such contract or option shall be terminated for the convenience of the Government, except that no repurchase costs or other damages may be assessed against such concerns due solely to the provisions of this subparagraph.

**Matta, Nahed**

**From:** Reginald Gipson [RGipson@jsiegypt.com]
**Sent:** Tuesday, June 10, 2003 5:32 PM
**To:** 'farafat@icsgroupusa.com'
**Cc:** Matta, Nahed; 'hanyhimed@hotmail.com'; 'ICSegypt@gega.net'; 'jim@preemicare.com'; Katrina Kruhm; 'tca@tedata.net.eg'
**Subject:** ICS contract for PreemiCare Incubators

June 10, 2003

Fawaz Arafat
President
ICS

Dear Mr. Arafat,

John Snow, Inc. the USAID contractor of the Healthy Mother / Healthy Child Project in Egypt solicited offers for the supply of normal and intensive care incubators in January 2001. An award was then made to ICS for the supply of PreemiCare Incubators under contract 205 and 205A dated June 16, 2001 and November 25, 2001, respectively. The incubators were delivered to Geologistics, Inc., the freight forwarder, and shipped to Egypt. The PreemiCare dealer in Egypt Hi-Med installed the incubators as they arrived.

Within almost two weeks from the installation it became evident that the complaints and number of service calls were increasing in reference to the operation of the incubators. ICS and the dealer were called to JSI for a meeting to assess the situation on September 24, 2002 and ICS agreed to contact PreemiCare and explain the situation. JSI/TCA contacted both the manufacturer and ICS to also request assistance. A representative of PreemiCare visited Egypt in December, 2002 and promised to investigate the complaints, suggest modifications and come back with a report. At that stage it was becoming clear that the incubators supplied required several modifications to become acceptable and up to standard.

The local agent Hi-Med sent the project a letter on January 13, 2003 expressing their concerns on the safety of the incubators and advising that the incubators be removed from service until the requested modifications are completed. The incubators were, therefore, taken out of service.

PreemiCare sent to Egypt spare parts, additional parts and modified parts to complete the task. PreemiCare agreed to send a team to upgrade and retrofit the incubators. On June 4, 2003 an Engineer from PreemiCare arrived in Egypt to perform the retrofit.

We received the spare parts (except the trays with barriers) required for the PreemiCare incubator retrofit and have met with Eng. Rhanda who has demonstrated to JSI and a MOHP representative the modifications that are to be made for each incubator. As I am sure you are aware, Eng. Rhanda will only be available until the 20th of June and this is not sufficient time to complete all the repairs and testing that needs to be completed for all of the incubators. Based on this, we would like to request that Eng. Rhanda's visit be extended until all incubators are completely retrofitted and certified or a suitable solution provided. Please note the urgency of this matter because the incubators have been out of use for more than six months which is unacceptable from the Ministry of Health stand point.

- John Snow, Inc. the USAID contractor of the Healthy Mother / Healthy Child Project in Egypt solicited offers for the supply of normal and intensive care incubators in January 2001.
- An award was then made to ICS for the supply of PreemiCare Incubators under contract 205 and 205A dated June 16, 2001 and November 25, 2001, respectively. The incubators were delivered to Geologistics, Inc., the freight forwarder, and shipped to Egypt.
- The PreemiCare dealer in Egypt Hi-Med installed the incubators as they arrived. Within almost two weeks from the installation it became evident that the complaints and number of service calls were increasing in reference to the operation of the incubators.
- ICS and the dealer were called to JSI for a meeting to assess the situation on September 24, 2002 and ICS agreed to contact PreemiCare and explain the situation. JSI/TCA contacted both the manufacturer and ICS to also request assistance. A representative of PreemiCare visited Egypt in December, 2002 and promised to investigate the complaints, suggest modifications and come back with a report. At that stage it was becoming clear that the incubators supplied required several modifications to become acceptable and up to standard.
- The local agent Hi-Med sent the project a letter on January 13, 2003 expressing their concerns on the safety of the incubators and advising that the incubators be removed from service until the requested modifications are completed. The incubators were, therefore, taken out of service.
- PreemiCare sent to Egypt spare parts, additional parts and modified parts to complete the task. PreemiCare agreed to send a team to upgrade and retrofit the incubators.
- On June 4, 2003 an Engineer from PreemiCare arrived in Egypt to perform the retrofit. We received the spare parts (except the trays with barriers) required for the PreemiCare incubator retrofit and have met with Eng. Rhanda who has demonstrated to JSI and a MOHP representative the modifications that are to be made for each incubator.
- JSI became aware, that Eng. Rhanda will only be available until the 20th of June and requested that her visit should be extended to complete all the repairs and testing that needs to be completed for all of the incubators and certified for use. or a suitable solution provided.
- JSI affirmed to ICS the urgency of this matter because the incubators have been out of use for more than six months which is unacceptable from the Ministry of Health stand point.
- JSI also requested final clarification on the following pending issues:

    1- The barrier trays should be sent to Egypt as soon as possible. As documented in previous correspondences, these incubators are not suitable for use in the MOHP facilities until the trays with barriers are included with the units. It is very important that these trays are received in Egypt before Eng. Rhanda departs so she will be able to complete the retrofit. Please inform us immediately regarding when these trays are sent from

Subject: RE: ICS contract for PreemiCare Incubators

Dear Mr. Arafat,

Thank you very much for your reply to my email. I was very pleased to know that you and Preemicare are committed to resolve all outstanding issues in the most efficient and expeditious manner. We have been informed that the current engineering team has revised their schedule for the incubator retrofit process. I am, therefore, concerned that the current incubator retrofit process continues without interruption until all incubators are back in operation and service. The Ministry of Health and Population officials have informed me that this process must be completed as soon as possible because of the great need for these incubators to provide services for newborns. Any further interruption of service will not be acceptable.

I, therefore, request that you send us the revised schedule in writing and clarification on how and when the retrofit process will be completed for all incubators and they will be certified as being safe for neonates.

We are also waiting for feedback from the other questions included in our June 10th correspondence.

Thank you for your attention.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

-----Original Message-----
From: Fawaz H. Arafat [mailto:farafat@ics-technologies.com]
Sent: Thursday, June 12, 2003 1:48 AM
To: farafat@icsgroupusa.com; Reginald Gipson
Cc: 2 A. MAGUID YOUNES; tca@tedata.net.eg; Katrina Kruhm; jim@preemicare.com; hanyhimed@hotmail.com; nmatta@usaid.gov
Subject: RE: ICS contract for PreemiCare Incubators

Dear Dr. Gibson

I am in receipt of your letter of June 10th, 2003. I am in daily contact with our office in Egypt together with Engineer Randa Rihana and her staff in the field.
As this issue is very important to ICS, I am traveling to California to meet with Preemicare On Friday June 13th, in order to resolve with Mr. Jim Fitzmaurice all issues related to the incubators. I would like to assure you of our and Preemicare's determination to resolve all these issues in the most efficient and expeditious manner.

With my best regards
Fawaz Arafat
ICS Technologies, Inc.
6663A Old Dominion Dr.
McLean, VA 22101
703 448 3700 Ext 203
Visit us at www.ics-technologies.com

-----Original Message-----
From: Reginald Gipson [mailto:RGipson@jsiegypt.com]
Sent: Tuesday, June 10, 2003 10:32 AM
To: 'farafat@icsgroupusa.com'
Cc: 'nmatta@usaid.gov'; 'hanyhimed@hotmail.com'; 'ICSegypt@gega.net'; 'jim@preemicare.com'; Katrina Kruhm; 'tca@tedata.net.eg'
Subject: ICS contract for PreemiCare Incubators
June 10, 2003

Fawaz Arafat
President
ICS

Dear Mr. Arafat,

John Snow, Inc. the USAID contractor of the Healthy Mother / Healthy Child Project in Egypt solicited offers for the supply of normal and intensive care incubators in January 2001. An award was then made to ICS for the supply of PreemiCare Incubators under contract 205 and 205A dated June 16, 2001 and November 25, 2001, respectively. The incubators were delivered to Geologistics, Inc., the freight forwarder, and shipped to Egypt. The PreemiCare dealer in Egypt Hi-Med installed the incubators as they arrived.

Within almost two weeks from the installation it became evident that the complaints and number of service calls were increasing in reference to the operation of the incubators. ICS and the dealer were called to JSI for a meeting to assess the situation on September 24, 2002 and ICS agreed to contact PreemiCare and explain the situation. JSI/TCA contacted both the manufacturer and ICS to also request assistance. A representative of PreemiCare visited Egypt in December, 2002 and promised to investigate the complaints, suggest modifications and come back with a report. At that stage it was becoming clear that the incubators supplied required several modifications to become acceptable and up to standard.

The local agent Hi-Med sent the project a letter on January 13, 2003 expressing their concerns on the safety of the incubators and advising that the incubators be removed from service until the requested modifications are completed. The incubators were, therefore, taken out of service.

PreemiCare sent to Egypt spare parts, additional parts and modified

parts to complete the task. PreemiCare agreed to send a team to upgrade and retrofit the incubators. On June 4, 2003 an Engineer from PreemiCare arrived in Egypt to perform the retrofit.

We received the spare parts (except the trays with barriers) required for the PreemiCare incubator retrofit and have met with Eng. Rhanda who has demonstrated to JSI and a MOHP representative the modifications that are to be made for each incubator. As I am sure you are aware, Eng. Rhanda will only be available until the 20th of June and this is not sufficient time to complete all the repairs and testing that needs to be completed for all of the incubators. Based on this, we would like to request that Eng. Rhanda's visit be extended until all incubators are completely retrofitted and certified or a suitable solution provided. Please note the urgency of this matter because the incubators have been out of use for more than six months which is unacceptable from the Ministry of Health stand point.

Additionally, JSI requests final clarification on the following pending issues:

1. The barrier trays should be sent to Egypt as soon as possible. As documented in previous correspondences, these incubators are not suitable for use in the MOHP facilities until the trays with barriers are included with the units. It is very important that these trays are received in Egypt before Eng. Rhanda departs so she will be able to complete the retrofit. Please inform us immediately regarding when these trays are sent from California and when they should be in Egypt. TCA is willing to provide assistance in clearing the items in Egypt.

2. We have been informed by Eng. Rhanda that the gasket around the base of the mattress tray is a disposable item and that it should be replaced. This gasket is not practical or acceptable; if not replaced after each case it would not meet basic infection control standards. In addition, the gasket is not easily installed. We kindly request a proposal for replacing this gasket with a permanent seal made of hard material that can be adequately sterilized.

3. We request a copy of the revised service manual (electronic or hard copy) for the modified incubator.

4. We request a copy of the FDA certification for the PreemiCare incubator model sold to the project in Egypt and clarification on whether or not the revised model has been FDA certified.

5. Since the units have not actually been used, we request written confirmation from both ICS and the local representative on the extended warranty terms being offered and a listing of spare parts currently available in Egypt for repairs that will be conducted during the extended warranty period. Please be reminded that our request is for one year of extended warranty free-of-charge with the same terms of the initial warranty from the date of PreemiCare re-certification or when the revised trays are installed, whichever is later.

6. We request a recommended list of spare parts and consumables with unit prices for two years beyond the extended warranty period.
7. We are also expecting that all incubators will be retrofitted and to receive all the PreemiCare retrofit checklists completed and signed by Eng. Rhanda before her departure.

Included at the bottom of each checklist should be a certification written and signed by the PreemiCare representative stating that "PreemiCare certifies that the incubator (serial XX) has been modified and tested and is 100% functional and safe for use with neonates."

If an incubator cannot be certified because essential parts are missing, a list of the items missing should be included on the checklist.

8. A meeting to report progress on the retrofitting of the incubators will be held at the JSI office on Thursday, June 19 at 3:00pm. ICS should ensure that ICS, PreemiCare, and the PreemiCare local representative are present for this meeting.

Thank you for your follow-up on the pending issues. We look forward to receiving your answers as soon as possible.

Sincerely,

Reginald F. Gipson, M.D.
Chief of Party

cc: Dr. Nahed Matta, USAID
Mr. Yousri Aclimandos, TCA
Mr. A. Megeid Younes, ICS/Egypt
Mr. Jim Fitzmaurice, PreemiCare
Dr. Hany Shafaie, Hi-Med