USAID

UNITED STATES AGENCY for INTERNATIONAL DEVELOPMENT

CAIRO, EGYPT

November 1, 2004

Mr. Joel Lamstein
President
John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210-1211

Subject: FAR Clause No.52.242-1 Notice of Intent to Disallow Costs

Reference: Contract No. 263-C-00-98-00041-00

Dear Mr. Lamstein:

Pursuant to FAR clause 52.242-1 of the subject contract, this letter is to notify you of USAID's intent to disallow the amount of $785,880.35 from the costs incurred under the subject contract.

Subject contract includes the requirement for JSI to procure approximately $18M in commodities as identified in the procurement plan subject to CTO/CO approval. This plan included procurement of infant incubators. Although the plan was never approved by the CO, JSI proceeded to procure and install 119 incubators. Within a few weeks after installation of the incubators, problems surfaced to the extent that the incubators were taken out of service at the recommendation of JSI's supplier/manufacturers local representative. After numerous failed attempts to repair the incubators JSI procured and installed replacement incubators.

It has come to my attention that the cost of the replacement incubators was inappropriately charged to and mistakenly paid by USAID. This letter serves as notice of our intent to disallow these costs in the amount of $785,880.35 as offsets against future invoices.

A chronology of pertinent events extracted from a JSI/ICS email dated June 28, 2004, is as follows:

USAID Office Building
Plot 1A off El-Laselki Road
New Maadi, Cairo - Egypt
Postal Code: 11435

Tel: (202) 522 7000
Fax: (202) 516 4628
(202) 516 4659

1. On June 13 and November 30, 2001, JSI under subject contract procured 119 Preemicare brand infant incubators.

2. Between approximately May and July 2002, the incubators were delivered and installed at various MOHP locations.

3. Within a few weeks after installation, complaints were received from MOHP staff about overheating, erratic display boards, inconsistent alarms, and other problems. These concerns were shared by JSI with JSI's supplier, ICS, in September 2002.

4. In December 2002, the incubators were taken out of service for safety concerns at the recommendation of JSI's supplier/manufacturers local representative.

5. After numerous failed attempts to repair the incubators, JSI procured and installed 119 replacement incubators.

Based on the above, USAID/Cairo intends to disallow the amount of $785,880.35 from the costs incurred under the subject contract.

The effective date of the Notice is November 1, 2004. In case of disagreement with the Notice, JSI may submit a written response no later than November 14, 2004.

Please confirm receipt of the Notice.

Sincerely,

Roy Plucknett
Contracting Officer
USAID/Egypt

NOV-12-01 MON 10:56 AM FAX: PAGE 1

ORIGINAL
JSI

June 13, 2001

# PURCHASE CONTRACT No. 04-01-205

This Purchase Contract is hereby entered between ICS Systems Integration Division, 6663-A Old Dominion Drive, McLean, VA 22101 (hereinafter called "ICS" or the "Supplier") and JOHN SNOW, INC., 44 Farnsworth Street, Boston, MA 02210 (hereinafter called "JSI" or the "Buyer") for the supply of Medical Equipment.

This Purchase Contract is made in duplicate; one copy for each party following signatures by both parties.

| ICS | JOHN SNOW, INC. |
|---|---|
| NAME | NAME |
| Fawaz Arafat | Kenneth J. Olivola |
| TITLE | TITLE |
| President | Director |
| SIGNATURE | SIGNATURE |
| [signature] | [signature] |
| DATE | DATE |
| 16/6/01 | 12/6/01 |

# PART 1: ACCEPTANCE BY THE CONTRACTING AGENCY

JSI, Healthy Mother/Healthy Child (Contracting Agency) has accepted the offer from ICS, 6663-A Old Dominion Drive, McLean, VA 22101 (Supplier) for the supply of the following Medical equipment as set forth in this contract:

| ITEM # | ITEM DESCRIPTION | Manufacturer | Model # | QTY | UNIT | Incidental Services | | TOTAL | Extended Price | Delivery Time |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Perunit | Total | | | |
| | Neonatal Bassinet Spare Basket | United Metal Fabricator | 8545 | 11 | $52.99 | N/A | | $52.99 | $582.89 | 12 weeks |
| 19 | Gas Supply | Squire-Cogswell/Aeros | Health cair | 11 | $2,476.53 | $275.17 | $3,026.87 | $2,751.70 | $30,268.70 | 5 Weeks |
| 20 | Incubator, intensive care | Medicare Industries | 605-1460500 | 25 | $7,935.10 | $793.51 | $19,837.75 | $ 7,935.10 | $198,377.50 | 11 weeks |
| 21 | Incubator, Normal Care Including Servo Humidifier # 1460430 | MediCare Industries | Preemicare 605 | 69 | $5,503.00 | $611.45 | $42,190.05 | $6,114.45 | $421,897.05 | 11 Weeks |
| | Total | | | | | | $65,054.67 | | $651,126.14 | |

1- COUNTRY OF ORIGIN: U.S.A.
2- This contract consists of the following documents:

PART 1 – ACCEPTANCE BY THE CONTRACTING AGENCY, which includes the Bidder's schedule and itemized prices
PART 2 – CONDITIONS OF THE CONTRACT
PART 3 - ACKNOWLEDGEMENT OF RECEIPT AND ACCEPTANCE

3- The total FOB value of this contract is $651,126.14.The total value for the commodities is $586,071.47. The total amount for incidental services (Installation and Training) for items #19, 20 and 21 is $65,054.67
4- The Supplier shall deliver all the items to Geologistics, Inc. in Alexandria, VA, USA.
5- PACKING: Each Model shall be specifically marked with:

(i) The model name and manufacturer's name.
(ii) The JSI Item number.
(iii) All accompanying parts for each model marked by piece.

Example:
JSI item # 2– Spare Basket
Model No. 8545 United Metal Fabricator

# PART 2: CONDITIONS OF CONTRACT

## 1. Definitions

The terms used in this contract shall have the following meanings:

A. "Agent" means TransCentury Associates, who is acting as the procurement services agent for the Contracting Agency.

B. "FOB" is defined in Attachment 1.

C. "Code 000" (US Only) means the geographic area described as in Attachment 2 ("Relevant A.I.D. Geographic Codes").

D. "Contracting Agency" means John Snow, Inc. (JSI) Healthy Mother/Healthy Child in Egypt.

E. "Destination" means the Freight Forwarder in Alexandria, Virginia.

F. "Effective Date" means the date on which the Supplier receives a Contract / P.O. from the Agent.

G. "Egypt" means the Arab Republic of Egypt.

H. "Free World Country" means any country which is not a non-Free World Country.

I. "Non-Free World Country" means any of the following countries: Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's Republic of China, Syria, and Vietnam.

J. "Supplier" means the successful bidder to whom this contract(s) has been awarded.

K. "United States" means the United States of America, including the 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, the Trust Territory of the Pacific Islands, and Guam.

L. "USAID" means the United States Agency for International Development.

M. "Local Representative" means the local in country (Egypt) Representative/Agent of the successful bidder who will be responsible for honoring the warranty, and performing the installation if required.

## 2. Governing Law and Language

The laws of the Commonwealth of Massachusetts govern this purchase contract except in cases where they contradict the AIDAR and/or FAR regulations cited in this purchase contract, in which case the latter shall prevail. The English language version

of this contract shall govern, and all notices pursuant to the provisions of this contract shall be in English. Each reference to a specified number of days shall be deemed to refer to consecutive calendar days.

## 3. Delivery

Delivery under this contract shall be on a FOB Destination basis; according to the delivery periods mentioned PART 1 – ACCEPTANCE BY THE CONTRACTING AGENCY - of this Contract. The Supplier shall deliver all medical commodities, accessories, and spare parts to be supplied under this contract into the custody of the freight forwarder in Alexandria, VA for transportation to Egypt. The freight forwarder address will be specified on the Contract Award Form at the time of award.

## 4. Responsibilities of the Agent

The Agent is employed by the Contracting Agency to supervise this contract and has concurrent authority to take or perform on behalf of the Contracting Agency any action which the Contracting Agency is permitted or required to take or perform under this contract, including (without limitation) (a) witnessing inspection of medical commodities, equipment and supplies prior to shipment to Egypt, (b) inspecting and accepting or rejecting the medical commodities, equipment and supplies at Destination, and (c) requiring replacement of defective parts or spare parts.

## 5. Legal Effect of USAID Approvals and Decisions

The parties hereto understand that the Contract has reserved to USAID certain rights such as, but not limited to, the right to approve the terms of this contract, the Supplier, and any or all plans, reports, specifications, subcontracts, bid documents, drawings, or other documents related to this contract and the project of which it is part. The parties hereto further understand and agree that USAID, is reserving any or all of the foregoing approval rights, has acted solely as a financing entity to assure the proper use of United States Government funds, and that any decision by USAID to exercise or refrain from exercising these approval rights shall be made as a financier in the course of financing this project and shall not be construed as making USAID a party to the contract. The parties hereto understand and agree that USAID may, from time to time, exercise the foregoing approval rights, or discuss matters related to these rights and the project with the parties jointly or separately, without thereby incurring any responsibility or liability to the parties jointly or to any of them. Any approval (or failure to disapprove) by USAID shall not bar the Contracting Agency or USAID from asserting any right, or relieve the Supplier of any liability which the Supplier might otherwise have to the Contracting Agency or USAID.

## 6. Payment

Request for payment shall be submitted in accordance with the following instructions:

A. <u>Payment Terms</u>. One hundred percent (100%) of the contract price for commodities, accessories, and spare parts, excluding the cost of incidental services, will be paid upon presentation of the documents required under

paragraph B below. If any incidental services are required under this contract, one hundred percent (100%) of the contract price for such services will be paid upon presentation of the documents required under paragraph C below. All payments will be made by wire transfer or company check on a net 30 days basis.

B. Request for Payment for Commodities, Accessories and Spare Parts. Payment due to the Supplier under this contract for commodities, and spare parts shall be based upon the Supplier's written request for payment accompanied by the following documentation:

(1) Supplier's itemized Commercial Invoice.

(2) "Supplier's Certificate and Agreement with the Agency for International Development for Project Commodities/ Invoice and Contract Abstract," Form AID 1450-4 (see Attachment 4), executed in accordance with the instructions thereon (a) by the Supplier for the cost of the commodities, (b) by the carrier for the cost of in-land transportation.

(3) Warehouse delivery receipt stating that commodities delivered are in accordance with the Purchase Order in quantities, brand names and marking requirements.

(4) A copy of the signed Bid /Award Contract Form.

(5) JSI/TCA Certificate of Acceptance.

C. Request for Payment for Incidental Services. Payment due to the Supplier under this contract for incidental services shall be based upon the completion of installation and training services, if required. The Suppliers must submit a written request for payment accompanied by the following documentation:

(1) Supplier's itemized invoice.

(2) "Supplier's Certificate and Agreement with the Agency for International Development for Project Commodities/ Invoice and Contract Abstract," Form AID 1450-4 (see Attachment 4), executed in accordance with the instructions thereon (a) by the Supplier for the cost of the commodities, (b) by the carrier for the cost of in-land transportation.

(3) Certificate of Acceptance by JSI/TCA that services were adequately rendered.

D. Both parties agree in accordance with the tender documents that installation is required for items listed in the previous table.

Since the supplier included the cost of installation but did not assign a specific value to incidental charges the amount of Ten Percent (10 % )of the value of those

B. The Government of Egypt will allow the Supplier to import free of customs and duties such materials and equipment as may be required under this contract.

## 10. Eligibility of Suppliers

A. No equipment, materials or services shall be eligible for USAID financing if offered by a supplier or subcontractor included on any list of suspended, debarred, or ineligible bidders used by USAID.

B. Except as otherwise provided in paragraph D below, the Supplier must be:

(1) An individual who is a citizen or legal resident of the United States;
(2) A corporation or partnership organized under the laws of the United States
(3) A controlled foreign corporation, i.e. any foreign corporation of which more than 50 percent of the total voting power of all classes of stock is owned by United States shareholders within the meaning of the Section 957 et seq. of the Internal Revenue Code (26 U.S.C. 957); or
(4) A joint venture or unincorporated association consisting entirely of individuals, corporations, or partnerships which is eligible under any of the foregoing categories.

C. Citizens of any non-Free World country, firms and organizations located in or organized under the laws of any non-Free World country, and firms and organizations owned in any part by citizens or organizations of any non-Free World country, are ineligible for financing by USAID as suppliers of commodities or as agents in connection with the supply of commodities; provided, however, that non-U.S. citizens lawfully admitted for permanent residence in the United States are eligible as individuals or owners, regardless of such citizenship; and, provided further, that USAID's Deputy Associate Administrator for Finance and Administration (DAA/FA) may authorize the eligibility of organizations having minimal ownership by citizens or organizations of non-Free World countries.

D. The rules stated in paragraph B above do not apply to suppliers of incidental services which are related to this procurement of equipment and included as part of this contract. Incidental services are defined as the installation or erection of USAID-financed equipment, or the training of Contracting Agency personnel in the maintenance, operation or use of such equipment.

## 11. Eligibility of Commodities

A. Definitions

(1) "Source" means the country from which a commodity is shipped to Egypt or Egypt itself if the commodity is located therein at the time of purchase. However, where a commodity is shipped from a free port or bonded warehouse in the form in which it was received therein, "source" means the country from which the commodity was shipped to the free port or bonded

warehouse.

(2) "Origin" of a commodity is the country or area in which the commodity is mined, grown, or produced. A commodity is produced when through manufacturing, processing, or substantial and major assembling of components a commercially recognized new commodity results that is substantially different in basic characteristics or in purpose or utility from its components.

(3) "Commodity" means each item, which is commercially recognized or sold as an independent unit. However, when the product being purchased is a kit consisting of items such as tools or scientific instruments, which are packaged as a single unit, the kit will be considered to be a single commodity and the items, included in the kit will be the components. When spare parts are being purchased, each separate shipment of spare parts will be considered to be a single commodity, and the parts included in the shipment will be the components. For purposes of this procurement, each of the line items listed in the Technical Specifications (Part E) will be considered a single, separate commodity and not merely a component of some other commodity.

(4) "Components" are the goods that go directly into the production of a produced commodity. (See also the definition of "commodity" above.)

B. Rule

Each commodity shall have its source and origin in the United States (Geographic Code 000) and meet the USAID componentry rules

Any commodity component from a non-Free World country (Afghanistan, Cambodia, Cuba, Iran, Iraq, Laos, Libya, North Korea, People's Republic of China, Syria, and Vietnam) makes the commodity ineligible for USAID financing; this means that if even one component of a commodity is from a non-Free World country, then the commodity is ineligible.

## 12. Change Orders

A. The Contracting Agency may at any time, by a written order, and without notice to the sureties, make changes within the general scope of this contract, in any one or more of the following: drawings, designs, or specifications, where commodities to be furnished under this contract are to be specially manufactured for the Contracting Agency.

B. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. The Supplier of the modification or change must assert any claim by the Supplier for adjustment under this clause within thirty (30) days from the date of receipt. The prior written approval of USAID may be required for any change order, which

exceeds $25,000.

13. Amendments

Modification of the terms of this contract shall be made by an amendment signed by the parties.

14. Settlement of Disputes

A. In the event of a disagreement under this contract, the Supplier shall submit a written statement to the Contracting Agency, briefly describing the nature of the problem, the position of the Supplier regarding the issue and a narrative of facts in support of the Supplier's position.

B. Within ten (10) days after receipt of the Supplier's statement, the Contracting Agency shall decide the issue and deliver a written statement of the decision to the Supplier, including the reasons supporting the decision, if adverse to the Supplier.

C. Within thirty (30) days after receipt of the Contracting Agency's decision, or the date such decision was due (whichever occurs first), the Supplier may submit to the Contracting Agency a written Notice of Appeal including a detailed description of the facts of the dispute with the dates of events, names of persons involved, references to documentation bearing on the matter (with copies attached), the relevant contract provision(s), the Supplier's contentions and conclusions, and a statement of why the Contracting Agency's decision is being questioned.

D. If within thirty (30) days after delivery of a Notice of Appeal, the parties can not mutually agree to a satisfactory settlement, the matter shall be presented for arbitration, and finally decided under the rules of Conciliation and Arbitration of the US Chamber of Commerce.

15. Marking

The Supplier shall ensure that all commodities furnished under this contract and their shipping containers carry the official red, white and blue USAID emblem. Emblems shall be affixed by metal plates, decal, stencil, label, tag, or other means depending upon the type of commodity or shipping container and the nature of the surface to be marked. The emblem placed on the commodities shall be as durable as the trademark, company or brand name affixed by the manufacturer. The emblem on each shipping container must be affixed in a manner, which assures that it will remain legible until the container reaches its destination. A list of suppliers of USAID emblems is set forth in Attachment 5 (which is a copy of Appendix 9B of USAID Handbook15, Chapter 9).

16. Inspection

A. All medical commodities and spare parts shall be subject to inspection and

testing by or on behalf of the Contracting Agency at the expense of the Contracting Agency prior to shipment. The Contracting Agency will notify the Supplier in writing of the names of any inspectors or inspection firms. It is understood that inspection and testing shall not in any way release the Supplier from any warranty or other obligations under this Contract.

B. If any inspection or test is made by or on behalf of the Contracting Agency on the premises of the Supplier, the Supplier shall provide all reasonable facilities and assistance for the safety and convenience of the Contracting Agency or its inspectors in the performance of their duties without additional charge.

17. Force Majeure

A. Except with respect to default of subcontractors, the Supplier shall not be liable for any excess costs if the failure to perform the Contract arises out of causes beyond the control and without the fault or negligence of the Supplier (Force Majeure) and if the Supplier, within twenty (20) days from the beginning of any such Force Majeure, notifies the Contracting Agency of such prevention of performance and the cause thereof. Such causes may include, but are not restricted to, acts of the Borrower/Grantee in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of the Supplier. If the failure to perform is caused by the default of a subcontractor and if such default arises out of causes beyond the control of both the Supplier and the subcontractor and without the fault or negligence of either of them (Force Majeure), and the Supplier, within twenty (20) days from the beginning of such Force Majeure, notifies the Contracting Agency of such prevention of performance and the cause thereof, the Supplier shall not be liable for any excess costs due to the failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Supplier to meet the required delivery schedule.

B. In the event of a Force Majeure, the Supplier, unless otherwise directed by the Contracting Agency in writing, shall continue to undertake and perform the duties set forth in this contract as far as is reasonably practical.

C. In the event of a Force Majeure resulting in a suspension of work, this contract shall be extended by a period equal to that for which the Supplier was prevented from performing.

D. The Supplier shall be entitled to reasonable costs incurred as a consequence of a Force Majeure.

E. If the Supplier's inability to perform by reason of the Force Majeure lasts for more than forty-five (45) days after notice has been given to the Contracting Agency, either party may terminate this contract and the Supplier shall be entitled to any sums which would be payable in case of termination of this contract by the Contracting Agency for convenience.

18. Termination for Convenience

A. This contract may be terminated by the Contracting Agency in whole, or from time to time in part, in accordance with this clause, whenever the Contracting Agency shall determine that such termination is in the best interest of the Contracting Agency.

B. Termination shall be effected by Notice of Termination to the Supplier, specifying that termination is for the convenience of the Contracting Agency, the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

C. After receipt of a Notice of Termination and except as otherwise directed by the Contracting Agency, the Supplier shall:

1. Stop work under the contract on the date and to the extent specified in the Notice of Termination, and place no further orders or subcontracts except as may be necessary for completion of the portion of the work under contract which is not terminated;

2. Terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the Notice of Termination

3. Assign to the Contracting Agency as it may direct, all of the right, title, and interest of the Supplier under the orders and subcontracts, in which case the Contracting Agency shall have the right to settle or pay any claims arising out of the termination of such orders and subcontracts;

4. With the approval or ratification of the Contracting Agency, to the extent the Contracting Agency may require, which approval or ratification shall be final and conclusive for all purposes of this clause, settle all outstanding liabilities and all claims arising out of such termination of orders and subcontracts;

5. Transfer title to the Contracting Agency and deliver as directed by the Contracting Agency, the completed or partially completed equipment, material, and parts which would be required to be furnished to the Contracting Agency under this contract;

6. Complete performance of the part of the work which has not been terminated by the Notice of Termination; and

7. Take such action as may be necessary for the protection of the property related to this contract which is in the possession of the Supplier and to which the Contracting Agency has title.

D. The Supplier shall submit to the Contracting Agency its written claim promptly but not later than three (3) months from the effective date of termination, except as the Contracting Agency may agree in writing.

E. The Supplier and the Contracting Agency shall consult within thirty (30) days of the submission of the claim concerning the whole or any part of the amount to be paid to the Supplier by reason of the termination of work. The contract shall be amended accordingly, and the Supplier shall be paid the agreed amount.

F. In deciding the amount due the Supplier, there shall be deducted (1) all settled claims which the Contracting Agency may have against the Supplier in connection with this contract and (2) the agreed price for, or the proceeds of sale of, property acquired by the Supplier or sold and not otherwise recovered by or credited to the Contracting Agency.

G. Any disagreement regarding termination amounts or procedures shall be settled under the clause of this contract entitled "Settlement of Disputes."

## 19. Termination for Default

A. The Contracting Agency may, by written notice of default sent to the Supplier by registered mail, terminate in whole or part this contract:

(1) If the Supplier fails to make delivery of the equipment within the time specified herein or any extension thereof expressly agreed to buy the Contracting Agency in writing, or

(2) If the Supplier fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and, in either of these two circumstances, does not cure such failure within a period of ten (10) days (or such longer period as the Contracting Agency may authorize in writing) after receipt of notice from the Contracting Agency specifying such failure.

B. In the event the Contracting Agency terminates this contract in whole or in part as provided in paragraph A of this clause, the Contracting Agency may procure, upon such terms and in such manner as the Contracting Agency may deem appropriate, commodities similar to those so terminated, and the Supplier shall be liable to the Contracting Agency for any excess costs for such similar commodities. However, the Supplier shall continue performance of this contract to the extent not terminated under the provisions of this clause.

C. The rights and remedies specified in this clause shall not be exclusive of, but are in addition to, any other rights and remedies available to the Contracting Agency.

## 20. Liquidated Damages

Failure by the Supplier to deliver the quantity or quality of commodities specified herein, or to perform the required incidental services (if any), in accordance with the terms of this agreement will, because of the urgent need for the commodities by the Contracting Agency, cause serious and substantial damages to the Contracting

Agency; however, it will be difficult, if not impossible, to prove the amount of such damages. Therefore, for each day of delay in the delivery of any commodities or in the performance of incidental services with respect to any commodities -- other than delay caused by force majeure as defined in the "Force Majeure" clause above or by the sole fault or negligence of the Contracting Agency or its agents -- the Supplier agrees to pay to the Contracting Agency, as liquidated damages and not as a penalty, one half of one percent (0.5%) the contract price for the commodities in question; provided, however, that the total liquidated damages under this clause shall not exceed ten percent (10%) of the total contract amount. The parties have estimated and agreed upon this sum as an attempt to make a reasonable forecast of probable actual loss because of the difficulty of estimating with exactness the damages, which will result. These liquidated damages are in addition to, not in lieu of, any other rights and remedies available to the Contracting Agency.

21. Worker's Compensation Insurance

A. If the Supplier will perform incidental services (i.e., the installation or erection of commodities to be furnished under this contract, or the training of Contracting Agency personnel in the maintenance, operation or use of such commodities) outside of the United States, the Supplier shall provide and thereafter maintain worker's compensation insurance in accordance with the Defense Base Act (DBA) (42 U.S.C. 1651) for overseas employment under this contract of all employees who are hired in the United States or who are U.S citizens or bona fide residents of the United States.

B. The Supplier agrees to procure the DBA insurance required by this clause from the DBA insurance carrier under contract with USAID unless the Supplier has a DBA self insurance program approved by the Department of Labor or has an approved retrospective rating agreement for DBA. Information on obtaining coverage under the USAID requirements contract and the list of countries for which USAID has secured waiver of DBA coverage for Supplier's employees who are not citizens of, residents of, or hired in the United States are shown in USAID Handbook 11, Chapter 3, Section 4.1.6.22.

C. The Supplier agrees to provide employees who are not citizens of, residents of, or hired in the United Stated with worker's compensation benefits as required by the laws of the country in which the employees are working, or by the laws of the employee's native country, whichever offers greater benefits, or in the absence of such law, employer's liability insurance.

D. With respect to all employees who are hired for employment outside the country, in which they are to be employed, this insurance coverage shall be provided prior to the departure for overseas employment under this contract.

E. The Supplier shall insert a clause similar to this clause, including this sentence, in all subcontracts except those exclusively for furnishing equipment and/or materials.

## 22. Performance Bond or Guaranty

A. The Supplier shall furnish to the Contracting Agency within fifteen (15) days after award, a performance bond or guaranty fully protecting the Contracting Agency against any excess costs incurred by it as a result of any failure by the Supplier to perform any of its obligations under this contract.

1. Such bond or guaranty shall be satisfactory to the Contracting Agency and, at the option of the Supplier, shall be in the form of a surety bond, bank guaranty, or irrevocable letter of credit. If a performance guaranty in the form of a bank guaranty or irrevocable letter of credit is used, it shall be in an amount equal to ten percent (10%) of the contract price. If a performance bond is used, the bond shall be in an amount equal to one hundred percent (100%) of the contract price and shall be in the form attached hereto (Part F). The performance bond or guaranty shall be drawn in favor of John Snow, Inc., and shall be collectible upon receipt of the Agent's written certification of Supplier's default hereunder. Confirmation of the performance bond or guaranty by an Egyptian bank is not required.

The bond or guaranty shall be released not later than thirty (30) days following the date of completion of contract performance, even though the warranty period may extend beyond such time.

## 23. Warranty

The Supplier shall provide a warranty under which the Supplier or its authorized Local In-Country Representative will replace or repair the medical commodities and spare parts to be supplied under this contract, or repair or replace any parts of such commodities, found to be defective due to faulty design, workmanship or materials. The warranty may exclude, however, ordinary wear and tear and damage due to improper handling, storage, or operation. Replacements and repairs shall be made without cost to the Contracting Agency. The Contracting Agency shall give the Supplier prompt notice of any claims under such warranty and, if the Supplier fails to remedy the defects within a reasonable time, the Contracting Agency shall have the right to take such remedial action as may be necessary and to claim the reasonable costs thereof from the Supplier.

The warranty for the medical commodities and spare parts to be supplied shall be valid for a period of no less than twelve (12) months after installation or eighteen (18) months from the purchase contract effective date, whichever is earlier.

The warranty shall cover parts and labor, at no cost to the Contracting Agency, and shall be honored by the Supplier's Local In-Country Representative.

## 24. Local In-Country Representative

The Supplier is required to have a Local In-Country Representative/Authorized Agent

for installation and warranty service (parts and labor), at no additional cost to the Contracting Agency. The local in-country representative / authorized agent shall be able to provide spare parts and supplies for the items procured whenever required by the end users. The Supplier shall submit a letter from the Local Representative (on local company's letterhead), who will certify that, they are the Supplier's local representative and shall carry out, the installation and honor the warranty service, for the items offered in conjunction with IFB No 263-0242-1012-8, at no additional cost to the Contracting Agency.

Neither the Supplier nor the Local Representative shall assign repair or maintenance work to any other company without the prior written approval of the Contracting Agency.

## 25. Packing

All materials and equipment must be properly prepared for export to withstand exposure to the elements and rough handling during ocean shipment. Such packing must be sufficient to ensure safe arrival at destination and fully cover such hazards as extreme temperature and/or possible corrosion due to salt air or open space.

## 26. Suspension of Work

A. The Contracting Agency may, at any time, by written order to the Supplier (Suspension of Work Order), require the Supplier to stop all, or any part, of the work required by the contract for a period of up to ninety (90) from the specified effective date.

B. Upon receipt of such an order, the Supplier shall immediately comply with its terms and take all steps to minimize the insurance of costs related to the work covered by the Order.

C. Within the period of the Suspension of Work Order, the Contracting Agency shall either:

(1) Cancel the Suspension of Work Order; or

(2) Terminate the work covered by such Order as provided in the "Termination for Convenience" clause above.

D. If the Suspension of Work Order is canceled or the Order expires, the Supplier shall resume work. An equitable adjustment shall be made as necessary in the time schedule, the price, or a combination thereof, or any other provisions of the contract that may be affected, and the contract shall be amended accordingly, if the Supplier asserts a claim for such adjustment within thirty (30) days after the end of the period of work suspension. Failure to agree to any adjustment shall be a dispute under the "Settlement of Disputes" clause of the contract.

## 27. Equal Employment Opportunity

The Supplier will not discriminate in recruitment or employment conditions of personnel hired in the United States because of race, religion, color, sex, or national origin and are in compliance with its equal employment opportunity obligations under Executive Order 11246 dated September 24, 1965.

## 28. Vesting of Title and Diversion Rights

USAID reserves the right to vest in itself title to the goods financed under this contract, provided that such goods are in a deliverable state and have not yet been off loaded in ports of entry in Egypt. USAID may direct the carriers to divert these goods to alternative destinations.

## 29. Incidental Services

The Local Representative shall perform the incidental services (installation and training) as designated in "Technical Specifications" (Part E) or as required by the warranty terms.

All materials and travel related costs required for the performance of the incidental services shall be furnished by the Supplier/Local Representative at no additional cost to the Contracting Agency

Upon arrival in Egypt from the United States, and after appropriate customs and other clearances, the medical commodities shall be delivered by the Contracting Agency or its representative to the project various sites in Upper Egypt (Aswan, Luxor, Qena, Beni-Suef, Fayoum, Assuit, Sohag, and Menya). The Local Representative will then be responsible to install the commodities within a one-week period (5 business days) after notification of the delivery. The Local Representative will also be required to obtain a letter of acceptance from the project site once the incidental service (installation and/or training) has been performed.

The Contractor will attempt to consolidate deliveries/installations in the same governorate but cannot guarantee the consolidation. It is expected that there will be multiple trips required to each governorate.

## 30. Notices

Any notices or other communication given by either party will be in writing or fax, shall be in English, shall be effective on the effective date of the notice or when delivered, whichever is later, and will be deemed duly given or sent when delivered to the following addresses:

A. To the Supplier: At the address shown on the Bid/Award/Contract Form

B. To the Contracting Agency: John Snow, Inc.
44 Farnsworth Street
Boston, MA 02210
Attn: Ms. Eva Ros

C. With a copy to the Agent: TransCentury Associates
4300 Montgomery Ave
Bethesda, MD
20814
Attention: Mr. Yousri Aclimandos

## PART 3: ACKNOWLEDGMENT OF RECEIPT AND ACCEPTANCE

ICS, 6663-A Old Dominion Drive McLean, VA 22101 certifies that it received Purchase Contract No. 04-01-205 for $651,126.14 and that it will supply the required quantities all goods with the technical specifications mentioned for the prices listed and within the delivery times listed.

DATE: 06/19/2001

NAME: Fawaz Arafat

TITLE: President

SIGNATURE:

Please make sure to mail this form signed to JSI at 44 Farnsworth Street, Boston, MA 02210 Attn: Ms. Eva Ros within 2 days after receipt. A copy should also be faxed to TCA in Cairo, Egypt 202 - 3936425 Attn: Mr. Yousri Aclimandos.

# PART 3: ACKNOWLEDGMENT OF RECEIPT AND ACCEPTANCE

ICS, 6663-A Old Dominion Drive McLean, VA 22101 certifies that it received Purchase Contract No. 04-01-205 for $651,126.14 and that it will supply the required quantities all goods with the technical specifications mentioned for the prices listed and within the delivery times listed.

DATE: 06/19/2001

NAME: Fawaz Arafat

TITLE: President

SIGNATURE:

Please make sure to mail this form signed to JSI at 44 Farnsworth Street, Boston, MA 02210 Attn: Ms. Eva Ros within 2 days after receipt. A copy should also be faxed to TCA in Cairo, Egypt 202 - 3936425 Attn: Mr. Yousri Aclimandos.

# Incubator Inspection and Testing Project

for

John Snow, Inc.

ECRI Project Numbers 515-727 and 515-758

February 2004

## 1.0 Introduction

John Snow, Inc., engaged ECRI to conduct testing of PreemiCare infant incubators that were procured as part of the Healthy Mother/Healthy Child program. In the summer of 2003, ECRI initially proposed to visit Cairo and inspect a sample of incubators that had been removed from hospitals and warehoused there after MOHP and JSI developed concerns about the incubators' safety. After several discussions, JSI and ECRI agreed that two incubators—one intensive care unit and one normal care unit—would be shipped to ECRI's U.S. headquarters in Plymouth Meeting, PA, for inspection and testing.

We identified several problems with the incubators and raised several concerns regarding the manufacturer's maintenance documentation. JSI communicated these problems and concerns to the incubator manufacturer's distributor, who disputed or dismissed our findings. One failure was attributed to an out-of-calibration simulator. The contractor was given the opportunity to visit our Plymouth Meeting facility to review and rectify the problems with the two units.

This report includes

- the findings from our inspection and testing of the two units performed in November 2003,
- a summary of the subsequent repair and calibration of the two units by PreemiCare's service representative in February 2004, and
- recommendations for JSI.

## 2.0 ECRI Testing

## 2.1 Background

ECRI received the two incubators on October 9, 2003. Each was shipped in a wooden crate, and there was no apparent damage to either crate. However, when we opened the crate containing the intensive care unit and removed the packing material, we found the left end of its infant compartment to be bent down and slightly to the front. This problem was addressed in a memo to JSI dated November 14, 2003. The serial number of the intensive care unit is 9098078I, and the serial number of the normal care unit is 9098001I. We were unable to [illegible]

Although neither unit was shipped with a hood gasket, ECRI concluded that the hoods close adequately without a gasket and that effects on temperature testing would be negligible. Other than the previously described shipping damage to the intensive care unit, there was no apparent physical damage to either unit.

PreemiCare's inspection procedures call for a "sensor simulator," which was not provided with the incubators. We attempted to call PreemiCare to purchase the simulator and learned that both the telephone and fax numbers were no longer in service. We then e-mailed PreemiCare President Jim Fitzmaurice, who replied: "We do not presently have a simulator available. There would be approximately 4 weeks lead time in making one available. I am unable to comment on the cost at this time." After receiving this reply, JSI arranged for the PreemiCare distributor in Cairo to provide its simulator, which was received at ECRI on November 6. The simulator was labeled "Medicare Industries Inc," "P/N 9710234," and "Instrument #665."

## 2.2 Significant Findings

Normal Care Unit

The normal care unit failed the test for high-temperature-alarm calibration. The high-temperature alarm should activate between 39.7° and 40.1°C. In testing this function, which requires the sensor simulator, we found that activation occurred at 42°C, two degrees above the specification maximum.

The incubator's humidification system did not operate. We measured no change in incubator humidity after one hour of operation at relative humidity settings of 50% and 90%. In addition, the unit's low-humidity alarm activated continuously.

We also noted that the incubator's power cord chassis connector is detachable and lacks a restraining mechanism to prevent accidental disconnection from line power.

Intensive Care Unit

The temperature display of the intensive care unit became erratic on two different days of testing; the ones and tens digits blacked out (see upper left corner of display photo). At the same time, the "air temp low" alarm also activated. The aberrant display and alarm occurred after approximately 30 minutes of operation at a temperature setting of 37°C.



After the incubator was turned off and back on, the alarm deactivated and the display was normal.

The incubator's humidification system also did not operate. We measured no change in incubator humidity after one hour of operation at relative humidity settings of 50% and 90%. Again, the unit's low-humidity alarm activated continuously.

As with the intensive care unit, we noted that the incubator's power cord chassis connector is detachable and lacks a restraining mechanism to prevent accidental disconnection from line power.

## 2.3 Testing Conclusions

Both incubators had major failures requiring manufacturer service. We recommended that JSI share this report with PreemiCare. We further suggested making arrangements for a service representative to come to ECRI to calibrate and repair the two incubators and then observe our retesting of these units. (This testing is detailed in the next section of this report.)

In regard to the line cords, ECRI recommends that all high-risk equipment with detachable power cords have adequate capture devices (e.g., a cleat or clamp) to secure the cord. Therefore, this is a modification that we believe should be performed on the incubators.

Due to the major failures identified in our testing, ECRI recommended that the other 117 incubators also be independently inspected.

mating. After vertically realigning the connectors, we reseated the modules and tested each system. The humidification system of the normal care unit operated properly. The humidification system of the intensive care unit, however, would not operate; its display indicated that the humidification module's reservoir was empty even though it was filled with water. The audible alarm did not activate.

## 3.0 PreemiCare Calibration and Repair Activities

On February 5 and 6, 2004, PreemiCare Service Engineer Randa Rihana visited ECRI headquarters to review our incubator inspection findings and to correct the functions that failed or required calibration. Fawaz Arafat, president of ICS Technologies, Inc., was also present for these activities.

Normal Care Unit

Ms. Rihana calibrated the unit's high-temperature alarm to activate within the specified temperature range of 39.7° to 40.1°C, using a sensor simulator that she had brought with her. At our request, she then connected the sensor simulator provided by JSI and obtained the same temperature display and alarm activation.

Intensive Care Unit

Ms. Rihana simply replaced the unit's airflow sensor and then demonstrated that the temperature display did not become distorted after extended operation at the highest air-temperature setting (approximately 39°C). Her troubleshooting of the unit's humidification system revealed that a wire to the water-level sensor was not connected. She remade the connection, and we then verified that the humidifier operated properly.

No modification was made to secure the line cords of either incubator, and the shipping damage to the intensive care unit was not repaired. Both units, however, are calibrated and functioning properly.

## 4.0 Project Conclusion and Recommendations

We agree with the list of unresolved incubator issues in Dr. Gipson's February 19, 2004, letter to Fawaz Arafat. It is essential that each of these issues be addressed by PreemiCare/ICS in order to keep the incubators in proper working order over their expected life. In addition to software documentation, JSI should obtain a complete and detailed description of all modifications that have been performed over the past year. PreemiCare must also provide supplemental information in the service manual to address the impact of any of the modifications on inspection, preventive maintenance, calibration, and/or repair procedures.

## 5.0 Appendix

ECRI's procedure for inspecting infant incubators (from: *Health Devices Inspection and Preventive Maintenance System*, 2001)

Completed inspection checklists for the two units inspected at ECRI in November 2003