IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOHN SNOW, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 06-0097C |
| | § | (Judge Thomas C. Wheeler) |
| THE UNITED STATES OF AMERICA | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF'S REPLY TO THE DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Daniel A. Ball
Ball Law Offices, P.C.
4416 East West Highway, Suite 400
Bethesda, Maryland 20814-4568
Direct: (301) 634-3147
Fax: (301) 215-9297
E-Mail: dball@dablaw.com

Dated: August 31, 2007

Counsel for Plaintiff John Snow, Inc.

# TABLE OF CONTENTS

**PAGES**

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Introduction ..........................................................1

I. The Government Has Admitted to Facts and Issues of Law Which Enable the Court to Resolve This Case on Summary Judgment ..........................................1

II. The Incubators Were Not "Defective" But Were Being Serviced, Retrofitted and Recertified For Use Until USAID Stopped the Agreed Upon Plan ..........................1

A. ECRI Did Not Make Any Finding That the Incubators Were Defective and ECRI Did Not Test for Design or Manufacturing Defects ..........................................1

B. The Parties Implemented ECRI's Recommendations for Correcting, Testing and Recertifying the Incubators to Return Them to Service ..........................3

III. Argument ..........................................................5

A. In a Cost-Plus-Fixed-Fee Contract, the Government Reimburses the Contractor For the Costs of Goods Even If They Are Nonconforming ..........................5

B. Warranty Services Were Provided on the Incubators Until the Government Stopped the Process ..........................................................7

1. The Government Does Not Have a Warranty Claim Against JSI .........8

C. The Government's Disallowance of Costs Paid and Administrative Offset Are Not Remedies Authorized Under FAR 52.212-4 ..........................................9

D. The Six Months Period of FAR 52.246-3(f) Also Limited the Government's Remedies to Replacement or Correction ..........................................11

1. The Incubators Were Accepted by Egypt And the MOHP After Delivery to Egypt and Upon Clearing Customs ..........................................12

2. The MOHP and the Government's Actions Evince Acceptance .........13

3. The "Such Other Time" Clause of FAR 52.246-3(f) Does Not Extend USAID's Clock ..........................................................15

4. The Incubators Did Not Have Latent Defects Such That Acceptance Could Be Negated ........................................................15

E. The Law Does Not Allow the Government to Take an Administrative Offset Under the Guise of Being an Equitable Adjustment ................................16

F. FAR 52.246-3(h) Does Not Apply in This Case ....................................18

G. The Commercial Items Clause Not Only Does Not Take Precedence, But the Government Violated Its Own Federal Acquisition Laws by Erroneously Including the Clause in the Contract ................................................18

H. The Government's Contention that Payments to JSI for the Incubators Was Just a Mistake Is Absurd ..............................................................20

I. The Government's Argument That The Incubators Costs Are Not Allowable Because They Are Not Reasonable Is Premised On The Wrong Version of the FAR ..........................................................................21

J. Section 801(e)(1) of the Federal Food, Drug and Cosmetic Act Allowed the Export of the Preemicare Model 605 Incubators Without a 510(k) Marketing Clearance ..................................................................23

CONCLUSION ..........................................................................25

## TABLE OF AUTHORITIES

**CASES** **PAGE**

North American Rockwell Corporation,
1971 WL 1503 (ASBCA, 72-1 BCA ¶ 9207,
ASBCA No. 14329 (November 29, 1971) ..........................................5

Appeal of Conti Products Corp.,
WDBCA 1699, 4 CCF 60476 (1948) ..........................................11

Appeal of Gray & Co.,
WDBCA 1890 (1949) ..........................................11

Spandome Corp. v. United States,
32 Fed. Cl. 626, 630 (1995) ..........................................16

United Techs. Corp. v. United States,
27 Fed. Cl. 393, 398 (1992) ..........................................16

Perkin-Elmer Corp. v. United States,
47 Fed. Cl. 672, 674 (2000) ....................16

Bar Ray Prods., Inc. v. United States,
162 Ct. Cl. 836, 837-38 (1963) ....................16

United States v. Wurts,
303 U.S. 414, 415 (1938) ....................21

Wisconsin Central Railroad Co. v. United States,
164 U.S. 190 (1896) ....................21

Applied Companies v. United States,
144 F.3d 1470 (Fed. Cir. 1998) ....................21

Fansteel Metallurgic Corp. v. United States,
172 F.Supp. 268 (CC 1959) ....................21

Aetna Casualty & Surety Co. v. United States,
526 F.2d 1127 (Ct. Cl. 1975) ....................21

**REGULATIONS**

FAR 52.212-4(o) ....................5

FAR 52.246-3(f) ....................6

FAR 52.212-4 ....................7

Internal Revenue Code, 26 U.S.S. 6621(b) ....................9

Federal Rule 14(b) ....................9

FAR 52.212-4(a) ....................10

FAR 52.246-3(f) ....................11

FAR 52.246-3 ....................12

FAR 52.246-3(e) ....................12

FAR 52.246-18 ....................13

FAR 52.212-4(a) ....................15

FAR 52.246-3(g)(1) ..........17

FAR 52.246-3(f) ..........17

FAR 52.246-3(h) ..........18

Federal Rule 11 ..........18

FAR 52.214 ..........19

FAR 16.306(a) ..........19

FAR 12.2 ..........19

P.L. 103-355 ..........19

FAR 12.201 ..........19

FAR 12.207 ..........19

FAR 12.207(a) ..........20

FAR 12.207(b)(1)(iii) ..........20

60 F.R. 48231.01 ..........20

FAR 31.204(a) ..........21

FAR 31.103(b)(1) ..........21

Subpart 31.2 ..........21

FAR 31.201(2)(a) ..........22

FAR 52.249-6(1) ..........22

FAR 31.201-2(b) ..........23

Section 801(e)(1) of Chapter VII of the Federal Food, Drug, and Cosmetic Act ..........23

21 U.S.C. 360 ..........23

## PLAINTIFF'S REPLY EXHIBITS


| EXHIBIT NUMBER | PAGE |
|---|---|
| 1. | 2 |
| 2. | 3 |
| 3. | 3 |
| 4. | 3 |
| 5. | 4 |
| 6. | 8 |
| 7. | 8 |
| 8. | 9 |
| 9. | 14 |
| 10. | 19 |
| 11. | 24 |
| 12. | 24 |

**APPENDIX NO. 1**
Admissions Made by the United States

**APPENDIX NO. 2**
History of Testing, Retrofitting and Recertifying the Incubators for Use
- with Exhibits 1-12

## INTRODUCTION

The Government's Opposition and this Reply illuminate the parties' disagreement over whether the 119 Preemicare incubators were "defective" or were able to be serviced, retrofitted, tested, recertified and returned to service for safe operation. The Government would like to brush aside summary judgment and have a lengthy trial over the factual issue of "defect" in order to hurdle the explicit Contract and FAR limitations on the Government's right to even assert the claim. For reasons set forth in JSI's Motion for Partial Summary Judgment, and in this Reply, there is no need for the Court or the parties to entertain multi-year litigation over the question of "defect". There are Contract and FAR provisions which limit the Government's remedies for its sudden frustration over the process of repairing, retrofitting, testing and recertifying the incubators before returning them to service.

## I. THE GOVERNMENT HAS ADMITTED TO FACTS AND ISSUES OF LAW WHICH ENABLE THE COURT TO RESOLVE THIS CASE ON SUMMARY JUDGMENT.

The Government Response to Plaintiff's Proposed Findings of Uncontroverted Facts has admitted to facts and issues of law which are ripe for determination by this Court on Summary Judgment. The Court is referred to Appendix No. 1 attached hereto for a summary of the admissions.

## II. THE INCUBATORS WERE NOT "DEFECTIVE" BUT WERE BEING SERVICED, RETROFITTED AND RECERTIFIED FOR USE UNTIL USAID STOPPED THE AGREED UPON PLAN.

### A. ECRI Did Not Make Any Finding That The Incubators Were Defective And ECRI Did Not Test For Design Or Manufacturing Defects.

The Government's Opposition rested largely on its claim that the incubators were defective, but the Government declined to present evidence of defectiveness, relying instead upon JSI's acknowledgement that the issue is disputed and not appropriate for summary judgment. Yet, the Government did not miss any opportunity to create the false and misleading

impression, cast JSI in a defamatory light, and argue that JSI was trying to unload "defective" incubators upon the Egyptians without any regard for the health and welfare of their infants. It is an untrue picture of the events. The record evidence shows that JSI, with over 27 years of experience implementing health care projects in over 84 countries, went to great lengths to coordinate the parties (ICS, Preemicare, Hi-Med, MOHP, USAID, ECRI and Arj-Med) to ensure that incubators were evaluated, serviced, retrofitted, tested and recertified before returning them to the field.

The Government looked to the ECRI report as proof that the incubators were defective. However, the Government misread the ECRI report when it argued in its Opposition at 7, "Further, JSI's own testing contractor concluded that the defects were so great . . ."[1] This is a false characterization of the report because ECRI did not make any finding that the incubators were defective. In fact, ECRI tested the incubators for performance; it did not test for design and/or manufacturing defects. The Project Conclusion of the ECRI report, Govt App. 0231, did not find that the incubators were defective. ECRI could not determine whether the temperature failures were due to engineering/manufacturing concerns, misuse, nonuse over a one year period of time, worn parts, ambient temperatures, or transportation prone problems.

- On October 27, 2004, Robert Maliff, Associate Director, Health Systems Group, ECRI, sent Dr. Reginald Gipson, JSI's Chief of Party in Egypt, an email, which stated in part: "Our testing was for performance; design and/or manufacturing testing requires a completely different and lengthy investigation. Our program could not determine whether this temperature (and other) failures were due to engineering/ manufacturing concerns." See Exhibit 1.

The incubators had not been used for about a year, had not been recalibrated before testing, and had been transported across Egypt from outlying health facilities to Cairo in back of cars or trucks, often along rough and unpaved roads.

[1] Actually, the MOHP requested in August 2003 for JSI to arrange for an independent evaluation of the incubators following Preemicare's first round of service and retrofits. ECRI was not "JSI's own testing contractor."

- The ECRI report noted that "all units had passed PreemiCare testing less than one year ago and had not been used since that time." See Govt. App. 0231.

There were also numerous errors in ECRI's testing and reporting protocols, calling into question the integrity of the testing. As the ECRI report noted, the temperature inspection failures were temperature control <u>or</u> temperature alarm related. ECRI later doubted the validity of its alarm testing protocols.

- On May 26, 2004, Robert Maliff of ECRIS sent an email to Katrina Kruhm of JSI, stating in part: "The Appendix C – Incubator Temperature Test Summary sent with the draft has the actual testing results. Some of these were wrongly marked as passing or failing by Lou [Schonder – ECRI] or the engineers on the cover forms, and Lou, during his review of the completed forms, had made the corrections before the submittal of our draft report. Appendices B and C represent the true test results after reviewing the original data." See Exhibit 2.

- The e-mail went on to state: "2. In terms of sound testing, we have concerns about the accuracy of the results as Lou had to correct several of the engineers while they were performing the sound test. Although failures were noted, with many results indicating sound levels above 70dBs, we are concerned with the the [sic] reliability and reproducibility of the results."

ICS and Preemicare responded via e-mail on June 12, 2004, stating that an inappropriate test protocol had been used and that the incubators needed to be recalibrated because they were in an uncontrolled environment (38 - 40 C) for almost one year and there were missing spare parts as a result of misuse by the MOHP facilities. See Exhibit 3.

**B. <u>The Parties Implemented ECRI's Recommendations For Correcting, Testing And Recertifying The Incubators To Return Them To Service</u>.**

Following the ECRI Report, at a meeting held in Cairo, Egypt on September 29, 2004, the MOHP, USAID, Preemicare, ICS and JSI agreed upon a Plan of Action for returning the incubators to service. See Exhibit 4. The Plan of Action devised a process that was meant to wean out incubators, if any, which did not meet international testing standards. In furtherance of this Plan in October 2004, ICS undertook repairs and modifications first on two incubators per the agreed upon Plan of Action. The remaining incubators were to be repaired, retested and

certified according to ECRI's test protocol, per the agreed upon Plan of Action. In addition, ICS had agreed to extend the warranty for an additional nine (9) months.

In October 2004, Arj-Med, a Nile Medical International representative in Egypt, evaluated the circuitry functions of the Preemicare incubators to ensure their efficient maintenance. Arj-Med confirmed on about October 27, 2004, that they could repair, maintain and guarantee the safe operation of the incubators. Arj-Med also noted that incubators needed to be recalibrated and could then be returned to service. JSI informed USAID via e-mail of Arj-Med's assessment. Thereafter, ICS completed repairs and modifications of the incubators, and they were tested by the MOHP and JSI engineers (who were trained to conduct the testing protocol by ECRI). The incubators were in the process of being recertified for use.

On December 15, 2004, the MOHP vis-à-vis Dr. Esmat Mansour, Head of IHC & Nursing Sector, HM/HC Executive Director, notified USAID in writing that the MOHP was satisfied with the resolution of the issues related to the Preemicare incubators and the MOHP was in the process of receiving, testing and distributing incubators to various hospitals in accordance with an agreement reached at the meeting on September 29, 2004. Dr. Mansour thanked JSI and USAID for their cooperation and their actions to maximize the use of incubators for the benefit of the project. See Exhibit 5.

Notwithstanding the agreed upon Plan of Action and the efforts by all parties to recertify the incubators and place them back in service, Roy Plucknett, USAID's fourth Contracting Officer on the Healthy Mother/Healthy Child Project, who joined it in September 2004, withdrew from the circle of cooperation, disavowed the Plan, refused to allow the recertification

process to be completed and the incubators returned to service, and demanded possession of the incubators.[2]

The Court is referred to Appendix No. 2 attached hereto, which is a History of Testing, Retrofitting and Recertifying the Incubators for Use. It includes Preemicare's Report dated January 7, 2003, which found misuse, improper cleaning, inadequate training and rough handling as causes for many of the reported incubator problems.

## III. ARGUMENT

### A. <u>In A Cost-Plus-Fixed-Fee Contract, The Government Reimburses The Contractor For The Costs Of Goods Even If They Are Nonconforming.</u>

The Government relied upon the warranty provisions of FAR 52.212-4(o) to contend that JSI violated the warranty of merchantability and fitness for use for a particular purpose, leading the Government to contend that JSI breached the Contract. To make this allegation, the Government had to completely disregard the warranty service which Preemicare, ICS and Hi-Med, and indirectly, JSI, were providing in servicing, testing, retrofitting and recertifying the incubators for use. See Appendix No. 2. If the goods met the specifications of the Contract, as they did, and were able to be serviced, repaired, retrofitted to make them user-friendly for the Egyptians in the field, retested in accordance with ECRI's testing protocol and international standards, recertified and returned to service, the incubators cannot be labeled "nonconforming."

Assuming *arguendo* that the incubators were nonconforming, the Government still must reimburse JSI for the costs of the incubators because this was a Cost-Plus-Fixed-Fee Contract. The issue was considered by the Armed Services Board of Contract Appeals in the appeal of *North American Rockwell Corporation*, 1971 WL 1503 (ASBCA), 72-1 BCA ¶ 9207, ASBCA

---

[2] The Government made the strange claim in its Opposition that USAID demanded possession of the incubators because there was a rent dispute and it wanted to ensure that the incubators were not resold in the market. JSI was never planning to sell the incubators to anybody else, and the incubators always belong to the MOHP. Then, after obtaining possession of the incubators, USAID reversed itself and demanded that JSI take possession of the incubators.

No. 14329 (November 29, 1971). In that case, the contracting officer disallowed costs incurred and an incentive fee under a Cost-Plus-Incentive-Fee Contract. The ASBCA stated:

> In some respects, the fee in a cost-plus-fee contract is analogous to the fixed price in a fixed price contract. In each case the contractor does not earn the fee or the fixed price unless it performs the contract, and in each case the contractor gets less than the full fee or the full fixed price if the contract is terminated before completion. However, the analogy is a very limited application. In the fixed price contract, if the item tendered by the contractor does not comply with the contract requirements, the Government has the right to reject it, and in such case the Government pays nothing and gets nothing. However, in the cost-plus-fee contract the Government reimburses the contractor for its costs incurred in producing the nonconforming supplies and receives and retains what the contractor has produced on a cost reimbursement basis. (emphasis added)

Whether the contract is a Cost-Plus-Incentive Fee or Cost-Plus-Fixed Fee, the cost-plus-fee contract is designed to require the Government to reimburse the contractor for its costs even if the goods or services provided under the contract are nonconforming. The Government can require the contractor to correct the nonconforming goods or services, or perform tests to demonstrate the adequacy of the goods, but the costs of correction are borne by the Government.[3] The ASBCA in *North American Rockwell Corporation* stated:

> The Government correctly cites the inspection, nonconforming supplies and other provisions of the contract as giving the Government the right to require the contractor to correct any and all discrepancies and deviations from the specifications and drawings. Unquestionably, the Government had the contract right to refuse to accept the tank and require the contractor to do corrective work, if, but only if, the Government put up the money to cover the costs of doing the desired additional work. The Government overlooks the principle that, when the funds under a cost reimbursement contract have been exhausted, the contractor cannot be required to do any additional work under the contract unless and until the Government provides the funds to cover the costs of doing such additional work. (emphasis added).

USAID's position is legally untenable. The principle that USAID overlooks is that the costs of the nonconforming goods are still the Government's to bear even if the Government

---

[3] FAR 52.246-3(f), discussed *infra*, also states that "the cost of replacement or correction shall be included in allowable cost, . . .."

requires correction or replacement – or rejects the goods. Also, when Preemicare, ICS, JSI, the MOHP and USAID went down the path of repair and recertification, the Government was responsible for bearing those costs; it was a legally untenable position for USAID to reject the incubators more than two years later when the incubators were ready to be returned to service and to disallow the costs of the incubators.

### B. Warranty Services Were Provided On The Incubators Until The Government Stopped The Process.

The Government tried to benefit from FAR 52.212-4, a Commercial Items, procurement clause. As discussed below, there are many flaws in the Government's reliance upon this FAR. At the outset, the Government compared itself to a consumer who has purchased a defective television set from a retailer and then sought a refund. See Opp. at 8. This is a wobbly analogy. Consumers do not sign 109 page purchase contracts incorporating federal acquisition regulations. And, JSI is not a Costco or a Nordstrom that can refund the price of an item returned more than two years later in order to appease its constituency.

The Government argued that JSI failed to provide conforming goods or satisfy its obligations under the Contract's warranty provision by curing the deficiencies in the incubators it provided. Here, the Government conveniently overlooked the testing, retrofitting and recertification process and that the MOHP was pleased with the results and was making preparations to receive the recertified incubators at its health care facilities. The Government also disregarded the fact that USAID's fourth Contracting Officer on this $50 million plus, multi-year Healthy Mother/Healthy Child Project disavowed the Plan of Action and refused to allow the recertification process to be completed. The Government accused JSI of failing to honor the commercial items warranty provision, but all evidence points to the fact that JSI, ICS, Preemicare, Hi-Med and Arj-Med were doing everything possible to "cure the deficiencies" until

the Government stopped the process and unilaterally rejected the incubators. The Government has no grounds to argue that the warranty on the supplies was not being honored.

### 1. The Government Does Not Have A Warranty Claim Against JSI.

The Government's disallowance of costs is the Government's attempt to hold JSI liable under a warranty actually provided by ICS, the supplier. The Government accused JSI of violating the warranty of merchantability and fitness for use for a particular purpose. But JSI was not contractually obligated to provide its own warranty for the incubators. JSI was only required to ensure that ICS, the supplier, provided a warranty. In fact, ICS provided a warranty. Purchase Contract No. 04-01-205 dated June 13, 2001 was signed by ICS on June 18, 2001 and by JSI on December 6, 2001. See Exhibit 6. Paragraph 23 of this contract addressed the warranty:

> The Supplier shall provide a warranty under which the Supplier or its authorized Local In-Country Representative will replace or repair the medical commodities and spare parts to be supplied under this contract, or repair or replace any parts of such commodities, found to be defective due to faulty design, workmanship or materials. The warranty may exclude, however, ordinary wear and tear and damage due to improper handling, storage, or operation. Replacements and repairs shall be made without cost to the Contracting Agency. The Contracting Agency shall give the Supplier prompt notice of any claims under such warranty and, if the Supplier fails to remedy the defects within a reasonable time, the Contracting Agency shall have the right to take such remedial action as may be necessary and to claim the reasonable costs thereof from the Supplier.
>
> **The warranty for the medical commodities and spare parts to be supplied shall be valid for a period of no less than twelve (12) months after installation or eighteen (18) months from the purchase contract effective date, whichever is earlier.** [Emphasis in original text.]
>
> The warranty shall cover parts and labor, at no cost to the Contracting Agency, and shall be honored by the Supplier's Local In-Country Representative.

See Exhibit 7.

USAID argued that JSI failed to pursue a warranty claim or other remedies against ICS. First, this is untrue. ICS was providing warranty service in Egypt vis-à-vis Hi-Med, its Egyptian counterpart. Second, in contracting with ICS, JSI had ICS sign USAID's Form 1450, creating privity between USAID and ICS. Form 1450 provides:

> 2. The supplier [ICS] will, upon the request of A.I.D., promptly make appropriate refund to A.I.D., plus interest at the rate established in accordance with the Internal Revenue Code, 26 U.S.S. 6621(b) from the time of payment to the supplier, in the event of
> (a) its nonperformance, in whole or in part under said contract, or
> (b) any breach by it of any of its undertakings in this Certificate and Agreement, or
> (c) any false certification or representation made by it in this Certificate and Agreement or in the invoice and Contract Abstract on the reserve hereof.

See Exhibit 8.

JSI gave USAID the right to pursue its claims against the ICS, the supplier, for a refund of the costs paid to ICS, but USAID has never done so. While USAID was quick to suggest that JSI should sue ICS, USAID could have asserted a claim against ICS to recoup the costs of the incubators. Under this cost reimbursement contract, JSI passed onto the Government the costs that ICS charged JSI for the incubators. JSI did not markup the costs. Third, JSI filed a Notice of Motion to Interested Third-Party under Rule 14(b) to bring ICS into this case, but ICS declined. The Government could have filed a third-party claim against ICS for the costs of the incubators, but failed to do so.

### C. The Government's Disallowance Of Costs Paid And Administrative Offset Are Not Remedies Authorized Under FAR 52.212-4.

In citing the commercial items warranty provision of FAR 52.212-4, the Government overlooked the importance of subsection (a), which provides in part:

> . . . The government may require repair or replacement of nonconforming supplies or re-performance of nonconforming services at no increase in contract price. The government must exercise its postacceptance rights (1) within a reasonable time after the defect was discovered; and (2) before any

> substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

The incubators were being repaired when the Government stopped the repair, retrofit and recertification process from being completed. The Government never required JSI to replace the nonconforming goods. Assuming this FAR applied, the Government had two remedies available to it: (1) require repair, or (2) requirement replacement of the nonconforming supplies. The FAR does not give to the Government the remedy of disallowance or of seeking a refund of the costs which it paid. It cannot be stated any simpler. USAID acted without legal authorization when it disallowed the costs of the incubators and unilaterally took an administrative offset from other monies owed under the Contract to JSI. Using the Government's simplistic consumer analogy, USAID was like the consumer who purchases a television set, returns it to the store two years later, then reaches behind the counter into the cash register to help himself to a refund.

Furthermore, the Government did not exercise any post-acceptance rights within a reasonable time. FAR 52.212-4(a) required the post-acceptance rights to be exercised within a reasonable time after the defect was discovered. Though JSI does not agree that the Contract or FAR gave the Government the post-acceptance right to disallow the incubator costs, the Government's Notices of Intent to Disallow Costs (November 1, 2004 and December 8, 2004) and its Disallowance (March 9, 2005) – the exercise of its post-acceptance rights – were not done within a reasonable time after the defects were discovered. The Government's position in the case is that "numerous problems arose shortly after installation"; JSI was promptly advised of the deficiencies; JSI would not have had to take action on September 24, 2002 (notifying ICS of its concerns) if the goods had not been defective; and "[t]he defects were first uncovered almost immediately after the incubators were installed at the MOHP facilities." Opp. at 7, 9 and 10. The Government waited more than two years after discovery of the alleged defects to notify JSI of its intention to reject the incubators and disallow the costs.

In *Appeal of Conti Products Corp.*, WDBCA 1699, 4 CCF 60476 (1948), it was held that two years was too long a time to wait before notifying a contractor that the supplies tendered were rejected. A carload of soap arrived at a destination with seals intact, and damage was discovered upon unloading. Without any notice to the contractor, the carrier was charged with the loss and the property was turned over to that carrier for disposition. The board held that it was error on the part of the contracting officer when the contracting officer attempted to charge the loss to the contractor two years later. The government was deemed to have accepted the supplies. Furthermore, in *Appeal of Gray & Co.,* WDBCA 1890 (1949), it was held that five months' delay in notifying the contractor after the government became aware of an alleged defect is also unreasonable.

In summary, FAR 52.212-4 which embodies the warranty of merchantability and fitness for use clause that the Government relies upon to claim that JSI breached the agreement sets forth the Government's remedies. The FAR gave the Government the post-acceptance rights to require repair or replacement. The FAR did not give the Government the right to disallow the costs of the incubators if the warranty of merchantability or fitness for use were breached. Furthermore, the post-acceptance rights must be exercised within a reasonable time after the defect was discovered. Here, the Government waited more than two years to take any action adverse to JSI, which is entirely too long a period of time.

### D. <u>The Six Months Period Of FAR 52.246-3(f) Also Limited The Government's Remedies To Replacement Or Correction</u>.

Indeed, JSI relies upon the six-months period set forth in FAR 52.246-3(f), which states in pertinent part:

> At any time during contract performance, but no later than 6 months (or such other time as may be specified in the contract) after acceptance of the supplies to be delivered under the contract, the Government may require the Contractor to replace or correct any supplies that are nonconforming at time

> of delivery. . . . Except as otherwise provided in paragraph (h) below, the cost of replacement or correction shall be included in allowable cost, . . .

Like its counterpart, FAR 52.212-4(a), the Government's remedy under FAR 52.246-3(f) is limited to requiring JSI to replace or correct the incubators. The Government's authorized remedy does not include disallowance or a forced refund of costs previously paid. Moreover, the Government has no later than 6 months after acceptance to require correction or replacement. The Government did not require correction or replacement within 6 months after acceptance[4], and the remedy of disallowance is not even authorized, whether it occurred within or after 6 months of acceptance of the incubators.

To get around the 6 months window, the Government made two arguments: First, that it did not accept the incubators, and second, that the Contract specified "such other time" so as to extend the Government's right to require repair or replacement later than 6 months after acceptance.

**1. The Incubators Were Accepted By Egypt And The MOHP After Delivery To Egypt And Upon Clearing Customs.**

In the Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Facts, the Government strained to deny that it ever accepted the incubators. See Response to Findings #10, #13 and #16. But the Government admitted in Finding #15 that the Contract incorporated by reference FAR 52.246-3, *Inspection of Supplies – Cost Reimbursement*; and that FAR 52.246-3(e) provides that "supplies shall be deemed accepted 60 days after delivery, unless accepted earlier." The Government admitted that the 119 Preemicare incubators cleared customs on

---

[4] Repairs to the incubators were not requested until mid-January 2003 when the MOHP asked that they be taken out of service and retrofitted per the recommendations of Preemicare's engineer. This was more than 6 months after delivery to the MOHP at the Egyptian port upon clearing customs. Also, it was more than 6 months after delivery and installation at the health clinics from May – July 2002. The incubators were not removed from the health care facilities until May 2003 and repairs were not completed until August 2003.

January 26, 2002, February 12, 2002 and April 29, 2002 and immediately became the property of Egypt and the MHOP. Findings #11 and #12. These dates are the first dates of acceptance. The clock for the Government began to run from the dates of acceptance. Alternatively, acceptance is deemed to have occurred no later than 60 days after delivery to Egypt and the MOHP. The Government has no leg to stand on when it claims that acceptance never occurred.

The Government denied that it accepted the incubators.[5] But the Contract and the FAR eliminate any uncertainty about when acceptance occurs by requiring acceptance to occur no later than 60 days after each shipment cleared customs – that is, when the supplies became the property of the MOHP in Egypt. The Government tried to skirt the Contract and the FAR as it contended that JSI and/or ICS continued to have possession of the incubators. This is a distortion of the events. JSI worked closely with the MOHP and provided assistance even where it had no contractual obligation – JSI's good will is now sadly used by the Government against it. As a public service to the MOHP, JSI helped the MOHP transport its incubators to clinics throughout Egypt because JSI had vehicles unlike the MOHP. Hi-Med, the servicing agent of ICS, installed the incubators for the MOHP.

**2. The MOHP and the Government's Actions Evince Acceptance.**

The Government's denial of acceptance raises the question, "What is acceptance?" In FAR 52.246-18 – *Warranty of Supplies of a Complex Nature,* both the October 1, 1997 and October 1, 2006 Editions, "Acceptance" is defined as:

> "...the act of an authorized representative of the Government by which the Government assumes for itself, or as an agent of another, ownership of existing and identified supplies, or approves specific services rendered, as partial or complete performance of the contract."

---

[5] What is acceptance? Webster's College Dictionary (Random House 1999) defines acceptance as: "1. the act of taking or receiving something offered. . . .5. a. a pledge to pay an order, draft, or bill of exchange when it becomes due. b. an order, draft, or bill of exchange that has been accepted."

Although this section of the FAR was not incorporated into the Contract by reference, it certainly provides guidance. It illustrates that acceptance occurs where the Government engages in just one act evincing ownership of the supplies or approves services rendered in connection with those supplies, whether or not there is partial or complete performance of the Contract. There are multiple actions by the Government and the MOHP that evince their ownership of the incubators – hence, acceptance. For example: the Government and the MOHP decided which clinics should receive the incubators. If the Government and the MOHP had not accepted the incubators, they would not be delivering the incubators around Egypt. Here is another example: The Government paid JSI for its costs of the incubators. Payment is clearly an act of an authorized representative of the Government. The Government would not have paid for the incubators if it did not accept them. Another example: Warranty services were provided by ICS, Preemicare and Hi-Med for the benefit of the MOHP and USAID. If the incubators had not been accepted, there would not have been any warranty services.

Here is another compelling fact confirming that the incubators had been accepted. On July 2, 2003, Dr. Esmat Mansour, the MOHP's Undersecretary and Healthy Mother/Healthy Child Project Executive Directed, instructed Dr. Reginald Gipson, JSI's Chief of Party:

> Reference is made to the Preemicare Incubators, purchased last year through TCA/JSI/offshore procurement and taken out of service by the end of January 2003. As per our agreement in the meeting held at JSI premises on July 1st 2003 in the presence of JSI/HMHCP/USAID/TCA representatives to:
>
> - Collect all Preemicare Incubators model 605 distributed in 2002 on neonatal care units.
> - Perform the required fixation and maintenance in a central workshop in Cairo by certified engineers from Preemicare.
> - Preemicare should also issue a certificate that the incubators are functioning safely and efficiently after retrofitting them as incubators are still in the warranty period.

See Exhibit 9.

If the incubators were not then the property of the MOHP and had not been accepted by the MOHP, the MOHP would not have been instructing JSI on what it should do with the incubators.

**3. The "Such Other Time" Clause of FAR 52.246-3(f) Does Not Extend USAID's Clock.**

The Government tried to extend the 6 months window for requiring repair or replacement (or disallowing the costs of the incubators, presumably) by turning to FAR 52.212-4(a). The Government argued that it had a "reasonable time" under this FAR to take action and that this clause counts as "(or such other time as may be specified in the contract)" of FAR 52.246-3(f). The argument fails because "reasonable time" is not a specified time in the Contract. The clause "such other time as may be specified in the contract" does not give the Government an open-ended, indeterminate, unspecified time frame known as "reasonable time". The Contract and FAR did not intend to substitute in place of the 6 months window for requiring repair or replacement some illusory, subjective time frame known as "reasonable time." There has to be another time frame specified by the contract; otherwise, the Government would be substituting ambiguity and subjectivity in place of a very defined period of time. The Government argued that its interpretation of the Contract and FAR gives reasonable meaning to the Contract provisions. JSI strongly disagrees and points out that the Government's strained interpretation actually renders meaningless the 6 months window and the clause "such other time as may be specified in the contract." In any event, whether it is 6 months or a reasonable time, the Government's only remedies under each FAR were to require correction or replacement – and these remedies were not pursued by the Government.

**4. The Incubators Did Not Have Latent Defects Such That Acceptance Could Be Negated.**

The Government does not contend that there are latent defects that hindered its ability to assess the quality of the incubators. A latent defect is one which is hidden from knowledge as well as sight, and could not be discovered by the exercise of reasonable care. *Spandome Corp v. United States,* 32 Fed. Cl. 626, 630 (1995). If the alleged defects had been latent, the

Government would have argued under FAR 52.246-2(k) that the Government's acceptance of supplies is "conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract." The existence of a latent defect can negate the effect of acceptance. *See Spandome Corp v. United States*, 32 Fed. Cl. 626, 630 (1995)(*citing United Techs. Corp. v. United States*, 27 Fed. Cl. 393, 398 (1992). To revoke its acceptance of supplies, the Government must asset a claim within a "reasonable time" after the discovery of a latent defect. *Perkin-Elmer Corp. v. United States*, 47 Fed. Cl. 672, 674 (2000)(*quoting Bar Ray Prods., Inc. v. United States*, 162 Ct. Cl. 836, 837-38 (1963).

Contrary to being latent or hidden, the Government's contention is that "numerous problems arose shortly after installation of the incubators, including overheating, erratic display boards, and malfunctioning alarms." Opp. at 7. The Government acknowledged that it had notice and knowledge of the problems for several years, but it was not until March 9, 2005 (Notice of Disallowance) that the Government for the first time alleged that the incubators were defective.[6] Instead of arguing that it had the right to revoke its acceptance, a claim which the Government cannot make because the problems with the incubators were not hidden or latent defects, the Government is left claiming that it never accepted the incubators. It is a specious argument that should be rejected by the Court.

### E. The Law Does Not Allow The Government To Take An Administrative Offset Under The Guise Of Being An Equitable Adjustment.

The Government argued that FAR 52.246-3(g)(1) permitted it to take the administrative offset under the guise of being an "equitable adjustment." The Government's reference to this FAR conveniently overlooked the fact that the FAR is subject to the 6 months time frame of

[6] Roy Plucknett, the USAID Contracting Officer, knew very little about the incubators when he issued Notices of Intent to Disallow on November 1, 2004 and December 8, 2004. He thought the incubator costs he was disallowing were for "replacement" incubators. And neither of the Notices ever used the word "defect" or "defective". It was not until issuing his Notice of Disallowance in March 2005 that USAID notified JSI that it was alleging the incubators were defective.

FAR 52.246-3(f) which precedes it. FAR 52.246-3(g)(1) expounds upon the remedies of correction or replacement in Subsection 3(f). Subjection 3(g)(1) provides in pertinent part:

> If the Contractor fails to proceed with reasonable promptness to perform required replacement or correction, the Government may – (i) By contract or otherwise, perform the replacement or correction and charge to the Contractor any increased cost or make an equitable reduction in any fixed fee paid or payment under the contract.

The Government arguably could have required JSI to correct or replace the incubators within 6 months of acceptance. JSI then would have had to *proceed with reasonable promptness* to perform the repair or replacement. As discussed above, within 6 months of acceptance, the Government did not require JSI to replace or correct the incubators. More importantly, Subsection 3(g)(1) comes into play *if* and only *if* JSI failed to proceed with reasonable promptness. Then, the Government may contract with another party or may itself perform the replacement or correction. Here, the Government itself did not require JSI to repair or replace the incubators at anytime. JSI acted on its own accord in bringing to the attention of the MOHP, ICS and USAID the problems being reported about the incubators, and JSI acted swiftly in seeing that the incubators were tested by Preemicare's engineer and serviced. It was not until mid-January 2003 that the MOHP asked for the incubators to be removed from service and retrofitted per the recommendations of Preemicare's engineer. Subsection 3(g)(1) does not apply because JSI proceeded with reasonable promptness to ensure that the incubators were corrected, even though the Government did not require correction within 6 months of acceptance. Subsection 3(g)(1) also does not apply because the Government, by contract or otherwise, did not perform the replacement or correction and incur any increased costs. The administrative offset which USAID is now calling an "equitable reduction" could only have been taken for an "increased cost" incurred by USAID in performing the replacement or correction. The equitable reduction clause relates back to *additional* costs incurred by the Government in having to replace

or correct the incubators due to the contractor's failure to proceed with reasonable promptness. The Government did not incur any additional costs because the Government did not replace or correct the incubators itself. Also, the costs which the Government disallowed were the original procurement costs. Therefore, FAR 52.246-3(g)(1) does not authorize the disallowance.

### F. FAR 52.246-3(h) Does Not Apply In This Case.

The Government reached to avoid summary judgment by claiming that there were irregularities regarding a 510(k) Notice and that FAR 52.246-3(h) extended the 6 months time limitation to allow the Government to require correction or replacement "at any time." This FAR does not apply because the "nonconformances" must themselves be due to "fraud, lack of good faith, or willful misconduct on the part of the Contractor's managerial personnel." There has never been any allegation or charge by the Government that JSI's managerial personnel engaged in fraud, willful misconduct or lack of good faith; and there is no evidence whatsoever that the alleged "defects" in the incubators – the nonconformances – were caused by fraud, lack of good faith or willful misconduct. The Government's reliance upon this FAR also does not get the Government around the problem that its remedies were limited to requiring correction or replacement. The remedy of disallowance or refund of costs paid is not allowed by this FAR. For a discussion of the 510(k) notice, see Section J *infra*.

### G. The Commercial Items Clause Not Only Does Not Take Precedence, But The Government Violated Its Own Federal Acquisition Laws By Erroneously Including the Clause in the Contract.

The Government argued that the commercial items clause of FAR 52.214 should take precedence over all other Contract terms and incorporated FAR provisions if there is a conflict. The Government sees the obvious conflict and flaw in its Contract and the arguments in its Opposition to have raised the issue in the first place. The Government is asking the Court to completely disregard (1) the fact that the Contract was a Cost-Plus Fixed Fee Contract; (2) FAR

16.306(a) which burdens the Government with the risks of costs; (3) FAR 52.246-3(e) which deemed the incubators "accepted" no later than 60 days after delivery; (4) FAR 52.246-3(f) which gave the Government 6 months to require correction or replacement; and (5) the absence of any Contract provision or FAR permitting the Government to obtain a refund of costs previously paid. Instead, the Government would have this Court find that a commercial items clause, incorporated by reference, reigns supreme and entitles the Government to a refund, just like a consumer, because JSI allegedly breached the warranty of merchantability and fitness for use. There is no legal basis for the Government's argument.

Furthermore, the Government violated its own FAR by erroneously or mistakenly incorporating by reference the commercial items clause into the Contract.

Page 78 of 109 of the Contract incorporated FAR 52.212-4 Contract Terms and Conditions for Commercial Items. This FAR should not have been incorporated by reference because the Contract was not a fixed price contract. The 1997 Edition of FAR Subpart 12.2 – *Special Requirements for the Acquisition of Commercial Items* provides in pertinent part:

> **FAR 12.201 General**
>
> Public Law 103-355 establishes special requirements for the acquisition of commercial items intended to more closely resemble those customarily used in the commercial marketplace. This subpart identifies those special requirements as well as other considerations **necessary for** proper planning, solicitation, evaluation and award of contracts for commercial items.
>
> **FAR 12.207 Contract type**
>
> Agencies shall use firm-fixed price contracts with economic price adjustment for the acquisition of commercial items. Indefinite-delivery contracts (see Subpart 16.5) may be used where the prices are established based on a firm-fixed-price or fixed-price with economic price adjustment. **Use of any other contract type to acquire commercial items is prohibited.**

See Exhibit 10.

The Contract was a Cost-Plus-Fixed-Fee Contract. The Government could not utilize a commercial items clause in this kind of contract. The incorporation of FAR 52.212-4 into the Contract by reference was USAID's contracting error. The commercial items clause is invalid and unenforceable against JSI. The incorporated clause is of no consequence here because the incubators procured by the Governments could not be deemed to be a commercial items procurement because the award of contracts for commercial items could only be by firm-fixed price contracts. This is not to suggest that the incubators were not properly procured, it just means that the procurement does not come within the ambit of a commercial items procurement; therefore, the FAR requirements for commercial items does not apply to this procurement.

The Government's argument at its core is that the commercial items clause should negate the entire Contract, more than 7 years of Cost-Plus-Fixed Fee payments in excess of $50 million to JSI, all for the sake of allowing the commercial items clause to stand supreme over this one procurement. This would turn the Contract on its head. Moreover, the Government admitted in Response to Finding #5 that the Contract was a Cost-Plus-Fixed Fee (CPFF) completion contract.

In its argument, the Government cited FAR 12.207(a), (b)(1)(iii) but those sections do not appear to exit. The Government also cited 60 F.R. 48231-01 but that section applies only to the Department of Defense, the General Services Administration, and NASA, not to USAID.

### H. <u>The Government's Contention That Payments To JSI For The Incubators Was Just A Mistake Is Absurd</u>.

The Government contended that it should not have paid JSI for the incubators and that its payments were just a "mistake." This contention, however, was not raised in the Notice of Disallowance (March 9, 2005). The argument is patently absurd and requires little in the way of a response. The Government paid JSI in accordance with its own Contract terms. Approvals for payment were given by USAID's Contracting Officer or the Cognizant Technical Officer per

delegated authority after JSI submitted documentation of its performance milestones and costs incurred.

The theory and cases cited by the Government are not even analogous to the case at bar. The Government's lead off authority is *United States v. Wurts*, 303 U.S. 414, 415 (1938), a 1938 Supreme Court decision involving an erroneous IRS refund. The language quoted by the Government was crafted decades before enactment of the FAR and has nothing to do with government contracting principles. The FAR sets forth the hurdles which the Government must meet before it can take action to recover funds. The Government also cited *Wisconsin Central Railroad Co. v. United States*, 164 U.S. 190 (1896), another erroneous tax refund case. *Applied Companies v. United States*, 144 F.3d 1470 (Fed. Cir. 1998), centered on the government's set off under an existing contract from two overpayments made by the Government on another contract years earlier. In *Fansteel Metallurgic Corp. v. United States*, 172 F.Supp. 268 (CC 1959), a complex price formula for the purchase of oxide and fluoride caused the Government to mistakenly overpay a contractor who admitted to the overpayment. In *Aetna Casualty & Surety Co. v. United States*, 526 F.2d 1127 (Ct. Cl. 1975), a construction contract dispute, the Government offset payments it made to satisfy a judgment because a surety failed to pay on a surety or performance bond. None of the cases lend support to the Government in the case at bar.

## I. **<u>The Government's Argument That The Incubators Costs Are Not Allowable Because They Are Not Reasonable Is Premised On The Wrong Version of the FAR.</u>**

In Section G of its Opposition, at 18, the Government cited FAR 31.204(a), FAR 31.103(b)(1), FAR 31.201-2 and Subpart 31.2 generally to argue that the costs are not allowable because they are not reasonable because it is unreasonable for JSI to be paid for costs which do not conform to the contract requirements.[7] The argument, if accepted, would preempt and

[7] The Government fails to provide any case authorities for its theory.

nullify the other Contract terms and the time limitations and remedies set forth in the FAR (correction or replacement, not refund). The barn door would be wide open for the Government to claim, at any time, that costs are not allowable – and should be disallowed even if they were previously allowed and paid – because it just is not reasonable for the Government to have to pay the costs.

Equally important, the Government misquoted FAR 31.201-2 when it argued that "a cost is allowable only when the cost complies with, among other factors, 'reasonableness' . . ." The Government applied the wrong version of the law because it used the idiom *"only when"* that is found in FAR 31.201(2)(a) as of October 1, 2004, not the FAR Edition of October 1, 1997 which was in effect (a) when the Contract was entered, (b) during the procurement phase, and (c) when USAID paid JSI for the incubators in 2002. FAR 52.249-6(i) provides that is the cost principles and procedures in part 31 of the FAR "in effect on the date of this contract" which apply. Thus, the Government could only use the 1997 Edition in its determination of allowable costs. The primary difference between the 1997 and 2004 Editions are noted in the table below.

| **October 1, 1997 Edition** | | **October 1, 2004 Edition** | |
|---|---|---|---|
| FAR § | | FAR § | |
| 31.201-2(a) | **Determining allowability.** (a) The factors to be considered in determining whether a cost is allowable include the following: (1) reasonableness. (2) allocability. (3) Standards promulgated by the CAS Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances. (4) Terms of the contract. (5) Any limitations set forth in this subpart. | 31.201-2(a) | **Determining allowability.** (a) A cost is allowable only when the cost complies with all of the following requirements: (1) Reasonableness. (2) Allocability. (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances. (4) Terms of the contract. (5) Any limitations set forth in this subpart. |

The 1997 Edition identifies a number of factors that are to be considered in determining whether a cost is allowable. "Reasonableness" is only one. Other factors to be considered are (4) Terms of the contract, (2) allocability – that is, whether the costs were incurred specifically for the contract and were meant to benefit the contract, and (3) Standards by the CAS board pertaining to the contractor's detailed accounting for the costs. The 2004 Edition required that all of the 5 requirements be met in order for payment to be made. The 1997 Edition did not require all five factors to be satisfied. Hence, the Government's analysis was wrong from inception, utilized a standard which is not applicable, and applied the wrong edition of the law.

Nonetheless, the costs of the incubators were reasonable because JSI incurred the costs in performance of the Contract and provided incubators meant to benefit the Contract and the MOHP. FAR 31.201-2(b) provides that reasonableness depends upon, among other factors, whether "it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance" and whether the costs incurred deviated from the contractor's established practices.

**J. Section 801(e)(1) Of The Federal Food, Drug And Cosmetic Act Allowed The Export Of The Preemicare Model 605 Incubators Without a 510(k) Marketing Clearance.**

In its near final attempt to thwart summary judgment, the Government threw into the caldron the claim that the incubators were not properly certified by the Food and Drug Administration.

The Preemicare Model 605 incubators could be exported legally and without FDA permission in accordance with Section 801(e)(1) of Chapter VIII of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 360). According to the FDA's website, the FDA allows the export of a device that does not have a 510(k) marketing clearance without prior FDA clearance if it meets two conditions:

- The device meets the requirements of 801(e)(1) – that is, the device is intended for export, and
- It is reasonably believed that the device could obtain 510(k) marketing clearance in the U.S. if reviewed by the FDA.

See http://www.fda.gov/cdrh/devadvice/39.html at page 5 of 14. See Exhibit 11.

This includes devices which are in Class II, i.e., the Preemicare incubators, or which the firm [Preemicare] reasonably believes would be "substantially equivalent" to a Class II device.

In response to a USAID inquiry in 2004, Preemicare submitted an FDA letter dated December 8, 1988, finding that the Preemicare Model D1-X1, Series 3000 incubator, a precursor to the Model 605, was "substantially equivalent" to devices marketed in interstate commerce. Whether or not Preemicare's Model 605 was properly covered by a 510(k) notice is irrelevant because to export the Model 605, it was sufficient under Section 801(e)(1) for Preemicare to reasonably believe that its incubator was "substantially equivalent" to another Class II device that was covered by a 510(k) notice. Preemicare indeed believed that its Model 605 was "substantially equivalent" because it submitted the FDA letter to make that claim. Further evidence of Preemicare's intention and/or belief is the FDA Device Listing document of Medicare Industries, Inc. (a/k/a Preemicare) for Preemicare Incubator Model 605, which form was submitted to the FDA under Section 510 of the Federal Food, Drug, and Cosmetic Act. See Exhibit 12.

The Government waited until 2004 to ask about 510(k) documentation for the incubators. This is two years after the incubators were delivered, accepted, installed, serviced, removed from service, retrofitted, and paid in full. The Government waited too long to raise this as an issue.

For the reasons set forth above and in Plaintiff's Motion for Partial Summary Judgment, Plaintiff John Snow, Inc. respectfully requests the Court to grant its Motion.

Respectfully submitted,

Dated: August 31, 2007

/s/

Daniel A. Ball
Ball Law Offices, P.C.
4416 East West Highway, Suite 400
Bethesda, Maryland 20814-4568
Direct: (301) 634-3147
Fax: (301) 215-9297
E-Mail: dball@dablaw.com

Counsel for Plaintiff John Snow, Inc.

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on the 31st day of August, 2007, a copy of the foregoing "PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT", along with the Exhibits attached hereto, and Appendices Nos. 1 and 2, including Exhibits to the Appendices, were filed electronically. I understand that notice of this filing will be sent to counsel for the Defendants by operation of the Court's electronic filing system.

/s/

Daniel A. Ball