# EXHIBIT 1

-----Original Message-----
**From:** Maliff, Robert [mailto:RMaliff@ECRI.org]
**Sent:** Wednesday, October 27, 2004 6:10 AM
**To:** Reginald Gipson
**Cc:** Ritter, Tim; Schonder, Louis; Katrina Kruhm
**Subject:** RE: PrimeeCare Incubators

Dr. Gipson:

I was traveling to our west coast on Tuesday and was able to respond to your request in the evening here.

After several rounds of testing, ECRI recommended that the PreemiCare incubators not be returned to service for clinical use due to numerous inspection failures. In our final round of testing, ECRI found that over 50% of the tested units failed to control the temperature inside the incubator – the inherent purpose of incubators.

Our testing was for performance; design and/or manufacturing testing requires a completely different and lengthy investigation. Our program could not determine whether this temperature (and other) failures were due to engineering/manufacturing concerns.

Please contact us if you have any questions.

Best Regards,

Rob

# EXHIBIT 2

**Reginald Gipson**

**From:** Katrina Kruhm

**Sent:** Monday, May 31, 2004 9:07 AM

**To:** Reginald Gipson

**Subject:** FW: 05-26-04 Revised ECRI report

-----Original Message-----
**From:** Maliff, Robert [mailto:RMaliff@ECRI.org]
**Sent:** Wednesday, May 26, 2004 9:31 PM
**To:** Katrina Kruhm
**Subject:** 05-26-04 Revised ECRI report

Katrina,

I've attached a revised report for your use, but would also like to address a few issues outside the official report.

1. The inspection result inconsistencies noted in your review are a result of Lou's review of the completed inspection forms. The Appendix C - Incubator Temperature Test Summary sent with the draft has the actual testing results. Some of these were wrongly marked as passing or failing by Lou or the engineers on the cover forms, and Lou, during his review of the completed forms, had made the corrections before the submittal of our draft report. Appendices B and C represent the true test results after reviewing the original data.

2. In terms of sound testing, we have concerns about the accuracy of the results as Lou had to correct several of the engineers while they were performing the sound test. Although failures were noted, with many results indicating sound levels above 70 dBs, we are concerned with the the reliability and reproducibility of the results.

3. ECRI plans to make some minor changes in the IPM in the future, but these will have no bearing on the results produced by this testing program. A revised IPM procedure will be forwarded to you for JSI's use in future incubator testing.

We look forward to discussing this revised report with you.

Rob

Robert P. Maliff
Associate Director
Health Systems Group
ECRI

(610) 825-6000, x5130
rmaliff@ecri.org

# EXHIBIT 3

21 21



**Reginald Gipson**

**From:** Fawaz Arafat [farafat@ics-technologies.com]
**Sent:** Saturday, June 12, 2004 2:25 AM
**To:** 'Reginald Gipson'; icsegypt@link.net
**Cc:** yousri96@aol.com; 'Katrina Kruhm'
**Subject:** RE: Preemicare Incubators

Dear Dr. Gibson

As advised in your email of May 31st, 2004, I contacted Preemicare and had a long discussion with Jim Fitzmaurice regarding your email and the incubators in Egypt. Jim informed me that he reviewed your comments regarding the visit of ECRI's representative at site, and he needs the details of the testing conducted on each incubator in order to evaluate the report and to decide on the steps to be taken.

Preemicare informed me that since the time the incubators were received by JSI and used in all hospitals in Egypt, Preemicare had visited Egypt twice and conducted certain modifications to eliminate any possible mis use of those incubators. In August of 2003, the incubators were again tested by Preemicare engineer Randa Rihana in Cairo in a series of testing in the presence of all concerned and were as such certified to be in accordance with the specification of the contract, and suitable for hospital use.

In February of 2004, ECRI , after testing two incubators in their facilities in the United States, confirmed by reporting them as suitable for infant use. Randa Rihana had to go to ECRI's facilities to assist ECRI in the testing after ECRI initially reported that the incubators could not be tested for a certain criteria.

Preemicare informed me that since the incubators have been stored for almost a year now in an uncontrolled environment, and most of them had different parts missing or broken before collecting them from all the hospitals in Egypt, that they recommend a complete service be conducted on those incubators.

ICS would be glad at this time to coordinate with Preemicare in order to provide this service. We envision some kind of an arrangement by which, Preemicare together with a local company perform complete service to those incubators under a specific task order to them from JSI. Preemicare can train the engineers of the local company on those incubators and make available all spare parts needed for their expected service life. In addition, and before employing the incubators into service, ECRI can come again, and test the incubators in the presence of Preemicare and the Local Company to certify them to the MoH for infant use.

With my best regards
Fawaz

-----Original Message-----
**From:** Reginald Gipson [mailto:RGipson@jsiegypt.com]
**Sent:** Monday, May 31, 2004 10:16 AM
**To:** 'farafat@ics-technologies.com'; 'icsegypt@link.net'
**Cc:** 'nmatta@usaid.gov'; 'yousri96@aol.com'; Katrina Kruhm
**Subject:** Preemicare Incubators

May 31, 2004

# EXHIBIT 4

# Minutes of the Meeting
# Review and Update on PreemiCare Incubators

**Date:** 29 September 2004
**Time:** 11:30 am – 12:30 pm
**Participants:**

**Dr. Esmat Mansour,** Head of IHC and Nursing Sector, HM/HC Executive Director, MOHP
**Dr. Nahed Matta,** HM/HC Team Leader, USAID
**Dr. Ali Abdel Megeid,** Workforce Team Leader, USAID
**Mr. Yousri Aclimandos,** Vice President, TCA
**Dr. Reginald Gipson,** Chief of Party, JSI

**Purpose:**

1. To review the current situation in reference to the disposition of the PreemiCare Incubators.
2. To address all technical matters pertaining to the incubators and decide on the actions required to have the incubators operating safely, efficiently, tested and returned to the MOHP.
3. To discuss and agree on the action plan for options to resolve the current situation.
4. To discuss the next steps required to implement the plan..

**Plan of Action:**

As a result of the discussions, consensus was reached on the following plan of action:

1- The Supplier, ICS, will proceed with having two incubators repaired by Arj-Med. ICS and PreemiCare are currently working with Arj-Med to be PreemiCare's representative in Egypt.
2- The two incubators will be selected by the MOHP and JSI engineers. It was noted that each incubator which was tested by ECRI has a data sheet which specifies each of the test and records whether the incubator passed or failed the different test items. Therefore, part of the criteria for selection of the incubators to be repaired includes failing the ECRI critical test for temperature control and alarm.
3- The MOHP and JSI engineers were trained by ECRI to perform the required test. Therefore, once the incubators are repaired the MOHP and JSI engineers will retest them according to the test protocol and compare the results after the repair

with the results from the ECRI test before to determine if the areas in which the incubators failed the previous test have been corrected.

4- If the incubators pass the initial tests, an extensive trial test will be performed which includes a simulation test of the incubators operation capacity in a reliable Neonatal Unit setting for 2 to 4 weeks where monitoring of the normal operation (without any infant) will be none by MOHP Neonatal Unit staff, MOHP and JSI engineers.
5- If the incubators pass the trial period, discussions will then proceed in reference to the estimated cost and who will provide the funds for repairs, required spare parts and a maintenance contract for one year for the incubators.
6- Once agreed, the other incubators will be turned over to Arj-Med to undergo the same level of repair and maintenance, test and delivery to the MOHP if they pass the test and trial period.

# EXHIBIT 5

**Ministry of Health & Population**
**Healthy Mother/Healthy Child Project**
**in Cooperation with USAID**

وزارة الصحة والسكان
مشروع صحة الأم والطفل
بالتعاون مع وكالة التنمية الدولية الأمريكية

December 15, 2004

Dr. Ali Abdel Megeid
HM/HC Team Leader
USAID

Dear Dr. Abdel Megeid,

As a follow up to my letter dated June 9, 2004 and Dr. Matta's reply dated July 13, 2004 (see attached), I would like to express my satisfaction with the current resolution of the issues related to the Preemicare Incubators. We appreciate the continuious cooperation of all parties in resolving this matter, especailly the approval of USAID (as stated in Dr. Matta's letter) through JSI's commodity procurement program to procure additional incubators which some were temporarily used while the Preemicare incubators were being repaired. Reference our agreement reached at the 29 September 2004 meeting (see attached Minutes of the Meeting) we are in the process of receiving and testing the Preemicare incubators and distributing them according to the Hospitals' requests and need for incubators.

We appreciate USAID and JSI actions to maximize the use of incubators for the benefit of the Project and especially for Egyptian newborns.

Thanks for your continuous cooperation.

Sincerely,

Esmat

Dr. Esmat Mansour
Head of IHC & Nursing Sector
HM/HC Executive Director

CC: Dr. Gipson, COP, JSI

21 El Sabaa Sakayaat St., Off El Kasr El Eini st., Fom El Khalig -cairo
Area Code No . 11628 Zein El Abdein
Tel. :5313011 - 5313761- 5313762 Fax:02-5313757

٢١ ش السبع ساقايات متفرع من شارع القصر العيني - فم الخليج - القاهرة
رقم بريدى ١١٦٢٨ بريد زين العابدين
تليفون : ٥٣١٣٠١١ - ٥٣١٣٧٦١ - ٥٣١٣٧٦٢ فاكس : ٥٣١٣٧٥٧ - ٠٢

# EXHIBIT 6

NOV-12-01 MON 10:56 AM FAX: PAGE

ORIGINAL

JSI

June 13, 2001

# PURCHASE CONTRACT No. 04-01-205

This Purchase Contract is hereby entered between ICS Systems Integration Division, 6663-A Old Dominion Drive, McLean, VA 22101 (hereinafter called "ICS" or the "Supplier") and JOHN SNOW, INC., 44 Farnsworth Street, Boston, MA 02210 (hereinafter called "JSI" or the "Buyer") for the supply of Medical Equipment.

This Purchase Contract is made in duplicate; one copy for each party following signatures by both parties.

| ICS | JOHN SNOW, INC. |
|---|---|
| NAME | NAME |
| Fawaz Arafat | Kenneth J. Olivola |
| TITLE | TITLE |
| President | Director |
| SIGNATURE | SIGNATURE |
| [signature] | [signature] |
| DATE | DATE |
| 16/6/01 | 12/6/01 |

# EXHIBIT 7

## 22. Performance Bond or Guaranty

A. The Supplier shall furnish to the Contracting Agency within fifteen (15) days after award, a performance bond or guaranty fully protecting the Contracting Agency against any excess costs incurred by it as a result of any failure by the Supplier to perform any of its obligations under this contract.

1. Such bond or guaranty shall be satisfactory to the Contracting Agency and, at the option of the Supplier, shall be in the form of a surety bond, bank guaranty, or irrevocable letter of credit. If a performance guaranty in the form of a bank guaranty or irrevocable letter of credit is used, it shall be in an amount equal to ten percent (10%) of the contract price. If a performance bond is used, the bond shall be in an amount equal to one hundred percent (100%) of the contract price and shall be in the form attached hereto (Part F). The performance bond or guaranty shall be drawn in favor of John Snow, Inc., and shall be collectible upon receipt of the Agent's written certification of Supplier's default hereunder. Confirmation of the performance bond or guaranty by an Egyptian bank is not required.

The bond or guaranty shall be released not later than thirty (30) days following the date of completion of contract performance, even though the warranty period may extend beyond such time.

## 23. Warranty

The Supplier shall provide a warranty under which the Supplier or its authorized Local In-Country Representative will replace or repair the medical commodities and spare parts to be supplied under this contract, or repair or replace any parts of such commodities, found to be defective due to faulty design, workmanship or materials. The warranty may exclude, however, ordinary wear and tear and damage due to improper handling, storage, or operation. Replacements and repairs shall be made without cost to the Contracting Agency. The Contracting Agency shall give the Supplier prompt notice of any claims under such warranty and, if the Supplier fails to remedy the defects within a reasonable time, the Contracting Agency shall have the right to take such remedial action as may be necessary and to claim the reasonable costs thereof from the Supplier.

**The warranty for the medical commodities and spare parts to be supplied shall be valid for a period of no less than twelve (12) months after installation or eighteen (18) months from the purchase contract effective date, whichever is earlier.**

The warranty shall cover parts and labor, at no cost to the Contracting Agency, and shall be honored by the Supplier's Local In-Country Representative.

## 24. Local In-Country Representative

The Supplier is required to have a Local In-Country Representative/Authorized Agent

# EXHIBIT 8

**SUPPLIER CERTIFICATE AND AGREEMENT WITH THE AGENCY FOR INTERNATIONAL DEVELOPMENT FOR PROJECT COMMODITIES AND CONTRACT ABSTRACT**

OMB No. 0412-0020
Exp. Date 08/31/96

| | |
|---|---|
| 1. COMODITY SUPPLIER'S NAME AND ADDRESS<br>*ICS Technologies, Inc.*<br>*6663 A Old Dominion Drive*<br>*McLean, VA 22101* | 2. FOR A.I.D. USE |
| | 3. A.I.D. IMPLEMENTATION NUMBER |
| 4. IMPORTER'S NAME AND ADDRESS<br>*John Snow International*<br>*44 Farnsworth Street*<br>*Boston, MA 02210-1211* | |

| 5. VESSEL | 6. FLAG | 7. PORT OF LOADING |
|---|---|---|
| | | |

**8. COMMODITY INFORMATION**

| A. Description of Commodity and Schedule B No. | b. Gross Weight (Lbs) | c. Measurement (inch) |
|---|---|---|
| Incubator, Intensive and Normal Care | 6025 Lbs | 1466.67 Cu Ft |

| 9. INVOICE INFORMATION | 10. CONTRACT INFORMATION | 11. SUPPLIER INFORMATION | |
|---|---|---|---|
| a. Number<br>EG1 1806 | a. Number<br>Amendment No 1 to PO 04-01-205 | a. Small Business<br>☒ Yes ☐ No (Complete b) | b. Estimated Value (% of Block 9c) Furnished from Small Businesses ____% |
| b. Date<br>February 27th, 2002 | b. Date<br>November 28th, 2001 | c. Socially and Economically Disadvantaged Enterprise<br>☐ Yes ☒ No (Complete d) | d. Estimated Value (% of Block 9c) Furnished from Socially and Economically Disadvantaged Enterprises ____% |
| c. Amount After Discount<br>$ 149,045.22 | c. Total Amount<br>$ 165,605.80 | e. Women-Owned Business<br>☐ Yes ☒ No (Complete b) | f. Estimated Value (% of Block 9c) Furnished from Women-Owned Business ____% |
| | d. Source/Origin (Country)<br>USA | | |

| 12. INSURANCE INFORMATION | | 13. TRANSPORTATION INFORMATION | |
|---|---|---|---|
| a. Insured Value | c. ☐ All-Risk Rate ____<br>☐ War Risk Rate ____<br>☐ Other (Specify) Rate ____ | a. Vessel Type<br>☐ Bulk ☐ Berth ☐ Tnkr ☐ Air | d. Freight Rate |
| b. Premium | | b. B/L or Air Waybill Number | Other Freight Charges |
| | | b. B/L or Air Waybill Date | Total Freight Charges |

**14. INFORMATION AS TO COMMISSIONS, CREDITS, ALLOWANCES, SIMILAR PAYMNETS, AND SIDE PAYMENTS**

| a. Recipient's Name | b. Recipient's Address | c. Amount Paid or to be Paid |
|---|---|---|
| None | N/A | |

| 15. ADDITIONAL INFORMATION AND REMARKS | 16. If Certification On Other Side Is Made by ☐ Carrier Or ☐ Insurer (Type or Print Name And Address Of Company) |
|---|---|
| | |

The supplier he... knowledges that the sum claimed on the accompanying invoice... claimed to be due and owing under the terms of the purchase contract identified on the reverse hereof (hereafter referred to as 'said contract') is to be paid, in whole or in part, out of funds made available by the United States Agency for International Development under the Foreign Assistance Act of 1961, as amended. In consideration of the receipt of such sum, the supplier agrees with and certifies A.I.D. as follows:

1. The undersigned is the supplier indicated in the Invoice-and-Contract Abstract on the reverse hereof, is entitled under said contract to the payment of the sum claimed, and is executing this Certificate and Agreement to obtain payment from A.I.D. funds.

2. The supplier will, upon the request of A.I.D., promptly make appropriate refund to A.I.D., plus interest [at the rate established in accordance with the Internal Revenue Code, 26 U.S.C. 6621 (b)] from the time of payment to the supplier, in the event of

(a) its nonperformance, in whole or in part, under said contract, or

(b) any breach by it of any of its undertakings in this Certificate and Agreement, or

(c) any false certification or representation made by it in this Certificate and Agreement or in the Invoice-and-Contract Abstract on the reverse hereof.

3. The supplier certifies, on the basis of such sources as are available to it and to the best of its information and belief, that:

(a) The price, excluding transportation, of any commodity for which payment is requested on the accompanying invoice does not exceed the lower of (i) the market price prevailing for comparable sales in the source country at the time of purchase or (ii) the price generally charged by the seller for comparable sales in the source country at the time of purchase. A comparable sale is one which is sufficiently similar to the present sale, with respect to quantity, quality, and conditions of sale that the price would not customarily be different from said contract price. Time of purchase means that period encompassing the date the purchase price is fixed during which prices in comparable sales remain substantially consistent.

(b) The cost of any ocean or air freight for which payment is requested on the accompanying invoice does not exceed the lowest of the following: (i) the lowest rate charged by the carrier for similar shipments on the same voyage; (ii) the rate prevailing in the industry for similar shipments; or (iii) the rat under any ocean or air charter approved by A.I.D. covering the transaction for which payment is requested. A similar shipment is one which is similar with respect to type of commodity, commodity rate classification, quantity, flag category, choice of ports, and other pertinent factors.

(c) The price of any other commodity-related service does not exceed the lower of (i) the prevailing price for the same or similar service or (ii) the price paid to the supplier under similar circumstances by other customers.

4. The supplier will, upon the request of A.I.D. promptly make refund to A.I.D. of any amount by which the price of commodities, freight, or other commodity-related services exceeds the maximum permitted under paragraph 3 above, plus interest [at the rate established in accordance with the Internal Revenue Code, 26 U.S.C. 6621 (b)] from the time of payment to the supplier.

5. To the best of its information and belief, any commodity or service supplied under said contract meets the source, origin, componentry, and nationality requirements in the contract; any marketing requirements in the contract have been complied with; and, unless otherwise agreed to by A.I.D., any commodity is new and unused.

6. The amount shown in block 9c is net of all trade discounts, whether in the form of payments, credits, allowances by the supplier or its agent to or for the account of the purchaser. The supplier will promptly pay to A.I.D. (Office of Financial Management, A.I.D., Washington D.C. 20523-0209) any adjustment refunds, credits, or allowances which hereafter become payable to or for the amount of the purchaser arising out of the terms of said contract or the customs of the trade.

7. (a) Neither the supplier nor its agent has given or received and will not give or receive a side payment, 'kickback', commission, or any other payment, credit, allowance, or benefit of any kind in connection with said contract form, to, or for the benefit of the purchaser, the purchaser's agent or the Borrower/Grantee other than those referred to in paragraphs 1 and 6.

(b) Any commission or similar payment paid to or to be paid by the supplier to its agent in connection with the transaction for which payment is requested is shown on the reverse hereof and does not exceed the lesser of (i) the amount customarily paid by the supplier in connection with similar transactions or (ii) the amount customary in the trade. If said contract provides that A.I.D. will not finance such payments, the supplier certifies that the amount of such payments is not included in the amount for which payment is requested.

(c) Any brokerage commission paid or to be paid in connection with the shipment does not exceed 2½ percent of the ocean freight charge.

(d) The suppl... is not compensated any person to obtain said contract except to the ...unt, if any, indicated on the reverse hereof.

8. The supplier will for a period of not less than three (3) years after the date of final payment maintain all business records and other documents which bear on its compliance with any of the undertakings and certifications herein and will, at any time requested by A.I.D., promptly furnish such records and documents to A.I.D. and provide such additional information as A.I.D. may request relating to such compliances.

9. The supplier has not been placed on the "Lists of Parties Excluded from Federal Procurement or Nonprocurement Programs," published by the General Services Administration, or the Treasury Department's "Consolidated List of Designated Nationals" and thereby rendered ineligible to receive A.I.D. funds. To the best of its knowledge, the supplier has not acquired, and in any event will not acquire, for resale under A.I.D financing the goods described on this form from any supplier included on the "Lists of Parties Excluded from Federal Procurement or Nonprocurement Programs," or included on the "Consolidated List of Designated Nationals" or from any affiliate of such a person.

10. The supplier acknowledges that A.I.D. has reserved the right to vest in itself title to the goods financed under said contract, provided that such goods are in a deliverable state and have not yet been offloaded in ports of entry in the cooperating country. A.I.D. may direct carriers to divert these goods to alternative destinations.

11. The supplier certifies that any ocean or air charter directly related to the transaction for which payment is requested has been approved by A.I.D. (Office of Procurement, Transportation Division, A.I.D., Washington, D.C. 20523-1419).

12. The supplier certifies that it has submitted a copy of every ocean bill of lading applicable to the transactions described on the reverse hereof to: (i) the Maritime Administration, National Cargo Division, 400 Seventh Street, S.W., Washington, D.C. 20590-0001, and (ii) Office of Procurement, Transportation Division, A.I.D., Washington, D.C. 20523-1419; and that such bill(s) of lading state all the carrier's charges including the basis for calculation such as weight or cubic measurement.

13. The supplier has filled in all applicable portions of the Invoice-and-Contract Abstract on the reverse hereof and certifies to the correctness of the information shown herein.

PERSONAL CERTIFICATION BY NATURAL PERSON SIGNING THIS CERTIFICATE AND AGREEMENT

The natural person who signs this Certificate and Agreement hereby certifies either that he/she is the supplier or that he/she has actual authority to sign on behalf of the supplier and to bind the supplier with regard to all certifications and agreements contained in this Certificate and Agreement. He/she further certifies, if he/she is not personally the supplier, that he/she is either an employee of the supplier or has written power of attorney to sign for and bind the supplier. He/she acknowledges signing and submitting this Certificate and Agreement to receive payment from A.I.D. funds and that A.I.D. in making such payment will rely on the truth and accuracy of this Personal Certificate as well as all other representations in this Certificate and Agreement.

The Supplier's Certificate and Agreement and the personal certification herein shall be governed by and interpreted according to the laws of the United States of America.

■ Commodity Supplier ☐ Carrier ☐ Insurer

Fawaz Arafat, President

Type or print name and title of official authorized to sign

Signature of official authorized to sign for (check one) Date

McLean, Fairfax, VA, USA

Place executed (City, County, State, Country)

NOTES: (a) Any amendments of, or additions to, the printed provisions of this Supplier's Certificate and Agreement are improper and will not be considered a part hereof. (b) False statements herein are punishable by United States Law. (c) The word 'copy' must be written after the signature on all copies other than the original.

# EXHIBIT 9

Ministry of Health & Population
Healthy Mother/Healthy Child Project
in Cooperation with USAID

وزارة الصحة والسكان
مشروع صحة الأم والطفل
بالتعاون مع وكالة التنمية الدولية الأمريكية

July 2, 2003

Dr. Reginald F. Gipson M.D.
Chief of Party
John Snow, INC.

صادر: ١٠٨٧
مشروع صحة الأم والطفل
تاريخ: ٢٠٠٣/٧/٥
مرفقات

Dear Dr. Gipson,

Reference is made to the Premicare Incubators, purchased last year through TCA/JSI/offshore procurement and taken out of service by the end of January 2003. As per our agreement in the meeting held at JSI premises on July 1st 2003 in the presence of JSI/HMHCP/USAID/TCA representatives to :

- Collect all Premicare Incubators model 605 distributed in 2002 on neonatal care units.
- Perform the required fixation and maintenance in a central workshop in Cairo by certified engineers form Premicare.
- Premicare should also issue a certificate that the incubators are functioning safely and efficiently after retrofitting them as incubators are still in the warranty period.

Please take the necessary arrangements to prepare a suitable place for fixing the incubators and arrange their transportation from hospitals to this site in Cairo and back to hospitals after necessary maintenance is performed.

Thank you and best regards

Esmat

Dr. Esmat Mansour

HM/HC Project Executive Director
Undersecretary for Primary Health Care

| Ref. 3647 | |
|---|---|
| Action | Date |
| Info | |

c.c.: Dr. Nahed Matta HM/HCP Team Leader

مشروع صحة الأم والطفل
تاريخ / مرفقات

# EXHIBIT 10

quantity variation is such as to cause an increase in the time necessary for completion. The contracting officer must receive the request in writing within 10 days from the beginning of the period of delay. However, the contracting officer may extend this time limit before the date of final settlement of the contract. The contracting officer shall ascertain the facts and make any adjustment for extending the completion date that the findings justify.

**11.703 Contract clauses.**

(a) The contracting officer shall insert the clause at 52.211-16, Variation in Quantity, in solicitations and contracts, when a fixed-price supply contract is contemplated for supplies, and for services that involve the furnishing of supplies.

(b) The contracting officer may insert the clause at 52.211-17, Delivery of Excess Quantities, in solicitations and contracts, when a fixed-price supply contract is contemplated.

(c) The contracting officer shall insert the clause at 52.211-18, Variation in Estimated Quantity, in solicitations and contracts when a fixed-price construction contract is contemplated that authorizes a variation in the estimated quantity of unit-priced items.

[48 FR 42159, Sept. 19, 1983, as amended at 54 FR 34753, Aug. 21, 1989. Redesignated and amended at 60 FR 48241, Sept. 18, 1995]

## Subpart 11.8—Testing

SOURCE: 62 FR 51230, Sept. 30, 1997, unless otherwise noted.

EFFECTIVE DATE NOTE: At 62 FR 51230, Sept. 30, 1997, subpart 11.8 was added, effective Oct. 10, 1997.

**11.801 Preaward in-use evaluation.**

Supplies may be evaluated under comparable in-use conditions without a further test plan, provided offerors are so advised in the solicitation. The results of such tests or demonstrations may be used to rate the proposal, to determine technical acceptability, or otherwise to evaluate the proposal (see 15.305).

# PART 12—ACQUISITION OF COMMERCIAL ITEMS

Sec.
12.000 Scope of part.
12.001 Definition.

**Subpart 12.1—Acquisition of Commercial Items—General**

12.101 Policy.
12.102 Applicability.

**Subpart 12.2—Special Requirements for the Acquisition of Commercial Items**

12.201 General.
12.202 Market research and description of agency need.
12.203 Procedures for solicitation, evaluation, and award.
12.204 Solicitation/contract form.
12.205 Offers.
12.206 Use of past performance.
12.207 Contract type.
12.208 Contract quality assurance.
12.209 Determination of price reasonableness when contracting by negotiation.
12.210 Contract financing.
12.211 Technical data.
12.212 Computer software.
12.213 Other commercial practices.
12.214 Cost Accounting Standards.

**Subpart 12.3—Solicitation Provisions and Contract Clauses for the Acquisition of Commercial Items**

12.300 Scope of subpart.
12.301 Solicitation provisions and contract clauses for the acquisition of commercial items.
12.302 Tailoring of provisions and clauses for the acquisition of commercial items.
12.303 Contract format.

**Subpart 12.4—Unique Requirements Regarding Terms and Conditions for Commercial Items**

12.401 General.
12.402 Acceptance.
12.403 Termination.
12.404 Warranties.

**Subpart 12.5—Applicability of Certain Laws to the Acquisition of Commercial Items**

12.500 Scope of subpart.
12.501 Applicability.
12.502 Procedures.
12.503 Applicability of certain laws to executive agency contracts for the acquisition of commercial items.

12.504 Applicability of certain laws to subcontracts for the acquisition of commercial items.

**Subpart 12.6—Streamlined Procedures for Evaluation and Solicitation for Commercial Items**

12.601 General.
12.602 Streamlined evaluation of offers.
12.603 Streamlined solicitation for commercial items.

AUTHORITY: 40 U.S.C. 486(c); 10 U.S.C. chapter 137; and 42 U.S.C. 2473(c).

SOURCE: 60 FR 48241, Sept. 18, 1995, unless otherwise noted.

**12.000 Scope of part.**

This part prescribes policies and procedures unique to the acquisition of commercial items. It implements the Federal Government's preference for the acquisition of commercial items contained in Title VIII of the Federal Acquisition Streamlining Act of 1994 (Public Law 103–355) by establishing acquisition policies more closely resembling those of the commercial marketplace and encouraging the acquisition of commercial items and components.

**12.001 Definition.**

*Subcontract*, as used in this part, includes, but is not limited to, a transfer of commercial items between divisions, subsidiaries, or affiliates of a contractor or subcontractor.

## Subpart 12.1—Acquisition of Commercial Items—General

**12.101 Policy.**

Agencies shall—

(a) Conduct market research to determine whether commercial items or nondevelopmental items are available that could meet the agency's requirements;

(b) Acquire commercial items or nondevelopmental items when they are available to meet the needs of the agency; and

(c) Require prime contractors and subcontractors at all tiers to incorporate, to the maximum extent practicable, commercial items or nondevelopmental items as components of items supplied to the agency.

**12.102 Applicability.**

(a) This part shall be used for the acquisition of supplies or services that meet the definition of commercial items at section 2.101.

(b) Contracting officers shall use the policies in this part in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in part 13, Simplified Acquisition Procedures; part 14, Sealed Bidding; or part 15, Contracting by Negotiation, as appropriate for the particular acquisition.

(c) Contracts for the acquisition of commercial items are subject to the policies in other parts of this chapter. When a policy in another part of this chapter is inconsistent with a policy in this part, this part 12 shall take precedence for the acquisition of commercial items.

(d) This part shall not apply to the acquisition of commercial items—

(1) At or below the micro-purchase threshold;

(2) Using the SF 44 (see 13.505);

(3) Using the imprest fund (see subpart 13.4); or

(4) Using the Governmentwide commercial purchase card.

[60 FR 48241, Sept. 18, 1995, as amended at 61 FR 39192, July 26, 1996]

## Subpart 12.2—Special Requirements for the Acquisition of Commercial Items

**12.201 General.**

Public Law 103–355 establishes special requirements for the acquisition of commercial items intended to more closely resemble those customarily used in the commercial marketplace. This subpart identifies those special requirements as well as other considerations necessary for proper planning, solicitation, evaluation and award of contracts for commercial items.

**12.202 Market research and description of agency need.**

(a) Market research (see 10.001) is an essential element of building an effective strategy for the acquisition of commercial items and establishes the foundation for the agency description

**12.207 Contract type.**

Agencies shall use firm-fixed-price contracts or fixed-price contracts with economic price adjustment for the acquisition of commercial items. Indefinite-delivery contracts (see subpart 16.5) may be used where the prices are established based on a firm-fixed-price or fixed-price with economic price adjustment. Use of any other contract type to acquire commercial items is prohibited.

**12.208 Contract quality assurance.**

Contracts for commercial items shall rely on contractors' existing quality assurance systems as a substitute for Government inspection and testing before tender for acceptance unless customary market practices for the commercial item being acquired include in-process inspection. Any in-process inspection by the Government shall be conducted in a manner consistent with commercial practice.

**12.209 Determination of price reasonableness when contracting by negotiation.**

When contracting by negotiation for commercial items, the policies and procedures in subpart 15.4 shall be used to establish the reasonableness of prices.

[62 FR 258, Jan. 2, 1997, as amended at 62 FR 51270, Sept. 30, 1997]

EFFECTIVE DATE NOTE: At 62 FR 51270, Sept. 30, 1997, in section 12.209, "15.8" was amended to read "15.4", effective Oct. 10, 1997.

**12.210 Contract financing.**

Customary market practice for some commercial items may include buyer contract financing. The contracting officer may offer Government financing in accordance with the policies and procedures in part 32.

**12.211 Technical data.**

Except as provided by agency-specific statutes, the Government shall acquire only the technical data and the rights in that data customarily provided to the public with a commercial item or process. The contracting officer shall presume that data delivered under a contract for commercial items was developed exclusively at private expense. When a contract for commercial items requires the delivery of technical data, the contracting officer shall include appropriate provisions and clauses delineating the rights in the technical data in addenda to the solicitation and contract (see part 27 or agency FAR supplements).

**12.212 Computer software.**

(a) Commercial computer software or commercial computer software documentation shall be acquired under licenses customarily provided to the public to the extent such licenses are consistent with Federal law and otherwise satisfy the Government's needs. Generally, offerors and contractors shall not be required to—

(1) Furnish technical information related to commercial computer software or commercial computer software documentation that is not customarily provided to the public; or

(2) Relinquish to, or otherwise provide, the Government rights to use, modify, reproduce, release, perform, display, or disclose commercial computer software or commercial computer software documentation except as mutually agreed to by the parties.

(b) With regard to commercial computer software and commercial computer software documentation, the Government shall have only those rights specified in the license contained in any addendum to the contract.

**12.213 Other commercial practices.**

It is a common practice in the commercial marketplace for both the buyer and seller to propose terms and conditions written from their particular perspectives. The terms and conditions prescribed in this part seek to balance the interests of both the buyer and seller. These terms and conditions are generally appropriate for use in a wide range of acquisitions. However, market research may indicate other commercial practices that are appropriate for the acquisition of the particular item. These practices should be considered for incorporation into the solicitation and contract if the contracting officer determines them appropriate in concluding a business arrangement satisfactory to both parties

# EXHIBIT 11

# Exporting Medical Devices

- Export Flowchart
- Export of Legally Marketed Devices
  - Requirements
  - Certificate for Foreign Government (CFG)
- Export of Unapproved Devices
- Export Procedures for Unapproved Devices
  - Export under Section 801(e)(1)
  - Export under Section 802
  - Export under Section 801(e)(2)
- Exporting for Investigational Use
- Exporting in Anticipation of Foreign Marketing Approval
- Obtaining Export Certificates
- References

## Export of Unapproved Devices

Chapter VIII of the Federal Food, Drug, and Cosmetic Act (FD&C Act) addresses FDA regulation of the import and export of foods, drugs, cosmetics, biologics, medical devices, and radiation emitting electronic products. Sections 801 and 802 of Chapter VIII list the specific rules governing the import and export of products, including the export of unapproved products.

Until April 1996 the law that governed the export of medical devices not legally marketed in the U.S. was Sections 801(e)(1) and (e)(2) of the FD&C Act. Public Law 104-134, Food and Drug Export Reform and Enhancement Act of 1996 (FDERA) modified portions of Section 801 and Section 802. This law significantly modified Chapter VIII by enhancing the ability of U.S. firms to export unapproved FDA products ***under certain conditions*** without prior permission from FDA. The most notable change was the addition of provisions to and extension of section 802 to medical devices.

The basis for the regulation of imports and exports is contained in Chapter VIII of the FD&C Act. There are no regulations in the Code of Federal Regulations (CFR) that cover export requirements except for 21 CFR 812.18 regarding the export of investigational devices.

Section 803 provides for the establishment of an Office of International Relations to act as FDA liaison with foreign governments.

Please note that U.S. manufactures that export medical devices outside the U.S. are required to register their facility on form FDA-2891 and list their devices on form FDA-2892 (21 CFR 807).

- Establishment registration instructions and form
- Device listing instructions and form

## Export Procedures for Unapproved Devices

### Exporting Medical Devices Via Section 801(e)(1)

Requirements

A medical device which would be considered to be adulterated or misbranded, may be exported under Section 801(e)(1) of the FD&C Act provided the device is intended solely for export. Although such a device would not meet the requirements of the FD&C Act to be sold domestically for commercial distribution, it may be exported legally and without FDA permission in accord with Section 801(e)(1) provided the device is:

- in accordance with the specifications of the foreign purchaser;
- not in conflict with the laws of the country to which it is intended for export;
- labeled on the outside of the shipping package that it is intended for export; and
- not sold or offered for sale in domestic commerce.

Once an adulterated or misbranded device is sold or offered for sale in commercial distribution in the U.S., it may not be exported under Section 801(e)(1) as an alternative to bringing the device into compliance with the requirements of the Act. Devices that have been imported are considered to be in domestic commerce.

Unapproved Devices due to lack of 510(k) marketing clearance

The FDA is aware that in certain instances there may be devices which firms may wish to manufacture solely for export, or which they may wish to export during the interim period while their Premarket Notification 510(k) is under review. FDA allows the export of a device that does not have a 510(k) marketing clearance without prior FDA clearance if it meets two conditions:

- the device meets the requirements of 801(e)(1) listed above, and
- it is reasonably believed that the device could obtain 510(k) marketing clearance in the U.S. if reviewed by FDA.

This includes only devices which are similar in design, construction, and intended use to class I or class II devices or which the firm reasonably believes would be "substantially equivalent" to class I or class II devices. Devices which would not be included under this consideration are:

- Preenactment class III devices for which FDA has called for the submission of a PMA
- Postenactment class III devices, i.e. placed on the market after May 28, 1976, or
- Devices evaluated by a firm and found to be *not substantially equivalent* to a 510(k)'d device.

# EXHIBIT 12

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

DEC 8 1988

Mr. Charles S. Boyd
President
PreemiCare Corporation
3346 Walnut Bend Lane
Houston, Texas 77042

Re: K881476
PreemiCare Model D1-XI, Series 3000
Dated: April 5, 1988
Received: April 7, 1988
Regulatory Class: II

Dear Mr. Boyd:

We have reviewed your Section 510(k) notification of intent to market the device referenced above and we have determined the device is substantially equivalent to devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments. You may, therefore, market the device, subject to the general controls provisions of the Federal Food, Drug, and Cosmetic Act (Act). The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, and labeling, and prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Performance Standards) or class III (Premarket Approval) it may be subject to such additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 895. In addition, the Food and Drug Administration (FDA) may publish further announcements concerning your device in the Federal Register. Please note this response to your premarket notification submission does not affect any obligation you might have under the Radiation Control for Health and Safety Act of 1968, or other Federal Laws or Regulations.

This letter immediately will allow you to begin marketing your device as described. An FDA finding of substantial equivalence of your device to a pre-amendments device results in a classification for your device and permits your device to proceed to the market, but it does not mean that FDA approves your device. Therefore, you may not promote or in anyway represent your device or its labeling as being approved by FDA. If you desire specific advice on the labeling for your device please contact the Division of Compliance Operations, Regulatory Guidance Branch (HFZ-323) at (301) 427-8040. Other general information on your responsibilities under the Act, may be obtained from the Division of Small Manufacturers Assistance at their toll free number (800) 638-2041 or at (301) 443-6597.

Sincerely yours,

Halyna P. Breslawec, Ph.D.
Director
Division of Gastroenterology-Urology
and General Use Devices (HFZ-420)
Office of Device Evaluation
Center for Devices and
Radiological Health