# In the United States Court of Federal Claims

No. 06-97C

(Filed: October 12, 2007)

****************************************
JOHN SNOW, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.
****************************************

Cost-Plus-Fixed-Fee Contract; Cost Disallowance for Allegedly Nonconforming Goods; Applicability of Commercial Items Clause; Agency's Post-Acceptance Rights; Summary Judgment; Genuine Issues of Material Fact.

*Daniel A. Ball*, Ball Law Offices, P.C., Bethesda, Maryland, for Plaintiff.

*Stephen C. Tosini*, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Deborah A. Bynum*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case arises from a 1998 cost-plus-fixed-fee contract between Plaintiff John Snow, Inc. ("JSI") and the United States Agency for International Development ("USAID") to implement a program aimed at reducing neonatal and maternal mortality in Egypt. The contract contained a list of tasks that JSI would perform, and milestone completion dates for each task. In performing one of the tasks, JSI shipped 119 Preemicare incubators to Egypt during January through April 2002, and installed the incubators in various Egyptian healthcare facilities during May through July 2002. Shortly after installation, healthcare facilities staff reported that some of the incubators were experiencing problems such as overheating, erratic data display boards, and malfunctioning alarms. JSI thereupon attempted to repair the incubators, and later removed them from service. During the next 2-1/2 years, JSI together with its subcontractor and manufacturer, attempted to determine the extent and causes of the malfunctions and to repair and test the incubators.

After first paying JSI for the costs of the incubators in 2002, USAID's Contracting Officer issued a final decision on March 9, 2005 disallowing these costs, and USAID then recouped $872,327.18 from JSI through administrative offsets. JSI has moved for partial summary judgment on its breach of contract claim, arguing that even if the incubators were defective, USAID failed to act in a timely manner to disallow the costs. Although acknowledging that genuine fact issues exist on whether the incubators performed properly, JSI contends that applicable Federal Acquisition Regulation ("FAR") contract clauses prohibit USAID from disallowing costs nearly three years after accepting the incubators. In response, Defendant asserts that JSI breached the contract by delivering nonconforming incubators. Defendant denies that USAID ever accepted the incubators, and argues that disallowing the costs was a reasonable and lawful response to JSI's breach.

JSI brought suit in this Court on February 6, 2006, and filed its Motion for Partial Summary Judgment on October 26, 2006. After conducting limited discovery pursuant to Rule 56(f), Defendant filed its Response to JSI's motion on June 29, 2007, and JSI filed its Reply on August 31, 2007. At the September 19, 2007 oral argument, the Court denied from the bench JSI's motion for partial summary judgment, and advised the parties that this opinion would follow. For the reasons explained below, the Court concludes that genuine issues of material fact exist, and that resolution of this matter by summary judgment is precluded. Accordingly, JSI's Motion For Partial Summary Judgment is DENIED.

## Factual Background[1]

JSI is an experienced government contractor based in Boston, Massachusetts, providing assistance to public health programs worldwide. In 1998, JSI entered into Contract No. 263-C-0098-00041-00 with USAID, a cost-plus-fixed fee completion form of contract to provide equipment and services to the Egyptian Ministry of Health Programs ("MOHP"). See FAR ¶ 16.306(d). The contract incorporated by reference many standard FAR clauses, including FAR ¶ 52.212-4, "Contract Terms and Conditions – Commercial Items (May 1997)" ("Commercial Items" clause), and FAR ¶ 52.246-3, "Inspection of Supplies – Cost Reimbursement (April 1984)" ("Inspection" clause). Under the contract, JSI procured 119 Preemicare neonatal incubators from a subcontractor, ICS Technologies, Inc. ("ICS"), in 2001 for $785,880.35. USAID approved the ICS subcontract, but the parties disagree on whether the subcontract approval also constituted approval of the incubators.

ICS delivered the incubators to Egypt in three shipments, and they cleared Egyptian customs on January 26, 2002, February 12, 2002, and April 29, 2002 respectively. Thereafter, JSI stored the incubators in its own building until installing them in healthcare

---

[1] The facts set forth in this opinion do not constitute findings of fact by the Court. The facts cited are either undisputed or alleged and assumed to be true for the purposes of JSI's motion.

facilities throughout Egypt during May through July 2002. Shortly after installation, MOHP's staff began experiencing problems with the incubators, such as overheating, erratic data display boards, and malfunctioning alarms. On September 24, 2002, JSI met with ICS and Preemicare's local representative, Hi-Med, to attempt to resolve these problems.

In December 2002, Preemicare sent an engineer to Egypt to investigate and remedy the problems reported by MOHP. The engineer issued a report on January 7, 2003 recommending that retrofits be done at Preemicare's cost. On January 13, 2003, Hi-Med sent a letter to JSI expressing concern for the safety of the incubators and recommending that all incubators be removed from service until modifications could be made. JSI shared this information with MOHP and USAID, and the following day, January 14, 2003, MOHP ordered all facilities to remove the incubators from service to allow JSI to examine and retrofit them. JSI removed all the incubators from Egyptian facilities and stored them during the retrofitting process. Preemicare's engineer completed the retrofit and issued certifications for 112 incubators by August 2003.

Before returning the certified incubators to Egyptian healthcare facilities, JSI retained ECRI, a U.S. non-profit health services research agency based in Plymouth Meeting, Pennsylvania, to conduct an independent study of the incubators. ECRI found an overall failure rate of 90 percent among the 44 incubators tested, and recommended to JSI on May 25, 2004 that the incubators not be used in patient care. The ECRI report concluded in part that "[h]ealthcare organizations in the United States would not accept these incubators for clinical care . . . ." Def.'s June 29, 2007 Response, App. at 231.

On September 29, 2004, representatives of MOHP, USAID, and JSI met and agreed upon a plan to return the incubators to service. Beginning in October 2004, JSI undertook additional efforts to repair and modify the incubators to comply with the ECRI test protocols. In spite of these efforts, USAID issued JSI a notice of intent to disallow the cost of the incubators on November 1, 2004. Four months later, on March 9, 2005, after failing to reach a negotiated agreement with JSI, USAID's Contracting Officer issued a final decision disallowing the cost of the incubators and stating that JSI was indebted to the U.S. Government in the amount of $872,327.18 ($785,880.35 for the incubators + $23,576.41 fee + $62,870.43 procurement services charge). USAID collected the amount due plus interest from JSI through administrative offsets in 2005.

In its February 6, 2006 two-count Complaint, JSI alleged breach of contract and breach of the implied covenant of good faith and fair dealing. JSI contends in its Motion for Partial Summary Judgment that the applicable FAR contract clauses require the Court to find that USAID breached the contract when the Contracting Officer issued the final decision to disallow the cost of the incubators, and collected the debt of $872,327.18 through administrative offsets.

## Discussion

### A. Standard for Decision

Summary judgment is appropriate only when (1) no genuine issue of material fact exists, and (2) the moving party is entitled to judgment as a matter of law. See RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001). Summary judgment will not be granted if "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see also Eli Lilly and Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001).

In reviewing a motion for summary judgment, the benefit of all presumptions and factual inferences run in favor of the non-moving party. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990) ("When deciding whether summary judgment is appropriate, this court resolves factual disputes against the movant."). The moving party bears the initial burden of showing an absence of evidence to support the opposing party's case. The non-movant must go beyond the pleadings to show specific facts that give rise to genuine issues of material facts. Disputes over facts that might affect the outcome of the case are considered "material." See Liberty Lobby, 477 U.S. at 247-48. If the non-moving party produces sufficient evidence to raise a genuine issue of fact material to the outcome of the case, the motion for summary judgment should be denied. Id. at 248.

### B. Genuine Issues of Material Fact

With its Motion for Partial Summary Judgment, JSI submitted 29 paragraphs of Proposed Findings of Uncontroverted Fact. Following limited discovery, Defendant responded to JSI's submission, disagreeing with 17 of JSI's 29 proposed findings of fact and offering multiple exhibits to support its position. Despite the many areas of contention, JSI nevertheless argues that there are no material facts in dispute that would prevent the Court from granting summary judgment in JSI's favor.

Contrary to JSI's assertion, the record reflects the parties' disagreement on at least four significant fact issues that preclude the granting of JSI's motion for partial summary judgment:

(1) Whether the Commercial Items clause applies to the contract;

(2) When, if ever, did USAID accept the allegedly nonconforming incubators;

(3) Assuming that acceptance occurred at some point after JSI delivered the incubators to Egypt, when, if ever, did USAID exercise its post-acceptance rights under the Inspection clause or the Commercial Items clause; and

(4) Whether the incubators were nonconforming.

Each of these material fact issues is discussed in greater detail below.

1. Does the Commercial Items Clause Apply to the Contract?

As noted above, the contract incorporated by reference the Commercial Items clause, FAR ¶ 52.212-4. Parties to a contract are generally bound by its terms. Giesler v. United States, 232 F.3d 864, 869 (Fed. Cir. 2000). JSI, however, raises issues of fact which if true could preclude application of the Commercial Items clause. In its briefs, JSI claims that USAID included the clause in the contract by mistake, and that the FAR prohibits application of the Commercial Items clause in cost-plus-fixed-fee contracts. Additionally, at oral argument, JSI argued that neonatal incubators are not commercial items and, therefore, the clause is inapplicable. Summ. J. Oral Arg. Tr. at 25-28. Defendant contends that the incubators are in fact commercial items and that JSI, an experienced contractor, should have known that the Commercial Items clause applied to the contract.

Whether the incubators are commercial items and whether the parties intended for FAR ¶ 52.212-4 to be included in the contract are questions of fact. These questions are material because FAR ¶ 52.212-4 provides rights and remedies to USAID that otherwise would be unavailable. For example, FAR ¶ 52.212-4(a) mandates that "[t]he Contractor shall only tender for acceptance those items that conform to the requirements of this contract." Additionally, the warranty provision in FAR ¶ 52.212-4(o) states that "[t]he Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract." If JSI fails to comply with any of the contract's terms and conditions, including the warranty provision, USAID may then terminate the contract and "shall not be liable to the Contractor for any amount for supplies or services not accepted . . . ." FAR ¶ 52.212-4(m). Defendant largely relies on these provisions in its argument that disallowance was a reasonable response to JSI's breach of contract in tendering nonconforming goods.

2. When Did Acceptance Occur?

Even assuming that the Commercial Items clause does not apply to the contract, other issues of material fact remain that preclude summary judgment. For example, the question of when, if ever, USAID accepted the incubators is a disputed issue of fact. The issue of acceptance is material because the date of acceptance determines whether USAID properly

exercised its post-acceptance rights within the time limits of the "Inspection" clause, FAR ¶ 52.246-3.

JSI proposes two possible dates for USAID's acceptance. First, JSI asserts that USAID accepted the incubators the moment they cleared Egyptian customs and that title passed on April 29, 2002.[2] JSI relies upon a contract clause and regulation providing that title passes to the cooperating country once the goods are "used" in that country. See Agency for International Development Acquisition Regulation ("AIDAR") 752.245-71. However, the Court does not equate the "passing of title" with "acceptance." JSI provides no citation to statute, regulation, or case law that would require such a finding. Absent an applicable contract clause, or other evidence such as an established course of dealing, the Court is unable to conclude that acceptance occurred when the incubators cleared Egyptian customs.

JSI also argues in the alternative that, under FAR § 52.246-3(e), acceptance occurred not later than sixty days after the incubators cleared Egyptian customs, or June 28, 2002. Defendant disputes this date and argues that even though USAID paid JSI for the incubators, it never accepted them. Defendant points to the fact that JSI stored the incubators at its own facility until they were installed in Egyptian healthcare facilities during May through July 2002. The Court concludes that determining if, or when, USAID accepted the incubators must await trial.

3. When and How Did USAID Exercise Post-Acceptance Rights?

Even if the date of acceptance were undisputed or could be determined as a matter of law, the question of whether USAID properly exercised its post-acceptance rights under the "Commercial Items" or "Inspection" clauses remains a material fact in dispute. JSI contends that USAID first exercised its post-acceptance rights when the Contracting Officer issued a final decision to disallow costs on March 9, 2005, more than two years after alleged acceptance. According to JSI, under FAR ¶ 52.246-3(f), both the late issuance of the Contracting Officer's final decision, and the chosen remedy of cost disallowance, are unlawful. Defendant responds that USAID acted in a timely manner under both FAR ¶¶ 52.246-3(f) and 52.212-4(a) because JSI was notified of defects "almost immediately" after installation in the summer of 2002. Def.'s June 29, 2007 Response at 10-11. Moreover, Defendant asserts that disallowance was a reasonable remedy given that JSI failed to perform under the contract for more than two years.

[2] As noted above, the incubators arrived in Egypt and cleared customs in three shipments on January 26, 2002, February 12, 2002 and April 29, 2002. For the purposes of this analysis, the Court considers the date that the final shipment cleared customs, April 29, 2002, as the date that title passed from JSI to USAID.

FAR ¶ 52.246-3(f) limits USAID's post-acceptance rights to requiring the contractor to "replace or correct" any nonconforming or defective goods "[a]t any time during contract performance, but no later than 6 months (or such other time as may be specified in the contract) after acceptance . . . ." Additionally, FAR ¶ 52.212-4(a) states that USAID may "require repair or replacement of nonconforming supplies . . . at no increase in contract price," but must exercise its post-acceptance rights "within a reasonable time after the defect was discovered or should have been discovered . . . ." Defendant argues that the two clauses may be read together to require repair or replacement *either* within six months or within a reasonable time after discovery of the defect. Defendant also argues that, if FAR ¶¶ 52.212-4 and 52.246-3 are deemed to conflict, FAR ¶ 12.102(c) requires that the "reasonable time" provision of the Commercial Items clause controls. FAR ¶ 12.102(c) provides that "[w]hen a policy in another part of this chapter is inconsistent with a policy in this part, this Part 12 shall take precedence for the acquisition of commercial items." In contrast, JSI contends that the specific six-month requirement in FAR ¶ 52.246-3(f) should control over the vague reasonableness requirement of FAR ¶ 52.212-4(a). There is evidence of record showing that JSI was on notice of incubator defects both within six months after the potential dates of acceptance, and within a reasonable time after discovery of the defects.

As noted above, the final shipment of incubators cleared Egyptian customs on April 29, 2002, and the incubators were installed during May through July 2002. The record shows that, between installation and September 24, 2002, JSI received complaints about the incubators. See Pltf.'s October 26, 2006 Brief at 5 (admitting that "[a]fter installation and operation of the incubators," JSI received complaints about the performance of the incubators). The record is unclear how USAID notified JSI of the problems, but on September 24, 2002, JSI met with its subcontractors to discuss the problems and decided to send a Preemicare engineer to investigate.

The investigator completed her report on January 7, 2003. Defendant claims that on January 14, 2003, MOHP ordered all of the incubators to be removed from service for testing and repair. JSI maintains that after receiving the investigator's report, it notified USAID that the incubators should not be used and *voluntarily* removed them from service for repair. Regardless of which version is true, it is apparent that the parties fundamentally disagree on when and how USAID became involved in the decision to remove the incubators for repair. The Court's determination of these fact issues must await trial.

Turning to JSI's contention that USAID's cost disallowance was unlawful regardless of its timing, both FAR ¶ 52.246-3(f) and FAR ¶ 52.212-4(a) appear to limit USAID's available remedies to repair or replacement. However, FAR ¶ 52.246-3(g)(1) provides that if the contractor fails to "proceed with reasonable promptness to perform required replacement or correction," USAID may either perform replacement or correction itself and make an equitable reduction, or terminate the contract for default. Triable issues remain on

the questions of whether JSI was proceeding with "reasonable promptness" and whether USAID's chosen remedy of cost disallowance was permitted under the contract.

### 4. Were the Incubators Nonconforming?

Finally, the question of whether the incubators were nonconforming also is a material issue of fact. JSI accepts that there "certainly is a dispute over the efficacy of the incubators, whether the repairs could be completed and the incubators certified and returned to service, and whether the incubators are 'defective' . . . ." Pltf.'s October 26, 2006 Brief at 10. JSI maintains that this question is immaterial, but to the contrary, the Court finds that it may be central to the outcome. If the incubators were not defective, then USAID had no right to disallow the costs paid for the incubators. If the incubators were defective, the question is whether USAID properly exercised its rights under the contract. The Court cannot rule on this question without receiving further evidence at trial.

## Conclusion

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment is DENIED. The parties are requested to file a Joint Status Report with the Court on or before October 26, 2007, indicating how they wish to proceed. The parties should address in their report whether any additional discovery is desired, the estimated length and location for trial, and a proposed schedule. The parties may include any other information in their report that they wish to bring to the Court's attention.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge